IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
(Fort Lauderdale Division)



NIGHT BOX
FILED

MAR 2 0 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

AUSTIN TUPLER, INC. et al.,

                Plaintiffs,

vs.

SUPPORT TRUCKING GROUP, et al,

                Defendants.

_____/

**CASE NO.: 00-6223 CIV Gold**
Magistrate Judge Simonton

## **INDEX TO AFFIDAVITS**

DANIEL BALAZI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CARLOS MARCELO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

JOSE MATOS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

EDDIE PEREZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42A

## AFFIDAVIT OF DANIEL BALAZI

STATE OF FLORIDA        )
                        ) **SS**
PALM BEACH COUNTY       )

I, DANIEL BALAZI, being first duly sworn, depose and state that I am over eighteen (18) years of age, that I am sui juris and this Affidavit is made voluntarily and of my own free will without threats or promises of benefits by or from any person, and is based on my personal knowledge. I further state as follows:

1.    I am an independent truck owner and operator who does business in Palm Beach and Broward County.

2.    I have been working as an independent contractor in Palm Beach and Broward County for over one year.

3.    As an independent contractor, I own my own work truck and equipment. I am responsible for the payment of all maintenance fees and related expenses for the use of my work truck including fuel.

4.    For the last several years, the price of fuel and maintenance on my vehicle has steadily increased.

5.    Also increasing over the last several years is the price of living to reside in Palm Beach County.

6.    As an independent owner, I regularly performed work for several brokerage companies. The brokerage companies, such as the Plaintiffs in the lawsuits in question, act as brokers of rock and other materials for

commercial and residential construction projects. The brokerage companies would pay for my services based on either the distance that I was required to travel from the material pick-up site to the job site or the amount of weight, usually in tons, that I was required to carry in my truck for each job.

7.     In assigning a price for each job, the brokerage companies used a Rate Sheet Form which was a guideline as to how to price the jobs per mile. The Rate Sheet Form utilized by the brokers was dated 1980. (See true and correct copy of the rate sheet attached hereto as Exhibit "A" and incorporated herein by this reference).

8.     The brokerage companies utilized Exhibit "A" to set the price that independent owners and operators where to be paid. For example, according to Exhibit "A", the first mile was to be paid at $0.70 (Exhibit A).

9.     Most job assignments were priced based on this rate sheet. On occasions, brokers would assign prices for jobs which were below the rate sheet. (Exhibit "A").

10.    It became increasingly difficult for me to continue working at the rates quoted and paid by the brokerage companies based on this 1980 Rate Sheet.

11.    I joined the group of other owners and operators in Palm Beach County who refused to accept any new work assignments for brokerage companies including, Siboney Contracting, Austin Tupler, Allied Trucking and others. Shortly thereafter, Tomeu, of Siboney trucking offered an

increase in the guide sheet of ten percent (10%). This statement was reiterated and documented in the Palm Beach Post February 10, 2000. (True and copy attached hereto as Exhibit "B").

12.    I decided to cease accepting work assignments and to reject the (10 %) increase. This was an unreasonable amount for my services. It is my understanding that the other owners and operators ceased accepting future job assignments for this same reason.

13.    It was never my intention to fix an absolute price for my work, but rather to require that the brokerage companies consider the increasing price of fuel and other expenses when determining how much to pay for my work.

14.    In fact, price setting was never considered, discussed or otherwise a demand of myself or the truckers.

15.    At the time I ceased accepting work assignments, I was not obligated under any pending contracts.  Based on my conversations with the other truckers who stopped accepting future job assignments, no trucker was under any current obligation and/or contract to perform work for a brokerage company.

16.    During my experience with the brokerage company, including those named as Plaintiffs in this lawsuit, I was never provided with a written contract for any jobs performed.

17.    It was my intention, as well as the other owners and operators, to make a statement to the brokerage companies, that wanted a new method and/or guideline for payment for our work performed.

18.  At the February 12, 2000 meeting with Cathleen Scott, I and the other truckers discussed and agreed, among other issues, that the brokerage companies should consider the rising price of fuel and increases in the costs of living and doing business in Palm Beach County when assessing the amount to pay the truckers for work performed.

19.  It was further decided at that meeting that since there were over 150 truckers present, we would form a non-profit organization for the purpose of legal representation. The non profit organization was to allow elected officials of the organization to communicate directly with the attorney so as to avoid the additional costs and expenses associated with having one attorney communicate with each 150 or more truckers individually.

20.  It was agreed by myself and the number of other truckers that we would attempt to work together with the brokers to create a new method of bidding jobs to ensure fair payment. It was agreed that the old rate sheet, being utilized by the brokers was out dated and too low. We agreed to a new "guide" sheet which encouraged a thirty percent (30 %) increase when brokers bided future jobs.

21.  The 1980 Rate sheet was used as a guideline by the brokerage companies to bid jobs. The truckers wanted an updated guide sheet. There was no discussion among the truckers to set a price per se on any job, rather the discussion by the truckers was to establish a new guideline to be used for bidding work which would allow for increases for fuel, cost of living and the like.

22.    Myself and other independent owners and/or operators refused to accept *new* assignments from the period of time beginning Monday February 7, 2000 until Friday February 18, 2000, eleven (11) days.

23.    During that time, myself and the truckers failed to accept new jobs. However, a number of other owners and/or independent operators continued to accept job assignments from brokers. As myself and the other truckers were situated in front of Palm Beach Aggregate, we were able to personally witness a large number of other truckers who continued to accept and perform assignments for the brokers, including those names in the lawsuits.

24.    In addition to the independent truck drivers who continued to accept assignments, a number of other truckers who were employees continued to haul to and from Palm Beach Aggregates.

25.    I was present all day and every day during the time the independent drivers met in front of the quarry, save one day, February 18, 2000. I never witnessed any violent acts by any of the workers. To the contrary, the truckers appeared peaceful and in control. In fact, the Florida Highway Patrol was also present all day and every day during the time period in question. To my knowledge, not one single individual was cited for disorderly conduct or the like.

///

///

///

I DANIEL BALAZI, state that I have read the foregoing Affidavit consisting of twenty-five (25) paragraphs and swear or affirm that it is true and correct to the best of my knowledge.

DANIEL BALAZI

STATE OF FLORIDA          )
                          )     SS:
COUNTY OF                 )


BEFORE ME, the undersigned authority, personally appeared_____
to me well known to be the person described in and who executed the foregoing
instrument, and acknowledged to and before me that he executed said instrument for
the purposes therein expressed, this ___ day of _____ 3/19/2000 , 19 2000


Notary Public
My Commission Expires:

Cathleen A Scott
My Commission CC809118
Expires February 14  2003

**EXHIBIT _A_**

*R. 1,980*

## TON MILES

FIRST 40 MILES HAUL : ADD $ 0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS: SUMAR $ 0.03 POR CADA LUZ Y SENAL DE PARADA

10 por toll

| | | | | | |
|---|---|---|---|---|---|
| = 0.70 | 13½ = 2.20 | 26 = 3.70 | 51 = 6.45 | 76 = 9.20 | 101 = 11.95 |
| ½ = 0.76 | 14 = 2.26 | 27 = 3.81 | 52 = 6.56 | 77 = 9.31 | 102 = 12.06 |
| = 0.82 | 14½ = 2.32 | 28 = 3.92 | 53 = 6.67 | 78 = 9.42 | 103 = 12.17 |
| ½ = 0.88 | 15 = 2.38 | 29 = 4.03 | 54 = 6.78 | 79 = 9.53 | 104 = 12.28 |
| = 0.94 | 15½ = 2.44 | 30 = 4.14 | 55 = 6.89 | 80 = 9.64 | 105 = 12.39 |
| ½ = 1.00 | 16 = 2.50 | 31 = 4.25 | 56 = 7.00 | 81 = 9.75 | 106 = 12.50 |
| = 1.06 | 16½ = 2.56 | 32 = 4.36 | 57 = 7.11 | 82 = 9.86 | 107 = 12.61 |
| ½ = 1.12 | 17 = 2.62 | 33 = 4.47 | 58 = 7.22 | 83 = 9.97 | 108 = 12.72 |
| ½ = 1.18 | 17½ = 2.68 | 34 = 4.58 | 59 = 7.33 | 84 =10.08 | 109 = 12.83 |
| ½ = 1.24 | 18 = 2.74 | 35 = 4.69 | 60 = 7.44 | 85 =10.19 | 110 = 12.94 |
| = 1.30 | 18½ = 2.80 | 36 = 4.80 | 61 = 7.55 | 86 =10.30 | 111 = 13.05 |
| = 1.36 | 19 = 2.86 | 37 = 4.91 | 62 = 7.66 | 87 =10.41 | 112 = 13.16 |
| = 1.42 | 19½ = 2.92 | 38 = 5.02 | 63 = 7.77 | 88 =10.52 | 113 = 13.27 |
| = 1.48 | 20 = 2.98 | 39 = 5.13 | 64 = 7.88 | 89 =10.63 | 114 = 13.38 |
| = 1.54 | 20½ = 3.04 | 40 = 5.24 | 65 = 7.99 | 90 =10.74 | 115 = 13.49 |
| = 1.60 | 21 = 3.10 | 41 = 5.35 | 66 = 8.10 | 91 =10.85 | 116 = 13.60 |
| = 1.66 | 21½ = 3.16 | 42 = 5.46 | 67 = 8.21 | 92 =10.92 | 117 = 13.71 |
| = 1.72 | 22 = 3.22 | 43 = 5.57 | 68 = 8.32 | 93 =11.07 | 118 = 13.82 |
| = 1.78 | 22½ = 3.28 | 44 = 5.68 | 69 = 8.43 | 94 =11.18 | 119 = 13.93 |
| ½ = 1.84 | 23 = 3.34 | 45 = 5.79 | 70 = 8.54 | 95 =11.29 | 120 = 14.04 |
| = 1.90 | 23½ = 3.40 | 46 = 5.90 | 71 = 8.65 | 96 =11.40 | 121 = 14.15 |
| ½ = 1.96 | 24 = 3.46 | 47 = 6.01 | 72 = 8.76 | 97 =11.51 | 122 = 14.26 |
| = 2.02 | 24½ = 3.52 | 48 = 6.12 | 73 = 8.87 | 98 =11.62 | 123 = 14.37 |
| ½ = 2.08 | 25 = 3.58 | 49 = 6.23 | 74 = 8.98 | 99 =11.73 | 124 = 14.48 |
| = 2.14 | 25½ = 3.64 | 50 = 6.34 | 75 = 9.09 | 100=11.84 | 125 = 14.59 |

**EXHIBIT** $\mathcal{B}$

The Palm Beach Post

# LOCAL NEWS

THURSDAY, FEBRUARY 10, 2000

## LAMBORGHINI SUIT

A lawsuit against Lamborghini should be thrown out of court, a federal magistrate says.

**STORY, 4B**

■ Rising cost of diesel fuel cited

# Truckers park rigs to protest for more pay

**By Larry Hobbs**
*Palm Beach Post Staff Writer*

Demanding higher pay, some 70 truckers parked their rigs outside of the Palm Beach Aggregates rock quarry Wednesday in a protest line that stretched a half mile along Southern Boulevard, west of Loxahatchee.

The rates for hauling road-building materials have not kept up with the rising costs of gas and maintenance, driver Jorge Valiente said. Valiente said he and most of the protesting drivers are independent and contract with Siboney Trucking, affiliated with Palm Beach Aggregates. The drivers are asking for a 15 percent increase in the per ton rate, now ranging from $1.50 to $3.50 depending on the distance driven, he said.

The price of diesel fuel has risen in recent months from about $1.05 to as much as $1.57 a gallon, Valiente said. He spends up to $120 a day on diesel fuel, about twice what he used to spend. "We're pretty much just surviving, not even making enough to maintain our trucks," he said.

Enrique Tomeu, an official with both Siboney and the quarry, said they recently offered drivers a 10 percent increase in the rate. He added that he can't help the drivers who contract with other companies that buy materials from Palm Beach Aggregates.

Valiente said the increase Siboney offered was only 7 percent and that it's not enough.

"We tried to explain what's going on and they won't listen to us," Valiente said. "Now we're trying to hurt them in their pockets to feel what we feel."

Independent truck drivers park on the side of State Road 80 in front of Palm Beach Aggregate near 20-Mile Bend to protest hauling rates on Wednesday.

JENNIFER POOS/Staff Photographer

"It's interrupting business in a big way," Tomeu said.

The protest and its idle truckers come at a time when Palm Beach Aggregates is seeking county permission for 24-hour operations to meet the demands of extensive road projects throughout the county. But nearby residents are complaining about the noise from the quarry's operations.

Truck drivers have staged similar pro-

THE PALM BEACH POST    THURSDAY, FEBRUAR

# Truckers staging protests across Florida

**TRUCKERS**
*From 1B*

tests throughout the state. As many as 300 truckers parked their rigs along Okeechobee Road in Hialeah Monday, and a protest involving 150 trucks took place Friday on U.S. 27 in Miami-Dade County. About 100 truckers also protested Friday in Cocoa Beach.

A low fuel supply from OPEC and a demand for heating fuel up north have contributed to the rising prices, officials in the state's transportation and petroleum industries said. Refineries are turning

more supplies into heating fuel than diesel fuel. Heating fuel and diesel fuel are very similar, said Bob McVety of the Florida Petroleum Council.

Taking their cue from truckers statewide, the local independent drivers organized the protest by communicating via CB radios in their trucks, Valiente said.

He was the first in the line about 7 a.m. Wednesday outside the quarry.

Florida Highway Patrol troopers and sheriff's office deputies made Valiente and several other trucks move from the front of the line to the back to clear the turn lane into the quarry. Otherwise, the disruption caused by the truckers was minimal and

legal, sheriff's Lt. B.E. Barkdoll said.

"They've got every right to exercise their civil rights, and we're just going to keep the peace," Barkdoll said.

The truckers ended the protest late in the afternoon Wednesday, but Valiente said they will be back today.

Some drivers who continued to haul material from the quarry sympathized with their protesting peers.

"I think it's a good thing — these guys need some help," said Leroy Hull, who added that he's happy with the $10 an hour he's making with an Okeechobee trucking company.

■ *larry_hobbs@pbpost.com*

# Student pleads against

**SCHOOLS**
*From 1B*

in College Park. She practically begged the board not to change her school. She didn't want to be sent back to private school — and have to wear school uniforms.

"I'm not a girly-girl," and most of the outfits were dresses, she said to a chorus of laughs. "And the pants were too tight."

The board just listened. It will

vote on the bou_ dations Feb. 28, set of recomm_ vember becaus_ schools too cr_ nearly empty. T_ distributes stud_ among the scho_

"Everyone c_ school and that_ interim Superin_ lin said.

■ *stephanie_des*

---

## Area deaths

**Palm Beach County**

**Adams, Catherine "Kitty,"** 77, of West Palm Beach. Tillman Funeral Home, West Palm Beach.

Quattlebaum-Holleman-Burse Funeral Home, West Palm Beach. Funeral Sunday.

**Devoe, Steven,** 94 of West Palm Beach. Siders Funeral

Beach. Siders Funeral Home, West Palm Beach. Funeral Friday.

**Keene, John L,** 75, of Delray Beach. E. Earl Smith and Son

West Palm Beach.

**Mallea-Gonzalez, August,** 83, of West Palm Beach. All County Funeral Home and Crematory. Funeral Friday.

**St. Lucie C**

**Bagnell,** Lucie. You_ Home, Port_

## AFFIDAVIT OF CARLOS MARCELO

STATE OF FLORIDA     )
                              ) **SS**
PALM BEACH COUNTY  )

I, CARLOS MARCELO, being first duly sworn, depose and state that I am over eighteen (18) years of age, that I am sui juris and this Affidavit is made voluntarily and of my own free will without threats or promises of benefits by or from any person, and is based on my personal knowledge. I further state as follows:

1.     I am an independent truck owner and operator who does business in Palm Beach and Broward County.

2.     I have been working as an independent contractor in Palm Beach and Broward County since 1988.

3.     As an independent contractor, I own my own work truck and equipment. I am responsible for the payment of all maintenance fees and related expenses for the use of my work truck including fuel.

4.     For the last several years, the price of fuel and maintenance on my vehicle has steadily increased.

5.     Also increasing over the last several years is the price of living to reside in Palm Beach County.

6.     As an independent owner, I regularly performed work for several brokerage companies. The brokerage companies, such as the Plaintiffs in the lawsuits in question, act as brokers of rock and other materials for

commercial and residential construction projects. The brokerage companies would pay for my services based on either the distance that I was required to travel from the material pick-up site to the job site or the amount of weight, usually in tons, that I was required to carry in my truck for each job.

7. In assigning a price for each job, the brokerage companies used a Rate Sheet Form which was a guideline as to how to price the jobs per mile. The Rate Sheet Form utilized by the brokers was dated 1980. (See true and correct copy of the rate sheet attached hereto as Exhibit "A" and incorporated herein by this reference).

8. The brokerage companies utilized Exhibit "A" to set the price that independent owners and operators where to be paid. For example, according to Exhibit "A", the first mile was to be paid at $0.70 (Exhibit A).

9. Most job assignments were priced based on this rate sheet. On occasions, brokers would assign prices for jobs which were below the rate sheet. (Exhibit "A").

10. It became increasingly difficult for me to continue working at the rates quoted and paid by the brokerage companies based on this 1980 Rate Sheet.

11. I joined the group of other owners and operators in Palm Beach County who refused to accept any new work assignments for brokerage companies including, Siboney Contracting, Austin Tupler, Allied Trucking and others.

12.    The reason I decided to cease accepting work assignments from the above-mentioned brokers was because the brokers refused to pay a reasonable amount for my services. It is my understanding that the other owners and operators ceased accepting future job assignments for this same reason.

13.    It was never my intention to fix an absolute price for my work, but rather to require that the brokerage companies consider the increasing price of fuel and other expenses when determining how much to pay for my work.

14.    At the time I ceased accepting work assignments, I was not obligated under any pending contracts.  Based on my conversations with the other truckers who stopped accepting future job assignments, no trucker was under any current obligation and/or contract to perform work for a brokerage company.

15.    During my experience with the brokerage company, including those named as Plaintiffs in this lawsuit, I was never provided with a written contract for jobs performed.

16.    It was my intention, as well as the other owners and operators, to make a statement to the brokerage companies that we would no longer work for such little payment and we wanted to utilize a new method and/or guideline for payment for our work performed.

17.    At the February 12, 2000 meeting with Cathleen Scott, I and the other truckers discussed and agreed, among other issues, that the brokerage companies should consider the rising price of fuel and increases in the

costs of living an doing business in Palm Beach County when assessing

the amount to pay the truckers for work performed.

18.    It was further decided at that meeting that since there were over 150

truckers present, we would form a non-profit organization for the purpose

of legal representation. The non profit organization was to allow elected

officials of the organization to communicate directly with the attorney so

as to avoid the additional costs and expenses associated with having one

attorney communicate with each 150 truckers individually.

I CARLOS MARCELO, state that I have read the foregoing Affidavit consisting of

eighteen (18) paragraphs and swear or affirm that it is true and correct to the best of my

knowledge.

_____
CARLOS MARCELO

STATE OF FLORIDA          )
                          )    SS:
COUNTY OF                 )


BEFORE ME, the undersigned authority, personally appeared 
to me well known to be the person described in and who executed the foregoing
instrument, and acknowledged to and before me that ___ executed said instrument for
the purposes therein expressed, this ___ day of _____ 3/18/2000 ___, 19___

_____
Notary Public
My Commission Expires:

Cathleen A Scott
My Commission CC809118
Expires February 14  2003

EXHIBIT _____ A

*R. 1,980*

## TON MILES

FIRST 40 MILES HAUL : ADD $ 0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS: SUMAR $ 0.03 POR CADA LUZ Y SENAL DE PARADA

(0 por toll)

| | | | | | |
|---|---|---|---|---|---|
| 1 = 0.70 | 13½ = 2.20 | 26 = 3.70 | 51 = 6.45 | 76 = 9.20 | 101 = 11.95 |
| 1¼ = 0.76 | 14 = 2.26 | 27 = 3.81 | 52 = 6.56 | 77 = 9.31 | 102 = 12.06 |
| 2 = 0.82 | 14½ = 2.32 | 28 = 3.92 | 53 = 6.67 | 78 = 9.42 | 103 = 12.17 |
| ½ = 0.88 | 15 = 2.38 | 29 = 4.03 | 54 = 6.78 | 79 = 9.53 | 104 = 12.28 |
| 3 = 0.94 | 15½ = 2.44 | 30 = 4.14 | 55 = 6.89 | 80 = 9.64 | 105 = 12.39 |
| 1½ = 1.00 | 16 = 2.50 | 31 = 4.25 | 56 = 7.00 | 81 = 9.75 | 106 = 12.50 |
| 1 = 1.06 | 16½ = 2.56 | 32 = 4.36 | 57 = 7.11 | 82 = 9.86 | 107 = 12.61 |
| 1½ = 1.12 | 17 = 2.62 | 33 = 4.47 | 58 = 7.22 | 83 = 9.97 | 108 = 12.72 |
| ; = 1.18 | 17½ = 2.68 | 34 = 4.58 | 59 = 7.33 | 84 = 10.08 | 109 = 12.83 |
| 1½ = 1.24 | 18 = 2.74 | 35 = 4.69 | 60 = 7.44 | 85 = 10.19 | 110 = 12.94 |
| ; = 1.30 | 18½ = 2.80 | 36 = 4.80 | 61 = 7.55 | 86 = 10.30 | 111 = 13.05 |
| 1½ = 1.36 | 19 = 2.86 | 37 = 4.91 | 62 = 7.66 | 87 = 10.41 | 112 = 13.16 |
|  = 1.42 | 19½ = 2.92 | 38 = 5.02 | 63 = 7.77 | 88 = 10.52 | 113 = 13.27 |
| 4½ = 1.48 | 20 = 2.98 | 39 = 5.13 | 64 = 7.88 | 89 = 10.63 | 114 = 13.38 |
| . = 1.54 | 20½ = 3.04 | 40 = 5.24 | 65 = 7.99 | 90 = 10.74 | 115 = 13.49 |
| ½ = 1.60 | 21 = 3.10 | 41 = 5.35 | 66 = 8.10 | 91 = 10.85 | 116 = 13.60 |
| . = 1.66 | 21½ = 3.16 | 42 = 5.46 | 67 = 8.21 | 92 = 10.92 | 117 = 13.71 |
| ½ = 1.72 | 22 = 3.22 | 43 = 5.57 | 68 = 8.32 | 93 = 11.07 | 118 = 13.82 |
| 0 = 1.78 | 22½ = 3.28 | 44 = 5.68 | 69 = 8.43 | 94 = 11.18 | 119 = 13.93 |
| 0½ = 1.84 | 23 = 3.34 | 45 = 5.79 | 70 = 8.54 | 95 = 11.29 | 120 = 14.04 |
| l = 1.90 | 23½ = 3.40 | 46 = 5.90 | 71 = 8.65 | 96 = 11.40 | 121 = 14.15 |
| 1½ = 1.96 | 24 = 3.46 | 47 = 6.01 | 72 = 8.76 | 97 = 11.51 | 122 = 14.26 |
| 2 = 2.02 | 24½ = 3.52 | 48 = 6.12 | 73 = 8.87 | 98 = 11.62 | 123 = 14.37 |
| 2½ = 2.08 | 25 = 3.58 | 49 = 6.23 | 74 = 8.98 | 99 = 11.73 | 124 = 14.48 |
| 3 = 2.14 | 25½ = 3.64 | 50 = 6.34 | 75 = 9.09 | 100 = 11.84 | 125 = 14.59 |

## AFFIDAVIT OF JOSE MATOS

STATE OF FLORIDA     )
                      ) **SS**
PALM BEACH COUNTY    )

     I, Jose Matos, being first duly sworn, depose and state that I am over eighteen (18) years of age, that I am sui juris and this Affidavit is made voluntarily and of my own free will without threats or promises of benefits by or from any person, and is based on my personal knowledge. I further state as follows:

1.      I am an independent truck owner and operator who does business in Palm Beach and Broward County.

2.      I have been working as an independent contractor in Palm Beach and Broward County for over ten (10) years.

3.      As an independent contractor, I own my own work truck and equipment. I am responsible for the payment of all maintenance fees and related expenses for the use of my work truck including fuel.

4.      For the last several years, the price of fuel and maintenance on my vehicle has steadily increased.

5.      Also increasing over the last several years is the price of living to reside in Palm Beach County.

6.      As an independent owner, I regularly performed work for several brokerage companies. The brokerage companies, such as the Plaintiffs in the lawsuits in question, act as brokers of rock and other materials for

commercial and residential construction projects. The brokerage companies would pay for my services based on either the distance that I was required to travel from the material pick-up site to the job site or the amount of weight, usually in tons, that I was required to carry in my truck for each job.

7.  In assigning a price for each job, the brokerage companies used a Rate Sheet Form which was a guideline as to how to price the jobs per mile. The Rate Sheet Form utilized by the brokers was dated 1980. (See true and correct copy of the rate sheet attached hereto as Exhibit "A" and incorporated herein by this reference).

8.  The brokerage companies utilized Exhibit "A" to set the price that independent owners and operators where to be paid. For example, according to Exhibit "A", the first mile was to be paid at $0.70 (Exhibit A).

9.  Most job assignments were priced based on this rate sheet. On occasions, brokers would assign prices for jobs which were below the rate sheet. (Exhibit "A").

10.  I had questioned the use of this method by the brokerage companies since it did not allow for either cost of living increases and/or any increases in the price of fuel or equipment costs.

11.  It became increasingly difficult for me to continue working at the rates quoted and paid by the brokerage companies based on this 1980 Rate Sheet.

///

12.    I requested on a number of occasions that the brokerage companies come up with a new way to price the jobs that allowed for the increase in the cost of living, fuel and related expenses to maintaining my truck.

13.    I also discussed the problem of low payment by the brokerage companies with other owners and operators.  Many of the other owners and operators expressed their own dissatisfaction with the brokerage company's method of setting the price for jobs and the low payment they received for work performed.

14.    A number of other owners and operators decided to refuse to accept any future work from the brokerage companies at their low rates.

15.    I was involved, and in fact, was one of the leaders of other owners and operators in Palm Beach County who refused to accept any new work assignments from the brokerage companies including, Siboney Contracting, Austin Tupler, Allied Trucking and others.

16.    The reason I decided to cease accepting work assignments from the above-mentioned brokers was because the brokers refused to pay a reasonable amount for my services. It is my understanding that the other owners and operators ceased accepting future job assignments for this same reason.

///

///

///

17. At the time I ceased accepting work assignments, I was not obligated under any pending contracts. Based on my conversations with the other truckers who stopped accepting future job assignments, no trucker was under any current obligation and/or contract to perform work for a brokerage company.

18. In fact, no brokerage company, including those named as Plaintiffs in this lawsuit, ever provided an owner operator with a written contract for jobs performed.

19. When myself and the other owners and operators ceased accepting job assignments, we decided to meet in front of Palm Beach Aggregates with our trucks, located on State Road 80, near Lion Country Safari.

20. We choose this spot as a meeting place since Palm Beach Aggregate was the main supplier of the building material that we previously hauled for the brokerage companies.

21. It was my intention, as well as the other owners and operators, to make a statement to the brokerage companies that we would no longer work for such little payment and we wanted to utilize a new method and/or guideline for payment for our work performed.

22. On February 10, 2000 we met with attorney Cathleen Scott while parked on State Road 80, for the purposes of discussing the issues with the brokerage companies, such as the companies bringing this lawsuit.

23. On February 12, 2000 we held a meeting with all interested independent owners and operators to discuss and consider possible solutions to the

problems with the brokerage companies.

24. Based on that meeting, it was decided that we would create an agreed on list of problems and try to resolve those problems with the brokerage companies, including those involved in this lawsuit. Specifically, we intended to discuss the use of new guidelines for assessing the price brokers paid independent truckers for their work performed.

25. At the February 12, 2000 meeting the truckers discussed and agreed that the brokerage companies should consider the rising price of fuel and increases in the costs of living an doing business in Palm Beach County when assessing the amount to pay the truckers for work performed.

26. It was further decided at that meeting that since there were over 150 truckers present, we would form a non-profit organization for the purpose of legal representation. The non profit organization was to allow elected officials of the organization to communicate directly with the attorney so as to avoid the additional costs and expenses associated with having one attorney communicate with each 150 truckers individually.

27. The following Monday, on or about February 14, 2000, Ms. Scott, on behalf of the truckers, forwarded a letter to each of the affected brokerage companies advising them of the problems the independent truckers were experiencing with the companies. (A true and correct copy of said letter is attached hereto as Exhibit "B" and incorporated herein by this reference.)

28. Pursuant to Exhibit "B", the truckers are requesting that an increase in the amount they are paid for their work. Nothing in Exhibit B requests the

absolute price fixing for work performed. To the contrary, Exhibit B

requests an increase in the method currently utilized by the brokerage

companies.

30.    Since the filing of this lawsuit, the efforts to finalize the formation of the

non-profit organization have been discontinued so as to devote all of the

truckers' resources to the preparation of the defense of this lawsuit.

I JOSE MATOS, state that I have read the foregoing Affidavit consisting of thirty

(30) paragraphs and swear or affirm that it is true and correct to the best of my

knowledge.

_____
Jose Matos

STATE OF FLORIDA          )
                          )    SS:
COUNTY OF                 )


BEFORE ME, the undersigned authority, personally appeared _Jose Matos_
to me well known to be the person described in and who executed the foregoing
instrument, and acknowledged to and before me that _he_ executed said instrument for
the purposes therein expressed, this _18_ day of _March, 2000_ ,19__.

_____
Notary Public
My Commission Expires:

Cathleen A Scott
My Commission CC809118
Expires February 14 2003

EXHIBIT _____ _A_

*R. 1980*

## TON MILES

FIRST 40 MILES HAUL : ADD $ 0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS: SUMAR $ 0.03 POR CADA LUZ Y SENAL DE PARADA

*(0 por toll)*

| | | | | | |
|---|---|---|---|---|---|
| 1 = 0.70 | 13½ = 2.20 | 26 = 3.70 | 51 = 6.45 | 76 = 9.20 | 101 = 11.95 |
| 1½ = 0.76 | 14 = 2.26 | 27 = 3.81 | 52 = 6.56 | 77 = 9.31 | 102 = 12.06 |
| 2 = 0.82 | 14½ = 2.32 | 28 = 3.92 | 53 = 6.67 | 78 = 9.42 | 103 = 12.17 |
| 3 = 0.94 | 15 = 2.38 | 29 = 4.03 | 54 = 6.78 | 79 = 9.53 | 104 = 12.28 |
| 1½ = 1.00 | 15½ = 2.44 | 30 = 4.14 | 55 = 6.89 | 80 = 9.64 | 105 = 12.39 |
| 1 = 1.06 | 16 = 2.50 | 31 = 4.25 | 56 = 7.00 | 81 = 9.75 | 106 = 12.50 |
| 1½ = 1.12 | 16½ = 2.56 | 32 = 4.36 | 57 = 7.11 | 82 = 9.86 | 107 = 12.61 |
| = 1.18 | 17 = 2.62 | 33 = 4.47 | 58 = 7.22 | 83 = 9.97 | 108 = 12.72 |
| = 1.24 | 17½ = 2.68 | 34 = 4.58 | 59 = 7.33 | 84 = 10.08 | 109 = 12.83 |
| = 1.30 | 18 = 2.74 | 35 = 4.69 | 60 = 7.44 | 85 = 10.19 | 110 = 12.94 |
| = 1.36 | 18½ = 2.80 | 36 = 4.80 | 61 = 7.55 | 86 = 10.30 | 111 = 13.05 |
| = 1.42 | 19 = 2.86 | 37 = 4.91 | 62 = 7.66 | 87 = 10.41 | 112 = 13.16 |
| 1½ = 1.48 | 19½ = 2.92 | 38 = 5.02 | 63 = 7.77 | 88 = 10.52 | 113 = 13.27 |
| = 1.54 | 20 = 2.98 | 39 = 5.13 | 64 = 7.88 | 89 = 10.63 | 114 = 13.38 |
| ½ = 1.60 | 20½ = 3.04 | 40 = 5.24 | 65 = 7.99 | 90 = 10.74 | 115 = 13.49 |
| = 1.66 | 21 = 3.10 | 41 = 5.35 | 66 = 8.10 | 91 = 10.85 | 116 = 13.60 |
| = 1.72 | 21½ = 3.16 | 42 = 5.46 | 67 = 8.21 | 92 = 10.92 | 117 = 13.71 |
| = 1.78 | 22 = 3.22 | 43 = 5.57 | 68 = 8.32 | 93 = 11.07 | 118 = 13.82 |
| ½ = 1.84 | 22½ = 3.28 | 44 = 5.68 | 69 = 8.43 | 94 = 11.18 | 119 = 13.93 |
| = 1.90 | 23 = 3.34 | 45 = 5.79 | 70 = 8.54 | 95 = 11.29 | 120 = 14.04 |
| ½ = 1.96 | 23½ = 3.40 | 46 = 5.90 | 71 = 8.65 | 96 = 11.40 | 121 = 14.15 |
| 2 = 2.02 | 24 = 3.46 | 47 = 6.01 | 72 = 8.76 | 97 = 11.51 | 122 = 14.26 |
| 2½ = 2.08 | 24½ = 3.52 | 48 = 6.12 | 73 = 8.87 | 98 = 11.62 | 123 = 14.37 |
| 3 = 2.14 | 25 = 3.58 | 49 = 6.23 | 74 = 8.98 | 99 = 11.73 | 124 = 14.48 |
| | 25½ = 3.64 | 50 = 6.34 | 75 = 9.09 | 100 = 11.84 | 125 = 14.59 |

EXHIBIT  _B_




LAW OFFICES OF

## STROLLA & SCOTT, P.A.

CATHLEEN SCOTT
STACY STROLLA

February 14, 2000

TELEPHONE (561) 802-3132
FACSIMILE (561) 802-3121

**Via Facsimile 832-3191**
**& U.S. Mail**

Atten: Enrica
Siboney Trucking
1000 Southern Boulevard
Suite 300
West Palm Beach, Florida 33405

Re:     Owners Assoc. of Palm Beach & Broward County
        (Striking Truckers Near Palm Beach Aggregates)

Dear Sir:

Please be advised that this law firm has the pleasure of representing the independent truckers, collectively known as, The Owners Association of Palm Beach and Broward County [herein after referred to as "Association"]. This organization is currently comprised of approximately 175 independent truck drivers and owners in Palm Beach and Broward Counties. The membership is expected to increase over the next three days.

The Association has authorized me to make the following demands on their behalf for the purpose of resolving this serious crisis.

Their demands are as follows:

(1)     The Association requires that the brokers increase the pay rate by thirty percent (30% )based on the 1980 Tariff Rate.

(2)     The Association requires that the brokers follow the insurance minimum requirements set by the State of Florida at $300,000.00 Currently, several companies require drivers to carry $1,000,000.00 of insurance coverage, resulting in outlandish premiums.

(3)     The Association requires that all brokers who sell gasoline to the drivers comply with the licensing requirement set by the State of Florida for such sales.

**Allied Trucking**
**February 14, 2000**
**Page 2**

(4)    The Association requires that all brokers are bonded through the Department of Transportation and State of Florida.

(5)    The Association requires that all rates are set and agreed to before the job begins and that all jobs have a five (5) hour minimum.

Obviously, both parties interests will best be served by an immediate, amicable resolve of this serious problem. As a result, we request that you respond to our demand in the next three (3) days.

Thank you in advance for your prompt response. I look forward to resolving this matter with you.

Sincerely,

Cathleen Scott

## AFFIDAVIT OF EDDIE PEREZ

STATE OF FLORIDA        )
                        ) **SS**
PALM BEACH COUNTY   )

I, EDDIE PEREZ, being first duly sworn, depose and state that I am over eighteen (18) years of age, that I am sui juris and this Affidavit is made voluntarily and of my own free will without threats or promises of benefits by or from any person, and is based on my personal knowledge. I further state as follows:

1.    I am an independent truck owner and operator who does business in Palm Beach and Broward County.

2.    I have been working as an independent contractor in Palm Beach and Broward County over ten (10) years.

3.    As an independent contractor, I own my own work truck and equipment. I am responsible for the payment of all maintenance fees and related expenses for the use of my work truck including fuel.

4.    For the last several years, the price of fuel and maintenance on my vehicle has steadily increased.

5.    Also increasing over the last several years is the price of living to reside in Palm Beach County.

6.    As an independent owner, I regularly performed work for several brokerage companies. The brokerage companies, such as the Plaintiffs in the lawsuits in question, act as brokers of rock and other materials for

commercial and residential construction projects. The brokerage companies would pay for my services based on either the distance that I was required to travel from the material pick-up site to the job site or the amount of weight, usually in tons, that I was required to carry in my truck for each job.

7.    In assigning a price for each job, the brokerage companies used a Rate Sheet Form which was a guideline as to how to price the jobs per mile. The Rate Sheet Form utilized by the brokers was dated 1980. (See true and correct copy of the rate sheet attached hereto as Exhibit "A" and incorporated herein by this reference).

8.    The brokerage companies utilized Exhibit "A" to set the price that independent owners and operators where to be paid. For example, according to Exhibit "A", the first mile was to be paid at $0.70 (Exhibit A).

9.    Most job assignments were priced based on this rate sheet. On occasions, brokers would assign prices for jobs which were below the rate sheet. (Exhibit "A").

10.   It became increasingly difficult for me to continue working at the rates quoted and paid by the brokerage companies based on this 1980 Rate Sheet.

11.   I joined the group of other owners and operators in Palm Beach County who refused to accept any new work assignments for brokerage companies including, Siboney Contracting, Austin Tupler, Allied Trucking and others.



12.    The reason I decided to cease accepting work assignments from the above-mentioned brokers was because the brokers refused to pay a reasonable amount for my services. It is my understanding that the other owners and operators ceased accepting future job assignments for this same reason.

13.    It was never my intention to fix an absolute price for my work, but rather to require that the brokerage companies consider the increasing price of fuel and other expenses when determining how much to pay for my work.

14.    At the time I ceased accepting work assignments, I was not obligated under any pending contracts. Based on my conversations with the other truckers who stopped accepting future job assignments, no trucker was under any current obligation and/or contract to perform work for a brokerage company.

15.    During my experience with the brokerage company, including those named as Plaintiffs in this lawsuit, I was never provided with a written contract for jobs to be performed.

16.    It was my intention, as well as the other owners and operators, to make a statement to the brokerage companies that we would no longer work for such little payment, we wanted to utilize a new method and/or guideline for payment for our work performed, or alternatively, form our own company.

17.    At the February 12, 2000 meeting with Cathleen Scott, I and the other truckers discussed and agreed, among other issues, that the brokerage companies should consider the rising price of fuel and increases in the

costs of living an doing business in Palm Beach County when assessing the amount to pay the truckers for work performed.

18.     It was further decided at that meeting that since there were over 150 truckers present, we would form a non-profit organization for the purpose of legal representation. The non profit organization was to allow elected officials of the organization to communicate directly with the attorney so as to avoid the additional costs and expenses associated with having one attorney communicate with each 150 truckers individually.

I EDDIE PEREZ, state that I have read the foregoing Affidavit consisting of eighteen (18) paragraphs and swear or affirm that it is true and correct to the best of my knowledge.

_____
EDDIE PEREZ

STATE OF FLORIDA            )

                           )    SS:

COUNTY OF                   )


BEFORE ME, the undersigned authority, personally appeared_____ to me well known to be the person described in and who executed the foregoing instrument, and acknowledged to and before me that ___ executed said instrument for the purposes therein expressed, this ___ day of _____, 19__.

                           _____
                           Notary Public
                           My Commission Expires:

EXHIBIT ___*A*___

R. 1,980

## TON MILES

FIRST 40 MILES HAUL : ADD $ 0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS: SUMAR $ 0.03 POR CADA LUZ Y SENAL DE PARADA

(10 por toll)

| | | | | | |
|---|---|---|---|---|---|
| = 0.70 | 13½ = 2.20 | 26 = 3.70 | 51 = 6.45 | 76 = 9.20 | 101 = 11.95 |
| = 0.76 | 14 = 2.26 | 27 = 3.81 | 52 = 6.56 | 77 = 9.31 | 102 = 12.06 |
| = 0.82 | 14½ = 2.32 | 28 = 3.92 | 53 = 6.67 | 78 = 9.42 | 103 = 12.17 |
| = 0.88 | 15 = 2.38 | 29 = 4.03 | 54 = 6.78 | 79 = 9.53 | 104 = 12.28 |
| = 0.94 | 15½ = 2.44 | 30 = 4.14 | 55 = 6.89 | 80 = 9.64 | 105 = 12.39 |
| = 1.00 | 16 = 2.50 | 31 = 4.25 | 56 = 7.00 | 81 = 9.75 | 106 = 12.50 |
| = 1.06 | 16½ = 2.56 | 32 = 4.36 | 57 = 7.11 | 82 = 9.86 | 107 = 12.61 |
| = 1.12 | 17 = 2.62 | 33 = 4.47 | 58 = 7.22 | 83 = 9.97 | 108 = 12.72 |
| = 1.18 | 17½ = 2.68 | 34 = 4.58 | 59 = 7.33 | 84 =10.08 | 109 = 12.83 |
| = 1.24 | 18 = 2.74 | 35 = 4.69 | 60 = 7.44 | 85 =10.19 | 110 = 12.94 |
| = 1.30 | 18½ = 2.80 | 36 = 4.80 | 61 = 7.55 | 86 =10.30 | 111 = 13.05 |
| = 1.36 | 19 = 2.86 | 37 = 4.91 | 62 = 7.66 | 87 =10.41 | 112 = 13.16 |
| = 1.42 | 19½ = 2.92 | 38 = 5.02 | 63 = 7.77 | 88 =10.52 | 113 = 13.27 |
| = 1.48 | 20 = 2.98 | 39 = 5.13 | 64 = 7.88 | 89 =10.63 | 114 = 13.38 |
| = 1.54 | 20½ = 3.04 | 40 = 5.24 | 65 = 7.99 | 90 =10.74 | 115 = 13.49 |
| = 1.60 | 21 = 3.10 | 41 = 5.35 | 66 = 8.10 | 91 =10.85 | 116 = 13.60 |
| = 1.66 | 21½ = 3.16 | 42 = 5.46 | 67 = 8.21 | 92 =10.92 | 117 = 13.71 |
| = 1.72 | 22 = 3.22 | 43 = 5.57 | 68 = 8.32 | 93 =11.07 | 118 = 13.82 |
| = 1.78 | 22½ = 3.28 | 44 = 5.68 | 69 = 8.43 | 94 =11.18 | 119 = 13.93 |
| = 1.84 | 23 = 3.34 | 45 = 5.79 | 70 = 8.54 | 95 =11.29 | 120 = 14.04 |
| = 1.90 | 23½ = 3.40 | 46 = 5.90 | 71 = 8.65 | 96 =11.40 | 121 = 14.15 |
| = 1.96 | 24 = 3.46 | 47 = 6.01 | 72 = 8.76 | 97 =11.51 | 122 = 14.26 |
| = 2.02 | 24½ = 3.52 | 48 = 6.12 | 73 = 8.87 | 98 =11.62 | 123 = 14.37 |
| = 2.08 | 25 = 3.58 | 49 = 6.23 | 74 = 8.98 | 99 =11.73 | 124 = 14.48 |
| = 2.14 | 25½ = 3.64 | 50 = 6.34 | 75 = 9.09 | 100=11.84 | 125 = 14.59 |