FILED BY_____D.C.

2000 MAR 30  AM 9: 11

CLER... U. S. DIST. CT.
S.D. OF FLA - MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 00-6223-CIV-GOLD/Simonton

AUSTIN TUPLER TRUCKING, INC., JUNER
HAULING CORPORATION, RETRANCA
EQUIPMENT & TRUCKING CORP.,TRUCK
BROKERAGE BY NATIONAL, INC., and
EASTMAN AGGREGATES

        Plaintiffs,

vs.

SUPPORT DUMP TRUCKING GROUP, INC.,
JUAN ARAGONES, OSCAR DE LEON,
REYNALDO RODRIGUEZ, RAFAEL D.
JIMENEZ, NORVEL IGARZA, ALAYN
HERNANDEZ, EDUARDO RODRIGUEZ,
OSMELY JIMENEZ, OSCAR SUAREZ,
JULIO GOMEZ, RIGODERTO PUPO,
RENIER MARTINEZ, GIRALDO VICTORIA,
VICTOR MORALES, JOHN DOE 1 through 300,
OWNERS ASSOCIATION OF PALM BEACH
AND BROWARD COUNTY, CHARLES LUQUE,
JORGE VALIENTE, JOSE MATOS, ISAAC
TURGEMAN, ILCEANE SFORCA, OSSIE
FERNANDEZ, and DANIEL BALAZI

        Defendants.

_____/

**PLAINTIFFS' AUSTIN TUPLER
TRUCKING, INC., ET. AL.'S
MOTION FOR PRELIMINARY
INJUNCTION**

Pursuant to Rule 65(a), Fed. R. Civ. P., Plaintiffs, Austin Tupler Trucking, Inc., Juner

Hauling Corporation, Retranca Equipment & Trucking Corp., Truck Brokerage By National, Inc.,

and Eastman Aggregates (collectively, "Plaintiffs") file this Motion for Preliminary Injunction. As grounds therefor, Plaintiffs state:

1.      Plaintiffs are all truck brokers working in South Florida.  Plaintiffs bid on construction contracts in Dade, Broward, and Palm Beach counties to provide trucking services for hauling materials to and from construction sites.  These construction projects are in and affect interstate commerce.  Plaintiffs then contract with independent truck owner-operators for the work to be done on these projects.  The independent owner-operators pick-up and deliver materials to the construction site and/or haul materials from the construction site in accordance with the needs of the project.  *See* Exhibit 21.

2.      Because Plaintiffs have a number of contracts with various construction projects, Plaintiffs are able to offer the owner-operators a consistent flow of work with regular payment schedules.  If one construction project does not need trucking services for the day or the week, chances are another project will need trucking services to haul material or debris to and from the work sites.  Because Plaintiffs have these contracts, they are able to offer consistent work to Defendants who contract with them.

3.      The Individual Defendants are independent truck owner-operators.  Each is an independent contractor and independent business owner.  They own their own truck or fleet of trucks which they use to complete work for Plaintiffs, other truck brokers, or construction contractors.  *See* Exhibits 21 and 22.

4.      Defendants are independent contractors responsible for their fuel, insurance, and maintenance of their vehicles.  These costs are part of their costs of doing business.  *See* Exhibits 21 and 22.

2

5.     Defendants control the manner, means, and details of their work.  Defendants call Plaintiffs to find out if there is any work available.  Plaintiffs let them know what jobs are available and the price to be paid for the job.  Most jobs are paid by the tonnage hauled or the mile driven. Defendants are free to accept or decline any job.  *See* Exhibits 21 and 22.

6.     As required by state and federal law, Plaintiffs verify that Defendants have a valid commercial driver's licence and Department of Transportation Certification before contracting with them.  Additionally, if someone other than the owner-operator is going to drive a truck for the owner-operator on a job for one of the Plaintiffs, the owner-operator must provide proof of coverage under the Florida Worker's Compensation law or proof of waiver.  *See* Exhibit 21.

7.     Defendants are required to maintain adequate insurance on their trucks.  Defendants are given the option of insuring their trucks under the Plaintiffs' insurance plan, but that is not required.  The majority of Defendants obtain their own private insurance.  *See* Exhibit 21.

8.     Defendants are not employees subject to the protections of the National Labor Relations Act because they are independent contractors.  This issue was decided specifically as it applies to Plaintiff Austin Tupler Trucking, Inc.  *See Austin Tupler Trucking, Inc. v. Local 2027, International Longshoremen's Assoc.*, 261 NLRB No. 29 (1982) (a copy is attached as Exhibit 12).

9.     The Association Defendants are associations of independent owner-operators, many of whom are Individual Defendants or John Doe Defendants.  The purpose of the associations is to affect a collective change in the prices or tariffs paid to the Individual Defendants by Plaintiffs and other brokers.  The Association Defendants have officers or individuals capable of speaking on behalf of the association members.  The Association Defendants have retained counsel.

3

10. Defendant Support Dump Trucking Group, Inc. is a non-profit corporation incorporated under the laws of the State of Florida and maintains its principal place of business in Florida. *See* Exhibit 14.

11. Defendant Owners Association of Palm Beach and Broward County is an unincorporated association made up of members who live and work in Palm Beach and Broward County. Dues for membership are $30. *See* Exhibit 22.

12. Defendants Juan Aragones, Oscar de Leon, Reynaldo Rodriguez, Rafael D. Jimenez, Norvel Igarza, Alayn Hernandez, and Eduardo Rodriguez are officers of Defendant Support Dump Trucking Group, Inc. *See* Exhibits 14 and 17.

13. Defendants have threatened to prevent any owner-operator who does not join their association from working in Dade County.

14. Defendant Juan Aragones, at a meeting on February 9, 2000, with various truck brokers, told them that before members of Defendant Support Dump Trucking Group, Inc. would return to work, the brokers would have to agree on a uniform, minimum tariff that would be paid for truck services. *See* Exhibits 23, 24 and 25.

15. Defendants Juan Aragones and Norvel Igarza handed out a rate sheet they proposed that all the brokers follow. These rate sheets would apply to Plaintiffs as well. *See* Exhibits 23, 24, 25 and 26.

16. On March 1, 2000, Defendant Juan Aragones called Plaintiff Truck Brokerage by National, Inc. ("National") wanting to discuss the rate to be paid independent owner-operators on a job hauling materials from Port Everglades to Miami. *See* Exhibit 36.

4

17.    Defendant Oscar de Leon, also an officer of Defendant Support Dump Trucking Group, Inc., is quoted in a newspaper article appearing in the February 24, 2000 edition of *The Herald* as saying, "We're trying to get better rates, better insurance rates, and some respect from the broker." Again, he is quoted as saying, "Right now, there's no minimum rate per load. We need to establish one. Now the broker pays us whatever they want to pay." *See* Exhibit 9.

18.    On March 4, 2000, Defendant Oscar de Leon went to a construction site located at N.W. 113th Ct and 127th Street where independent owner-operators who had contracted with Plaintiff Austin Tupler Trucking, Inc. ("Tupler") were delivering materials. Defendant Oscar de Leon told the owner-operators to stop working until Plaintiff Tupler agree to pay the owner-operators more money on the job. Plaintiff Tupler had to agree to a .10 per ton increase before the owner-operators were allow to continue doing the job. *See* Exhibit 37.

19.    Defendant Reynaldo Rodriguez, in addition to being an officer of Defendant Support Dump Trucking, Inc., has also supported acts of violence in furtherance of the conspiracy to raise prices. Specifically, a group of unknown Defendants seen throwing rocks at a truck that was attempting to work during the work stoppage on February 23, 2000, were using Mr. Rodriguez's truck. Additionally, the same group of unknown Defendants picketed and attempted to stop work on a project on Biscayne Boulevard in Dade County on February 22, 2000. This incident resulted in fist fights between the Defendants and the owner-operators trying to work. The Defendants were again using Mr. Rodriguez's truck. *See* Exhibit 20.

20.    Defendants Osmely Jimenez and Oscar Suarez made threats to other independent owner-operators who were attempting to work during the work stoppage. On February 10, 2000, these defendants went to Bishop Pit in Palm Beach County and threatened several drivers who were

working under contracts they had with Plaintiff Tupler Trucking and told them if they did not stop working their trucks would be damaged. One of the truckers was told that if he did not stop working, his truck would be shot. *See* Exhibit 35.

21.     Defendant Julio Gomez was involved in a shooting of a truck being driven by a driver leaving a Rinker FEC aggregate pit in Dade County. An unknown Defendant, while riding in Mr. Gomez's truck, shot the gas tank of the Rinker truck and disabled it. This occurred on or about February 10, 2000. *See* Exhibit 34.

22.     Defendant Rigoderto Pupo was involved in a rock throwing incident on or about January 28, 2000, near a Rinker FEC aggregate pit in Dade County. A group of unknown Defendants were throwing rocks at Rinker trucks from a truck belonging to Mr. Pupo. *See* Exhibit 34.

23.     Defendants Charles Luque, Jorge Valiente, Jose Matos, Isaac Torgeman, and Ilceane Sforca are directors of Defendant Owners Association of Palm Beach and Broward County. Through their attorney Cathleen Scott, they have demanded from Plaintiff Eastman Aggregate that Eastman must pay 30% above the 1980 tariff rate, in addition to other conditions before the owner-operators will return to work. *See* Exhibit 22.

24.     Defendants Ossie Fernandez and Daniel Balazi are members of Defendant Owners Association of Palm Beach and Broward County. *See* Exhibit 3.

25.     On or about February 2, 2000, Defendants orchestrated a collective work stoppage that has affected Dade, Broward, and Palm Beach counties in addition to other counties in Florida and has spread to other parts of the United States. *See* Exhibits 21 and 22.

6

26.      As part of the work stoppage, Defendants congregated along the sides of state and federal highways in Dade, Broward, and Palm Beach counties. At times, over 150 trucks have been parked on Okeechobee Road (US27) in Dade County. These protests were at or near the entrance to several aggregate pits who supply materials to Plaintiffs for use on construction projects. *See* Exhibits 21 and 26.

27.      The aggregate pits along US27 boycotted were CSR Rinker, White Rock quarries, and Tarmac. *See* Exhibit 21.

28.      Plaintiffs do business with Rinker, White Rock, Tarmac and Palm Beach Aggregate. Plaintiffs send owner-operators to these quarries to pick up materials and deliver them to the construction site. *See* Exhibits 22 and 26.

29.      Defendants congregated on the sides of state and federal highways for the purpose of identifying and following owner-operators who wanted to continue doing business with Plaintiffs and those who did not honor Defendants' illegal work stoppage. *See* Exhibits 22, 28-33, and 35.

30.      While at the entrances to the quarries, Defendants threatened and harassed owner-operators and employee drivers of the quarries that wanted to work by throwing rocks at their trucks, using firearms to shoot their trucks, blockading access to roads such as the Florida Turnpike, and beating drivers. They also followed the working owner-operators to other locations. *See* Exhibits 22, 28-32, and 34.

31.      Defendants acts of violence interfered with and prevented Plaintiffs from doing business with these quarries, and consequently fulfilling their obligations under their contracts for the construction projects. *See* Exhibits 21 and 22.

7

32.     Defendants congregation on the sides of state and federal highways was for the purpose of forcing Plaintiffs to acquiesce to their demands that Plaintiffs and other brokers agree to set minimum tariffs on trucking services in violation of federal and state antitrust laws. *See* Exhibit 21.

33.     Additionally, Defendants' congregation on the sides of state and federal highways was in violation of Fla. Stat. § 337.406, as Defendants did not have a permit for such demonstrations.

34.     Defendants' congregation on the sides of state and federal highways caused traffic delays and created a danger to the public.

35.     Local and state law enforcement agencies failed to cure this public hazard.

36.     Plaintiffs also received bomb threats and other threats of violence if they were to continue doing business during the work stoppage. *See* Exhibits 21 and 22.

37.     Defendants congregated at Plaintiffs' places of business, trespassed on their property, damaged trucks and equipment, and assaulted employees.

38.     Defendants' acts of violence were for the purpose of forcing Plaintiffs to acquiesce to their demands that Plaintiffs and other brokers agree to set minimum tariffs on trucking services in violation of federal and state antitrust laws.

39.     Now that Defendants have returned to work, Defendant Support Dump Trucking Group, Inc., through their officers, specifically Defendants Juan Aragones and Oscar de Leon, have shut down jobs until Plaintiffs agree to a higher price on that job. *See* Exhibits 36 and 37.

40.     The Sherman Anti-Trust Act, the Clayton Act, and the Florida Anti-Trust Act of 1980 provide for injunctive relief from antitrust violations.

8

41.     Defendants' actions constitute an illegal contract, combination, or conspiracy under the antitrust laws because each is an independent business owner that would normally be in competition with other Defendants.

42.     Defendants' collective action constitutes illegal price fixing by attempting to force Plaintiffs to agree to set a uniform, minimum price or tariff for trucking services or to agree to an increase in prices paid.

43.     Defendants' collective action constitutes an illegal boycott of Plaintiffs, their customers and suppliers, and other independent owner-operators by shutting down their businesses and threatening other owner-operators with acts of violence for doing business with Plaintiffs.

44.     Defendants' actions constitute a *per se* violation of both federal and state antitrust laws and should be enjoined.

45.     Defendants' actions have caused and will continue to cause irreparable harm to Plaintiffs absent an immediate injunction. For example, Plaintiff Tupler lost $62,000 each day during Defendants' illegal work stoppage and has been forced to pay more for trucking services on jobs Defendants have shut down until Plaintiff Tupler agreed to pay the increase. Additionally, Plaintiff Tupler has received letters from general contractors threatening to seek damages against Plaintiff Tupler Trucking due to its inability to perform under its contracts, a situation due solely to Defendants' illegal actions. *See* Exhibit 21.

46.     Enjoining Defendants' illegal conduct, specifically, (1) their congregating on the side of federal and state roads, (2) their congregating in front of Plaintiffs' businesses, Plaintiffs' customers' businesses, and Plaintiffs' suppliers' businesses, (3) their threatening, harassing, and engaging in acts of violence toward owner-operators who contract with Plaintiffs, and (4) their

9

interfering with individual jobs where Plaintiffs have contracted to perform trucking services, will not cause any damage to Defendants. Accordingly, any security required should be minimal.

47.    Because the identity of so many of the Defendants remains unknown, Plaintiffs request that any order entered by the Court be served by the Association Defendants on their members.

For the reasons stated herein, Plaintiffs respectfully request the Court enter an order enjoining Defendants, the class they represent, their officers, agents, and employees, and any and all persons or organizations, including the named Association Defendants or any of them under their control or authority, or persons or organizations in active concert or participation with said Defendants from:

    a.    all activity to collectively set prices or tariffs for which they will work, including any collective gathering or agreement for the purpose of setting prices or tariffs;

    b.    all roadside demonstrations and/or mass parking, defined as more than two trucks and/or two people, on all roadways in Dade, Broward, and Palm Beach counties, specifically Okeechobee Road and all roads where Plaintiffs do business;

    c.    all forms of threats, harassment, or violence toward other independent truck owner-operators, truck drivers, and Plaintiffs' suppliers or customers;

    d.    any attempts to disrupt the normal operations of Plaintiffs' businesses, including any attempts to disrupt any jobs Plaintiffs have contracted to perform or to influence in any way the prices Plaintiffs pay on any jobs;

    e.    all obstructions of Plaintiffs' businesses, the businesses of their suppliers or customers, or the homes or property of other truck drivers or independent truck owner-operators; and

   f.  all boycotts of Plaintiffs' businesses, customers, suppliers, or owner-operators doing business with Plaintiffs.

   Plaintiffs also request that Defendants provide copies of any injunction entered by the Court to all independent truck owner-operators who are or have participated in any way in the work stoppage. Plaintiffs further request that Defendants Support Dump Trucking Group, Inc. and Owners Association of Palm Beach and Broward County provide copies of any injunction to all of its members and file within 10 days of the date of the Court's Order, a list of the names and addresses of all persons to whom a copy of the injunction has been given.

   Respectfully submitted this 27th day of March, 2000.

         By:_____

FISHER & PHILLIPS LLP
NationsBank Tower
One Financial Plaza, Suite 2300
Fort Lauderdale, Florida 33394
Telephone: (954) 525-4800
Facsimile: (954) 525-8739

         Charles S. Caulkins
         (Fla. Bar No. 0461946)
         James C. Polkinghorn
         (Fla. Bar No. 0376892)
         Edward H. Trent
         (Fla. Bar No. 0957186)
         Attorneys for Plaintiffs.

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of PLAINTIFFS' AUSTIN TUPLER TRUCKING, INC., ET. AL.'S MOTION FOR PRELIMINARY INJUNCTION was served by First Class United States mail this ___27th___ day of March, 2000, upon the following:

Richard Diaz, Esq.
Richard A. Diaz, P.A.
2701 Southwest 3rd Avenue
Miami, Florida 33127-2335
Attorneys for Support Dump
Trucking Group, Inc., Juan Aragones,
Oscar De Leon, Rafael D. Jimenez,
Alayn Hernandez, and Renier Martinez

Hosey Hernandez, Esq.
Hosey Hernandez, P.A.
Coconut Grove Bank Building
2701 South Bayshore Drive, Suite 602
Coconut Grove, Florida 33133
Attorneys for Support Dump Trucking
Group, Inc.

Cathleen A. Scott, Esq.
Strolla & Scott, P.A.
120 South Olive Avenue, Suite 303
West Palm Beach, Florida 33401-5532
Attorneys for the Owners Assoc. of
Palm Beach and Broward County,
Oscar Suarez, Victor Morales, Jose
Matos, Ilceane Sforca, Jorge Valiente,
Daniel Balazi and Ossie Fernandez

Angel Ruiz, Esq.
Gomez, Del Pino & Ruiz, P.A.
1835 West Flagler Street
Miami, Florida 33135
Attorneys for Julio Gomez

Terry R. Swartz, Esq.
Sonneborn Rutter Cooney
Klingensmith & Eyler, P.A.
1545 Centrepark Drive North
West Palm Beach, Florida 33401
Attorneys for Isaac Turgeman

Individual Defendants:

Reynaldo Rodriguez
2769 West 71st Place
Hialeah, Florida 33016

Norvel Igarza
2990 West 9th Avenue
Hialeah, Florida 33012

12

Eduardo Rodriguez
575 West 16th Street
Hialeah, Florida 33010

Osmely Jimenez
2624 Riverside Drive
Coral Springs, Florida 33065

Rigoderto Pupo
1555 West 44th Place #338
Hialeah, Florida  33012

Charles Luque
4701 Lyons Road, #212
Coconut Creek, Florida 33073

_____
Attorney

# Business

Sun-Sentinel

SOUTH FLORIDA

Market Watch 2
Humberto Cruz 3
Stock listings 4

WEDNESDAY · FEBRUARY 23, 2000 · NWS

500: 1,352.17 (+6.08)   ▼ NASDAQ: 4,382.12 (-29.62)   ▼ RUSSELL 2000: 540.95 (-4.73)   ▼ 30-YR BOND: 6.08% (-0.07%)

## TRUCKERS

# Strike ends at Port of Miami

## Tensions remain as protests continue

**BY DOREEN HEMLOCK**
BUSINESS WRITER

The picket lines came down and cargo rolled briskly on Tuesday at the Port of Miami for the first full day in two weeks,

as independent truckers ended a strike amid scattered pay accords and mounting lawsuits.

Some South Florida truck brokers, shipping lines and even firms in the construction industry agreed to concessions to truckers, but terms varied widely. Miami-based **Salom Transportation**, for example, added an 8 percent fuel surcharge for its unionized drivers, while other companies raised hauling fees by

10 percent to 15 percent on select routes.

Tensions remained, however. Hundreds of owner-operators of dump trucks in ..... Dade County staged off the job on Tuesday, "trying to negotiate with the brokers," said their spokesman, Juan Aragones. The dump-truck group has been protesting low fees and rising costs for the past 23 days, Aragones said.

Trucker protests also continued nationwide, as rigs from the Northeast

streamed into Washington, D.C., on Tuesday demanding redress from Congress.

Executives welcomed the end to the strike at South Florida's busiest port. Yet they cautioned it likely would take another week to fully reduce the cargo backlog in Miami, and that higher fees for trucks likely would be passed on to

■ **STRIKE** continues on 8D

ATTACHMENT / EXHIBIT ___

# NESS

sun-sentinel.com • SUN-SENTINEL, SOUTH FLORIDA

# Truckers go back to work in Miami

## ■ STRIKE

CONTINUED FROM PAGE 1D

shippers and eventually, consumers.

"Business is back to normal, I'm happy to report," said John Abisch, president of the Florida Customs Brokers and Freight Forwarders Association. "But I'm sure the rates we pay for trucking will go up."

Not all the independent truckers seemed pleased with the settlement. Jose Rodriguez, a leader among striking port drivers, said independent truckers got only "a small promise" for higher pay, but no guarantees for raises nor detailed timetables for implementation.

Strikers had sought major raises in long-stagnant hauling fees, shorter waiting times and better working conditions at the Port of Miami, and a drop in truck insurance fees, reportedly among the nation's highest, in Miami-Dade County.

"We didn't get even 25 percent

of what we wanted," Rodriguez said. "Many truckers went back to work, because they were scared. We were threatened that if we don't work, we'd be fired. And some drivers got subpoenas on a suit, alleging we harassed and intimidated others to stay off the job. Those charges are completely false."

Rodriguez said a hearing is set for this morning in Miami-Dade Circuit Court on the harassment charges.

The International Longshoremen's Association sought an injunction, charging that strikers blocked the port entrance and committed acts of violence — allegations that the independent truckers flatly deny, said Hosey Hernandez, a lawyer who represents Rodriguez and the striker group.

In Broward and Palm Beach counties, meanwhile, trucking activity increased on Tuesday, although slowdowns had pinched ports and construction activity far less than in Miami-Dade in recent weeks.

At Port Everglades, it was business "as usual" on Tuesday, said spokeswoman Janice Kimmel, who found herself stuck in port traffic in the afternoon behind a line of cargo trucks.

In Palm Beach County, dump trucks again hauled rock and other construction materials. **Palm Beach Aggregates** in West Palm Beach said business was fully restored on Tuesday for the first time in about 10 days. The company agreed with individual truckers to increase hauling fees by as much as 10 percent on select routes to offset rising costs, Vice President Enrique Tomeu said.

Still, that doesn't mean Palm Beach Aggregates will drop the suit it filed last week, alleging that striking truckers illegally conspired to fix prices and asking strikers for damages upward of $15,000.

"We'll probably carry this [suit] until the end to make sure these illegal activities don't happen again," Tomeu said.

*Business Writer Joseph Mann contributed to this report.*

ATTACHMENT / EXHIBIT 2

## The Palm Beach Post

THURSDAY, FEBRUARY 10, 2000

■ Rising cost of diesel fuel cited

# Truckers park rigs to protest for more pay

**By Larry Hobbs**
*Palm Beach Post Staff Writer*

Demanding higher pay, some 70 truckers parked their rigs outside of the Palm Beach Aggregates rock quarry Wednesday in a protest line that stretched a half mile along Southern Boulevard, west of Loxahatchee.

The rates for hauling road-building materials have not kept up with the rising costs of gas and maintenance, driver Jorge Valiente said. Valiente said he and most of the protesting drivers are independent and contract with Siboney Trucking, affiliated with Palm Beach Aggregates. The drivers are asking for a 15 percent increase in the per ton rate, now ranging from $1.50 to $3.50 depending on the distance driven, he said.

The price of diesel fuel has risen in recent months from about $1.05 to as much as $1.57 a gallon, Valiente said. He spends up to $120 a day on diesel fuel, about twice what he used to spend. "We're pretty much just surviving, not even making enough to maintain our trucks," he said.

Enrique Tomeu, an official with both Siboney and the quarry, said they recently offered drivers a 10 percent increase in the rate. He added that he can't help the drivers who contract with other companies that buy materials from Palm Beach Aggregates.

Valiente said the increase Siboney offered was only 7 percent and that it's not enough.

"We tried to explain what's going on and they won't listen to us," Valiente said. "Now we're trying to hurt them in their pockets to feel what we feel."

Independent truck drivers park on the side of State Road 80 in front of Palm Beach Aggregate near 20-Mile Bend to protest hauling rates on Wednesday.

JENNIFER PODIS/Staff Photographer

"It's interrupting business in a big way," Tomeu said.

The protest and its idle truckers come at a time when Palm Beach Aggregates is seeking county permission for 24-hour operations to meet the demands of extensive road projects throughout the county. But nearby residents are complaining about the noise from the quarry's operations.

Truck drivers have staged similar pro-

*Please see* **TRUCKERS, 5B**

# Truckers staging protests across Florida

**TRUCKERS**
*From 1B*

ests throughout the state. As many as 300 truckers parked their rigs along Okeechobee Road in Hialeah Monday, and a protest involving 150 trucks took place Friday on U.S. 27 in Miami-Dade County. About 100 truckers also protested Friday in Cocoa Beach.

A low fuel supply from OPEC and a demand for heating fuel up north have contributed to the rising prices, officials in the state's transportation and petroleum industries said. Refineries are turning more supplies into heating fuel than diesel fuel. Heating fuel and diesel fuel are very similar, said Bob McVety of the Florida Petroleum Council.

Taking their cue from truckers state-wide, the local independent drivers organized the protest by communicating via CB radios in their trucks, Valiente said.

He was the first in the line about 7 a.m. Wednesday outside the quarry.

Florida Highway Patrol troopers and sheriff's office deputies made Valiente and several other trucks move from the front of the line to the back to clear the turn lane into the quarry. Otherwise, the disruption caused by the truckers was minimal and legal, sheriff's Lt. B.E. Barkdoll said.

"They've got every right to exercise their civil rights, and we're just going to keep the peace," Barkdoll said.

The truckers ended the protest late in the afternoon Wednesday, but Valiente said they will be back today.

Some drivers who continued to haul material from the quarry sympathized with their protesting peers.

"I think it's a good thing — these guys need some help," said Leroy Hull, who added that he's happy with the $10 an hour he's making with an Okeechobee trucking company.

■ *larry_hobbs@pbpost.com*

ATTACHMENT / EXHIBIT 3

SUNDAY, FEBRUARY 13, 2000                    The Palm Beach

# LOCAL

**FIT FOR TRIAL AT 79**
Forrest Tucker has several health
problems, but he'll have to stand
trial on bank robbery charges.
**STORY, 4B**

## Truckers take strike to streets

### About 175 independent haulers organize, hire an attorney and vow to stop work until they get more pay.

**By Marc Caputo and Robert P. King**
*Palm Beach Post Staff Writers*

WEST PALM BEACH — They wanted to be heard.

With blaring horns and revving diesels, about 80 truckers went on an hourlong convoy Saturday afternoon that snarled traffic in order to raise awareness of their week-old protest over low hauling rates.

They hired a lawyer and in the evening organized a nonprofit group called the Truck Drivers Association of Palm Beach County, which they say represent 75 percent of the area's independent haulers.

The 175-member group then voted to stop all hauling until they reach a settlement with their brokers. They said this will affect almost all port operations and construction in the county, from homes to road projects to major commercial developments.

"We're organized now. And we're here to stay," said 38-year-old Boca Raton driver Charles Luque, who had an American flag fluttering from his window into the diesel smoke.

The procession and work stoppage are part of a handful in Florida designed to slow construction projects throughout South Florida. Containers have

*Please see* **TRUCKERS, 9B**

# 'We're not going to be quiet'

## TRUCKERS
*From 1B*

already started piling up at Miami's port.

The protest, prompted by rising diesel costs, is also directed at the high fees charged by the brokers who act as middle men between construction sites and the truckers.

The drivers' demands include a 30 percent raise, a five-hour minimum per job and a lowering of the insurance they must carry to the $300,000 minimum set by state law. They also want a guarantee that their pay rates will be set before they do the work.

"Our goal is to resolve this. But we have to make a statement," said Cathleen Scott, the group's attorney. "We're willing to stay on strike until this is resolved."

The group, which concluded its meeting at the Crowne Plaza hotel in West Palm Beach about 10 p.m., elected a six-member board, including Luque, Jorge Valiente of West Palm Beach, Jose Matos of West Palm Beach, Isaac Turgeman of West Palm Beach and Oceane Sforca of Boca Raton.

For the past week, truckers in Palm Beach County have been largely unseen as they parked their rigs along Southern Boulevard in front of a rock quarry west of Loxahatchee. But on Saturday, the CB radios began crackling with frustration, prompting the motorcade to travel along Southern to South Dixie Highway and back west on Belvedere Road.

Now, the truckers plan a motorcade every day until they get higher rates. They also plan to start picket lines Monday.

"Truckers are getting paid now what we got 30 years ago, so this is now or never," said Ozzie Fernandez, a 29-year-old hauler from Royal Palm Beach.

## Public shows support

For example, Fernandez said that two weeks ago, he had to haul fill from a construction site at a rate of $1.15 per cubic yard per mile. Based on a price scale he got from his uncle, he said he would have been paid at a rate of $1.40 in 1986; $1.28 in 1970. Each truck carries about 18 cubic yards or 22.5 tons.

Meanwhile, truckers say insurance, inspection and maintenance costs are rising.

Judging by the reaction to Saturday's line of trucks, the haulers have the public on their side. Bystanders waved, raised fists of support and pumped their arms to encourage the drone of horns echoing down Dixie Highway and Belvedere. One man pulled his car over and egged on the truckers until veins bulged from his forehead. A few peeved motorists frowned and choked on fumes.

Francis Langdon, a county resident for 46 years, heard the rumble and came out of her home to cheer them on.

"They want more pay and they deserve it," Langdon said. "Plus, this is fun."

The truckers aren't completely broke, though. About 125 of them paid $30 apiece to hire Scott on Saturday night. They stopped giving money only after Scott's assistants ran out of receipts.

The fuel crisis hit at the worst time for 24-year-old Daniel Balazi. Raising his live-in girlfriend's two children, he said he just bought a $61,000, 22.5-ton truck three months ago and pays a $969 monthly mortgage and $954 for insurance. But diesel has gone from an average of $1.05 to $1.57 a gallon, making his average daily fuel costs range from $100 to

$120, up by about $33-$40 a day.

"We're not going to be quiet any longer," Balazi said. "No one was taking us seriously, so we had to get their attention."

■ *marc_capudo@pbpost.com*



TUESDAY, FEBRUARY 15, 2000

ATTACHMENT / EXHIBIT 4

The Pal

**LOCKING UP**
Palm Beach Isles residents want gates, but organizers find it will be expensive and time-consuming.
**STORY, 3B**

# LOCAL

*One of more than 40 truckers gives the thumbs-up as he drives south on Dixie Highway in West Palm Beach.*

# Truckers' protest could force delays for local projects, contractors argue

**By Julie Waresh**
*Palm Beach Post Staff Writer*

Road builders say a protest by local dump truck drivers so far has had little effect on business, but they expect projects to be delayed if it lasts much longer.

The 175 independent drivers, who are objecting to low hauling rates, vowed last week to stop work until they reach a settlement with trucking brokers, who set hauling rates.

"The problem is they haven't changed the fees for truckers since 1980," said Cathleen Scott, a lawyer representing the truckers. "It's our position that (truckers) are being taken advantage of."

The drivers have stationed their trucks outside a rock quarry on Southern Boulevard west of Loxahatchee and have taken to the roads in protest convoys for the past several afternoons.

The bulk of their cargo is crushed rock for road projects, but they also haul construction materials for housing and commercial projects.

"It will affect everybody if it goes on long enough," said Mike Slade, president of Ranger Construction Industries Inc., a West Palm Beach company that is widening Jog Road for the county and extending a runway at Palm Beach International Airport.

In Boynton Beach, the protest held

> *The problem is they haven't changed the fees for truckers since 1980.'*
>
> **CATHLEEN SCOTT**
> Lawyer representing the truckers

up a load of gravel for the Ocean Avenue bridge over the Intracoastal Waterway. The builder, Archer Western Contractors, found another supplier and received the order only a day late, a spokesman said.

At issue is the inflated price of diesel fuel, which has risen to about $1.65 a gallon from about $1.05 six months ago.

Truckers are demanding a 30 percent rate hike, as well as a reduction in the $1 million in insurance coverage brokers require the independent haulers to carry, Scott said.

After subtracting the cost of the truck itself, as well as maintenance, fuel, tolls and insurance, some truckers are left with just $40 a day, Scott said.

Meanwhile, business has come to a halt at least one trucking brokerage; brokerages act as middlemen between truckers and contractors.

"We understand things need to change," said Justo Navarro, vice president of operations for Siboney Con-

tracting Co. in West Palm Beach. "But they need to change over time."

Navarro, whose business stopped when the protest began last Wednesday, said he's willing to raise rates on future contracts but not on contracts already negotiated.

Scott said the truckers, who have formed the Owners Association of Palm Beach and Broward Counties, are prepared to form their own brokerage if they can't reach a settlement.

The work stoppage has not affected the operations of local sugar cane and citrus growers, although U.S. Sugar Corp. said some of the tractor-trailer haulers that carry citrus for the company have added fuel surcharges.

DiVosta Homes Inc., which has housing projects in West Palm Beach, Palm Beach Gardens, Jupiter and Stuart, primarily uses its own trucks, spokesman Glen Trotta said.

The local stoppage, which consists primarily of dump truck drivers, is separate from the fuel price protest by tractor-trailer operators that has snarled shipments at the Port of Miami.

Tropical Shipping, the Port of Palm Beach's largest tenant, said it has had no disruptions in business.

"We've been away from all the action down in Miami," said Richard Calcote, vice president of finance. "We haven't had any impact up here."

■ *julie_waresh@pbpost.com*

ATTACHMENT / EXHIBIT 5

# The Herald

**FRIDAY, FEBRUARY 11, 2000**

# Trucker strike a menace to local economy

## Port of Miami idled; convoy shot at on Turnpike



because two of South Florida's largest imports — fresh fruits and vegetables and cut flowers — are highly perishable.

But trucker slowdowns and picketing was fast spreading across the country, so near-term it appears likely that other cities will share South Florida's problems rather than capitalize on them.

The actions in South Florida are the most aggressive reaction to soaring diesel fuel prices that analysts say are wiping out profit for truckers, particularly independent owner-operators who work for themselves. Even if fuel prices fell today, a number of other problems threaten the long-term viability of the trucking trade.

Diesel fuel costs are up by more than 50 percent in the past year. Fuel constitutes roughly 20 percent of a truck's operating costs, and its rise has squeezed already thin profit margins into negative terri-

money for every single haul, said Bob Costello, chief economist for the American Trucking Associations, who testified before Congress on the crisis early in the day.

One possible solution is a so-called fuel surcharge, where customers pay an extra fee because of higher petroleum prices. Recently, major airlines began adding a fuel surcharge on ticket prices.

However, the airline industry is controlled by a relative handful of companies, so the carriers have power to raise prices. But for independent truckers, raising prices means risking losing business to a competing driver, particularly since cargo shippers also have been having profit problems.

"The core issue isn't fuel," said Todd Spencer, executive vice president of the Owner Operator Independent Drivers Association. "It's the inability to effect price increases.

The chaotic pricing of the

effectively deregulated the industry. It sent trucking fares plummeting — greatly helping the economy by reducing costs for companies and consumers. But put a number of trucking firms out of business.

That led to the rise in independently owned trucks. But independents also are being squeezed, in part because truck driving is a popular occupation for recently arrived immigrants, who often offer low rates to get their business started, he said.

Spencer said he believes a re-regulation of the business is needed, although he acknowledged that the notion would be a tough sell in Congress.

"There needs to be some kind of regulatory concern to get freight rates set based on the service provided," he said.

But in Miami, the issues run deeper than mere diesel fuel costs, said Oscar Pupo, who's heading an organization called the Support Trucking Group.

overweight loads at no extra cost, or pay the insurance on hazardous materials out of their own pocket.

Furthermore, truckers say delays around and at the port are crippling their productivity by limiting the number of trips they can make each day. The port in downtown Miami has no direct freeway access and entering it requires crossing busy Biscayne Boulevard.

Penelas said he is hoping to establish a local body — such as a task force — to bring the sides together. However, he stressed the fuel prices aren't something the county controls. And many of the delays, he says, result from the fact that much of Miami's cargo must be inspected and documented by Customs and the Drug Enforcement Administration.

"People have to understand that just because it's happening at the seaport doesn't mean it's a problem caused by the seaport," he said.



**The Herald**    www.herald.cor

TODAY IN OUR
INTERNET EDITION
**BREAKING NEWS
CONTINUOUSLY
UPDATED**

# METRO

ATTACHMENT EXHIBIT

## PROTESTING FOR HIGHER WAGES



Dump-truck drivers on strike, above, took their protest public on State Road 27 on Friday, parking about 150 trucks along both sides of the roadway. The sign on one truck, right, translates as 'strength through union.'



**PHOTOS BY JON KRAL
HERALD STAFF**

ATTACHMENT / EXHIBIT 1

# Truckers clog roads to protest fuel prices

BY ALFONSO CHARDY
achardy@herald.com

Honking horns and driving together in a caravan, dozens of trucks slowed traffic on some expressways and at the entrance to the Port of Miami-Dade on Wednesday.

The road protest, organized by independent truck drivers, was aimed largely against an extraordinary spike in diesel fuel prices in recent weeks. Truck drivers vowed to continue the protests until trucking rates go up or fuel prices come down.

Several hundred independent

'We are going to do this every day until this is resolved.'

— OSCAR PUPO, protest spokesman

truckers also stopped picking up loads at the port Wednesday, although operations there continued. Other trucks operated normally, delivering cargo to and from the port. While Wednesday's hourlong protest began after 9 a.m. and did not interfere with rush hour, it did slow down traffic on parts of Biscayne Boulevard, State Road 112 and Interstates 95 and 395. Truckers used those expressways to get to Biscayne Boulevard and the port near downtown.

Truck drivers said they intend to carry out a similar protest this morning and on several mornings thereafter.

"We are going to do this every day until this is resolved," said Oscar Pu-

▶ PLEASE SEE TRUCKS, 2B

EDITOR: MARK SEIBEL mseibel@herald.com 305-376-3638 or 954-764-7026 ext. 3

INSIDE

---

**SOUTH FLORIDA**

**A CONSERVATIVE JEW** from Boca Raton is marketing a ring to Catholics honoring the Jubilee year. He says he's doing it because of a revelation he had nine years ago. 3B

---

**IN BUSINESS**

**FLORIDA'S AGRICULTURE SECRETARY** has requested a federal declaration of agricultural disaster for the South Miami-Dade lime growers hit with citrus canker. 1C

# Truckers taking protest to road

▶ TRUCKS, FROM 1B

po, spokesman for the protest movement known as Support Trucking Group.

Wednesday's protest follows similar demonstrations last week by dump truck drivers who parked vehicles along the sides of Okeechobee Road.

Truckers are also taking action elsewhere in the United States.

An item on the Web site of the American Trucking Associations said independent truckers in the Northeast are starting to park their rigs rather than operate with increasing diesel prices.

Canadian Trucking Alliance chief executive officer David Bradley said shippers could face transportation disruptions unless they are willing to pay higher rates to make up for soaring diesel prices.

## COST 'SKYROCKETS'

Bob Costello, chief economist at the American Trucking Associations, said diesel fuel has been increasing gradually for the last year but that in the last month it "skyrocketed."

Costello estimated the increase nationwide since last year at 56 percent, going from 93 cents a gallon to $1.44 now. It has risen about 14 percent since January, when the price stood at $1.26. In other parts of the country, particularly New England, the price has hit $2.12 per gallon.

The main reason for the increase, Costello said, was a cutback in overall production by major oil producing countries to drive up prices.

Other reasons, he said, include increased oil demand as a result of a booming economy and the return of cold weather in the Northeast after unusually warm winters in recent years.

"Trucking companies have a hard time, because diesel fuel is the second-highest expense after labor, up to 20 percent of operating expenses," Costello said. "So when fuel prices go up, it can have a significant impact on truck owners who are already running on profit margins of 2 to 4 percent."

## A NEAR DOUBLING

Pupo, the Miami-Dade independent truckers' spokesman, said that until recently he spent $80 to $90 a week on fuel but that now he spends as much as $150.

The hike, Pupo said, has eroded the truckers' weekly take-home pay along with taxes, fees and local insurance requirements.

"On the average," he said, "we make about $600 a week, but of that we have to pay about $140 on fuel, $150 on insurance, $80 on taxes and fees, and $60 on maintenance. That leaves us about $170 per week."

One solution, Pupo said, would be for shipping companies to do away with local insurance requirements and increase rates. For example, he said, the local load delivery rate could be increased from $37 to $60 per trip.

But Costello, the American Trucking Associations economist, said another solution would be for President Clinton to order the release into the market of oil stored in the Strategic Petroleum Reserve to increase oil supply.

# Strike's ripple effect

## Trucker protest harming firms

BY GREGG FIELDS
gfields@herald.com

Fernando Rodriguez-Vila, a vice president at Miami's Iberia Tiles, has a problem.

He has customers who want his company's products, but the goods are sitting in containers at the Port of Miami. In the wake of a local strike by independent truckers, he can't get them delivered.

"We do have at the moment about 30 containers at the port, and four or five are very urgently needed," he said. "Because we can't deliver materials, we have to delay closings and may have to lose those sales. It's a messy situation, to say the least."

Situations like Iberia's are

▶ PLEASE SEE TRUCK, 2C



PEDRO PORTAL/HERALD STAFF

## FLORIDA'S SOARING FUEL PRICES

The average retail price of both diesel and unleaded gasoline has risen markedly in the last year.

$1.546

$1.115

$.977

$1.378

FLORIDA AVERAGE RETAIL PRICES
DOLLARS PER GALLON, INCLUDING TAXES
SOURCE: UCG

Feb. 9 1999  Mar.  Apr.  May  Jun.  Jul.  Aug.  Sept.  Oct.  Nov.  Dec.  Jan. 2000  Feb. 8

MBZ021200          JERE WARREN  HERALD STAFF

## Chilly weather, OPEC blamed for diesel hikes

BY JAMES McNAIR
jmcnair@herald.com

Independent truck drivers angry about the escalating price of diesel fuel can blame two things: an overall rise in oil prices and a three-week blast of cold weather in January.

Throughout the United States, independent truck drivers are idling their rigs, picketing and petitioning government over diesel prices that have skyrocketed from less than $1 a gallon a year ago to as much as $2.70 a gallon in parts of New York and New England.

The high prices are threatening to put some haulers out of business, and trucking stoppages have suspended many local shipments.

How did diesel prices swing that far in one year?

In January, the wave of freezing temperatures that swept the Northeast triggered a surge in heating oil consumption. Because diesel fuel is a variation of heating oil — minus much of the sulfur content — diesel was redeployed to warm homes and businesses up north. As a result, diesel inventories fell and prices rose.

But diesel prices were already on the rise, all because oil prices had fallen to historically low levels more than a year ago. Tighten-

▶ PLEASE SEE DIESEL, 2C

# Star sha on s

AOL, as like

From Herald ...

NEW Y dia Netwo biggest: In percent Fri speculatio online com offerings i

StarMe rose $5.25 million sh month da which rose day, have s two weeks

"The c acquisition looking to content," s Graves, the end ga

Investo dia after B the Web America citing th three per lish a do to take growth in the maga

StarMe In rece and StarN steps to p net marke



**A SMALL BOMB** exploded in the heart of Wall Street before daybreak Friday, shattering windows and slightly injuring one person, **3C**.

**SCOTT ADAMS**, an internet entrepreneur who sold his Web hosting company, plans to share the business lessons he learned – for a price, **3C**.



**TELEMUNDO**, the nation's seco Spanish-language network, has ad best be described as getting back work? See Sunday's Business sec

**FIELD**   dsatterfield@herald.com   **305-376-4525**   or   **954-764-7026**   ATTACHMENT / EXHIBIT

PEDRO PORTAL / HERALD STAFF

**GAME PLAN:** Orestes Guas, president of the Support Trucking Group, discusses strategies with other truckers near the Port of Miami entrance.

# Containers pile up at the port

► TRUCK, FROM 1C

beginning to multiply in South Florida, economic leaders say, as the wildcat strike that began Monday continues to ripple, and threatens to cripple the international trade that is the lifeblood of the local economy.

The protest by the independent truckers isn't unique to South Florida. Truckers in other areas, including New Jersey, also have begun to protest soaring diesel fuel prices that have put them in an economic squeeze.

Talks between local independent truckers and the shipping companies that employ them have stalled. A summit proposed for tonight was canceled late Friday.

As the stalemate continues — over issues that range from allowing truckers to add a surcharge for soaring diesel fuel prices to help with heavy insurance burdens — the ranks of the unemployed are swelling in trade-related industries.

Bob Raitt, general manager at the Port of Miami Terminal Operating Co., one of the largest cargo handlers at the seaport, said he will have a minimum of staff on hand Monday. Typically on a Monday, he might ask the union hall to send over 75 workers, who

earn roughly $24 per hour.

"Last Monday, when they kind of caught us by surprise, we lost $42,000 from having labor and nothing to generate revenue," he said.

Meanwhile, the Port of Miami is bulging with containers with nowhere to go. Raitt's company alone has 4,500 waiting to be moved.

Perhaps more ominously, shippers are taking their business elsewhere. "I've already heard reports of five ships skipping Miami" and heading to other ports, he said.

"We've had minimal activity at the port all week," said John Nee, general manager for commercial operations at Maersk, one of the largest shipping companies in Miami. Clients, he added, are increasingly annoyed. "Basically, each of them wants their cargo."

Truckers say their problems date back to the 1980s, when transportation industries were deregulated. Many companies collapsed in the new era. That led to the rise of the independent trucker — essentially a driver who negotiates his own contracts with companies for hauling goods.

Today, there are 400,000 trucking companies in the United States, and 280,000 of them have six or fewer

employees.

As the competition has mushroomed, prices have dropped. Oscar Pupo, a spokesman for the local independent truckers, said a driver might bring in $600 in weekly revenue, but almost half of that goes toward insurance and fuel.

"We can't continue," he said.

At a meeting with Miami-Dade Mayor Alex Penelas Friday, shippers agreed that there's a need to pay drivers some type of fuel surcharge, Penelas said. Airlines recently began levying a similar charge on passengers.

"I'm starting to see some parameters of what may be a settlement," Penelas said. Penelas has hopes that if the fuel surcharge dispute can be settled, truckers might return to work while the other issues are ironed out.

"At least the dialogue continues," he said.

Pupo adds that he and other truckers believe the long-term viability of the trucking business is at stake — a sobering prospect considering the role it plays in the local economy.

"It's the end of the story," he said. "If I can't get a fair contract, I'm going to sell my truck."

## HIGHS &

NEW HIGHS
Amdocs
API Sat
Aerolite
Amdocs
Amdocsll
ActHener
Amoena
Austria
Boxxal wt
Caw Com
CmbWm
Cablm
Carmxln
Checkpoint
Checkpt
Chnail
Chnail
ConstmI
ConstmI
CorPtgt
CrosGm
CrosGm
CypSem
CypSem
DaISem
EMm
EMm
Epicom
Equ mt
France
FireAgr
GmCm
Gmm
Gmbia
Engrgh
Gcilema

## DIVIDENDS

Mangagang Dignal

Raptam Sy

Surrey Bk & Trust

Tenycon Comm Sys

Tollgate Com Sys

Badger Meter

Chester Buncap

Riley Phy Sp

## STOCK NEWS

Haverty 1 Ind
Hercules 1 f
IBH Inc 4
IVAX Corp
WILE

Times Mirror A .22 from .20
Transcontinental Rlty 18 from 18
Urban Shopping .59 from .56
Vulcan MArtials .21 from .198
VICE I

## STOCK SPLITS

**Declared Stock Splits**
Allegiance Telecom 3 for 2
BroadVision Inc 3 for 1
Cisco Systems 2 for 1
Cox Radio Inc A 3 for 1
Group 1 Software 3 for 2

Anchor BnCp Wisc .07 from .065
Badger Meter .205 from .18
Banco Latinoamer 1.25 from .96A
Black Hills Corp .11 from .10

# Dump-truck drivers halt key deliveries

By MIMI WHITEFIELD
mwhitefield@herald.com

While cargo is moving briskly out of the Port of Miami-Dade, hundreds of independent dump-truck drivers in west Miami-Dade County are refusing to haul gravel, sand, rock and dirt — protesting the same issues that angered port drivers.

The dump-truck drivers' strike, which began Feb. 1, is delaying road, construction and landscaping projects across South Florida — especially those dependent on large volumes of fill.

"When a company starts a project, we're the first ones to go there with gravel, sand and rock," said Sergio Concepcion, a striking driver who lives in Southwest Dade.

On Wednesday, drivers parked their trucks along the shoulder of Okeechobee Road from Northwest 116th Way almost to the entrance of

▶ PLEASE SEE TRUCKERS, 12A

Feb. 24, 2000
Miami Herald

**ATTACHMENT / EXHIBIT ___9___**



ATTACHMENT / EXHIBIT 

# The Herald

www.herald.com

| | | |
|---|---|---|
| **S&P 500** STOCK INDEX | 1,353.43 | −7.26 |
| ▼ **DOWN** 10,092.63 −183.10 | **NASDAQ** STOCK INDEX | 4,617.65 +67.32 |
| | **BONDS** U.S. 30-YEAR | 6.13% +.01% |
| **DOW** 30 INDUSTRIALS | **HERALD** BLOOMBERG | 158.88 −1.25 |

# Drivers idle loud

# BUSI

## Gravel, dirt haulers hit streets as organizer hopes for Monday return

**BY MIMI WHITEFIELD**
mwhitefield@herald.com

Dozens of dump trucks, their horns blaring, lumbered down Biscayne Boulevard and into downtown Miami Thursday in a show of support for a wildcat strike by independent truckers that is now in its 25th day.

Afterward, dump truckers drove slowly down Interstate 95 and the Palmetto Expressway before making a

circuit through Hialeah and heading to Okeechobee Road where hundreds of independent drivers have parked their trucks along the shoulder of the road since their strike began Feb. 1.

Although the slow-moving trucks tied up traffic at a number of intersections during their three-hour trek, ''we tried to keep as organized as we could,'' said Oscar de Leon, vice president of the Support Dump Trucking Group.

Unlike the independ the Port of Miami, who to work pending resolu their grievances, mos than 1,100 striking dum have remained adam won't work until t increases from the tr who match drivers wit

But de Leon said t drivers, who haul gra dirt and fill were hope reach agreement soo who are holding out o increases. ''We're tryi broker to agree by Mo

▶ PLEAS

# Penelas offers to help mediate truck dispute

▶ **TRUCKERS,** FROM 1C

Meanwhile, de Leon said.

"We need to keep working with brokers to get better rate increases." Some brokers have only made verbal, rather than written commitments to raise rates.

Drivers — faced with rising diesel fuel, costs, high insurance premiums, and hefty maintenance costs — say they need a rate increase in the 30 to 35 percent range.

"They're very frustrated and are looking for someone to help them out," said Eric Padron, who works in Miami-Dade Mayor Alex Penelas' office.

Several drivers met with Penelas late Thursday afternoon, but "he explained the county doesn't have the legal authority to regulate dump trucks like it does taxis and tow trucks," Padron said.

Penelas told them, however, he would be willing to play a nudge them [the trucking firms] inch by inch," said Hosey Hernandez, an attorney for the Support Trucking Group and the Support Dump Trucking Group, loose-knit organizations that have come together over the issues that prompted the strike.

Hernandez said he expected mediating role and try to bring the truckers and trucking company brokers together.

The dump truck drivers believe their strike has been ignored, said Padron, while all the attention has focused on the independent truckers who haul containers to and from the Port of Miami.

"Those truckers began returning to work last week-end after they decided to negotiate for rate increases and a fuel surcharge with individual trucking firms.

The state insurance commissioner's office also agreed to look into another pivotal issue for drivers: their complaint that they must buy insurance at high markups from trucking brokers if they want to work.

"We told them to start working while we work on these issues. Hopefully, we can deliveries today," said Russell Sepielli, project manager for All Rite Paving Contractors, a Hollywood company that has experienced delays in some of its projects because of the strike.

In recent weeks, he said, the company has had difficulties getting lime rock, which forms a base for asphalt used to pave parking lots and roads.

"We've had a minimum of two-week delays in deliveries of lime rock," said Sepielli, whose company contacts brokers when it needs dump trucks and drivers.

The trucking firms say they need to sell insurance in-house to standardize policies and guarantee payment of premiums, but drivers complain many firms are making big profits on the in-house sales.

Although the independent dump truck drivers have insisted on solidarity — saying they won't go back to work until rate increases have been won by all their colleagues, some dump trucks were mak-ing deliveries Thursday.

"We started to take some

After the strike ends, he said, it will probably take about two weeks for deliveries to get back to normal. "The entire industry is needing the same things at the same time," he said.

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 12

ATTACHMENT / EXHIBIT 11

AUSTIN TUPLER TRUCKING, INC. AND
COLD COAST, INC. 1/

                    Employer

          and                                    Case 12-RC-6042

LOCAL 2027, INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL-CIO

                    Petitioner

          REGIONAL DIRECTOR'S DECISION AND ORDER

          Upon a petition duly filed under Section 9(c) of the National Labor

Relations Act, as amended, a hearing was held before a hearing officer of the

National Labor Relations Board.

          Pursuant to the provisions of Section 3(b) of the Act, the Board has

delegated its authority in this proceeding to the undersigned.

          Upon the entire record in this proceeding, the undersigned finds: 2/

          1.  The hearing officer's rulings made at the hearing are free from

prejudicial error and are hereby affirmed.

          2.  The Employer is engaged in commerce within the meaning of the Act

and it will effectuate the purposes of the Act to assert jurisdiction herein. 3/

          3.  The labor organizations involved claim to represent certain employees

of the Employer. 4/

          4.  No question affecting commerce exists concerning the representation

of certain employees of the Employer within the meaning of Section 9(c)(1) and

Section 2(6) and (7) of the Act, for the following reasons:

---

1/  The name of Gold Coast, Inc. appears as amended at the hearing.
2/  The Petitioner has filed a Request for Personal Appearance at the Regional
    Office for the purpose of making oral argument in this matter. This request
    is hereby denied as the record and briefs adequately present the issues and
    the positions of the parties.
3/  Both Austin Tupler Trucking, Inc. and Cold Coast, Inc. are Florida corporations
    engaged in the trucking industry in the State of Florida. During the past 12
    months, each corporation has provided services valued in excess of $50,000 for
    other enterprises within the State of Florida which meet a direct jurisdictional
    standard of the Board.
4/  The Petitioner is an organization chartered by International Longshoremen's
    Association, and one of its purposes is to represent employees with regard to
    their wages, hours, and general working conditions with their employers.
    Employees attend Petitioner's meetings and elect Petitioner's officers. I find
    that Petitioner is a labor organization within the meaning of the Act.
    Teamsters, Local Union No. 769, affiliated with International Brotherhood of
    Teamsters, Chauffeurs, Warehousemen and Helpers of America (herein referred to
    as Teamsters) was permitted to intervene in this matter on the basis of their
    collective bargaining contract with Gold Coast, Inc.

Exhibit 5

The Petitioner seeks a bargaining unit of drivers, including owner-operators, employed by Austin Tupler Trucking, Inc. (herein referred to as Austin) and Cold Coast, Inc. (herein referred to as Gold). Both Austin and Gold contend that the owner-operators are independent contractors. Gold and Teamsters contend that their contract is a bar to any election held among Gold's truck drivers. Austin and Gold are separate corporations engaged in the same business of delivering materials to construction sites and have the same ownership, the same office staff, including dispatchers, and make all of their deliveries with trucks under lease to one or the other company. The owner-operators for both companies sign the same lease agreement form and may work on the same job, reporting to the same dispatchers. Upon consideration of the above facts and entire record, I find that Austin and Gold constitute a single Employer within the meaning of the Act.

The basic difference between the two companies is that Gold delivers where the contractor asks for union operators on union jobs. For about eight years Gold has had collective bargaining agreements with the Teamsters. While the job title of owner-operator is not mentioned in previous contracts, the Employer's president testified that they have been part of the bargaining unit since the first recognition of Teamsters. It is noted that for about the past five years, the owner-operators have been the only individuals operating trucks for Gold. The current agreement between Gold and Teamsters was entered into on November 12, 1980, and runs for a one-year period. This current contract clearly establishes wages, hours, and other conditions of employment for Gold's owner-operators. It is noted that if a truck leased to Gold is assigned to an Austin job, the owner is paid by Gold; continues to receive his benefits under the Teamster contract, and Austin pays Gold for the use of that truck and driver. In view of the foregoing, I find that the terms of the current collective bargaining agreement provide that Gold has the authority to direct the work of the owner-operators to the extent that they are employees rather than independent contractors, and that these drivers are covered by the terms of that collective bargaining agreement.

The Petitioner also contends that the agreement between Gold and the Teamsters cannot be a bar to this petition because it was signed at a time when Gold had not hired a sufficient number of employees in the bargaining unit, as the unit was expanding. It is further noted that the only job classification involved in this matter is that of owner-operator and at all times material herein, Gold had owner-operators. With regard to whether there were 30 percent of the

employees hired in that classification, it is impossible to determine that from
the current record, although it is clear that the numbers increased.  It appears
that on the date the contract was signed, November 12, 1980, there were about 25
owner-operators under lease to Gold, but there is no evidence concerning the number
of owner-operators employed by Gold at the close of hearing, the time to use for a
comparison.  Permanneer California Corp., 175 NLRB 348.  It is noted that Teamsters
has been recognized as the representative of these owner-operators for a number
of years, and Gold is hauling materials for construction contractors, an industry
which has a fluctuation for need of materials on the job.

Although I find that while Austin and Gold are a single Employer, I
conclude that the owner-operators for each company may be represented in separate
bargaining units.  I rely particularly on the fact that the owner-operators driving
for Gold have been represented by the Teamsters.  Further, I find that the contract
with the Teamsters is a bar to an election among the Gold drivers, who are owner-
operators or who are selected and paid by the owner.

Austin obtains agreements to deliver supplies by receiving calls from
construction firms or by soliciting business from construction firms.  The contracto
gives Austin the location of the supplier and the time it opens, the location of
the construction site, and the time it will be ready to receive supplies and the
approximate amount of supplies and the estimate of the number of trucks it wishes
to be assigned to move the materials.  This job is then listed for dispatch, and
with all jobs for the next day, including the jobs continuing from previous days,
the owner-operators are placed on the dispatch board.  Owner-operators already
hauling on a job will generally be placed to continue on that job; with respect to
new jobs, the owner-operators whose jobs have ended or have been off the dispatch
list will be placed on the dispatch list for the next day.  All drivers are supposed
to call the dispatch office during a certain period to be given the jobs that they
are assigned for the next day.  The drivers may refuse the jobs offered, and either
not work for Austin the next day or ask for another job.  They are told if they want
another job to call back at a later hour to see whether other jobs are available.
There is no rule that a driver must call in for dispatch, or must accept a dispatch
for the next day.  If a driver does not call for dispatch for a significant period,
he is treated as not interested in driving for Austin, and taken off the regular
dispatch list until he calls and specifically requests to be back on the dispatch
list.

When a driver accepts a dispatch he is told the time that the supplier will be open for loading and the time that the customer will be open for receiving. It is clear from the record that the driver does not have to begin his work at that time, but can decide when he wishes to begin work that day, and will not be punished for arriving after the job has begun. The driver will continue to work on that job for the day unless for some reason the job foreman tells him to leave or the job ends. The driver may himself decide to leave the job early and has a right to do so without seeking approval from anyone. It therefore is clear, that the driver can set his own hours of work each day, but cannot begin before the supplier opens and cannot work after the job closes. The Austin owner-operators cannot at the same time lease their trucks and work for other trucking companies, but they do have a right under their leases to do work for themselves, and apparently can do work for other trucking companies that do not need leased vehicles in order to operate. Several owner-operators testified that they have done so in the past, and have never been given any reprimand or punishment from Austin. Several drivers testified that they did not have this right, but could only drive for Austin while under lease. However, they testified that they had never been specifically told that, but assumed that they could not do so.

Austin operates as a trucking company with certification from the Florida Public Service Commission. Under this certification, Austin is held liable for violations of Florida laws made by the drivers hauling under its certificate. Generally, when Austin is charged for violations of a law by one of its owner-operators, Austin will pay that charge and then subtract that from the revenue it owes the owner-operator. The Florida Public Service Commission had rules requiring that a company with the Commission's certification must keep complete records concerning the trucks and drivers operating under its certificate. However, those regulations were eliminated by the Public Service Commission, and Austin no longer keeps or is required to keep records concerning safety inspections, driver qualifications, or other specific records concerning the operations of the leased vehicle when operating for another trucking company.

When it signs a lease agreement for a truck to operate under its dispatch, Austin does not test the driver and does not test or inspect the vehicle for safety, but holds the truck owner responsible to meet the laws concerning those matters. Most of the trucks leased by Austin are driven by its owner, but some owners provide someone else to drive their truck, and some lease more than one truck to Austin, and provide other drivers for those trucks. The owner of the truck has a right under his

lease to use another driver for his vehicle, and in such situations must supply Austin written evidence that the other driver is covered by a Workmen's Compensation Plan.

Austin does not carry Workmen's Compensation for any drivers of the trucks under lease to it. Austin pays the truck owners 90 percent of the revenue from the loads they have delivered. Austin does not deduct taxes or social security from the owners' checks.

The truck owners may purchase insurance for their trucks through Austin, or may purchase it individually from wherever they wish, so long as Austin is listed as covered by that policy. A large majority of the owners have purchased their insurance from other sources.

The truck owners are responsible for the maintenance of their trucks and may choose any place to have such maintenance performed. Austin apparently does not inspect these trucks nor require that the owner submit records showing such maintenance.

Austin has an area of gas pumps where its owner-operators can purchase fuel for their trucks. They are not required to purchase gas, or any other item from Austin. The owner-operator is not required to park his truck on Austin's or selected property, but decides independently where to park it.

With regard to the supervision of the owner-operators or their drivers, it has already been noted that they call the office each evening to get their dispatch for the next day, if one is available, and they can refuse that dispatch without penalty. On the jobs that they accept, the dispatcher gives them the various times the job starts but ordinarily will not give them any instructions as to which roads to take between the supplier and the customer. The driver is normally free to select the route to make the delivery. In some cases, where there are specific instructions or specific problems, Austin may require the drivers to follow a certain route, but this is unusual. The driver may not be familiar with the territory and ask for instructions on the best route between the supplier and customer, or may ask which route Austin has used to figure the mileage for the job in order to determine what he can expect to earn on each trip. When the driver arrives with his first load to the construction job he is instructed where to dump the load and generally given instructions on the job site by the customer's foreman. Several drivers testified that Henry Lorenzo, an Austin employee, often comes on the job or meets them on the road and gives them work instructions. These instructions would include changing jobs, and generally changing what they are doing. Lorenzo apparently has given them instructions as to whether or not they could operate overweight

without fear of having to pay the fine. Austin managers testified that Lorenzo is basically a sales employee who goes to various contractors to seek work. However, as he is on the road and speaks Spanish, if a customer calls the office with a complaint about the drivers and cannot communicate with them because they speak only Spanish, management will have Lorenzo go to the job site to explain to the drivers what the customer wants them to be doing. With regard to Lorenzo telling drivers to take overweight loads, management testified that they check with the customer and if it agrees to pay any fine, Lorenzo will tell the drivers that any fine will be paid for them. Austin's owner and general manager testified that at one time, when Austin had its own trucks and hired drivers to operate them, Lorenzo had supervisory authority but he does not have such authority over the drivers of leased trucks, the only trucks currently operated by Austin under its certificate.

The lease agreements provide that either the owner of the vehicle or Austin may terminate the lease upon 24-hour notice, and the agreement contains no requirement that it be for any specific reason. Several former owner-operators testified that they have had their lease terminated by Austin without an opportunity to challenge or bargain concerning such termination. Austin officials testified that if a vehicle under lease does not call in for a dispatch for a successive number of weeks, they will treat the vehicle as no longer seeking work through Austin and will take the vehicle from the dispatching list. They will then send the vehicle's owner a standard letter notifying him of the cancellation and advising him to remove Austin signs from his vehicle, and advising that he may call Austin if he wishes to resume operating under lease with Austin. Several examples were given where owners who lease were so terminated and upon receipt of a later call from that owner, Austin entered into a new lease to resume their relationship. However, there was testimony that others had their lease cancelled for other reasons and were told by Austin that they could no longer drive for them.

At the hearing, copies of various contracts between owner-operators and Austin were placed into evidence. The current lease agreement used by Austin in relevant part provides:

> NOW THEREFORE, THE FOLLOWING CONTRACT IS ENTERED INTO:
>
> I
>
> Independent Contractor 5/ hereby agrees to furnish to Carrier, 6/ subject to the terms and conditions set forth in this Contract the motor vehicle equipment described above, to be used for the hauling of road building and construction aggregates.

---

5/ Independent Contractor refers to the truck owner.
6/ Carrier refers to Austin.



## II

The equipment to be furnished by.Independent Contractor
as set forth above shall conform to the following require-
ments: It shall meet the safety requirements of the
Carrier and all other requirements of whatsoever nature
imposed by any other municipal state or governmental
agency and compliance therewith shall be the obligation
of and at the expense of the Independent Contractor.

## III

INDEPENDNET CONTRACTOR Shall provide and pay for all
equipment and maintain same at his expense, including
but not limited to all repairs for said equipment,
gasoline and all expense, parking charges and/or fees.
In addition thereto, Independent Contractor shall provide
and pay for all license fees, In addition thereto,
Independent Contractor shall provide and pay for license
fees, equipment use fees or taxes, driver license fees,
union fees or dues,.fees addedded by municipal corporation
and any other state or governmental agencies necessary
for the proper and lawful operation of the equipment on
the highways of the State, Independent Contractor shall
also be responsible for all weightfines.

## IV

Carrier understands and agrees that the Independent
Contractor will choose which days of the week he wishes
to work and which days of the week he wishes not to work.
It is also agreed and understood by the Carrier that at
times the Independent Contractor may have some of his
own work to perform.

## V

Independent Contractor represents to the Carrier that he
is the owner and the operator of the above described
equipment and that he does, in fact intend to drive this
equipment himself. However, should he decide at any time
to put a driver on the equipment herein mentioned, he will
cover this driver with Workmen's Compensation should he
fail to cover the driver with Workmen's Compensation, the
Carrier will cover the driver with Workmen's Compensation
and will make a deduction from the gross monies due the
Independent Contractor for not supplying a Certificate of
Workmen's Compensation.

## VI

Independent Contractor further agrees to indemnify and
save harmless Carrier from all loss, damage injury or
expense, including attorney's fees arising out of the
failure of the Independent Contractor to comply with
the provisions of the Contract, and to indemnify and
save harmless Carrier from any and all claims, losses
fines and/or expenses arising out of the operation of
any of the said equipment. Independent Contractor shall
be solely responsible for and shall pay for all damages
by reason of shortages, or any claims of those parties
contracting with the Carrier, involving the use of the
Independent Contractor's equipment where a dispute arises
as the amount of hauling conducted by the Independent
Contractor and in the event shortage or loss shall be
charged against the Carrier by the contracting third
party, the carrier may deduct such a loss or claim
shortage from monies due Independent Contractor.

## VII

CARRIER shall compensate Independent Contractor for the
use of the aforesaid equipment and his services as driver
on the following basis: on each individual job at the
agreed price.

### VIII

This Contract shall become effective on the date executed and shall continue until Feb. 1, 1982. THIS Contract shall not be considered renewed for an additional term of one year, operation of law or otherwise, in the event the parties continue to deal with each other after the expiration of the one year period.

### IX

It is understood by both parties to this Contract, That either the Independent Contractor or Carrier may terminate this Contract with 24 hours notice. Upon such termination of Contract Independent Contractor will remove and destroy all signs affixed to vehicle or otherwise, indicating Carrier's name, number an other identification connected with Carrier.

While many of the drivers have not signed the new lease form, and are operating under the old lease form, it is clear that the operations under both are the same and they show the commitments made by both parties to the leases.

After consideration of the above facts, the entire record, and the briefs submitted by the parties, I find that the drivers driving trucks leased to Austin are either independent contractors or employeees of the lessor and are not employees of Austin. Kentucky Prince Coal Corp., 253 NLRB No. 70; Fleet Transport Company, Inc. 196 NLRB 436. I note that in a previous matter, Case 12-RC-5914, I found that Austin owner-operators were independent contractors, and Austin's president testified at the hearing that its operations have not changed since the issuance of that Decision. Accordingly,

IT IS HEREBY ORDERED that the petition filed herein be, and it hereby is, dismissed. 1/

DATED AT Tampa, Florida, this 29th day of May 1981.

(SEAL)

_Harold A. Boire_

Harold A. Boire, Regional Director
National Labor Relations Board, Region 12
706 Federal Building, 500 Zack Street
Post Office Box 3322, Tampa, Florida 33601

---

1/  Under the provisions of Section 102.67 of the Board's Rules and Regulations, a request for review of this Decision may be filed with the National Labor Relations Board, addressed to the Executive Secretary, 1717 Pennsylvania Avenue, N.W., Washington, D.C. 20570. This request must be received by the Board in Washington by June 11, 1981.

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 12

AUSTIN TUPLER TRUCKING, INC. 1/

Employer

and                                                           Case 12-RC-5924

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 675

Petitioner

### REGIONAL DIRECTOR'S DECISION AND ORDER

Upon a petition duly filed under Section 9(c) of the National Labor

Relations Act, as amended, a hearing was held before a hearing officer of the

National Labor Relations Board.

Pursuant to the provisions of Section 3(b) of the Act, the Board has

delegated its authority in this proceeding to the undersigned.

Upon the entire record in this proceeding, the undersigned finds: 2/

1. The hearing officer's rulings made at the hearing are free from

prejudicial error and are hereby affirmed.

---

1/ The name of the Employer appears as amended at the hearing.
2/ On September 16, 1980, the Acting Regional Director for Region 12 issued
a Notice of Representation Hearing setting this case for hearing on
September 25, 1980. Copies of the Notice of Representation Hearing were
served on both the Employer and its counsel. On the afternoon of September
24, 1980, counsel for the Employer filed a motion to postpone the hearing,
which motion was denied by the Acting Regional Director. The hearing pro-
ceeded as scheduled on September 25, 1980. Ms. Helen Salinder, an employee
of Employer's counsel appeared at the hearing, but did not enter an appear-
ance on behalf of the Employer. Ms. Salinder testified that she had been
instructed by her employer to come to the hearing only to deliver certain
documents; that the Employer was unavailable; and that the Employer's
counsel was out of the city. No other representative of the Employer
appeared at the hearing. In view of the above, I find the record adequate
for determining the issues herein, notwithstanding the fact that the
Employer's counsel or other authorized representative did not attend the
hearing. Tropicana Products, Inc., 122 NLRB 121. Since the close of the
hearing, the Employer has not communicated with the undersigned in any
manner, has not filed a post-hearing brief, and has not filed any motion
to re-open the record herein.

Exhibit



2. The Employer is engaged in commerce within the meaning of the Act. 3/

3. The labor organization involved claims to represent certain employees of the Employer. 4/

4. No question affecting commerce exists concerning the representation of certain employees of the Employer within the meaning of Section 9(c)(1) and Section 2(6) and (7) of the Act for the following reasons:

The Petitioner seeks to represent a bargaining unit consisting of the Employer's truck drivers whom the Petitioner contends are employees rather than independent contractors. The record establishes that the Employer apparently owns no trucks, and apparently has, or has had lease agreements with about 180 truck owners who drive their trucks (herein referred to as drivers). The Employer holds a Florida state certification as a motor carrier; the leased trucks must have the name and certification number of the Employer on their sides, and the drivers must carry a vehicle identification card issued by the Florida Public Service Commission to the Employer.

While under lease to the Employer, drivers can haul only for the Employer. The Employer has a dispatcher at its office, and drivers are expected to call for dispatch each evening, but may notify the dispatcher that they do not want a load. When drivers call in to the dispatcher, the dispatcher gives the driver the location of the supplier, the site of the delivery, and the time for delivery. When the driver makes the first delivery, he or she is generally then

---

3/ The Employer, Austin Tupler Trucking, Inc., is a motor carrier operating under certification from the Florida Public Service Commission. The Employer has approximately 180 trucks under lease agreements, and dispatches leased trucks daily to pick up and deliver materials.

Two lessors who drive their trucks under leases with the Employer testified that they generally are dispatched to haul fill materials, rocks, and other related materials from suppliers to various construction sites, including road building sites. Both drivers testified that they have delivered materials to construction projects at the Miami International Airport. One driver testified that he has been dispatched to deliver materials to the construction site of a parking lot at a Veteran's Administration hospital and to the construction site of a United States Post Office. The same driver also testified that he has observed trucks leased to the Employer hauling contraband siezed by the United States Customs Service, from Miami to an incinerator. Both drivers testified that the Employer has a fuel pump at its premises from which lessors may purchase fuel to operate their trucks. Inasmuch as the undersigned takes notice of the fact that no motor vehicle fuel is manufactured or refined within the State of Florida, the fuel which is purchased by the Employer for resale to the lessors must have originated outside the State of Florida.

In view of the foregoing and the record as a whole, I find that the Employer meets the Board's statutory jurisdiction. Inasmuch as the Employer failed to provide relevant information regarding the Board's discretionary jurisdictional standards, I find that the Employer is engaged in commerce within the meaning of the Act, and that it will effectuate the policies of the Act to assert jurisdiction over the Employer in this proceeding. Tropicana Products, Inc., supra.

4/ The Board has found that the Petitioner is a labor organization within the meaning of Section 2(5) of the Act. Tracor Marine, Inc., 229 NLRB 1016.

dispatched by the jobsite foreman to pick up further loads. If there are too many trucks delivering to a jobsite, the jobsite foreman or a supervisor of the Employer may release the truck from that site.

Drivers fill out forms for each delivery, which are supplied by the Employer and show the name of the customer, the weight of the delivery and other information necessary to compute the delivery charge. At the end of each day, the drivers mail the completed forms to the Employer's office. Utilizing the information on the completed forms, the Employer bills the customer and pays the driver 90 percent of the revenue, deducting 10 percent as its commission.

The Employer has a fuel pump and a group insurance policy for trucks under lease. If a driver gets fuel from the Employer's pump and/or insures his or her truck under the Employer's policy, fuel and insurance charges are deducted from the driver's check. Each driver decides where to purchase fuel and insurance, and drivers are not required to make any purchases from the Employer.

As charges to its customers are on the basis of the weight of the load and the mileage of the trip, the Employer has a set mileage charge between various locations. Drivers are paid on the basis of that set charge, but are free to take any route between the supplier and the jobsite; drivers sometimes take a longer but faster route in order to make more trips during the day.

Drivers park their trucks where they choose, decide where and when to have their trucks serviced, and are not required to submit any reports to the Employer concerning truck maintenance. Drivers wear whatever clothes they choose when working, are not required to attend safety or other types of meetings held by the Employer, and pay their own income and social security taxes.

At the hearing, copies of contracts between drivers and the Employer were received into evidence, and a driver testified that he and all other drivers signed a contract with the Employer which was similar to the contracts received into evidence. In pertinent part, these contracts provide as follows:

I

> THE INDEPENDENT CONTRACTOR [5] agrees to furnish to the CARRIER, [6] subject to the terms and conditions of this contract, the motor vehicle described above [7] to be used for the hauling of road building and construction aggregates.

---

[5] The driver is referred to in the contracts as THE INDEPENDENT CONTRACTOR.
[6] The Employer is referred to in the contracts as the CARRIER.
[7] Each contract recites the Unit Number, Year, Make, Type and Serial Number of the driver's truck.

## II

The equipment to be furnished by the INDEPENDENT CONTRACTOR...shall...meet safety requirements of the Florida Public Service Commission, Municipal, State or other Governmental Agency, and compliance shall be...the obligation of and at the expense of the INDEPENDENT CONTRACTOR.

## III

THE INDEPENDENT CONTRACTOR shall provide and pay all equipment and maintain same at his expense, including but not limited [sic] to all repairs, gasoline, oil and parking. THE INDEPENDENT CONTRACTOR shall provide and pay for all license fees...fees assessed by Municipalities or State or other Governmental Agencies necessary for the proper and lawful operation of the equipment of [sic] the highways of the State.

## IV

CARRIER understand [sic] and agrees that the INDEPENDENT CONTRACTOR will choose which day of the week he wishes to work and which day he wishes not to work. THE INDEPENDENT CONTRACTOR understands and agrees to notify CARRIER'S OFFICE if for any reason he can't perform the job he was assigned or if for any reason he has to leave the job.

* * * * * * * *

It is also agreed and understood by the CARRIER that at times the INDEPENDENT CONTRACTOR may have some of his own work to perform.

* * * * * * * *

## V

THE INDEPENDENT CONTRACTOR represents to the CARRIER that he is the owner and operator of the above described equipment and that he does, in fact intend to drive the equipment himself. However, should he decide at any time to put a driver on the equipment herein described, he will provide this driver with Workman's Compensation and shall furnish CARRIER with the certificate of WORKMAN'S COMPENSATION.

## VI

THE CARRIER shall compensate the INDEPENDENT CONTRACTOR for all work bid hereafter for the use of the aforementioned motor vehicle and any other equipment, and for his services at the agreed upon price for each individual job.

* * * * * * * *

Any disputes as to price must be complained of within five (5) working days after payment.

* * * * * * * *

If said dispute remains unsettled after 30 days the matter may be litigated with attorney's fees and costs to be awarded to the successful party and paid by the unsuccessful party.

* * * * * * * *

- 4 -

VIII

Should the INDEPENDENT CONTRACTOR violate any of the
rules or regulations of the Florida Public Service
Commission, the CARRIER may cancel this Contract.
It is further understood by both parties to this Con-
tract that either party may cancel this Contract with
24 Hours notice.

\* \* \* \* \* \* \* \*

After full and careful consideration of the brief submitted by the

Petitioner and the cases cited therein and in view of the foregoing and the

record as a whole, and particularly relying on the provisions of the contract

between the Employer and the drivers as set forth hereinabove, [8]/ I find that

drivers petitioned for herein are independent contractors rather than employees.

Fleet Transport Company, Inc., 196 NLRB 436; George Transfer & Rigging Co., Inc.,

208 NLRB 494. Accordingly, I shall dismiss the petition herein.

ORDER

IT IS HEREBY ORDERED that the petition filed herein be, and it hereby

is, dismissed. [9]/

DATED AT Tampa, Florida, this 16th day of October 1980.

(SEAL)

Harold A. Boire, Regional Director
National Labor Relations Board, Region 12
706 Federal Building, 500 Zack Street
Post Office Box 3322, Tampa, Florida  33601

---

[8]/ In its post-hearing brief, the Petitioner correctly points out that the con-
tracts between the Employer and the drivers received into evidence at the
hearing had expired prior to the filing of the petition herein.
The record establishes that the most recent contracts received into evidence
expired on March 31, 1980, and a driver testified that he has not had a con-
tract with the Employer since March 31, 1980, when his most recent contract
expired. As I find, infra, that in particular reliance upon the terms of the
recently expired contracts between the drivers and the Employer, the drivers
are independent contractors rather than employees, it follows, a fortiori, that
since the record fails to establish that the Employer owns and operates any
trucks itself, in the absence of any contractual restraints whatever upon the
driver's operation of his or her truck, the drivers are more clearly independent
contractors free to operate his or her truck in any manner he or she chooses,
subject only to applicable statutes, ordinances and regulations.
[9]/ Under the provisions of Section 102.67 of the Board's Rules and Regulations,
a request for review of this Decision may be filed with the National Labor Rela-
tions Board, addressed to the Executive Secretary, 1717 Pennsylvania Avenue, N.W.,
Washington, D.C. 20570.  This request must be received by the Board in Washington
by October 29, 1980.

- 5 -

FJZ

ATTACHMENT / EXHIBIT _D_

261 NLRB No. 29                                'D--8508
                                              Davie, FL

UNITED STATES OF AMERICA

BEFORE THE NATIONAL LABOR RELATIONS BOARD

AUSTIN TUPLER TRUCKING, INC.,
AND GOLD COAST, INC.[1]

                    Employer

            and                    Case 12--RC--6042

LOCAL 2027, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION,
AFL--CIO

                    Petitioner

DECISION ON REVIEW

On May 29, 1981, the Regional Director for Region 12 of the
National Labor Relations Board issued a Decision and Order in the
above-entitled proceeding in which he found that no question
concerning representation exists with respect to any employee of
the Employer and dismissed the petition filed herein. The
Regional Director found, _inter alia_, that the owner-operator
drivers who lease their equipment to Austin Tupler Trucking,
Inc., are independent contractors and not employees. Thereafter,
in accordance with Section 102.67 of the National Labor Relations
Board Rules and Regulations, Series 8, as amended, the Petitioner

-----------------------------

[1] The Regional Director found, and it is undisputed, that Austin
Tupler Trucking, Inc., and Gold Coast, Inc., constitute a
single employer.

261 NLRB No. 29

D--8508

filed a timely request for review. By telegraphic order dated October 6, 1981, the Board granted the request for review with respect to the issue of whether the owner-operator drivers are independent contractors.[2]

Pursuant to the provisions of Section 3(b) of the National Labor Relations Act, as amended, the National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the entire record in this case with respect to the issue under review and hereby affirms the Regional Director for the following reasons.[3]

The Employer is a transportation contractor, or broker, which solicits business from construction firms. It performs the contracted service of delivering materials to construction sites by using owner-operator drivers who either make the deliveries themselves in their trucks or hire other drivers to do so. An owner-operator who wishes to perform this service must sign a lease agreement with the Employer pursuant to which the owner-operator undertakes to furnish the equipment and the driver (usually himself) to the Employer. He may hire a driver, however, without seeking the Employer's permission, on such terms as he and the driver may agree. The owner-operator is responsible for

---------------------------

[2] The Board denied the Petitioner's request for review in all other respects and does not have before it any issues with respect to representation for drivers of Gold Coast, Inc. Hereinafter, references to the Employer pertain only to Austin Tupler Trucking, Inc.

[3] The Petitioner's request for oral argument is hereby denied as the record, the request for review, and the briefs adequately present the issue and the positions of the parties.

- 2 -

D--8508

fueling and maintaining his truck, paying all fees and taxes necessary for its operation, and indemnifying the Employer from all losses arising therefrom.[4] The agreement provides that the owner-operator may choose which days he wishes to work, that he may perform ''some of his own work'' in addition to the work he performs for the Employer, and that he will be paid an agreed price for each individual job, normally 90 percent of the gross the Employer receives from the customer.[5] The typical agreement runs for a year, but may be terminated by either party on 24 hours' notice.[6]

The Employer does not give its lessee-owner-operators a driving test, but ''assume[s] that a person who owns anywhere from a twenty to a sixty thousand-dollar dump truck is qualified.'' Although the agreement requires the owner-operator to maintain his equipment so as to conform with the safety requirements of the Employer and the requirements of all governmental agencies, the Employer neither imposes any safety requirements nor inspects the trucks. It checks only the registration to ascertain that the truck is the type required for the Employer's jobs.

An owner-operator obtains work from the Employer by calling the Employer's dispatch office and accepting, if he wishes, the

--------------------------

[4] The owner-operator also provides workmen's compensation coverage for any driver he hires to drive a leased vehicle.

[5] The Employer carries no workmen's compensation coverage and deducts no taxes or social security from its remittance to the owner-operators.

[6] The agreements of many of the active owner-operators have expired, but the parties continue to operate under the contract terms.

- 3 -

D--8508

job assigned to him for the day. If he prefers, he may reject the
job offered and call later to see whether a different job is
available. When he accepts a job, he is told the location, the
time the construction site will be open for receiving deliveries,
and directions to the site if he requests them. He is not
required to make such deliveries at any specific time, however.
Although the price he is paid is computed by using mileage
figures based on the Employer's estimate of the shortest route,
the owner-operator is free to select his own route.[7] He does not
report to a terminal, but picks up the materials at the
supplier's premises. Once at the construction site, he is
directed where to unload by the customer's foreman, who also
gives him any special instructions if necessary.

Leased vehicles display bumper stickers or removable signs
bearing the Employer's name. Owner-operators may, but are not
required to, purchase fuel or insurance from the Employer. If
they purchase their own insurance, the Employer must be named as
an additional insured and the policy limits must be at least
$100,000/$300,000/$50,000, presumably greater than mandated by
the State of Florida, where the operation herein takes place.

The Board recently recapitulated the test used to resolve
the issue herein where it stated that ''[t]he Board seeks to
determine if the alleged employing entity . . . reserves the
right to control the manner and means by which the result is
accomplished, or whether it concerns itself with results only,

---

[7] The Employer computes mileage in advance of negotiating a
price with the customer.

- 4 -

D--8508

leaving the manner and means to the driver.'' <u>Mitchell Bros.</u>
<u>Truck Lines</u>, 249 NLRB 476, 480 (1980). The question is one of
degree, and we weigh a number of factors, no one factor being
decisive. <u>Id</u>.

Not only is no one factor decisive, but the same set of
factors that was decisive in one case may be unpersuasive when
balanced against a different set of opposing factors. And though
the same factor may be present in different cases, it may be
entitled to unequal weight in each because the factual background
leads to an analysis that makes that factor more meaningful in
one case than in the other.

There are, in the instant case, as is usual in these cases,
certain factors that may be indicative of employee status as well
as factors indicative of independent contractor status. To decide
on which side of the line these drivers fall requires more than a
quantitative analysis based on adding up the factors on each
side; it requires the difficult task of assessing the relative
significance of each factor, and ultimately each set of factors,
in light of the impact of each factor on the overall relationship
between the drivers and the Employer.

The instant case is similar in some respects to cases such
as <u>Mitchell Bros. Truck Lines</u>, <u>supra</u>, and <u>Rediehs Interstate</u>,
<u>Inc.</u>, 255 NLRB No. 127 (1981), where the Board found owner-
operator drivers to be employees. However, there are differences
that are of decisive significance.

In <u>Mitchell Bros.</u> and <u>Rediehs</u>, the Board relied heavily on
the extensive Federal and state trucking regulations which the

D--8508

employers in those cases were required to enforce, and found that
those regulations largely dictated the nature of the relationship
between the employers and the owner-operators. Thus, those
employers required applicants for owner-operator leases to
undergo ''a rigorous qualification program.'' Rediehs, supra, sl.
op. at p. 3. There application forms called for applicants to set
forth their experience, training, employment history, and traffic
and accident histories. Applicants had to be 21 years old, speak
and understand English, possess a valid driver's license, and
know how to load freight securely. They had to undergo a written
examination, a road test, and a physical examination. These
requirements governed not only the owner-operators, but also any
drivers they wished to hire to drive the leased trucks. Those
employers also enforced rules prohibiting driving while ill,
fatigued, or under the influence of drugs or alcohol or carrying
unauthorized passengers, and prohibiting unauthorized persons
from driving the trucks, and exceeding speed and hour limits.
They also imposed affirmative operating rules such as wearing
corrective lenses or hearing aids, if necessary, and securing
loads properly.[8] In order to enforce many of these rules, those
employers required the owner-operators to submit daily time logs.

------------------------------

[8] In Rediehs, the following additional rules were enforced:
Operating a truck within 4 hours of consuming alcohol;
allowing more than one person in a sleeper berth or
transferring to or from a sleeper berth and the cab while the
truck is in motion; disengaging the vehicle's motive power
except to change gears or to stop; and operating when the
presence of carbon monoxide is known, suspected, or likely to
occur. In addition, drivers were required to inspect the
vehicle and load at regular intervals, place red flags on
''projecting'' loads, use turn signals and lights (continued)

D--8508

Those employers also retained control over the specifications for the leased vehicles and the condition in which the owner-operators kept them.[9] The employers inspected the trucks regularly, and in Rediehs, the owner-operators were required to complete a daily vehicle condition statement as part of their daily logs.

In the instant case, government regulations play almost no role in the relationship between the Employer and the owner-operators. The hauling involved is, with minor exceptions, intrastate, and so involves virtually no Federal regulations. Moreover, intrastate trucking in Florida underwent a substantial deregulation in 1980, largely eliminating the Employer's legal responsibility for supervising the owner-operators in the performance of their contracts. Thus, the owner-operators are not required to submit time logs or any other routine reports to the Employer.[10] Unlike the employers in Mitchell Bros. and Rediehs, the Employer does not inspect the vehicles, does not administer

---

[8] correctly and at designated times, and utilize seat belts if the truck has them.

[9] The specifications set forth in Rediehs related to lamps and reflectors; turn signals; service, parking and emergency brakes; windows; fuel system; coupling devices, tires, sleeper berths, heaters, wipers, defrosters, mirrors, horns, speedometers, exhaust system, floors, seat belts, rear end protection, emergency equipment, and maximum noise levels within the truck cabs.

[10] For purposes of proper billing, the Employer requires the owner-operators promptly to turn in customer tickets or receipts for deliveries. This clerical requirement, however, does not substantially impinge on the manner or means by which the owner-operators make the deliveries.

D--8508

driving tests or physical examinations to the owner-operators,
and there is no evidence that the Employer requires an
application setting forth the owner-operator's employment or
driving history. Instead, the Employer limits its inquiry
regarding their qualifications solely to the fact that each
owns an expensive truck. With regard to the details of operation,
there are no rules, and the only specfication as to the truck is
that it be a tandem dumptruck.

Like the owner-operators in Mitchell Bros. and Rediehs, the
owner-operators here are free to choose, within certain limits,
their own hours of work, and may refuse job assignments.[11] In the
earlier cases, however, this freedom was somewhat illusory, for
those employers had exclusive use of the leased vehicles when
delivering materials, and on return hauls the owner-operators
could ''trip lease'' their trucks to other authorized carriers
only with the employer's permission. Thus, if the owner-operator
refused and employer's offer of work, it meant that his truck was

--------------------------------

[11] While there was evidence that an extended pattern of job
refusals could affect an owner-operator's future work
opportunities with the Employer, the fact that they can refuse
loads is more than a theoretical right, for the Employer's
payroll records show an extremely wide range of gross receipts
by the owner-operators which suggests a wide range in the
amounts of hauling they choose to perform for the Employer.

D--8508

idle. Here, on the other hand, the owner-operators have the
option of working for others during the term of the lease, and
they do not necessarily work primarily for the Employer. Although
we noted in Rediehs that a worker is not required to work only at
one place in order to be an employee under the Act, we were
dealing there with drivers who worked primarily for the employer,
and we relied specifically in Mitchell Bros. on the fact that,
under the exclusive arrangement present there, the employer was
insured that the driver was regularly available during the
workweek. That condition does not obtain here.

In Mitchell Bros. and Rediehs, we found significant the fact
that the employers provided a number of free services to the
owner-operators, such as liability and cargo insurance, regular
cash advances, the privilege of using the employers' credit to
purchase fuel, the processing of permit applications, and the
handling of bookkeeping for the hauls. Here, while the Employer
apparently handles bookkeeping (the details are not set forth in
the record), and the owner-operators may, at their option,
purchase insurance coverage and fuel from the Employer on credit,
the Employer provides none of the other services.

In sum, the relationship between the Employer and these
owner-operators is more closely akin to that of agent-client
rather than employer-employee. The Employer obtains jobs for the
owner-operators and receives a 10-percent commission, the balance
going to the owner-operators. The Employer does not supervise the
work, either directly or indirectly, and owner-operators perform
work obtained by the Employer or by anyone else, setting their

D--8508

own hours, consistent only with the customer's needs, not the Employer's, and operate with a high degree of independence. They do not report to the Employer's facility for their loads, but proceed directly to the source designated by the customer. They can affect their profit and loss by varying the amount and timing of their driving and by the manner in which they maintain their trucks; in the absence of detailed regulations, they can work more hours than is permitted in the regulated sector of the industry; and they exercise entrepreneurial judgment regarding the mechanical specifications of the trucks in which they have a very substantial investment. Thus, they control the manner and means by which the hauls are accomplished, and the Employer is concerned solely with the result. We find, therefore, that the owner-operators are not employees within the meaning of the Act and, accordingly, we affirm the Regional Director's dismissal of the petition filed herein.

      Dated, Washington, D.C.    April 15, 1982

                         -------------------------------
                         John H. Fanning,     Member

                         -------------------------------
                         Howard Jenkins, Jr.,   Member

                         -------------------------------
                         Don A. Zimmerman,    Member

(SEAL)                   NATIONAL LABOR RELATIONS BOARD

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 12

ATTACHMENT / EXHIBIT _____

AUSTIN TUPLER TRUCKING, INC. 1/

Employer

and                                                          Case 12-RC-5924

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 675

Petitioner

REGIONAL DIRECTOR'S DECISION AND ORDER

Upon a petition duly filed under Section 9(c) of the National Labor

Relations Act, as amended, a hearing was held before a hearing officer of the

National Labor Relations Board.

Pursuant to the provisions of Section 3(b) of the Act, the Board has

delegated its authority in this proceeding to the undersigned.

Upon the entire record in this proceeding, the undersigned finds: 2/

1. The hearing officer's rulings made at the hearing are free from

prejudicial error and are hereby affirmed.

---

1/ The name of the Employer appears as amended at the hearing.
2/ On September 16, 1980, the Acting Regional Director for Region 12 issued
a Notice of Representation Hearing setting this case for hearing on
September 25, 1980. Copies of the Notice of Representation Hearing were
served on both the Employer and its counsel. On the afternoon of September
24, 1980, counsel for the Employer filed a motion to postpone the hearing,
which motion was denied by the Acting Regional Director. The hearing pro-
ceeded as scheduled on September 25, 1980. Ms. Helen Salinder, an employee
of Employer's counsel appeared at the hearing, but did not enter an appear-
ance on behalf of the Employer. Ms. Salinder testified that she had been
instructed by her employer to come to the hearing only to deliver certain
documents; that the Employer was unavailable; and that the Employer's
counsel was out of the city. No other representative of the Employer
appeared at the hearing. In view of the above, I find the record adequate
for determining the issues herein, notwithstanding the fact that the
Employer's counsel or other authorized representative did not attend the
hearing. Tropicana Products, Inc., 122 NLRB 121. Since the close of the
hearing, the Employer has not communicated with the undersigned in any
manner, has not filed a post-hearing brief, and has not filed any motion
to re-open the record herein.

Exhibit 6



2. The Employer is engaged in commerce within the meaning of the Act. 3/

3. The labor organization involved claims to represent certain employees of the Employer. 4/

4. No question affecting commerce exists concerning the representation of certain employees of the Employer within the meaning of Section 9(c)(1) and Section 2(6) and (7) of the Act for the following reasons:

The Petitioner seeks to represent a bargaining unit consisting of the Employer's truck drivers whom the Petitioner contends are employees rather than independent contractors. The record establishes that the Employer apparently owns no trucks, and apparently has, or has had lease agreements with about 180 truck owners who drive their trucks (herein referred to as drivers). The Employer holds a Florida state certification as a motor carrier; the leased trucks must have the name and certification number of the Employer on their sides, and the drivers must carry a vehicle identification card issued by the Florida Public Service Commission to the Employer.

While under lease to the Employer, drivers can haul only for the Employer. The Employer has a dispatcher at its office, and drivers are expected to call for dispatch each evening, but may notify the dispatcher that they do not want a load. When drivers call in to the dispatcher, the dispatcher gives the driver the location of the supplier, the site of the delivery, and the time for delivery. When the driver makes the first delivery, he or she is generally then

---

3/ The Employer, Austin Tupler Trucking, Inc., is a motor carrier operating under certification from the Florida Public Service Commission. The Employer has approximately 180 trucks under lease agreements, and dispatches leased trucks daily to pick up and deliver materials.

Two lessors who drive their trucks under leases with the Employer testified that they generally are dispatched to haul fill materials, rocks, and other related materials from suppliers to various construction sites, including road building sites. Both drivers testified that they have delivered materials to construction projects at the Miami International Airport. One driver testified that he has been dispatched to deliver materials to the construction site of a parking lot at a Veteran's Administration hospital and to the construction site of a United States Post Office. The same driver also testified that he has observed trucks leased to the Employer hauling contraband seized by the United States Customs Service, from Miami to an incinerator. Both drivers testified that the Employer has a fuel pump at its premises from which lessors may purchase fuel to operate their trucks. Inasmuch as the undersigned takes notice of the fact that no motor vehicle fuel is manufactured or refined within the State of Florida, the fuel which is purchased by the Employer for resale to the lessors must have originated outside the State of Florida.

In view of the foregoing and the record as a whole, I find that the Employer meets the Board's statutory jurisdiction. Inasmuch as the Employer failed to provide relevant information regarding the Board's discretionary jurisdictional standards, I find that the Employer is engaged in commerce within the meaning of the Act, and that it will effectuate the policies of the Act to assert jurisdiction over the Employer in this proceeding. Tropicana Products, Inc., supra.

4/ The Board has found that the Petitioner is a labor organization within the meaning of Section 2(5) of the Act. Tracor Marine, Inc., 229 NLRB 1016.

dispatched by the jobsite foreman to pick up further loads.  If there are too many trucks delivering to a jobsite, the jobsite foreman or a supervisor of the Employer may release the truck from that site.

Drivers fill out forms for each delivery, which are supplied by the Employer and show the name of the customer, the weight of the delivery and other information necessary to compute the delivery charge.  At the end of each day, the drivers mail the completed forms to the Employer's office.  Utilizing the information on the completed forms, the Employer bills the customer and pays the driver 90 percent of the revenue, deducting 10 percent as its commission.

The Employer has a fuel pump and a group insurance policy  for trucks under lease.  If a driver gets fuel from the Employer's pump and/or insures his or her truck under the Employer's policy, fuel and insurance charges are deducted from the driver's check.  Each driver decides where to purchase fuel and insurance, and drivers are not required to make any purchases from the Employer.

As charges to its customers are on the basis of the weight of the load and the mileage of the trip, the Employer has a set mileage charge between various locations.  Drivers are paid on the basis of that set charge, but are free to take any route between the supplier and the jobsite; drivers sometimes take a longer but faster route in order to make more trips during the day.

Drivers park their trucks where they choose, decide where and when to have their trucks serviced, and are not required to submit any reports to the Employer concerning truck maintenance.  Drivers wear whatever clothes they choose when working, are not required to attend safety or other types of meetings held by the Employer, and pay their own income and social security taxes.

At the hearing, copies of contracts between drivers and the Employer were received into evidence, and a driver testified that he and all other drivers signed a contract with the Employer which was similar to the contracts received into evidence.  In pertinent part, these contracts provide as follows:

I

THE INDEPENDENT CONTRACTOR [5] agrees to furnish to the CARRIER, [6] subject to the terms and conditions of this contract, the motor vehicle described above [7] to be used for the hauling of road building and construction aggregates.

---

[5] The driver is referred to in the contracts as THE INDEPENDENT CONTRACTOR.
[6] The Employer is referred to in the contracts as the CARRIER.
[7] Each contract recites the Unit Number, Year, Make, Type and Serial Number of the driver's truck.

## II

The equipment to be furnished by the INDEPENDENT
CONTRACTOR...shall...meet safety requirements of
the Florida Public Service Commission, Municipal,
State or other Governmental Agency, and compliance
shall be...the obligation of and at the expense of
the INDEPENDENT CONTRACTOR.

## III

THE INDEPENDENT CONTRACTOR shall provide and pay all
equipment and maintain same at his expense, including
but not limeted [sic] to all repairs, gasoline, oil
and parking.  THE INDEPENDENT CONTRACTOR shall provide
and pay for all license fees...fees assessed by Munici-
palities or State or other Governmental Agencies neces-
sary for the proper and lawful operation of the equipment
of [sic] the highways of the State.

## IV

CARRIER understand [sic] and agrees that the INDEPENDENT
CONTRACTOR will choose which day of the week he wishes
to work and which day he wishes not to work.  THE
INDEPENDENT CONTRACTOR understands and agrees to notify
CARRIER'S OFFICE if for any reason he can't perform the
job he was assigned or if for any reason he has to leave
the job.

\* \* \* \* \* \* \* \*

It is also agreed and understood by the CARRIER that at
times the INDEPENDENT CONTRACTOR may have some of his
own work to perform.

\* \* \* \* \* \* \* \*

## V

THE INDEPENDENT CONTRACTOR represents to the CARRIER that
he is the owner and operator of the above described equip-
ment and that he does, in fact intend to drive the equipment
himself.  However, should he decide at any time to put a
driver on the equipment herein described, he will provide
this driver with Workman's Compensation and shall furnish
CARRIER with the certificate of WORKMAN'S COMPENSATION.

## VI

THE CARRIER shall compensate the INDEPENDENT CONTRACTOR for
all work bid hereafter for the use of the aforementioned
motor vehicle and any other equipment, and for his services
at the agreed upon price for each individual job.

\* \* \* \* \* \* \* \*

Any disputes as to price must be complained of within five
(5) working days after payment.

\* \* \* \* \* \* \* \*

If said dispute remains unsettled after 30 days the matter may
be litigated with attorney's fees and costs to be awarded to the
successful party and paid by the unsuccessful party.

\* \* \* \* \* \* \* \*

## VIII

Should the INDEPENDENT CONTRACTOR violate any of the rules or regulations of the Florida Public Service Commission, the CARRIER may cancel this Contract. It is further understood by both parties to this Contract that either party may cancel this Contract with 24 Hours notice.

\* \* \* \* \* \* \* \* \*

After full and careful consideration of the brief submitted by the Petitioner and the cases cited therein and in view of the foregoing and the record as a whole, and particularly relying on the provisions of the contract between the Employer and the drivers as set forth hereinabove, [8/] I find that drivers petitioned for herein are independent contractors rather than employees. Fleet Transport Company, Inc., 196 NLRB 436; George Transfer & Rigging Co., Inc., 208 NLRB 494. Accordingly, I shall dismiss the petition herein.

### ORDER

IT IS HEREBY ORDERED that the petition filed herein be, and it hereby is, dismissed. [9/]

DATED AT Tampa, Florida, this 16th day of October 1980.

(SEAL)

Harold A. Boire, Regional Director
National Labor Relations Board, Region 12
706 Federal Building, 500 Zack Street
Post Office Box 3322, Tampa, Florida  33601

---

[8/] In its post-hearing brief, the Petitioner correctly points out that the contracts between the Employer and the drivers received into evidence at the hearing had expired prior to the filing of the petition herein. The record establishes that the most recent contracts received into evidence expired on March 31, 1980, and a driver testified that he has not had a contract with the Employer since March 31, 1980, when his most recent contract expired. As I find, infra, that, in particular reliance upon the terms of the recently expired contracts between the drivers and the Employer, the drivers are independent contractors rather than employees, it follows, a fortiori, that since the record fails to establish that the Employer owns and operates any trucks itself, in the absence of any contractual restraints whatever upon the driver's operation of his or her truck, the drivers are more clearly independent contractors free to operate his or her truck in any manner he or she chooses, subject only to applicable statutes, ordinances and regulations.

[9/] Under the provisions of Section 102.67 of the Board's Rules and Regulations, a request for review of this Decision may be filed with the National Labor Relations Board, addressed to the Executive Secretary, 1717 Pennsylvania Avenue, N.W., Washington, D.C. 20570. This request must be received by the Board in Washington by October 29, 1980.

- 5 -

# ARTICLES OF INCORPORATION
# H0000000705 0

The undersigned incorporator, for the purpose of forming a corporation under the Florida
Not for Profit Corporation Act, hereby adopt(s) the following Articles of Incorporation:

ATTACHMENT / EXHIBIT ____

## ARTICLE I    NAME
The name of the corporation shall be: Support Dump Trucking Group, Inc.

## ARTICLE II    PRINCIPAL OFFICE
The principal place of business and mailing address of this corporation shall be:

    2701 S. Bayshore Drive #602
    Miami, Florida 33133

## ARTICLE III    PURPOSE(S)
The specific purpose(s) for which the corporation is organized is(are):

    Please see attached.

## ARTICLE IV    MANNER OF ELECTION OF DIRECTORS
The manner in which the directors are elected or appointed is:

  The manner of the election of directors will be provided in the
  bylaws.

## ARTICLE V    INITIAL REGISTERED AGENT AND STREET ADDRESS
The name and Florida street address of the initial registered agent are:

    Hosey Hernandez, Esq.
    2701 S. Bayshore Drive #602
    Miami, Florida 33133

## ARTICLE VI    INCORPORATOR
The name and address of the Incorporator to these Articles of Incorporation are:

    Juan Arragones
    2701 S. Bayshore Drive #602
    Miami, Florida 33133

_____          02-14-00
Signature/Incorporator                Date

(An additional article must be added if an effective date is requested.)

*Having been named as registered agent and to accept service of process for the above stated corporation at the place
designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I
further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties,
and I am familiar with and accept the obligations of my position as registered agent.*

_____          2/14/00
Signature/Registered Agent            Date

# H0000000705 0

00 FEB 18 AM 8: 13
SECRETARY OF STATE
TALLAHASSEE, FLORIDA
FILED

H00000007050

## ARTICLE III: PURPOSE(S):
The specific purpose(s) for which the corporation is organized is (are):

To provide effective representation of the views and concerns of professional truckers at all levels of government and to upgrade highway safety by supporting and advocating responsible initiatives that will produce measurable improvements in highway safety for truckers and other highway users and defending the rights of professional truckers in the courts and other jurisdictions when those rights are threatened.



FILED
00 FEB 18 AM 8: 13
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

H00000007050

*Law Offices of*
**RICHARD J. DIAZ, P.A.**

ATTACHMENT / EXHIBIT

Richard J. Diaz
Ana M. Santisteban

2701 S.W. 3rd Avenue
Miami, Florida 33129-2335
(305) 285-1122
Fax (305) 285-0354

February 11, 2000

Molnat, Inc.
Via Facsimile: (305) 825-2302

Overland Carriers, Inc.
Via Facsimile: (305) 821-6523

REC Corporation
Via Facsimile: 1-954-581-5171

Portland Trucking Serv.
Via Facsimile: (305) 690-9121

Allied Trucking of Florida
Via Facsimile: (305) 885-3131

Try-County, Inc.
Via Facsimile: 1-954-450-0236

F&C Trucking
Via Facsimile: (305) 823-2617

Farache Trucking
Via Facsimile: 1-954-742-5811

Sunrise Transport
Via Facsimile: (305) 829-1771

Austin Topier
Via Facsimile: (305) 383-0844

Lopalra Corp.
Via Facsimile: (305) 266-5703

Alpeitia Trucking
Via Facsimile: (305) 220-6930

Allied of West Palm Beach
Via Facsimile: (561) 640-4222

Marimel Trucking
Via Facsimile: 1-954-252-9138

Wendel Dennis Trucking
Via Facsimile: 1-561-792-8912

Tate Transport
Via Facsimile: 1-954-581-6038

Sorrel Development
Via Facsimile: (305) 883-4952

Rinker FEC
Via Facsimile: (305) 818-4951

Juner
Via Facsimile: (305) 587-0300

National
Via Facsimile: (305) 822-7231

Alco
Via Facsimile: (305) 655-3106

Florida Aggregate
Via Facsimile: (561) 718-3747



02/11/2000  11:52     9545916171          RETRANCA EQUIPMENT AD                    PAGE  01

02/11/2000  10:17     3052368354          RICHARD J DIAZ PA                        PAGE  02

Dear Gentlemen:

This letter advises you that my office, as well as the Law Office of Hosey Hernandez, Esq., represents all current tractor trailer and dump truck drivers engaged in a work stoppage in Miami-Dade County, Florida.  We are informed that most, if not all, company brokers are interested in an immediate meeting to discuss, negotiate and finalize all matters giving rise to this stoppage.  You are cordially invited to attend a meeting today, February 11, 2000, at 5:00 p.m. at City of West Miami  Hall, 901 S.W. 62nd Avenue,  in West Miami, Florida.  Because of space concerns, we request only one representative per company and, if such company has legal counsel, one legal representative per company.

Very truly yours,

Richard J. Diaz, Esq.                              Hosey Hernandez, Esq.

ATTACHMENT / EXHIBIT 6

# DEMANDS FROM
# THE INDEPENDENT TRUCKERS
# TO THE DIFFERENT BROKERS

1- Establishment of a minimum tariff by all
   brokers.  Revision of said tariff.

2- The Insurance percentage should be the same for
   those insured through the brokers and for those
   who have their own insurance.

3- The distance in miles for the tariff should begin
   at the point where the trucks are actually loaded
   and end at the point where the trucks are actually
   unloaded.

4- These requests are signed by all independent
   truckers that participate in their drafting.

5- At a later date, copies with all participant
   signatures will be distributed.

   "We are not asking for hand-outs…we are
          demanding our rights."

## A LOS DIFERENTES BROKER

1- Aplicacion de una tarifa minima para todos los broker,
Revision de dicha tarifa.

2-El porciento de descuento del broker debe ser igual tanto para
los que tengan seguros con ellos, como

para los que tengan seguro propio.

3-La distancia en milla a aplicar segun la tarifa, debe ser desde
el punto donde se cargan los camiones, hasta el punto dode se
voltee la carga.

4-Estas solicitudes estan firmadas por todos los caminoneros
endependeientes que pariciparon en su redaccion.

5-Posteriormente se les entregara copias con las firmas de
todos los participantes.

NO PEDIMOS LIMOSNAS EXIGIMOS NUESTROS DERECHOS

# TO ALL TRUCKERS

AS YOU KNOW FUEL PRICES HAVE GONE UP BY $0.48 CENTS PER GALLON SINCE JULY OF 1999.
 IF WE BURN AN AVERAGE OF 90 GALLONS A DAY PER TRUCK, THATS $43.20 LESS PER DAY THAT THE TRUCK MAKES.
* TIRE PRICES HAVE INCREASED BY 7-10% EACH YEAR.
* WE PAY ABOUT $800.00 PER YEAR FOR OUR TAG.
* HEAVY USE ROAD TAX IS ABOUT $490.00 PER TRUCK.

| WHAT IT COSTS TO RUN FOR A DAY: | | THIS IS WHAT THE TRUCK MAKES: | |
|---|---|---|---|
| TRUCK PAYMENT | $80.00 | TRUCK GROSS | $380.00 |
| INSURANCE | $40.00 | LESS 11% BROKERAGE | $ 41.80 |
| TIRES | $17.50 | LESS EXPENSES | $298.48 |
| MAINTENANCE | $11.90 | | |
| TAG & HEAVY USE TAX | $ 5.17 | THIS IS ALL THAT'S LEFT | $ 39.72 |
| FUEL (AT TODAYS PRICE) | $143.91 | $39.72 X 5 DAYS= | $ 198.60 |
| TOTAL EXPENSES | $298.48 | | |

NOT TO MENTION THAT DOT IS VERY STRICT AND NOW SOME OF THE PITS LOAD ONLY TO 70,000 LBS. AND THIS MAY TAKE 2 TO 3 TRIES BACK AND FORTH TO THE SCALE AND THE LOADER, BUT THE RATES HAVE NOT CHANGED. WE CAN BLAME MANY PEOPLE FOR THIS BUT IT IS US, THE TRUCKERS, WHO MUST MAKE THE CHANGE FOR BETTER RATES AND THE TIME FOR THIS CHANGE IS NOW!
BASED ON THE INCREASES DETAILED ABOVE, RATES HAVE TO BE INCREASED OR THERE WILL BE NO MORE INDEPENDENT DUMP TRUCKS IN SOUTH FLORIDA. THAT MEANS NO MORE BROKERS EITHER, SO THE BROKERS NEED TO GET INVOLVED IN INCREASING RATES OR THEY TOO WILL BE LOOKING FOR A JOB. THE BROKERS WORK FOR US, FINDING US WORK AND GETTING US PAID IN ADDITION TO GETTING A FAIR RATE FOR OUR SERVICES. THAT'S WHY THEY CHARGE THE HIGH BROKERAGE FEES. IF WE DON'T WORK THEY DON'T GET PAID. NO MORE OF THE ATTITUDE "IF WE RAISE THE RATE SOME OTHER BROKER WILL GET THE JOB" OR "IF YOU DON'T WANT THE JOB I'LL GIVE IT TO SOMEBODY ELSE." PRETTY SOON THERE WILL BE NOBODY TO GIVE WORK TO, WE WILL ALL BE WORKING AT MCDONALDS OR WALMART, IF WE ARE LUCKY.

WE NEED TO STICK TOGETHER NOW OR WE ALL GO OUT OF BUSINESS.
JOIN US MONDAY FEBRUARY 7, 2000, AT 9:00 AM ALONG OKEECHOBEE AT THE TURNPIKE.
LET'S MAKE AN IMPACT ON THE INDUSTRY.

FROM: RANDY READY FOR REPO.

MIEMBROS DE LA COMISION

ATTACHMENT / EXHIBIT 17

| | | |
|---|---|---|
| Juan Aragones | Presidente | (305) 978-7546 |
| Oscar De Leon | Vice Presidente | (305) 542-9360 |
| Reynaldo Rodriguez | Finazas | (786) 367-3673 |
| Rafael D Jimenez | Relaciones Publicas | (305) 498-8309 |
| Norvel Igarza | Secretario | (305) 409-2255 |
| Alayn Hernandez | Propaganda | (786) 367-2519 |
| Eduardo Rodriguez | Vocal | (786) 205-1808 |

## DEMANDAS PLANTEADAS POR LOS CAMIONEROS
### INDEPENDIENTES
### A LOS DIFERENTES BROKER

1. Aplicacion de una tarifa minima para todos los broker

ATTACHMENT / EXHIBIT _____

# TO ALL TRUCKERS

AS YOU KNOW FUEL PRICES HAVE GONE UP BY $0.48 CENTS PER GALLON SINCE JULY OF 1999.
 IF WE BURN AN AVERAGE OF 90 GALLONS A DAY PER TRUCK, THATS $43.20 LESS PER DAY THAT THE TRUCK MAKES.
* TIRE PRICES HAVE INCREASED BY 7-10% EACH YEAR.
* WE PAY ABOUT $800.00 PER YEAR FOR OUR TAG.
* HEAVY USE ROAD TAX IS ABOUT $490.00 PER TRUCK.

| WHAT IT COSTS TO RUN FOR A DAY: | | THIS IS WHAT THE TRUCK MAKES: | |
|---|---|---|---|
| TRUCK PAYMENT | $80.00 | TRUCK GROSS | $380.00 |
| INSURANCE | $40.00 | LESS 11% BROKERAGE | $ 41.80 |
| TIRES | $17.50 | LESS EXPENSES | $298.48 |
| MAINTENANCE | $11.90 | | |
| TAG & HEAVY USE TAX | $ 5.17 | THIS IS ALL THAT'S LEFT | $ 39.72 |
| FUEL (AT TODAYS PRICE) | $143.91 | $39.72 X 5 DAYS= | $ 198.60 |
| TOTAL EXPENSES | $298.48 | | |

NOT TO MENTION THAT DOT IS VERY STRICT AND NOW SOME OF THE PITS LOAD ONLY TO 70,000 LBS. AND THIS MAY TAKE 2 TO 3 TRIES BACK AND FORTH TO THE SCALE AND THE LOADER, BUT THE RATES HAVE NOT CHANGED. WE CAN BLAME MANY PEOPLE FOR THIS BUT IT IS US, THE TRUCKERS, WHO MUST MAKE THE CHANGE FOR BETTER RATES AND THE TIME FOR THIS CHANGE IS NOW!
BASED ON THE INCREASES DETAILED ABOVE, RATES HAVE TO BE INCREASED OR THERE WILL BE NO MORE INDEPENDENT DUMP TRUCKS IN SOUTH FLORIDA. THAT MEANS NO MORE BROKERS EITHER, SO THE BROKERS NEED TO GET INVOLVED IN INCREASING RATES OR THEY TOO WILL BE LOOKING FOR A JOB. THE BROKERS WORK FOR US, FINDING US WORK AND GETTING US PAID IN ADDITION TO GETTING A FAIR RATE FOR OUR SERVICES. THAT'S WHY THEY CHARGE THE HIGH BROKERAGE FEES. IF WE DON'T WORK THEY DON'T GET PAID. NO MORE OF THE ATTITUDE "IF WE RAISE THE RATE SOME OTHER BROKER WILL GET THE JOB" OR "IF YOU DON'T WANT THE JOB I'LL GIVE IT TO SOMEBODY ELSE." PRETTY SOON THERE WILL BE NOBODY TO GIVE WORK TO, WE WILL ALL BE WORKING AT MCDONALDS OR WALMART, IF WE ARE LUCKY.

WE NEED TO STICK TOGETHER NOW OR WE ALL GO OUT OF BUSINESS.
JOIN US MONDAY FEBRUARY 7, 2000, AT 9:00 AM ALONG OKEECHOBEE AT THE TURNPIKE.
 LET'S MAKE AN IMPACT ON THE INDUSTRY.

FROM: RANDY READY FOR REPO.

# OFFENSE-INCIDENT REPORT

ATTACHMENT / EXHIBIT

## MIAMI-DADE POLICE DEPARTMENT

Agency Report Number: 2000-0389

| Original Day Reported | Date | Time (mil) | Time Arrived (mil) | Time Completed (mil) |
|---|---|---|---|---|
| Wed | 02-09-2000 | 2015 / 2015 | 2023 | 2052 |

Incident Type: 3 Criminal Mischief

From: Wed 02-09-2000 1930

OFF/INC #1 3 Description: Criminal Mischief — C Committed — Statute Violation Number: C806-13

Incident Location: NW 121 Way + 104 Rd — Medley — 33178 — District 22 — Grid 872 — Zone 03

Business Name/Area Identifier: Rainbow

Location Type: 26

# OFF/INC 1 — # Victims 1 — # Offenders 0 — # Veh. Stolen 0 — Other 88

**NARRATIVE**

Reporter states that he was stopped in the roadway by several protesters. One or more of the protesters went to the rear of the truck and cut the air brake hose on the right side, disabling the truck.

**VICTIM/WITNESS**

OFF/INC Indicator: 1 — V/W Code: V — V. Type: 4 — Name: National Brokerage, Inc.

Address: 12080 NW So River Dr — City: Medley — State: Fl — Zip: 33178 — Business Phone: (305) 888-1717

**VICTIM/WITNESS**

OFF/INC Indicator: 1 — V/W Code: C — V. Type: 4 — Name: Sierra, Artolin

Address: 501 SW 104 Ave — City: Miami — State: Fl — Zip: 33174 — Business Phone: (305) 552-0826

Race: W — Sex: M — Date of Birth: 09-02-1928

**ADMINISTRATIVE**

Officer(s) Reporting: [signature] — I.D. Number(s)/Locator Code: 92-22 — Unit: 303

Officer Reviewing: [signature] — I.D. Number: 5977

Page 1 of 2

VEHICLE/PROPERTY REPORT

## METRO-DADE POLICE DEPARTMENT

| Date of Supplement | | 1. Original 2. Supplement |
|---|---|---|
| | Agency Report Number | 2000-0889 |

| Original Date Reported | Primary Offense Description | Victim #1 Name |
|---|---|---|
| 02-09-00 | Criminal Mischief | National Trucking |

**Person Code:** V - Victim, S - Suspect, M - Missing, A - Arrestee, E - Escapee

**Status Code:** 1 Stolen, 2 Recovered, 3 Missing, 4 Recovered, 5 Suspicious | 5 Impounded, 6 Abandoned, 7 Fast Return, 8 Seized, 9 Other

**Damage Code:** 0 N/A, 1 Arson, 2 Criminal Mischief, 3 During Other Offense | 4 Stripped/Theft From, 9 Other

**Type:** 1 Auto, 2 Truck/Van, 3 Motorcycle, 4 Camper/RV, 5 Bus | 6 Trailer, 7 Boat, 8 Aircraft, 9 Other

**Recovery Location:** 1 Family Residence, 2 Apt Complex, 3 Housing Project, 4 Commercial/Industrial | 5 Park/Playground, 6 Shopping Mall, 7 Woods, 8 Water, 9 Other

**Recovery Code:** Stolen/Recovered: 1 Local/Local, 2 Local/Local, 3 Other/Local

| Person Code # Veh. # | Status | Damage | Type | Year | Make | Model | Style |
|---|---|---|---|---|---|---|---|
| V 1 1 9 | 2 | 2 | | 88 | Mack | Dumptruck | |

| Tag Reg./Doc. # | Reg. State | Reg. Year | Decal Number | Tag Type |
|---|---|---|---|---|
| M0722R | FL | | | |

| VIN/Hull/FAA | Estimated Value |
|---|---|
| 2M1N190Y8JC023629 | $        00 |

| Condition 1 Window Closed 2 Locked 3 Keys in Ignition | Insurance Company | Lien Holder |
|---|---|---|

| Color (Top; Bottom) | Description, Identifying Characteristics, Noticeable Damage, Interior Color, etc.) |
|---|---|
| Blue | |

| Vessel | Length | Hull Material | Propulsion | Boat Type |
|---|---|---|---|---|

| Recovery Address/Geographic Indicator | Date Recovered | Value Recovered |
|---|---|---|
| | | $        00 |

| Recovery Loc. Recovery Code | Original Reporting Agency | Report Number | Hold Y-Yes N-No | Reason/Authority |
|---|---|---|---|---|

**Method of Theft:** 00 N/A, 1 Keys, 2 Tow Truck, 3 Hot Wire, 4 Steering Column, 5 Ignition Punch, 8 Unknown

**Components Stripped:** 0 N/A, 1 VIN Plate, 2 Tires/Wheels, 3 Radio/CB, 4 Battery, 5 Interior, 6 Transmission, 7 Engine Parts, 8 Major Body Parts, 9 Tag/Decal Stolen, 10 Other-Specify

| Towed By | Storage Location | FCIC/NCIC | Location of Original Theft |
|---|---|---|---|

**Type of Theft:** 00 N/A, 01 Burglary, 02 Robbery, 03 Shoplifting, 04 Pocket Picking, 05 Purse Snatching, 06 Embezzlement, 07 From Coin Oper. Machine, 08 From Public Access Bldg, 09 From Vehicle, 11 By Computer, 12 Fraud, 99 Other

**Person Code:** V-Victim, P-Proprietor, A-Arrestee, S-Suspect, Z-Other | **Status Code:** 1 Stolen, 2 Recovered | 3 Stolen and Recovered, 4 Recovered for Other Jurisdiction | 5 Lost, 6 Found, 7 Safekeeping | 8 Evidence/Seized, 9 Other | **Damage Code:** 0 N/A, 1 Arson | 2 Criminal Mischief, 3 During other Offense, 9 Other

**Property Type:** A. Auto Accessory/Part, B. Bicycle, C. Camera/Photo Equipment, D. Drug, E. Equipment/Tool | F. Food/Liquor/Consumable, G. Gun, H. Household Appliance/Stereo, I. Plant/Citrus, J. Jewelry/Precious Metal | K. Clothing/Fur, L. Livestock, M. Musical Instrument, N. Construction Machinery, O. Office Equipment | P. Art/Collection, Q. Computer Equipment, R. Radio/Stereo, S. Sports Equipment, T. TV/Video/VCR | U. Currency/Negotiable, V. Credit Card/Non-Negotiable, W. Boat Motor, X. Structure, Y. Farm Equipment | Z. Miscellaneous

| Person Code # Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|
| V 1 1 9 | 2 | | A | | Air Brake hose | | |

| Serial Number | Owner Applied Number | Description (Size, Color, Caliber, Barrel Length, Etc.) |
|---|---|---|

| Value | Value Recovered | Date Recovered | FCIC/NCIC |
|---|---|---|---|
| $    51 00 | $ | | |

| Person Code # Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|

| Serial Number | Owner Applied Number | Description (Size, Color, Caliber, Barrel Length, Etc.) |
|---|---|---|

| Value | Value Recovered | Date Recovered | FCIC/NCIC |
|---|---|---|---|
| $ | $ | | |

| Person Code # Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|

| Serial Number | Owner Applied Number | Description (Size, Color, Caliber, Barrel Length, Etc.) |
|---|---|---|

| Value | Value Recovered | Date Recovered | FCIC/NCIC |
|---|---|---|---|
| $ | $ | | |

| Property Stolen | $ | Change in Property Stolen Value | |
|---|---|---|---|
| Value Recovered | $ | Change in Property Recovered Value | |

**Activity:** P Possess, S Sell, B Buy, T Traffic, R Smuggle | D Deliver, E Use, K Dispense/Distribute, M Manufacture/Produce/Cultivate | Z Other

**Type:** A Amphetamine, B Barbiturate, C Cocaine, E Heroin, H Hallucinogen | M Marijuana, O Opium/Derivative, P Paraphernalia/Equipment, S Synthetic

**Unit:** U Unknown, Z Other | 1 Gram, 2 Milligram, 3 Kilogram, 4 Ounce, 5 Pound | 5 Ton, 6 Liter, 8 Milliliter, 9 Dose Unit-Item

| Activity | Type | Description | Quantity | Unit | Estimated Street Value |
|---|---|---|---|---|---|
| | | | | | $        00 |
| | | | | | $        00 |
| | | | | | $        00 |

| NARRATIVE |
|---|
| |

| Officer(s) Reporting | I.D. Number(s)/Locator Code | Unit | Date |
|---|---|---|---|
| D. Westcott | 92  22 | 303 | 02-08-00 |

| Officer Reviewing & Approving | I.D. Number | Routed To | Referred To | Assigned To | By | Date |
|---|---|---|---|---|---|---|

| Case Status | Clearance Status: 1 Arrest, 2 Exceptional | 3 Unfounded, 4 Open Pend | A-Adult J-Juvenile | Date Cleared | Jail Number | Number Arrested |
|---|---|---|---|---|---|---|

**Exception Type:** 1 Extradition Declined, 2 Arrest on Primary Offense Secondary Offense without Prosecution, 3 Death of Offender, 4 V/W Refused to Cooperate, 5 Prosecution Declined, 6 Juvenile/No Custody

| OBTS Number | Page 2 of 2 |
|---|---|

**OFFENSE INCIDENT REPORT**  ATTACHMENT / EXHIBIT _____

Original
Supplement  1

| Agency ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| FLO  0 6 2 2 0 0 | MIRAMAR POLICE DEPARTMENT | 00 - 02 - 3757 |

| | Reported Day | Date | Time Dispatched | Time Arrived | Time |
|---|---|---|---|---|---|
| WED | 0 | 022300 | 0740 | 0746 | 0825 |

Incident Type: 01 Felony  02 Misdemeanor  03 Ordinance  04 Traffic  08 Other
Misdemeanor

| Incident Type | 1 | WED 022300 0715 | WED 022300 0715 |

#1  Offense Type Description  DEADLY MISSILE (OCCURRED VEH.)  Statute Violation Number  C 790 19

#2

Incident Location (Street Apt Number): 14300 BLK OF MIRAMAR PKWY  MIRAMAR  33027

Business Name / Area Identifier

Forced Entry  Occupancy

Location Type: 01 Residence-Single  02 Apartment/Condo  03 Residence-Other  04 Hotel/Motel  05 Convenience Store  06 Gas Station  07 Liquor Sales  08 Bar/Nightclub  09 Supermarket  10 Dept/Discount Store  11 Specialty Store  12 Drugstore/Hospital  13 Bank/Financial Inst  14 Commercial/Office Bldg  15 Restaurant  16 Storage  17 Gov/Public Bldg  18 School/University  19 Jail/Prison  20 Religious Bldg  21 Airport  22 Bus/Rail Terminal  23 Construction Site  24 Other Structure  25 Parking Lot/Garage  26 Highway/Roadway  27 Park/Woodlands-Field  28 Lake/Waterway  29 Motor Vehicle  32 Other Mobile  33 Other

| #Offenses | #Victims | #Offenders | #Prem. Ent. | #Veh. Stolen |
|---|---|---|---|---|
| 01 | 01 | 01 | 00 | 00 |

Offense Indicator  V 1 3  RODRIGUEZ, PEDRO LUIS  305 447-4937
Address (Street Apt Number)  13884 S.W. 63 ST.  MIAMI  FL.  33183  Business Phone
Other Contact Info  DRIVER OF THE VEH.

| Vic Type | Race | Sex | Date of Birth or Age | Res. Type | Res. Status | Extent of Injury | Injury Type(s) | Relationship | Ethnicity |
|---|---|---|---|---|---|---|---|---|---|
| 1, 2 or 3 | W | M | 09.10.63 | 3 | 1 | 0 | 00 | 00 | |

Offense Indicator  V 1 4  ROCA & SON INC.  Business Phone
Address  11890 N.W. 87 CT. BAY #4  HIALEAH GARDENS, FL. 33018  305 820-803
Other Contact Info  OWNER OF THE VEH.

| Vic Type | Race | Sex | Date of Birth or Age | Res Type | Res Status | Extent of Injury | Injury Type(s) | Relationship | Ethnicity |
|---|---|---|---|---|---|---|---|---|---|
| N | N | N/A | 0 | 0 | 0 | 00 | 00 | |

Offense Indicator  Suspect Code  S 1

Clothing (Describe)  TALL

Scars/Marks/Tattoos  GRAY

**NARRATIVE**

V-1 (RODRIGUEZ) ADVISED THROUGH Z-1 (FERNANDEZ) BECAUSE V-1 DOES NOT SPEAK
ENGLISH. V-1 ADVISED THE FOLLOWING: HE WAS TRAVELING EAST BOUND ON MIRAMAR PARKWAY
APPROXIMATELY 14300 BLOCK WHEN A WHITE NISSAN PICKUP TRUCK  TRAVELING
WEST BOUND WITH 2 LATIN MALES INSIDE THE CAB AND 4 LATIN MALES INSIDE THE BED
ONE OF THE MALES FROM THE BED USED A SLING SHOT WITH A STEEL ROLLER TO BREAK V-1's
DRIVER SIDE WINDOW. THE STEEL ROLLER WAS PLACED INTO PROPERTY. Z-1 ADVISED HE THINKS THE OWNER
OF THE NISSAN PICKUP TRUCK IS REYNALDO RODRIGUEZ (786-367-3673), ONE OF THE ORGANIZERS OF THE PICKET-

Report Contains  OIR, Pee RPT. 2 VEH/PROP RPT. PROP RECEIPT.

| Officer(s) Reporting | ID. Number(s) | Unit | Date |
|---|---|---|---|
| Tripler | 544 | 2388 | 2-23-00 |

Offense Status of Application  Referred To  RECORDS  CID

Case Status  OPEN

Page  4

# PERSON(S) REPORT

Juvenile  1. Original
2. Supplement  **1**

| Agency ORI Number | Agency Name | | Agency Report Number |
|---|---|---|---|
| FLO **0 6 2 2 0 0** | MIRAMAR POLICE DEPARTMENT | | **0 0 0 2 3 7 5 7** |

Original Date Reported  **0 2 2 3 0 0**  Case Reference  **DEADLY MISSILE**

V/W Codes: 1. Proprietor 2. Other — Victim Type: 1. N/A 2. Juvenile 3. U.S. Officer 4. Adult — Type: 3. Business 4. Government 5. Church 9. Other — Race: W N/A W. White d. Black — American Indian Oriental Asian Unknown — Sex: N. N/A M. Male I. Female U. Unknown — Residence Type: 1. N/A 2. Florida 3. Out of State — Residence Status: 1. N/A 2. Full Year 3. Part Year 4. Non Resident — Extent of Injury: 1. None 2. Minor 3. Serious 4. Fatal

Injury Type: 33. Laceration  37. Loss of Teeth  Victim Relationship to Offender — Offense Indicator: #1 #3 Both

| V/W Code | # | V Type | Name (Last First Middle or Business) | | | | | Residence Phone |
|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 1 3 | FERNANDEZ, GERARDO | | | | | |

Address, Street Apt Number  **1203 NW 126 AVE.**   State  **SUNRISE**   **FL**   Zip **33323**   Business Phone **954 583-0801**

Other Contact Info, Time Available, Interpreter etc.  **Cell Phone 305-606-2602**   Synopsis of Involvement  **GENERAL MANAGER**

| Victim Type | Race | Sex | Date of Birth or Age | Res Type | Res Status | Extent of Injury | Injury Type(s) | Relationship | Ethnicity | Residence Phone |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 or 3 | W | M | 0 9 1 5 4 7 | 2 | 1 | Ø | Ø | Ø | | |

Offense Indicator: #1 #3 Both

Address, Street Apt Number  City  State  Zip  Business Phone

Other Contact Info, Time Available Interpreter etc.  Synopsis of Involvement

| Victim Type | Race | Sex | Date of Birth or Age | Res Type | Res Status | Extent of Injury | Injury Type(s) | Relationship | Ethnicity |
|---|---|---|---|---|---|---|---|---|---|
| 2 or 3 | | | | | | | | | |

Offense Indicator: #1 #2 — Suspect Code: S. Suspect E. Escapee R. Recovered Z. Other A. Arrested M. Missing  Code #  Juvenile Name (Last First Middle)

Maiden Name  Nickname/Street Name  Place of Birth  Residence Phone

Last Known Address (Street Apt Number)  City  State  Zip  Business Phone

Occupation  Employer/School  Address  Social Security Number

Driver's License State/Number  Immigration and Naturalization Number  Other ID Number  OBTS Number (Arrested)  FCIC/NCIC

Clothing (Describe)  Scars/Marks/Tattoos (Location/Describe)

| Race | Sex | Date of Birth or Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Complexion  Build  Facial Hair  Teeth  Speech/Voice  Special Identifiers

Offense Indicator: #1 #2 — Suspect Code: S. Suspect E. Escapee R. Recovered Z. Other A. Arrested M. Missing  Code #  Juvenile Name (Last First Middle)

Maiden Name  Nickname/Street Name  Place of Birth  Residence Phone

Last Known Address (Street Apt Number)  City  State  Zip  Business Phone

Occupation  Employer/School  Address  Social Security Number

Driver's License State/Number  Immigration and Naturalization Number  Other ID Number  OBTS Number (Arrested)  FCIC/NCIC

Clothing (Describe)  Scars/Marks/Tattoos (Location/Describe)

| Race | Sex | Date of Birth or Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Complexion  Build  Facial Hair  Teeth  Speech/Voice  Special Identifiers

| Incident Type | Foul Play Suspected? | Missing Before? | Fingerprints Available? | Photo Available? | Dental Record Available? | NCIC Form Provided? |
|---|---|---|---|---|---|---|
| 1. Runaway  5. Disaster 2. Parental  Victim 3. Involuntary  6. Voluntary 4. Disability  Adult 5. Endangered  8. Unknown | 1. Yes 2. No | 1. Yes 2. No 3. Unknown | 1. Yes 2. No 3. Unknown | 1. Yes 2. No 3. Unknown | 1. Yes 2. No 3. Unknown | 1. Yes 2. No |

Date Last Seen  Time Last Seen  Location Last Seen Address City St  Accompanied By

Mental/Physical Condition  Medication Required/Type  Doctor/Dentist (Name Phone Number)

Property Carried  ID Type/Number  ID Type/Number

Probable Destination  Name/Address  Transportation Mode

Recovery Information: 0. N/A 1. Voluntary  2. Located Not Returned  3. Hospitalized 4. HRS Custody  5. Law Enforcement Custody 6. Returned to Parent  7. Deceased 9. Other

| Officer(s) Reporting | ID Number(s) | Unit | Date |
|---|---|---|---|
| **Trimble** | **244** | **2388** | **2-23-00** |

Officer Reviewing (If Applicable)  ID Number  Routed To  Referred To  Assigned To  By  Date

Page **2** of **4**

## VEHICLE/PROPERTY REPORT

Original ___ Supplement ___ 1

| Agency ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| FL0 0 6 2 2 0 0 | MIRAMAR POLICE DEPARTMENT | 0 0 0 2 3 7 5 7 |

Original Date Reported: 0 2 2 3 0 0    Case Reference: DEADly MISSiLE

### VEHICLE/VESSEL

| Person Code | Item # | Status | Damage | Type | Year | Make | Type | Size |
|---|---|---|---|---|---|---|---|---|
| V | 1 | 9 | 9 | 2000 | STERLING | DUMP TRUCK | |

Tag Number: PM4248R    State: FLORIDA    Year: 2000    Serial Number: 01501219    Tag Type:

VIN/Hull #: 2FZXEDYBXYAG32961    Estimated Value: 90000 00

Insurance Company: NATIONAL CASUALTY COMPANY

Color Top/Bottom: BLK

Vessel Name: ___    Length: ___    Hull Material: ___    Propulsion: ___    Boat Type: ___

Method of Theft: N/A    Towed By: N/A

### PROPERTY

| Person Code | Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|---|
| V | 1 | 9 | 9 | 2 | 01 | WINDOW (DRIVER SIDE) | | |

Value: 300 00

| Person Code | Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|---|
| S | 1 | 9 | 9 | 2 | 1 | STEEL ROLLER | | |

### ADMINISTRATIVE

| Officer/s Reporting | ID Number | Unit | Date |
|---|---|---|---|
| Trimble | 244 | 2B8 | 2-23-00 |

| Officer Reviewing (if Applicable) | ID Number | Routed To | Referred To | Assigned To | By | Date |
|---|---|---|---|---|---|---|

Page 3 of 4

# VEHICLE/PROPERTY REPORT

Origina   /
1 Supplement

| Agency ORI Number | Agency Name | Agency Report Number |
|---|---|---|
| 0 6 2 2 0 0 | MIRAMAR POLICE DEPARTMENT | 0 0 0 2 3 7 5 7 |

Original Date Reported: 0 2 2 3 0 0    Case Reference: DEADLY MISSILE

**VEHICLE/VESSEL**

| Person Code/Item # | Status | Damage | Type | Year | Make | Model |
|---|---|---|---|---|---|---|
| S 1 1 | 9 | 9 2 | 80's | NISSAN | PICK UP TRUCK |

Tag Reg Doc #    Reg. State    Reg Year    Decal Number    Tag Type

VIN Hull F&A    Estimated Value $    00

Condition    Insurance Company    Lien Holder

Color/Top Bottom:  WHITE    Description

Vessel Name    Length    Hull Material    Propulsion    Boat Type

Recovery Address/Geographic Indicator    Date Recovered    Value Recovered $    00

Recovery Loc    Recovery Code    Original Reporting Agency    Report Number    Hold    Reason/Authority

Method of Theft    Components Stripped    Towed By    Storage Location    FCIC/NCIC

**THEFT**

Type Theft

**CODES**

**PROPERTY**

| Person Code/Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|

Serial Number    Owner Applied Number    Description
Value $    Value Recovered    Date Recovered    FCIC/NCIC

**PROPERTY**

| Person Code/Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|

Serial Number    Owner Applied Number    Description
Value $    Value Recovered    Date Recovered    FCIC/NCIC

**PROPERTY**

| Person Code/Item # | Status | Damage | Property Type | Quantity | Name | Brand | Model Name/Number |
|---|---|---|---|---|---|---|---|

Serial Number    Owner Applied Number    Description
Value $    Value Recovered    Date Recovered    FCIC/NCIC

**DRUGS**

Activity    Type    Description    Quantity    Unit    Estimated Street Value $    00
Activity    Type    Description    Quantity    Unit    Estimated Street Value $    00
Activity    Type    Description    Quantity    Unit    Estimated Street Value $    00

**PROPERTY DETAILED**

**ADMINISTRATIVE**

| Officer Reporting | ID Number | | Date |
|---|---|---|---|
| TRimpler | 244 | 2388 | 02-23-00 |

Officer Reviewing (if Applicable)    ID Number    Routed To    Referred To    Assigned To    By    Date

4 of 7

## NARRATIVE CONTINUATION

| Agency ORI Number | Agency Name | |
|---|---|---|
| F10 0, 6, 2, 2, 0, 0 | MIRAMAR POLICE DEPARTMENT | 0, 0, 0, 2, 3, 7, 5, 7 |

| Original Date Reported | Case Reference |
|---|---|
| 0, 2, 2, 3, 0, 0 | THROWING DEADLY MISSILE |

I RECEIVED A FACSIMILE TRANSMISSION FROM 2-1. POSSIBLE OWNER OF THE WHITE PICK UP TRUCK. REYNALDO RODRIGUEZ, 2769 W. 71ST. PLACE HIALEAH FLORIDA 33016. 786-367-3673.

THE ORGANIZERS: ① NORVEL IGARZA, 2990 W. 9th AVE. HIALEAH, 305-863-6150, ② OSCAR DE LEON, 13424 N.W. 6ST. MIAMI, Fl 33182, 305-551-8602. ③ ALAIN HERNANDEZ, 12401 W. OKEECHOBE RD #34, HIALEAH GARDENS, FL., 33016, 305-231-53?? ④ RAFAEL D. JIMENEZ, 19720 SW 116AVE. MIAMI 33159. ⑤ EDUARDO RODRIGUEZ, 575W 16ST HIALEAH, 305-381-0113 ⑥ REYNALDO RODRIGUEZ ⑦ JEAN ARAGONES.

| Report Contains | | | | | Related Report Number(s) |
|---|---|---|---|---|---|
| N.C. | | | | | 00023936 |
| Officer(s) Reporting Bentsler | | | ID Number(s) 244 | Unit 2388 | Date 02-24-00 |
| Officer Reviewing (if Applicable) | ID Number r/53 | Routed To RECORDS | Referred To C13 | Assigned To | By | Date |

| Case Status OPEN | Clearance Type 1 Arrest  2 Exceptional | 3 Unfounded | A-Adult J-Juvenile | Date Cleared | Arrest Number | Number Arrested |
|---|---|---|---|---|---|---|
| Exception Type 1 Extradition Declined | 2 Arrest on Primary Offense Secondary Offense Without Prosecution | 3 Death of Offender 4 V/W Refused to Cooperate | 5 Prosecution Declined 6 Juvenile / No Custody | OBTS Number | | Page 1 of 1 |

STATE OF FLORIDA      )
                         ) SS
COUNTY OF DADE      )

ATTACHMENT / EXHIBIT _____

## AFFIDAVIT OF AUSTIN TUPLER

1      My name is Austin Tupler. I am the owner of Austin Tupler Trucking, Inc.

2      My Company is a transportation broker for dump trucks that solicits agreements from contractors to deliver road building and construction aggregates. Under my contracts with general and subcontractors, I am instructed what materials are needed for the job site on any particular day, what time deliveries are to be accepted and where the material to be delivered is located. I then offer the job to different owner-operators who have signed independent contractor agreements with my Company. If an owner-operator accepts the job, he or she will pick-up the material from its location and deliver it to the construction site. Based on a ticket receipt indicating the amount of material picked up and the amount of material delivered, the owner operator is paid for the shipment.

3      Austin Tupler Trucking, Inc. owns no trucks of its own that are used in its business. Accordingly, all of our business is done through contracts with independent owner-operators who own their own trucks.

4      Independent owner-operators sign independent contractor agreements with Austin Tupler Trucking, Inc., a copy of which is attached hereto as Exhibit "A." Additional documents that the independent owner-operator signs are attached hereto as Exhibit "B." These documents include an acknowledgment by the independent owner-operator that they are an independent contractor and not an employee of Austin Tupler Trucking, Inc.

5      The owner-operator controls the manner, means and details of his or her work.

_____
Initials

6       The owner-operator can accept any job that is offered or decline any job that is offered.

7       The owner-operator determines what days of the week and what hours he or she will work and what hours he or she will not work.

8       Owner-operators are responsible for the maintenance of their trucks.

9       While owner-operators are given the option of purchasing insurance through our insurance company, this is not required. Indeed, most owner-operators have their own insurance through outside companies.

10.      Owner-operators are paid by the load, based on tonnage or miles with varying rates depending upon my contract with the general contractor.

11.      We do not withhold any taxes such as withholding taxes or social security taxes from the pay to independent contractors because the payment does not represent wages.

12.      Under the independent contractor agreement, we lease the use of the independent owner-operator's truck and he or she agrees to provide a driver for the truck to meet the needs of Austin Tupler Trucking, Inc. in performing its obligations under its contracts with construction contractors.

13.      The rates that are paid to independent contractors are determined based on Austin Tupler Trucking, Inc.'s contract with the construction contractor. Various factors impact the rate we are able to pay. Such factors as the number of miles that must be driven on each job, the number of traffic lights on the most direct route of travel, how well the customer or construction contractor

2

Initials

pays his bills, and whether the owner-operator likes to work for the construction company that we have contracted with all effect the rates we pay on any given job.

14.     There is no standard or uniform price sheet. The price that we pay per job is based strictly on various factors that have allowed us to make a successful bid to obtain the work on a construction project

15.     Austin Tupler Trucking, Inc. has approximately 400 customers from very large to very small construction companies. At the present time, we are engaged in a very large project with the Department of Transportation on stretches of I-95 from Golden Gables to U.S. 1   Gilbert Southern, the general contractor, has already sent a letter to our Company threatening to hold us responsible for any delays from our failure to continue hauling materials as a result of the owner-operator's work stoppage. See Exhibit "C."

16.     We have on our schedule an average of 70 jobs per day. This allows us to offer a variety of work opportunities for each of the owner-operators.

17.     The owner-operators are paid by our Company on a weekly basis although we are typically only paid on a monthly or semi-monthly basis by the construction companies.

18.     As a result of the owner-operator's work stoppage, we are averaging approximately $75,000 to $120,000 of gross revenue per week compared to average weekly gross revenues of $500,000 prior to the work stoppage. As a result of the work stoppage we are losing income before taxes of approximately $62,000 per week not including legal fees and extra costs incurred due to increased security at our facilities.

3

Initials

19.     Austin Tupler Trucking, Inc. contracts with approximately 185 owner-operators. Of these approximately 125 owner-operators would be willing to continue working in spite of the work stoppage but for the violence and intimidation they have experienced. My information comes from reports given to me directly by the owner-operators who have said they fear continuing to work because of threats they have received at home, while on the road, and at the aggregate pits.

20.     Austin Tupler Trucking, Inc. obtains a majority of its materials from White Rock quarries, Rinker quarries and Tarmac quarries in Dade County. It also obtains materials from Loxahatchee pit and Palm Beach Aggregates in Palm Beach County, and from a variety of aggregate pits in Broward County.

21.     With approximately 300 to 400 trucks parked on the side of the road and truckloads of strikers with load speakers yelling obscenities and threats at drivers as they attempt to enter the quarries, particularly along Okeechobee Road in Dade County, where Rinker, Tarmac, and White Rock all have quarries, it is extremely difficult, if not impossible, for those independent owner-operators who want to continue working for Austin Tupler Trucking, Inc. to do their work.

22.     Several drivers have reported to me that when they are approached by one of the striking owner-operators, another owner-operator will approach the truck and cut the brake lines, rendering the truck inoperable.

23.     There have been signs placed by the office doors at some of our customers including Tarmac quarries indicating that Austin Tupler Trucking, Inc. is unfair to the truckers. One of the signs is in our possession.

*A.T.*

Initials

4

24.     We have kept records of various reports of violence. A composite of these reports is attached here as Exhibit "D."

25.     I have received two calls personally from unidentified truckers who claim that if we do not agree to the tariffs listed on tariff rates published by Support Dump Trucking Group, Inc., we are never going to have any trucks working for us again. We have caller identification but it showed up that the number from which the call was placed was blocked.

26.     Austin Tupler Trucking, Inc. has also received a bomb threat where the caller said that if we continue to try and do business and not meet the demands of the independent owner-operators who are engaged in the work stoppage that our facilities would be blown up.

27.     We have had to hire additional security to protect our employees and facilities from additional acts of violence.

Affiant further sayeth naught.

I declare under penalty of perjury that the foregoing affidavit consisting of twenty seven (27) numbered paragraphs is true and correct to the best of my knowledge.


_____
AUSTIN TUPLER, Affiant

Date: February ___, 2000.

5

SERVICE CONTRACT

ATTACHMENT / EXHIBIT __

THIS CONTRACT, made and entered into by and between _____  _____,

of Florida,  Federal I.D. No. _____ (hereinafter called "BROKER") and

_____ with offices at_____

_____, (hereinafter called "INDEPENDENT CONTRACTOR"),

on this _____ day of _____, 19_____.

### WITNESSETH:

WHEREAS, BROKER is engaged in the business of arranging for the transportation by others of certain road building and construction aggregates, and related commodities; and

WHEREAS, INDEPENDENT CONTRACTOR is engaged in the business of transporting commodities similar or identical to those above-identified and in the pursuit of such business venture owns certain commercial motor vehicle equipment hereinafter identified, and as INDEPENDENT CONTRACTOR has advised BROKER of its desire to transport the commodities identified; and

| UNIT # | YEAR | MAKE | TYPE | I.D. # | TAG # |
|--------|------|------|------|--------|-------|

WHEREAS, BROKER desires to contract  for INDEPENDENT Contractor's services and equipment, INDEPENDENT CONTRACTOR hereby agrees to furnish BROKER, subject to the terms and conditions set forth in this Contract the motor vehicle equipment described above, to be used for the hauling of road building and construction aggregates;

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter stated, it is hereby agreed by and between BROKER and INDEPENDENT CONTRACTOR that, for and during the term hereinafter stated, BROKER shall adhere to and perform said provisions and INDEPENDENT CONTRACTOR will operate the equipment and perform such other services herein stated in the manner agreed to, and subject to the following terms and conditions:

I

The equipment to be furnished by INDEPENDENT CONTRACTOR as set forth above shall conform to the following requirements: it shall meet the safety requirements of the United States Department of Transportation, including but not limited to 49 C.F.R. S 393, and all other requirements of whatsoever nature imposed by any other municipal, state or governmental agency and compliance therewith shall be the obligation of and at the expense of INDEPENDENT CONTRACTOR.

II

INDEPENDENT CONTRACTOR shall provide and pay for all equipment and maintain same at his expense, included but not limited to all repairs for said equipment, gasoline and all fuel expense, parking charges and/or fees.  In addition thereto, INDEPENDENT CONTRACTOR shall provide and pay for all license fees, equipment use fees or taxes, driver license fees, fees added by municipal  corporation and any other state or governmental agencies for the proper and lawful operation of the equipment on the highways of the state.  INDEPENDENT CONTRACTOR shall also be responsible for all weight fines.

III

BROKER understands and agrees that the INDEPENDENT CONTRACTOR will choose which days of the week he wishes to work and which days of the week he wishes not to work.  INDEPENDENT CONTRACTOR is not obligated to accept for transportation any load or shipment offered by BROKER, but if such load or shipment is accepted, it will be INDEPENDENT CONTRACTOR'S  obligation under the terms of this Contract to transport such load or shipment, from origin to destination, but by a manner and means and over routes and in accordance with a schedule selected by INDEPENDENT CONTRACTOR.   It is also agreed and understood by the BROKER and the INDEPENDENT CONTRACTOR that the INDEPENDENT CONTRACTOR does not work exclusively for the BROKER and that the INDEPENDENT CONTRACTOR may work for other companies and brokers.

IV

INDEPENDENT CONTRACTOR represents to the BROKER that he is the owner and the operator of the above-described equipment.  INDEPENDENT CONTRACTOR warrants that any driver of said equipment, including INDEPENDENT CONTRACTOR, is properly licensed to operate such equipment as provided in 40 C.F.R. S383, or any and all applicable state laws or regulations, and that such driver shall obey all applicable federal and state laws and regulations, included but not limited to 49 C.F.R. S391 and 392 to the extent applicable, relating to the operation of the equipment.  INDEPENDENT CONTRACTOR further warrants that any driver operating such equipment will be covered, at the INDEPENDENT contractor's expense, with worker's compensation insurance.  Should such driver not be covered with worker's compensation insurance, the BROKER, at its option, may elect to cover such driver with worker's compensation and will make a deduction from the gross monies due the INDEPENDENT CONTRACTOR for such coverage.

V

INDEPENDENT CONTRACTOR further agrees to indemnify and save harmless BROKER from all loss, damage, injury or expense, including attorneys fees arising out of failure to the INDEPENDENT CONTRACTOR to comply with the provisions of the Contract, and to indemnify and save harmless BROKER from any and all claims, losses, fines and/or expenses arising out of the operation of any of the said equipment.  INDEPENDENT CONTRACTOR shall be solely responsible for and shall pay for all damage by reason of shortages, or any claims of those parties contracting with the BROKER, involving the use of the INDEPENDENT CONTRACTOR's equipment where a dispute arises as to the amount of hauling conducted by the INDEPENDENT CONTRACTOR and in the event shortage or loss shall be charged against the BROKER by the building contractor, the BROKER may deduct such loss or claim shortage from monies due INDEPENDENT CONTRACTOR.

We at AUSTIN TUPLER TRUCKING, INC., welcome you and thank you for contracting with our firm as an independent contractor.

Our entire staff is here to keep you advised as much as is possible of the many laws and regulations that you must adhere to as an independent contractor.

Should you at any time have any difficulty in understanding any of these laws of regulations, please telephone our office for an explanation, or to set up an appointment for a personal visit to our office where more detailed information that may help is available, or will be made available.

We do not own any trucks and, therefore, are not in competition with you.

Our staff constantly seeks jobs for you, the independent contractor, and can usually offer you many choices in different locations.

When you telephone each evening from 6:30 P.M. to 10:00 P.M., Sunday through Thursday and 5:30 P.M. to 9:00 P.M. on Friday, we will offer you your choice of what jobs are available for the next day. The choice is yours. You can accept or refuse any offer, as you determine what is best for you.

Chances are that from time to time you may have contracted for a job of your own privately, and would want to fill that commitment. Please be advised that you are your own boss - you do whichever job you please.

You must turn in your invoices to us with proof of delivery of any materials from one point to another, on those jobs that you selected to do from the job offers we made to you, in a timely manner. These invoices will be paid the Friday following the week the work was done in with the understanding that you turn your invoices in on time. If you do not give us an invoice with proof of delivery, we will not be able to pay you. We would also like it understood that we do not give loans or advances.

We have drop boxes in Dade, Broward and Palm Beach Counties, where you may deposit your invoices together with proof of delivery, for pick-up by our staff, thus saving you considerable postage. As an alternative, if you so desire, you may also deliver your invoices to us, together with proof of delivery to our offices from 6:30 AM to 10:00 PM Monday through Thursday, to 9:00 PM on Fridays, till noon on Saturdays, and from 6:30 PM to 10:00 PM on Sundays.

Accuracy, completeness and timeliness help us to process your invoices quickly, and we ask your cooperation in this matter.

At the end of the year and prior to January 31st of the new year, we will provide you with a Form 1099, indicating the gross amount we paid you as a result of your invoices to us, for those jobs you selected to do.

In return for the services that we perform for you, we will deduct 11% of your weekly gross as our brokerage fee.

From time to time we will provide you with updated information that may be of some importance to you.

According to the law (Florida DOT Chapter 397.12), you are required to have identification on both doors of your power unit. We will sell you a set of decals. However, you have no obligation to use them. You can use your own identification as long as it conforms to current law as far as size and lettering are concerned.

Once again, thank you for contracting with this firm. Ask around and you will find we have been working for other independent contractors like you and they will tell you that we find the best jobs in town.

By my signature affixed herein below, acknowledge receipt of a copy of this document.


_____          _____
Signature of Independent Contractor                    Date

# Austin Tupler Trucking, Inc.

ATTACHMENT / EXHIBIT

### 6570 SW 47 COURT • DAVIE, FL • 33314

## INDEPENDENT CONTRACTOR ACKNOWLEDGMENT

I, _____, hereby acknowledge that I am an Independent
Contractor (IC) under a service contract with Austin Tupler Trucking, Inc. (TUPLER).

Affidavit of Independent Contractor status:

I, _____, sworn under oath, do depose as follows:

1. I maintain a separate business with my own work facility, truck, equipment, materials or similar
   accommodations;
2. I hold or have applied for a federal employer identification number;
3. I perform or agree to perform specific services or work for specific amounts of money and control the means of
   performing the services or work;
4. I incur the principal expenses related to the service or work that I perform or agree to perform;
5. I am responsible for the satisfactory completion of work or services that I perform or agree to perform and could
   be held liable for a failure to complete the work or service;
6. I receive compensation for work or services performed for a commission or on a per job or competitive-bid basis
   and not on any other basis;
7. I may realize a profit or suffer a loss in connection with performing work or services;
8. I have continuing or recurring business liabilities or obligations; and
9. The success or failure of my business depends on the relationship of business receipts to expenditures.

Sworn by:

_____
Independent Contractor Name (please print or type)

_____     _____
Independent Contractor Signature                 Social Security Number

Sworn to and subscribed before me this _____ day of _____, Florida.

_____     Personally known to me

_____     Produced as Identification

Type of Identification: _____     Notary Public, State of Florida Seal

© Greenwich Risk Management - ICACK-0197

# Austin Tupler Trucking, Inc.

### 6570 SW 47 COURT • DAVIE, FL • 33314

## TO WHOM IT MAY CONCERN

This will serve to attest to the following outlined facts which directly relate to my business operations:

1.  That I work as an Owner-Operator/Independent Contractor.
2.  That my REMUNERATION is directly derived principally from my business operations as an Owner-Operator/Independent Contractor.
3.  That as a result of work performed under various contracts and/or work orders, I receive a stipulated price as agreed to by contract, whether oral or written, expressed and/or implied.
4.  That the control and direction of my method and/or procedure of work is completely at my option and/or discretion. However, under my contract I must comply with all Federal, State, County and Municipal rules, laws and regulations.
5.  That within reasonable limits, I control the time element for completion of any given and/or continuing contract, as subject to the terms and conditions of the contract.
6.  That my business as an Owner-Operator/Independent Contractor, I do not have any employees.
7.  That I am aware that should I hire an employee or employees which should require me to prove Workers' Compensation Insurance on such employees, it is my responsibility to secure Workers' Compensation Insurance and furnish the lessee with a certificate of that insurance.
8.  That I am aware that the relationship between myself and the lessee makes me an Owner-Operator/Independent Contractor and I am not covered by Workers' Compensation Insurance.
9.  That the above listed facts are all true, correct and accurate to the best of my knowledge and belief.

Attested by:

_____

Owner-Operator/IC Name (please print or type)


_____          _____

Owner-Operator/IC Signature                        Social Security Number


_____          _____

Witness to Owner-Operator/IC Signature             Date

© Greenwich Risk Management - ICBIZOPSACK-0197

# Gilbert Southern

Corp.
*A Kiewit Company*

February 12, 2000

Austin Tupler Trucking, Inc.
6570 SW 47th Court
Davie, FL 33314

**ATTACHMENT / EXHIBIT**

Attention: Mr. Glen Tupler

Re:  I-95 Bridge Widening and Reconstruction
     FDOT Project No. 87270-3534
     Gilbert Southern Project No. 3152

Subj: **Trucking Delays**

Attn: Mr. Tupler

This letter is to notify Austin Tupler Trucking, Inc. that we have not received required deliveries since Thursday February 3, 2000. While we understand the reason for Tupler's failure, i.e., the independent travelers unwillingness to work, this is Tupler's problem, not Gilbert's. This subcontract requires that Tupler perform its work at "time as Contractor may direct, and so as to promote the general progress of the entire construction."

It further provides that you are fully responsible for our increased cost, including those assessed by the Owner, should your delay in performance result in our increased cost. Please be advised that we fully intend to hold Austin Tuper Trucking, Inc. responsible under the terms of our subcontract.

Sincerely,

**GILBERT SOUTHERN CORP.**

Timothy J. Cleary
Project Manager

cc:  Job File
     M. Conner, GSC
     Area Office, GSC

## STRIKE 2000

ATTACHMENT / EXHIBIT _P_

### VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/5/00 | 12:00 n. | 384 | The driver told me that he was able to do 1 load out of Whiteside. They told me that if he came back they would burn his truck. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

REPORT TAKEN BY: Tony August

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/6 | 6.20 AM | 6267 | _(illegible)_ |
| 2/6 | 6.50 | — | _(illegible)_ |
| 2/6 | 6.50 | — | _(illegible)_ |
| 2/6 | 6.45 | White Tank | 1 Truck on at _(illegible)_ |
| 2/6 | 6.50 | Picket Line | 418, 261, 266, 136, 237, _(illegible)_ 216  (funnel in) 260 261 |
| | 6.59 | Pinker | CSX Trucks coming in in foot |
| | 7.05 | Florida Hydraulics | in at of Pinker _(illegible)_ |
| | 7.25 | Back/up | Back entrance of Pit clean |
| | 745 | | 485, 486  I stopped Stoke to them they were loaded. I told them _(illegible)_ |
| | 8.15 | Stationed | Stationed @ Pinker fac. entrance. _(illegible)_ |
| | 8.40 | | _(illegible)_ |
| | 8.46 | | _(illegible)_ |
| | 9.00 | | _(illegible)_ Port everglades |
| | 9.40 | | @ Port everglades ( ship w/slag only 3 loads out of Port 384 & 385 _(illegible)_ |
| | 11.05 | | _(illegible)_ |
| | 10.45 | | 159, 419, in line 125 trucks strong 260, 261. _(illegible)_ 121 |
| | 11.15 | | update on Toyta trucks 473, 411, 548, 144, 247, 428 _(illegible)_ |
| | 1.45 | | The strike line extends from 152nd to T-like _(illegible)_ 152 to 100 Trucks.  3C Toyta Trucks _(illegible)_ |
| | 12.05 | | _(illegible)_ |
| | 12.46 | | _(illegible)_ |
| | 1.00 | | Parked @ entrance to Pinker fac |

**REPORT TAKEN BY:** T-10 _(illegible)_

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2-7 | 6:50 | 432 | stated that rocks were thrown at his truck sometime last week he also asked me after I gave him his dispatch if he would be able to get into the job because of the strike. |
| 2-7 | 7:19 | 471 | To please not ~~giving~~ give him anything out of W/R because of the strike. |
| | | 199 | *(illegible handwriting)* |
| 2-5 | 12:00 A | 384 | Told me that this ~~person~~ ... on his way out of Watergate, he was threatened with damage to his truck if he come back. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**REPORT TAKEN BY:** _____

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | (circled) | REMARKS |
|------|------|---------|-----------|---------|
| 2/1/0 | 6:00am | #626 | | *(illegible)* |
| 2/5/0 | 11:00a. | #616 | | *(illegible)* had on *(illegible)* a box of *(illegible)* train at 500 E 4th or way |
| | | | | He was not going back to way and taking of money Because of labor unrest |
| | | | | last tuesday & wed. 2/1 or 2/2/00 |
| | | | | was handing out flyers at way per |
| | | | | H BY-C4E  "Ronnie" |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**REPORT TAKEN BY:** _____

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/7 | 6³⁰ᴬᴹ | Ronnie | (W.R.Q.) Pitcan Sunday to R.R. Depot |
| | 9⁰⁰ | Theats | over the C.B. to trucks hauling on U.S. 27 To be care full and join the strike or windshields could be broken or trucks get on fire. |
| | 11⁰⁰ | Donni Mason, Steve (Nuland) (Tarmac), Bobby Heidraich (USR) | Donnie Offered escort if we wanted to send Tructs to Port Everglades |
| | 4⁰⁰ᴾᴹ | Donnie Mason (Tarmac) wanted truck to | haul to their plants. Refered to Glen |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

REPORT TAKEN BY: Jerry

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**REPORT TAKEN BY:**

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/7- | *illegible* AM | | *spoke with Rinker sec. security that told me there were no problems at the entrance* |
| 2/7- | | | |
| | *illegible* | | *while I spoke w/ Rinker security one of the lot trucks honked at us because the truckers going to shut's go to miramar, smith etc. Fla miami* |
| | 9:35 | | *Rinker sec. in (Tacoma) Toyota drove up to entrance at Rinker w/ 7 people 216, 121, 216, + 9 213, 49* |
| | | | *we left Bob/Wes w/Rinker sec.* |
| | | | 340, 416, 90, 911, 418, 218, 217 |
| | | | 287, 136, 366, 241, 105, 197, 97 |
| | | | 597, 251, 216, 48, 183, 548, 88, |
| | | | *60 people gathered @ entrance at Rink, FEC* |
| *illegible* | *illegible* | 7 Trl | Googe Trucks were threatened |
| | | | |
| *illegible* | FEC | Fleet Transport were threatened |
| *illegible* | | | |
| | | | Raining Broke up the Group |
| | | | |
| | | | |
| | | | |

**REPORT TAKEN BY:** *J. Gigg*   FEC

## STRIKE 2000

### VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 7/3/00 | 6 50 pm | 431 | AFTER HE RECIEVE OUR DISPATCH, HE WAS CALLED ON HIS CELL PHONE AND TOLD THAT "WE LIKE YOU, DO NOT GO OUT FROM ZINKEN" THEY DID NOT IDENTIFY THEM SELFS, HE DID NOT GO OUT FROM ZINKEN. |

REPORT TAKEN BY _____

# STRIKE 2000

### VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2-8-00 | 8:00AM | 95 | REPORTS: He was able to get out of Ricker Fee at 6:00 A.M. The Treats over CB and Trkers Blocking my Entrance to Ricker Impede me from going on. |
| 2-8-00 | 10:40 AM | 59 | REPORTS: On my way into (Solid Waste NW 138 ST & 97 Ave Miami with a load of Trash I was confronted by TJP #79 (Force) Told me not to go into the Pump, I asked why? Told me because no Trucks are supposed to be working. I will return the load. |

**REPORT TAKEN BY:** CECILIO A. Cill

Fab. E 2000

## STRIKE 2000

MARE TUPLER

### VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 02-8-00 | 7:15 Am | | 610 radio reports That 300 Dump Trucks are on strike because of Low wages. The dump Truck drivers say the rates are at the same rate they were 20 years ago. |
| | | | They say they make Avg 100⁰⁰ per day before you take out Brokerage. ② Fuel ③ Insurance |
| 2-8-00 | 12:00 noon | 45 CD 60 CD | Smith dce Pembroke Falls Shoridell 9146de 2 Pick-up Trucks Tell guys were waving guns Telling them not to work or else. |
| | | 61 CD | 61 was cut off by a pickup and told not work or else |
| 2-8-00 | 9:00 Am | 828 CD | Told not to work if want to keep his Truck in 1 Piece. to Leave. |
| 2-8 | 1:00 Pm | 401 Tupler | Smith dce Shoridell 9146de A pickup- full of guys Come up to his Door Don't work everybody on strike. Truck #299 was with the group Tupler |

REPORT TAKEN BY: _____

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/8/00 | 9:30 am | 118, 123, 622, 357 P342 | These trucks told me that #481 told them that he got a call last night at his home. He was warned not to go to Rinker FEC. They knew he was dispatched to Rinker. |
| 2/8/00 | 10:50 am | | I heard Allied trucks on the CB saying that today is the last day of work for them. They were saying that the trucks from W.P.B. have to join their brothers in miami. |
| 2/8/00 | 11:00 am | 357 | He told me that he heard that if any trucks left the yard, there would be damage to the truck. He wasn't threatened personally. |

REPORT TAKEN BY: Tony Angotti

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/5/00 | 3:00 AM | 159 | He was called at 3:30 AM and told not to go to work and that they better see his truck at okeechobee on Monday 2/7/00. He is running scared and his truck is parked at his house. There were rumors that his truck windshield was broken by strikers but he (is) denied the incident. |
| 2/8/00 | 8 AM | 167 | Was told not to go back or he will be taken care of. He is scared, not going to work. |
| 2/8/00 | 8:00 AM | 573. | Was told on the yard this morning that he would better stay put. Not to move his truck. |
| 2/5/00 | | 630 | Cracked the windshield of his truck on Friday. |

**REPORT TAKEN BY:**  Frank Villarrod

## STRIKE 2000

### VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/8/00 | 12:55 | 401 | (#71273-1) Threaten to do some damage to truck if continues to work. Approached by Spanish driver. |
| 2/8/00 | 12:55 | 273 | (#71273-1) Received a phone call from another Tuplen truck and he was told that his name was mentioned as a working driver. Some retaliation will follow. For his own safety to stay home. |
| 2/7/00 | 1:40pm | 285 | (#73073-1) Was told by Radio then by a line of people that blocked his truck as he approached tarmac to dump the slag from Port Everglades, not to come back anymore or else they were not going to be responsible. |
| 2/7/00 | 2:50pm | 384 | (#73073-1) Was stopped by a line of people as he came loaded out of tarmac to make sure that he won't come back, otherwise they will retaliate. He told them that he was not going to go back. |

REPORT TAKEN BY: _Frank Villarroel_

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/8 | | | 6 Miguel Huddel Station 1.59⁹ Diesel. |
| | | 1) 2 (GSE) | Gonzales & Sons is hauling for Racchi's Metro Turnpike Job from Rinker Lakes (5 Trucks) |
| | | 3) | Trucks moved from north of the Turnpike to: 138st to 116 Way intersection Tarmac & National to stop truck going to Tarmac Plants & Port |
| | 10⁰⁰ | | Tan Toyota Tacoma with 49, 416, 161, 217, stopping Rinker Trucks at their educ 418, 216 Picketers were screaming at Truckers hauling out of Rinker F.E.C. to stop, or they know where they lived or parked their trucks. |
| | All morning long. | | Threats over the C.B. to stop or somebody could be a victim of violence. |

**REPORT TAKEN BY:** Terry

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/9 | 7:45 AM | 533 | TRUCKER STATES THAT AS HE WAS PULLING OUT FROM HIS YARD THIS MORNING THE TIRES ON THE TRUCK WENT FLAT DUE TO NAILS BEEN PLACED UNDER THE TIRES ALSO ON DRIVER'S DOOR HAND WRITTEN ON THE DUST "WE ARE ON STRIKE" HE PARKS HIS TRUCK IN SW DADE COUNTY IN A PRIVATE YARD |

REPORT TAKEN BY: _____

NAME: [illegible]

DATE: 2-9-2000 [illegible]

NIGHT DISPATCH SHEET

| TAPE | TRUCK | JOB | TAPE | TRUCK | JOB | TAPE | TRUCK | JOB |
|---|---|---|---|---|---|---|---|---|

(6) COMING OUT [illegible]

A CAR WITH 6 TO 7 GUYS [illegible]

[illegible] ONE [illegible] OF THE [illegible]

[illegible] HIM WHY WAS HE LETTING THEM DOWN

[illegible] TO THAT AT THE END [illegible]

WAS [illegible] THE STRIKE. HE

TOLD [illegible]

[illegible] TO [illegible]

COULD NOT STOP WORKING. IF HE WAS GOING

TO LOSE HIS HOUSE AND HIS TRUCK, HE WAS

BETTER OFF DEAD ANYWAY. SO HE DID NOT

CARE IF THEY WERE GOING TO KILL HIM

OR HURT HIM [illegible]. THE OTHER GUY

SAID WE DO NOT WANT TO KILL HIM OR HURT HIM,

WE JUST WANT YOU TO STOP WORKING.

DRIVER ([illegible]) SAID, I WILL NOT STOP WORKING,

AND THEY LEFT.

## STRIKE 2000

### VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/9/00 | | 550 | These drivers, among others, were on |
| | | 581 | Lk RD. with pickt signs. They were |
| | | 554 | telling the working trucks to stop |
| | | | The leader is a driver from REC. Eastman, |
| | | | portland also had people on Lux RD. |
| | | | They went into Bishop to try to |
| | | | stop trucks. The leader is driving a |
| | | | white Dodge Dakota pickup. Most of |
| | | | the trucks went back to work after |
| | | | the strikers left. |
| | | | |
| 2/9/00 | 10:30 am | 141 | Was told to stop working at Bishop. The |
| | | | driver told me that they didn't threaten |
| | | | him but he didn't want any damage done |
| | | | to his truck. |

**REPORT TAKEN BY:** _Tony Angott_

NAME: [illegible]

DATE: 2-9-200

NIGHT DISPATCH SHEET

TRUCK [illegible]

| TAPE | TRUCK | JOB | TAPE | TRUCK | JOB | TAPE | TRUCK | JOB |
|---|---|---|---|---|---|---|---|---|

IN THE [illegible] BEFORE THE [illegible]
TRUCK [illegible] WITH [illegible]
THREE [illegible] WHEN [illegible] HE HEARD
ON THE CB SOMEBODY [illegible]
ELSE "WHAT IS THE [illegible] DOING [illegible]" HE
THOUGHT HE HEARD [illegible] "I CAN HEAR
YOU [illegible]. THEN THEY SAID "YOU [illegible]
YOUR TRUCK". SINCE HE HEARD THAT [illegible]
[illegible] THREATEN, HE JUST WENT
AHEAD & PARKED THE TRUCK.

NAME: _____
DATE: _____

NIGHT
DISPATCH
SHEET

| TAPE | TRUCK | JOB | TAPE | TRUCK | JOB | TAPE | TRUCK | JOB |
|------|-------|-----|------|-------|-----|------|-------|-----|
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |
|      |       |     |      |       |     |      |       |     |

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2/10/00 | 10.30 | G60 | Dick Rotherton ) 4 men in a Orange |
|  |  | G61 | Dick Rotherton ) Paving pickup truck came |
|  |  | CJ8 | Mustock ) into Bishop ct & stopped |
|  |  | 166 | these trucks. They told the trucks |
|  |  | 581 | that if they didn't stop their trucks |
|  |  |  | would be damaged. CJ8 was told |
|  |  |  | that his truck would be shot. |
|  |  |  | I recognized the 5 true guys |
|  |  |  | in the pickup truck. #166-Oscar Jimenez, |
|  |  |  | #581-Oscar Suarez. Tom connell called |
|  |  |  | P350. The police came out & took a |
|  |  |  | report. I gave the police the names |
|  |  |  | & addresses of the 2 people that |
|  |  |  | I recognized (case # 00-035307) |
|  |  |  | Later the trucks on strike told me |
|  |  |  | that they know it was me who gave |
|  |  |  | the police the names & addresses of |
|  |  |  | the threatners. |

**REPORT TAKEN BY:** Troy Hugott

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2-10 | 10:30A | 509 | Rocks + nails thrown at his truck by Rock Island Rd + Atlantic Blvd. |
| 2-10 | 3:00p. | 17 | Threatened by other truckers (5). If he worked they would tear up his truck. Palm Ave — |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

REPORT TAKEN BY: _____

**STRIKE 2000**

**VIOLENCE AND INTIMIDATION REPORT**

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2-23-00 | 8:15 AM | ROCA | Received a call from Carlos. Said that one of his TRKS # 717 sustained damages. A rock smashed the side window. A white pick up TRK with 4 pro strikers were seen at the site of incident. This incident took place at Miramar Parkway & 145 Ave. Our supervisor (Cerry) confirmed this action, we called B.S.O. to go to this site and make out a police report. Miramar Police: Case # 000 23757 Officer Thimpler. Informed the Hialeah Gardens Police (officer Romero) to be on the look out for the above described vehicle in the Okeechobee Area. |

REPORT TAKEN BY: ___Cecilio Gill___

# STRIKE 2000

## VIOLENCE AND INTIMIDATION REPORT

| DATE | TIME | TRUCK # | REMARKS |
|------|------|---------|---------|
| 2-22-00 | 9:15AM | 393 | Received A Call saying THAT AT Rozzo Pit, THere is An Individual Taking Pictures of All TRuck Going In And out of THis Pit. |
| 2-22-00 | 11:30AM | Rora | Received A call FRom CARlos saying THAT Pro Strike Individuals Followed His TRucks FRom Rozzo Pit To THe GilBert Job site (Biscayne 149st) And THAT A Confrontation Took Place. * Tiller Field superVisor were Told To Go To THis siTe. |

REPORT TAKEN BY: _____ Cecilio Gill _____

STATE OF FLORIDA          )
                          ) SS
COUNTY OF PALM BEACH)

ATTACHMENT / EXHIBIT ____

## AFFIDAVIT OF BERNIE EASTMAN

1      My name is Bernie Eastman.  I am part owner of Eastman Aggregates, Inc.

2      Our Company is a trucking and excavation company that supplies and hauls materials

to construction job sites.  We also provide hourly truck rentals for paving and other various jobs

3      Eastman Aggregates, Inc. owns four trucks of its own that are used in its business

Accordingly, most of our business is done through contracts with independent owner-operators who

own their own trucks

4      Our relationship with the independent owner-operators is strictly by subcontract.  Each

independent owner-operator signs an independent contractor agreement.  A copy of that agreement

is attached hereto as Exhibit "A."

5      The owner-operator controls the manner, means and details of his or her work.

6      The owner-operator can accept or decline any job that is offered.  The only condition

is that once a job is accepted, it must be performed until completed.

7      The owner-operator determines what days of the week and what hours he or she will

work

8      The amount paid to each independent contractor is determined by the amount hauled

or based on a competitive bid on a per job basis.  There is no set rate sheet to determine rates we pay

to independent owner-operators

9      Prior to the work stoppage by the independent owner-operators, our overall sales

were up over 43%.  Our sales have dropped dramatically since the work stoppage due solely to our

_____
Initials

Mar 09 00 05:22p    E  .tman Aggregates Inc    5    434 3477    p.3
MAR. 9 2000  5:07PM    NO. 0625  P  2/3

inability to deliver materials to the job sites as a result of the b  ycott

10.    It is our estimation that 75% of the truckers have wanted to work throughout the work stoppage but have been intimated by other owner-operators who are engaged in the work stoppage. Based upon threats of physical violence and damage to their trucks, these owner-operators have refused to work or haul any materials for Eastman Aggregates.

11.    Eastman Aggregates purchases materials from Ryans Lox Pit and Palm Beach Aggregate. At or near the entrance of each of these aggregate pits, protesting owner-operators have parked along the side of the road where they honk their horns and yell at truckers who are driving in or out of the aggregate pit. These drivers have also been approached by the protesting owner operators and told that they need to stop working and honor the work stoppage. They have been told that if they fail to honor the work stoppage, they would be subject to retaliation. As a result, we have been unable to provide any materials out of Palm Beach Aggregates or Ryans Lox Pit during the work stoppage.

12.    On or about February 14, 2000, we received a facsimile from Cathleen Scott of the law offices Strolla and Scott, P.A. The letter indicated that she represents the Owners Association of Palm Beach and Broward County and demanded that we increase the rates that we pay independent owner-operators by 30% based on the "1980 tariff rate." A copy of the letter is attached hereto as Exhibit "B."

13.    Eastman Aggregates does not use any tariff sheet in the payment of its drivers. I am also unaware of what the "1980 tariff rate" is or was.

14.    I have also received copies of a rate sheet that was supposedly approved by the Owners Association of Palm Beach and Broward County, a copy of which is attached hereto as

2

B. E

Initials

Case 0:00-cv-06223-ASG    Document 44    Entered on FLSD Docket 03/30/2000    Page 110 of 177
Mar 09 00 05:23p    E  tman Aggregates Inc    5  434 3477    p.4
MAR. 9. 2000  5:08PM    NC. 7525    P  3/3

Exhibit "C"

15.    The Owners Association of Palm Beach and Broward County has also solicited other independent owner-operators to join their Association, a copy of a flyer reported to be theirs is attached hereto as Exhibit "D"

16    During the course of the work stoppage, we received an anonymous phone call saying that if we continued to dispatch trucks that our office could burn down easily. We also had several drivers tell us they had been threatened by those protesting and as a result of the threats they would not work as long as the work stoppage was continuing   A copy of our incident log from February 9, 2000, is attached hereto as Exhibit "E"

Affiant further sayeth naught

I declare under penalty of perjury that  the foregoing affidavit consisting of sixteen (16) numbered paragraphs is true and correct to the best of my knowledge

BERNIE EASTMAN, Affiant

Date  March  9th, 2000

3                                                    B. E
                                                   Initials

ATTACHMENT / EXHIBIT

# INDEPENDENT CONTRACTOR AGREEMENT

## BACKGROUND

**A. Entity and Independent Contractor,** hereinafter identified, Desire: (1) to enter into an Independent Contractor arrangement so that their rights, obligations, duties, responsibilities, liabilities, taxes and other expenses will be determined and calculated at the commencement of their association; (2) to conform to the "Safe Harbor" rules of the IRS, and other governmental and Statutory requirements, concerning the determination and qualification of the status of Independent Contractor; (3) to enter into this Independent Contractor Agreement (herein referred to as Agreement) in order to guarantee to each other, the matter to be preformed by each Party, and for the Contractor to guarantee, indemnify and hold harmless the Entity, from a breach and/or deviation from the Agreement, by the Contractor.

**B. Relationship.** The relationship between the Parties shall be only that of Entity and an Independent Contractor, to the exclusion of any other relationship. Nothing contained herein shall be construed to be inconsistent with such relationship and status; nor constitute the Contractor, or any of its agents or employees, as servant, partner, employee, agent or representative of the Entity. Parties fully understand the differences and the legal and tax consequences resulting from the Independent Contractor relationship. Contractor can either accept or reject any work offered, but once accepted, Entity shall be obligated to pay and Contractor shall be obligated to complete such task.

**C. Parties** wish to enter into this Agreement and recognize that this Agreement is broad in scope and coverage, and will encompass all of Entity's and Contractor's work and the work of numerous different Professionals and Businesses.

**D. Arbitration Process.** Parties wishing to accomplish all objectives of this Agreement , without resorting to litigation which could cause irreparable injury and harm to each Party's goodwill and reputation, among others, have agreed, by signing this Agreement, to initially seek redress of grievances only through the Arbitration Process except as provided in the Restrictive Covenants. To save time, money, and expense among others, the Parties further intend to encourage compliance with the Arbitration Process by the assessment of Costs against Party who abuses or circumvents the Arbitration Process, and to discourage or minimize the Judicial or Court Process by assessment of Costs against the proponent thereof. The Parties request all courts sustain these provisions and wishes of the Parties, as contained herein, by enforcing this Agreement against the Party who litigates in violation of the Arbitration Process by assessing the Arbitration Cost, Court Cost, and Damages pursuant to the provisions of the Arbitration Process.

**E. Contractor** is desirous of consummating this Agreement with the Entity, in a capacity as herein described, which will necessitate the obtaining from and the disclosure by the Entity, of Trade Secrets, Proprietary and Confidential Articles, information and matters, including the establishment of personal relationships with groups, corporations, and other entities, or persons (such as but not limited to customers, clients, patients, patrons, or otherwise), doing business with or serviced by the Entity, and its employees and workers, some of which may be referenced herein. The Contractor acknowledges that the Entity will perform much of its disclosure within a short period of time after the signing of this Agreement, and therefore, to induce the Entity to enter into this Agreement and to divulge the foregoing, among others, the Contractor is willing, by this Agreement and otherwise, to abide by all the terms and conditions stated herein regardless of their burdensome nature, the legal consequences and the long lasting effect thereof.

**F. Business** conducted and the Professional Services rendered by the Entity entail Trade Secrets (partially defined in ¶ 12) and Proprietary and Confidential Articles, information and matters concerning the Entity's activities; such that circumstances mandate Secrecy and prohibition against the divulgence, release, disclosure, publication or unauthorized duplication and commercialization of any such information. Entity therefore requires, and Contractor agrees to grant and Guarantee, such protection through this Agreement, the Arbitration Process herein, the applicable Federal and State Laws and Courts thereunder, with the Contractor understanding that irreparable injury and harm may result from Contractor's breach or default of the provisions of this Agreement.

**G. Entity and Contractor:** recognize the tremendous value attributable to the Trade Secrets, Proprietary and Confidential Articles (Copyrights, Trademarks, Service marks, if any, when and where applicable) among others, which gives Entity, a Competitive Edge or Advantage; understand the importance of Secrecy concerning such Trade Secrets and Proprietary and Confidential Articles information and matters and the importance against Copying any of them (and the unlawful use of Copyrights and Articles or Programs which are Copyrighted, Trademarked and Service marked, if any, when and where applicable); are mindful of the irreparable injury and harm, which may result from breach of this Agreement and the divulging, releasing, disclosing, copying, or using of such Articles, information, or matters, in violation of this Agreement or otherwise.

**H. Entity** has expended time, expense and money over a period of time in locating, choosing, giving extra ordinary or specialized training or education, schooling, and giving experience to employees and workers of Entity and molding all into a well organized efficient and experienced working team. The contents hereof constitutes a "legitimate business interest" and a "protectible interest" to which Entity seeks protection. Contractor recognizes these facts and understands that such is a valuable asset of Entity and is an inherent part which attributes greatly to the successful operation of Entity's business, Profession, and activity.

Initials_____/_____
Contractor/Entity

I. **Parties Acknowledge** they: have read and understand this Agreement; Concur as to its contents and resultant effect; have authority to sign this Agreement without the joinder of anyone else; have been independently advised as to the legal content of this Agreement; have had an opportunity to hire Counsel of their own choice; and have received a copy of this Agreement.

J. **Symbol** (*#) refers to contents in INDEX ¶ 26, which bears the same (*#) and which contents are construed as though appearing at the citation (*#) in the paragraph's.

## FOR CONSIDERATION RECEIVED, THE PARTIES AGREE:

1. EXECUTION.
      This Agreement is executed by the names Party stated at (*1) (herein referred to as Entity) having its office at the address stated at (*2), and the Independent Contractor named at (*3) (herein referred to as Contractor) whose address is stated at (*4), on the date declared on (*5), in the county and State of (*6).

2. KNOWLEDGE OF CONTRACTOR.
      Contractor fully understands that there will be NO: Withholding, Social Security, Unemployment Compensation, Workers' Compensation, Taxes; Contributions to any Qualified Pension, Profit Sharing, Defined Benefit Plans and Trusts; Fringe Benefits; nor other similar expenses, to be paid by the Entity for, or on behalf of the Contractor, from payments made by the Entity, or from income to be received by the Contractor.

3. CONTRACTOR'S DUTIES AND OBLIGATIONS.
      Contractor understands he will be required to: pay for himself and his employees, Social Security at current rates, which will be higher than those normally paid as employee of Entity; Workers' Compensation; Unemployment Compensation; file necessary reports and returns with applicable governmental authorities and submit satisfactory proof thereof to, when requested by, Entity; Withhold Taxes or pay Estimated Taxes on income received from Entity, depending on his own circumstances.

4. ENTITY'S DUTIES AND OBLIGATIONS.
      Entity shall be required to: file US form 1099 ( or equivalent); performed fully other information-reporting requirements which may be necessary, such as those, pursuant to the Internal Revenue Service and the rules and regulations thereunder, from time to time, on all funds which may be paid to the Contractor.

5. PLACE OF BUSINESS.
      Contractor's work place shall be his own choosing. Contractor's presence on Entity's premises shall be required except as otherwise necessary to carry out the work required herein. Contractor's place of business is stated at (*7). Contractor shall pay the rent stated at (*8). Any other workplace used by the Contractor shall be at Contractor's own choosing and shall be at Contractor's own expense. Entity shall not furnish to contractor any place of Business unless specifically stated at (*7).

6. INVESTMENT AND INCOME FLUCTUATIONS.
      Parties acknowledge that Contractor has or will have a substantial investment (by lease or ownership) in equipment and assets used, which are of significant value in performing services for the Entity, such as those stated at (*9), among others. Additionally, Contractor understands that he risks income fluctuation, because profits are not guaranteed, but are linked to something other than the hours worked, such as sales, "other output" or those stated at (*10).

7 ARBITRATION PROCESS.
      a. **Intent of Parties.** Parties intend that this Arbitration Process shall have the broadest scope to resolve all issues except in those instances which cannot be the subject matter of Arbitration, and shall be construed to enforce its applicability and use. Arbitrators and Umpires shall have the broadest power and authority to resolve all such issues. Parties intend that the Trier of Fact shall liberally construe items of expense in Awarding Costs hereunder to those complying with the provisions hereof.
      b. **Entity and Contractor** shall simultaneously, within 5 calendar days after being given Notice of a Request for Arbitration by any Party, each appoint 1 Arbitrator. These appointed Arbitrators shall, withing 5 calendar days of their joint appointment, either render their Award or appoint a neutral party to sever as Umpire-Arbitrator. The Award of the Majority shall be binding and enforceable in any Court of Law or Equity. The Arbitrators shall be bound by the provisions of this Agreement and the applicable Arbitration Statutes of either the State named at (*11) of the Federal Government. The Arbitrators shall work expeditiously and with out undue publicity to render an Award or Decision according to their own simple, informal, and cost effective Procedure. All time periods stated herein may be extended, for reason, by written agreement of the Arbitrators.
      c. **In the event that either Entity or Contractor** fails(defaulting party) to appoint an Arbitrator, for any reason in time allocated, when otherwise required to do so pursuant to the provisions hereunder, then the Performing Party, who has already appointed his Arbitrator, shall be at liberty to seek and Arbitrator for the Defaulting Party with notice to the Defaulting Party, from the American Arbitration Association. Upon such appointment of such and Arbitrator, the Arbitration Process shall proceed as if such appointed Arbitrator, had been duly appointed by the Defaulting Party pursuant to the terms hereof. All shall be bound by the Award of the Arbitrators, to the same extent as if all Arbitrators were appointed by the Parties.

d. **In the event that the appointment Arbitrators** do not, for any reason, appoint and umpire, when and as required herein, then either Arbitrator, may seek an Umpire from the American Arbitration Association with Notice to the Defaulting Party, who, when so appointed, shall be deemed to have been Duly appointed pursuant the provisions of this paragraph, and their Award, shall be binding on all Parties, to the same extent as if each Arbitrator had been appointed by the Parties and their appointed arbitrators had appointed an Umpire.

e. **Definition.**

(1) Reference to the American Arbitration Association, shall broadly include any Group performing similar services including any Court or Judicially appointed person.

(2) Arbitration Cost shall include the cost of the American Arbitration Association and their Arbitrator(s) and Umpire(s), and all other appointed Arbitrator(s), and all costs and expenses associated or connected therewith or incurred in the Arbitration Process, including, but not limited to, depositions and other such pleadings and service, filing and secretarial expenses, copying and printing costs and other such similar expenses, except as stated in sub ¶e.(4).

(3) Court Cost shall include, but shall not be limited thereto, attorney and appellate fees, court and other expenses, filing fees, printing and copying expenses, depositions, other such pleadings and service, except as stated in sub ¶e.(4).

(4) A/C Cost shall be those costs incurred only during the period from the onset of Arbitration to the Final Award, which shall include the cost of court and judicial pleadings such as: service, attorney fees, and court costs incurred pursuant to, and in accordance with the Arbitration Process (such as but not limited to subpoenas for the attendance of witnesses, and for the production of books, records, documents and other evidence which is not otherwise available), and such pleading which are mutually agreed upon by the Arbitrators.

f. **Assessment of Arbitration Cost.**

(1) Any Party failing, at any time during this Arbitration Process, to appoint an Arbitrator (Defaulting Party) as required herein, shall bear the Arbitration Cost, except as otherwise provided in sub¶ i.

(2) Any Party who does not participate in the Arbitration Process in good Faith OR endeavors to circumvent, bypass, or obstruct in any manner the Arbitration Process by way of but not limited to that of technicalities, pleadings, or otherwise, shall be liable for, the Arbitration Cost, except as otherwise provided in sub ¶ i.

g. **Assessment of Court Cost.** Any Party who files any pleading in Court on any matter or issue which should properly have been the subject matter of the Arbitration Process, prior to the rendition of a final Award, and which is not an A/C Cost, shall be liable for all Court Cost connected therewith. In addition, such Party must comply with the Arbitration Process.

h. **Assessment of A/C Cost.** The A/C Cost shall always be bourne by the respective Parties.

i. **Comparative Assessment of Arbitration Cost.** In addition to all of the foregoing: If no Party has violated the provisions of sub¶s f (1) and f(2) above, OR if each of the Parties violates sub ¶s f (1) or f(2) above, then the Arbitration Cost, shall be assessed by the Arbitrators in relation to the respective positions of the Parties as they deviated from the Award Rendered by the Arbitrators. For example, if Party A offers to settle for [$200.00] and Party B demands [$800.00] and the Award of the Arbitrators is [$600.00], then Party A would pay 2/3 and Party B would pay 1/3 of the Arbitration Cost (Explanation, Party A: The deviation of Party A's settlement offer from the Arbitrators' Award =[$400.00] which is the numerator; and the SUM of each Party's deviation from the Arbitrators' Award =[$600.00] which is the denominator; Therefore, [$400.00]/[$600.00] or 2/3 of the Arbitration Cost is assessed to Party A).

j. **Court Cost of enforcing Arbitrators' Award.** In addition to all of the foregoing, any Party who is successful in Enforcing the provisions of the Arbitrators' Award pursuant to the Arbitration Process, shall be entitled to all Court Cost.

8. SERVICES OR WORK CONTRACTED.

Entity is contracting with Contractor for the performance of special service, skills or work stated at (*12), for the period stated at (*13), but not otherwise on an "on going" basis, and shall pay to Contractor by the Job and not by the Hour, for such service, skill or work, the sum stated at(*14), with all expenses and costs, not otherwise enumerated herein, to be paid solely by the Contractor.

9. INTERPRETATION.

a. **Background** shall be integral part of this Agreement and statements therein are true.

b. **Binding Effect.** This Agreement shall be binding upon and inure to the Benefit of the Parties, their successors, permitted assigns (which is not in violation of sub ¶10.a), Legal Representatives and heirs. Contractor shall execute any desirable or necessary documents to carry out the purposes hereof, but failure to do so shall not affect this Agreement.

c. **Construction.** Agreement shall be construed: according to the laws of the State of (*11); and interpreted in a manner to uphold and enforce the binding effect of all its provisions: to do justice to all Parties if doubt or ambiguity arises hear from. Nothing stated in this Agreement shall be construed:

(1) as granting to the Independent Contractor, any exclusive license or contract;

(2) as creating any other relationship than one of an Independent Contractor arrangement.

d. **Entity.** refers to its successors and assigns by merger, consolidation or otherwise.

e. **Invalid Portion.** Agreement is severable and the invalidity of any part shall not affect the validity of the remaining parts, which shall be enforceable accordingly.

f. - - - **In INDEX ¶26,** that Parties have considered the option and have opted for no response; it refers ONLY to the specific, immediate and

Initials_____/_____
Contractor/Entity

adjacent portion of the text contents, in which and wherein the Citation (*#) appears.

    **g. Legal Representative** refers to the executor, administrator, guardian, trustee, and/or any other similar personal substitute for a Party.

    **h. Order of Paragraphs** (¶'s). The Agreement shall be construed as a whole, with no importance being placed upon the order of the paragraphs.

    **i. Parties** refers to Entity, Independent Contractor & their legal representatives, whenever the context permits or requires.

    **j. Pronouns** refer to the masculine, feminine or neuter gender, and any word shall refer to the singular or plural, as required or appropriate to the context.

    **k. Supremacy.** Any discrepancy or ambiguity shall be resolved: in favor of the written as against the printed portion; in favor of the typed as against the printed portion; and in favor of the contents stated in INDEX ¶ 26, as against any other ¶.

    **l. Time Is Of The Essence** in all time periods in this Agreement.

    **m. Title of ¶'s** and sub-¶'s are for reference purposes only, and shall not limit, in any way, the contents, application or effect thereof.

## 10. GENERAL PROVISIONS.

    **a. Assignment** of Agreement by Contractor, shall not be valid without prior, written and signed consent of the Entity and such Assignment shall be void, with the assignee receiving no rights nor interest herein.

    **b. Entire Agreement.** This Agreement contains the entire understanding of the Parties; No modification, amendment, change or discharge hereof shall be valid or binding, unless such is made with the written consent of the Party to be charged.

    **c. Exhibits** (*15) are an integral part hereof, as though they appear verbatim herein.

    **d. Liability For Breach.** Subject to the Arbitration Process contained herein, any Party breaching any provision, shall be liable to the injured Party for damages and Court Cost. The injured Party shall have the right: of specific performance; to an injunction; to a receivership; and to all other legal or equitable remedies.

    **e. Modification** hereof is permitted only by instrument signed by Party to be charged.

    **f. Notice,** demand, offer or other information required or permitted to be given, made or sent, shall be written and signed by the Party making or giving same; such shall be sent by registered or certified mail, return receipt required, or my be made by personal delivery. Notices shall be sent to the Parties, at their addresses herein, or as may be changed in writing, from time to time. A Party relying upon personal delivery shall have the burden of proving same.

    **g. No Waiver,** weather oral or by inaction, shall be valid nor shall any such waiver, waive any subsequent breach, whether similar or dissimilar, unless such is in writing and signed by the Party against whom the waiver is asserted.

    **h. Survival ¶'s:** Background, 7, 9, 10, 12, 14, 15, 16, 18, 23, & 26 and other rights, obligations and liabilities, "timely accruing", shall survive Termination, expiration, cancellation or otherwise of this Agreement for enforcement thereof thereafter.

    **i. Termination.** Agreement shall Terminate upon Parties' bankruptcy, appointment of a receiver, assignment for benefit of creditors, or liquidation.

    **j. Venue** for Arbitration, Legal Proceeding, Litigation, or Trial is (*16).

## 11. NO CONTROL.

    Parties recognize and acknowledge that Entity is interested only in the Results to be obtained, and shall have no right whatsoever to control the means by which the results are to be accomplished, nor to direct the manner and method of performance by Contractor, nor over the number and scheduling of the hours to be worked, nor over the individuals to be employed by the Contractor, but such shall be under the sole control of the Contractor.

## 12 DEFINITIONS.

    **a. Trade Secret** means the whole or any portion or phase of any formula, pattern , device, combination of devices, or compilation of information which is for use, or is used, in the operation of a Business or Profession and which provides such an Advantage, or an opportunity to obtain an Advantage over those who do not know or use it. Trade Secret includes any scientific, technical, or commercial information including any design, process, procedure, list of suppliers, list of customers, business code, or improvement thereof. Irrespective of novelty, invention, patent ability, the state of the prior art, and the level of skill in the business or profession, art, or field to which the subject matter pertains, a Trade Secret is considered to be: (1) Secret; (2) Of Value; (3) For use or in use by such Business or Profession; and (4) Of Advantage to such Business or Profession, or providing an opportunity to obtain an Advantage, over those who do not know or use it.

    **b. Article** means any object, device, machine, material, substance, or composition of matter, or any mixture or Copy thereof, whether in whole or in part, including any complete or partial writing, record, recording, drawing, sample, specimen, prototype, model, photograph, microorganism, blueprint, map or Copy thereof.

    **c. Copy** means any of the following: (1) any facsimile, replica, photograph, or other reproduction in whole or in part of an Article and any note, drawing, or sketch made of or from and Article or part or portion thereof: (2) any material object, reproduced by any method, now known or later developed, from which the Article, in whole or part, can be perceived, reproduced or otherwise communicated, either directly or indirectly.

## 13. NO INTEREST.

    Contractor shall have no right, title, interest or claim to any of the Accounts or Trade Receivables or in any other Asset whatsoever, of the Entity, except as otherwise stated at (*17).

August 3, 1998                      Initials_____/_____

Page 4 of 8                              Contractor/Entity

# STATEMENT OF FACTS

**14. CONTRACTOR'S RESPONSIBILITY.**

Contractor shall be solely responsible for: all labor with necessary training and instruction; equipment, such as tools, motor vehicle; materials, such as printing, stationery; supplies; all insurance necessary or required overhead expense; and those stated (*18); and all other expenses, of whatever nature or kind, to be incurred in the performance of his duty, services, skills and work, under the Agreement, and shall be liable for damages and personal injury, connected or arising from his operation or performance hereunder.

**15. INSURANCE.**

**a. Contractor agrees** to supply insurance coverage which will fully exonerate, indemnify and hold harmless the Entity from and against any and all claims, actions and expenses (including attorneys' and appellate fees and other costs incidental to the defense of any such claim or action) which arise out of damage or injury (including death) to persons or property, and which are directly or indirectly caused by or sustained with reference to any act or omission of the Contractor in connection with the performance of its duties hereunder and to assume the defense of any and all such claims or actions, without expense to the Entity. Contractor shall provide the Entity with proof of its duties hereunder and to assume the defense of any and all such claims or actions, without expense to the Entity. Contractor shall provide the Entity with proof of such insurance and shall also provide for the insurer to notify the Entity in the event of any lapse or termination of such coverage.

**b. Contractor agrees** to procure and maintain a policy of general liability insurance in the amount stated at (*19) for all person discharging duties of the Contractor hereunder, whether on the payroll of the Entity or the Contractor. Such obligation for insurance coverage shall include the purchase of a "tail", which insures against claims made subsequent to the term hereof, or subsequent to any further or extended term hereof, to the extent that same allegedly occurred during said terms. In this manner, the Contractor's insurance will be fully effective throughout the period of limitations applicable to any claim. The Contractor shall provide Entity with proof of such insurance with respect to all employees and agents rendering service hereunder, and shall also provide for the insurer to notify the Entity in the event of any lapse or termination of such coverage.

**16. BOOKS AND RECORDS.**

Contractor shall set up and maintain adequate books and records for the performance of his duties, service, skills and work, under the Agreement, which shall clearly show all receipts from the Entity and disbursements for all items necessary or required of him, pursuant to the Agreement.

**17. EQUIPMENT AND SUPPLIES.**

Contractor shall be required to use its own equipment and supplies which shall remain the property of the Contractor. Entity shall in no event be responsible or liable for any damage to persons or property related to the use, misuse or failure of any equipment used by the Contractor, even though some existing equipment may be furnished, rented or loaned to the Contractor by the Entity. Contractor's use of such existing equipment shall constitute a full acceptance by it thereof, and the Contractor agrees to provide insurance coverage ( in the manner and to the extent provided in ¶ 15) as to any claim or action which may arise in connection with the use, misuse or failure of the equipment and supplies, whether owned by the Contractor or otherwise, regardless as to whom such damage may have been caused.

**18. GUARANTEE.**

Contractor guarantees the service and skills rendered and work performed, pursuant the Agreement, and shall promptly honor and make good on such guarantee, at his sole expense, whenever requested to do so by the Entity or required under the circumstances.

**19. LICENSES.**

Contractor shall obtain and maintain in good standing, at his expense, all city, county, state, federal, occupational, and other licenses required for the performance of his duties, services, skills and work under the Agreement. Such shall be made available to Entity immediately upon request.

**20. THIRD PARTY ACTION.**

This Agreement is not exclusive. Contractor may perform similar service, skills and work, as described n the Agreement, for third parties (not mentioned in Agreement), provided such does not in any way, directly affect his duties, services, skills and work to be performed under the Agreement and does not otherwise breach or is in conflict with the Agreement.

**21. DELEGATION OF WORK.**

Contractor may delegate to third parties, whatever services and work are necessary for performance under the Agreement, provided such does NOT:

(a) conflict with any other signed document, or understanding with the Entity;

(b) breach or conflict with any agreement, document or understanding between the entity and third parties;

(c) compromise the position of the Entity or Contractor in any way. An Exception to and a Restriction on the foregoing is stated at (*20). Contractor shall continue to remain personally liable in all events. In no way shall Contractor be acting in the capacity of foreman or supervisor on behalf

Initials_____/_____

Contractor/Entity

of entity when Contractor engages any assistants.

22. PROFITS AND LOSES.

Nothing in the Agreement shall guarantee to the Contractor, that he will make a profit or that any profit can or will be made from the performance of the duties, services, skills and work hereunder.

23. BREACH.

This Agreement may be terminated by the Entity without Liability therefore, whenever Contractor fails to diligently pursue the performance of his duties, services, skills or work, required under the Agreement or as necessary and required under the circumstances.

24. PROFESSIONALS AND #'S.

Contractor states that: the Attorney representing him in the conduct of his business/profession is, or will be (*21), whose address is (*22); the Accountant representing him, in maintenance of his books, records and filing of his Returns and other information-reporting requirements, is, or will be (*23), whose address is (*24); he carries Casualty insurance, Workers' Compensation insurance with the Insurance Company (*25) and Insurance Agent (*26), whose address is (*27); Contractor's I.D.# and /or his Social Security # is (*28); Contractor's Occupational License # is (*29); and Contractor's Business Tel. # is (*30).

25. SIGNS.

Entity shall make available to the Contractor certain designated signs, for use by the Contractor on a temporary basis during the following time periods and only for the following purposes stated when Contractor is working on jobs obtained by the Owner;

A. Whenever the Contractor is hauling and transferring earth material (gravel, sand, dirt and other similar substances) for and on behalf of the Entity.

B. For the purpose of facilitating the entering and leaving gravel, earth and sand pits and transferring contents therefrom to offsite jobs and other locations.

Initials_____/_____
                    Contractor/Entity

26. INDEX.

| | | | |
|---|---|---|---|
| (*1) | Eastman Aggregates, Inc. | :Entity. | ¶1 |
| (*2) | P.O. Box 6469<br>Lake Worth, FL 33466 | :Entity's Address. | ¶1 |
| (*3) | (Insert Name) | :Independent Contractor. | ¶1 |
| (*4) | (Insert Address) | :Independent Contractor's<br>Address. | ¶1 |
| (*5) | (Insert Date) | :Date Signed. | ¶1 |
| (*6) | Eastman Aggregates, Inc. Office | :Place Signed. | ¶1 |
| (*7) | - - - | :Contractor's place of<br>business | ¶5 |
| (*3) | - - - | :Contractor to pay the<br>Stated rent. | ¶5 |
| *9) | Year: (Insert Year)    Make: (Insert Make)<br>V. I. N.#:(Insert Vin #) | :Contractor's investment<br>In Assets. | ¶6 |
| (*10) | Amount hauled or competitive bid on a per job basis. | :Profits are linked to the items stated<br>herein and not to hours worked. ¶6 | |
| (*11) | State of Florida | :Applicable Law.    ¶7 & 9 | |
| (*12) | Certified Driver's License Class "B" or better. | :Special services, skills, work to be<br>performed by Contractor for Entity¶8 | |
| (*13) | One year, with option to renew as to be agreed upon<br>by both parties. | :Term of Agreement    ¶8 | |
| (*14) | On amount hauled or competitive bid on a per job basis. | :Entity's payment to Contractor for<br>such services.    ¶8 | |
| (*15) | Statement of Facts | :Exhibits    ¶10 | |
| (*16) | Palm Beach County ___ | :Venue for Arbitration, Litigation or<br>Trial.    ¶10 | |
| (*17) | - - - | :Contractor has no right, etc.,<br>except as stated.    ¶13 | |

Initials_____/_____
Contractor/Entity

STATEMENT OF FACTS

| (*18) | Insurance for the truck, fuel, maintenance, repairs, Workers Compensation, employment taxes (federal & state), and Fictitious Name Compliance. | :Contractor is to pay these expenses, among others¶14 |
| (*19) | Auto Insurance (State Minimum) $300,000.00. | :Amount of Insurance.   ¶15 |
| (*20) | Furnish copy of Insurance on (*9) and , Workers Compensation Coverage or Waiver of all employees. Valid Certified Drivers License Class "B" or better (*12) | :Restrictions on Contractor's delegation of services and work, if any.               ¶21 |
| (*21) | (Insert Name) | :Attorney            ¶24 |
| (*22) | (Insert Address) | :Attorney Address      ¶24 |
| (*23) | (Insert Name) | :Accountant          ¶24 |
| (*24) | (Insert Address) | :Accountant Address    ¶24 |
| (*25) | (Insert Carrier Name) | :Insurance company carrying Insurance.           ¶24 |
| (*26) | (Insert Agency Name & Agent's Name) | :Insurance Agent       ¶24 |
| (*27) | (Insert Agency Address) | :Insurance Agent's Address.¶24 |
| (*28) | (Insert FEN# or SS#) | :Contractors Federal  i. D. # or Social Security #.     ¶24 |
| (*29) | (Insert # & County) | :Contractor's Occupational License # & County of Issue.¶24 |
| (*30) | (Insert Phone #) | :Contractor's Business Telephone #. ¶24 |

By:_____

    Contractor/Authorized Signature
    Contractor: (Insert Name or Corp Name)
    Name/Title: (Insert Title)

By:_____

    Entity/Authorized Signature
    Eastman Aggregates, Inc.
    Patti Thornton/Vice President





ATTACHMENT / EXHIBIT _____

LAW OFFICES OF

# STROLLA & SCOTT, P.A.

CHARLES SCOTT
STACY STROLLA

February 14, 2000

TELEPHONE (561) 802-3132
FACSIMILE (561) 802-3121

**Via Facsimile 434-3477**
**& U.S. Mail**

Eastman Aggregate
3705 Bellevue Avenue
West Palm Beach, Florida 33461

Re:    Owners Assoc. of Palm Beach & Broward County
       (Striking Truckers Near Palm Beach Aggregates)

Dear Sir or Madam:

Please be advised that this law firm has the pleasure of representing the Independent truckers, collectively known as, The Owners Association of Palm Beach and Broward County [herein after referred to as "Association"]. This organization is currently comprised of approximately 175 independent truck drivers and owners in Palm Beach and Broward Counties. The membership is expected to increase over the next three days.

The Association has authorized me to make the following demands on their behalf for the purpose of resolving this serious crisis.

Their demands are as follows:

(1)    The Association requires that the brokers increase the pay rate by thirty percent (30% )based on the 1980 Tariff Rate.

(2)    The Association requires that the brokers follow the insurance minimum requirements set by the State of Florida at $300,000.00 Currently, several companies require drivers to carry $1,000,000.00 of insurance coverage, resulting in outlandish premiums.

(3)    The Association requires that all brokers who sell gasoline to the drivers comply with the licensing requirement set by the State of Florida for such sales.

120 SOUTH OLIVE AVENUE • SUITE 303 • WEST PALM BEACH, FLORIDA 33401

Eastman Aggregate
February 14, 2000
Page 2

(4)    The Association requires that all brokers are bonded through the Department of Transportation and State of Florida.

(5)    The Association requires that all rates are set and agreed to before the job begins and that all jobs have a five (5) hour minimum.

Obviously, both parties interests will best be served by an immediate, amicable resolve of this serious problem. As a result, we request that you respond to our demands in the next three (3) days.

Thank you in advance for your prompt response. I look forward to resolving this matter with you.

Sincerely,

Cathleen Scott

CS/cb

# RATE LIST

# LISTA DE PRECIOS

ATTACHMENT / EXHIBIT _____

RATE LIST APPROVED BY THE ASSOCIATION OF INDEPENDENT
TRUCK DRIVERS OF PALM BEACH COUNTY
DUMP TRUCK DIVISION

LISTA DE PRECIOS APROBADA POR LA ASOCIACION DE CAMIONEROS
INDEPENDIENTES DEL CONDADO PALM BEACH
DIVISION CAMIONES DE VOLTEO

FEBRUARY 2000

BY HOUR DAY TIME/POR HORA DE DIA (5 HOURS MINIMUM)

$41.80 TANDEM
$46.60 TRIAXLE
$66.50 TRAILER

BY HOUR NIGHT TIME/POR HORA DE NOCHE (5 HOURS MINIMUM)

$48.76 TANDEM
$50.06 TRIAXLE
$72.05 TRAILER

ADD $ 0.03 PER EACH LIGHT , STOP SIGN AND $0.10 PER TOLL

| | | | | | |
|---|---|---|---|---|---|
| 1 = 1.00 | 12 = 2.63 | 23 = 4.34 | 42 = 7.10 | 64 = 10.24 | 86 = 13.39 |
| 11/2 = 0.99 | 121/2 = 2.70 | 231/2 = 4.42 | 43 = 7.24 | 65 = 10.39 | 87 = 13.53 |
| 2 = 1.07 | 13 = 2.78 | 24 = 4.50 | 44 = 7.38 | 66 = 10.53 | 88 = 13.68 |
| 21/2 = 1.14 | 131/2 = 2.86 | 241/2 = 4.58 | 45 = 7.53 | 67 = 10.67 | 89 = 13.82 |
| 3 = 1.22 | 14 = 2.94 | 25 = 4.65 | 46 = 7.57 | 68 = 10.82 | 90 = 13.96 |
| 31/2 = 1.30 | 141/2 = 3.02 | 251/2 = 4.73 | 47 = 7.81 | 69 = 10.96 | 91 = 14.11 |
| 4 = 1.38 | 15 = 3.09 | 26 = 4.81 | 48 = 7.96 | 70 = 11.10 | 92 = 14.20 |
| 41/2 = 1.46 | 151/2 = 3.17 | 27 = 4.95 | 49 = 8.10 | 71 = 11.25 | 93 = 14.39 |
| 5 = 1.53 | 16 = 3.25 | 28 = 5.10 | 50 = 8.24 | 72 = 11.39 | 94 = 14.53 |
| 51/2 = 1.61 | 161/2 = 3.33 | 29 = 5.24 | 51 = 8.39 | 73 = 11.53 | 95 = 14.68 |
| 6 = 1.69 | 17 = 3.41 | 30 = 5.38 | 52 = 8.53 | 74 = 11.67 | 96 = 14.82 |
| 61/2 = 1.77 | 171/2 = 3.48 | 31 = 5.53 | 53 = 8.67 | 75 = 11.82 | 97 = 14.96 |
| 7 = 1.85 | 18 = 3.56 | 32 = 5.67 | 54 = 8.81 | 76 = 11.96 | 98 = 15.11 |
| 71/2 = 1.92 | 181/2 = 3.64 | 33 = 5.81 | 55 = 8.96 | 77 = 12.10 | 99 = 15.25 |
| 8 = 2.00 | 19 = 3.72 | 34 = 5.95 | 56 = 9.10 | 78 = 12.25 | 100 = 15.39 |
| 81/2 = 2.08 | 191/2 = 3.80 | 35 = 6.10 | 57 = 9.24 | 79 = 12.39 | |
| 9 = 2.16 | 20 = 3.87 | 36 = 6.24 | 58 = 9.39 | 80 = 12.53 | |
| 91/2 = 2.24 | 201/2 = 3.95 | 37 = 6.38 | 59 = 9.53 | 81 = 12.68 | |
| 10 = 2.31 | 21 = 4.03 | 38 = 6.53 | 60 = 9.67 | 82 = 12.82 | |

ATTACHMENT / EXHIBIT

Tired Of Low Rates? High Insurance Premiums?

# OWNERS ASSOCIATION OF PALM BEACH & BROWARD COUNTY



## Invite You To Join Our Organization

## ALL INDEPENDENT DRIVERS & OWNERS INVITED TO JOIN OUR CAUSE

Membership In Our Organization Will Remain Open For Three (3) Days Until February 18, 2000. After That Time Membership Will Close.

All Benefits Negotiated Will Benefit Members _Only_–So Don't Miss Out.

**How To Join?**
You Can Join By Driving Your Truck to The Strike Zone (State Road 80 – 1 Mile West of Lion Country Safari). Membership Dues Are $30.00 Per Driver. JOIN NOW!!

# Eastman Aggregates, Inc.

February 10, 2000

Re:   Trucker Strikes

List of Events on 2/9/2000

Time:        6:30-7:00am
Where:       Palm Beach Aggregates Pit and East Coast Paving Asphalt Plant
             located on Southern Blvd East of 20 mile Bend
Description of events given to Alberton Oliva, truck foreman from the following
drivers (214,44, 1128, 101, 432, 1126, 3017).  They were hauling out of pit and
there were a bunch of dumptrucks with signs on them from Allied Trucking, Ro-
Go Trucking, and Siboney parked at the entrance of the pit and then along
Southern Blvd by the entrance, with guys picketing and the drivers said to Al we
don't want to have any trouble so we are going home.  Some of the trucks
continued to work and some went home.

Time:        9:30-10:00am
Where:       Ryan's Lox pit located @ Lox Road; Parkland, FL
Description of events given to Alberto Oliva, truck foreman from the following
drivers (435, 436, 437, 294, 292, 4861, 1279, 1173, 5858, 959, 969, 2311, 6, 1126,
799).  They were hauling out of pit and saw a group of guys picketing and said to
Al we don't want any trouble so we are going home. Some continued to work and
some went home.

Time:        After lunch
Where:       Pit on Southern Blvd & Crestwood
Description of events given to Alberto Oliva, truck foreman from the following
drivers (440, 999, 655, 326, 964).  A guy in a pickup truck came into the pit and
stated to the drivers, "Finish your day but, not be here tomorrow!"

Time:          1:00pm
Where:         Eastman Office located @ 3705 Bellevue Ave; Lake Worth, FL
What happened:   Carl Hauthaway answered an incoming phone call to the office
               and the conservation goes as follows:
Carl:          "Good afternoon Eastman"
Unknown:       "Is Bernie Eastman in?"
Carl:          "Bernie's on the other line, can I take a message or would you like to
               hold?"
Unknown:       "Just tell him something...Tell Bernie not to dispatch any trucks
               tonight. If he dispatches any trucks, that his office will burn down
               easily. You guys must cooperate."

Then the unknown male caller hung up the phone. Carl immediately *69'ed the
call and retrieved the phone number of (561) 795-7839. This incident was
reported to Palm Beach County Sheriffs Department and a statement was given to
Officer Matthew Lavidna # 6232 and is on record under case # 00-0355012. This
was reported to the police to have it on record if anything happened and to
heighten police patrols of the office. No action was taken to find out who the
caller was.


Report made by:   Patti Thornton
Statements from:  Al Oliva- Truck Foreman
                  Carl Hauthway-Assistant Comptroller

ATTACHMENT / EXHIBIT _____

STATE OF FLORIDA )
                 ) SS
COUNTY OF _____ )

### AFFIDAVIT OF _____

1.   My name is *Raul Cardellick* and I am the owner of _*Habnet, Inc*_.

2.   _*Habnet, Inc*_ is a truck brokerage business. We contract with about **90** different independent truck owner-operators.

3.   I attended a meeting on February 9, 2000, with various independent truck owner-operators.

4.   The meeting was held at the Hialeah City Hall and began at 3:00PM.

5.   I learned of the meeting from a fax I received on stationery from the law offices of Richard J. Diaz, P.A.

6.   Juan Aragonez who is the President of the association of owner-operator known as the Commission was present at the meeting.

7.   During the meeting, Mr. Aragonez indicated that rates paid to truckers needed to go up.

8.   Myself and the other brokers that were present at the meeting told Mr. Aragonez that we could not set prices.

9.   We also told Mr. Aragonez that the brokers do not set rates based on a rate sheet. There is no uniform rates sheet used by truck brokers.

_____A. C._____

Initials

10.    Mr. Aragonez emphasized that there needs to be a set minimum amount set for bids and a uniform, minimum tariff paid to truckers.

11.    Mr. Aragonez referred to rates on a rate sheet that was handed out to us at the meeting. A copy of this rate sheet is attached hereto as Exhibit "A".

12.    Mr. Aragonez emphasized that there had to be an agreement on setting a minimum tariff.

13.    After there were comments to Mr. Aragonez that the rates on the rate sheet appear to be high, the meeting broke down.

14.    The next day, on February 10, 2000, some drivers that have contracted with me to provide trucking services brought me a new rate sheet. A copy of which is attached hereto as Exhibit "B".

15.    When the truckers gave me the second rate sheet, they said that they had been given this new sheet and that it was better than the one we had been given before.

16.    The truckers told me that they want to establish a minimum tariff to be paid but that they would respect any current contracts that pay below the minimum they hope to set.

I declare under penalty of perjury that the foregoing affidavit containing sixteen (16) numbered paragraphs is true and correct to the best of my knowledge.

_____
AFFIANT

Date: February 17, 2000.



ATTACHMENT / EXHIBIT

**TON MILES**

FIRST 40 MILES HAUL ADD : $0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS : SUMAR $ 0.03 POR CADA LUZ Y SEÑAL DE PARADA

| | | | | |
|---|---|---|---|---|
| 1    - .080 | 13.5 - 2.53 | 32 - 5.01 | 57 - 8.17 | 82 - 11.34 | 107- 14.51 |
| 1.5 - .087 | 14   - 2.60 | 33 - 5.14 | 58 - 8.30 | 83 - 11.47 | 109- 14.63 |
| 2    - .094 | 14.5 - 2.67 | 34 - 5.26 | 59 - 8.43 | 84 - 11.60 | 109- 14.78 |
| 2.5 - .098 | 15   - 2.74 | 35 - 5.39 | 60 - 8.56 | 85 - 11.72 | 110- 14.83 |
| 3    - 1.01 | 15.5 - 2.80 | 36 - 5.51 | 61 - 8.69 | 86 - 11.85 | 111- 15.01 |
| 3.5 - 1.15 | 16   - 2.87 | 37 - 5.64 | 62 - 8.81 | 87 - 11.97 | 112- 15.13 |
| 4    - 1.21 | 16.5 - 2.94 | 38 - 5.76 | 63 - 8.94 | 88 - 12.10 | 113- 15.26 |
| 4.5 - 1.28 | 17   - 3.01 | 39 - 5.89 | 64 - 9.05 | 89 - 12.23 | 114- 15.39 |
| 5    - 1.35 | 17.5 - 3.08 | 40 - 6.02 | 65 - 9.18 | 90 - 12.36 | 115- 15.52 |
| 5.5 - 1.42 | 18   - 3.15 | 41 - 6.13 | 66 - 9.31 | 91 - 12.49 | 116- 15.65 |
| 6    - 1.49 | 18.5 - 3.22 | 42 - 6.27 | 67 - 9.44 | 92 - 12.55 | 117- 15.73 |
| 6.5 - 1.56 | 19   - 3.29 | 43 - 6.40 | 68 - 9.57 | 93 - 12.68 | 118- 15.91 |
| 7    - 1.63 | 19.5 - 3.35 | 44 - 6.54 | 69 - 9.70 | 94 - 12.81 | 119- 16.01 |
| 7.5 - 1.70 | 20   - 3.41 | 45 - 6.65 | 70 - 9.82 | 95 - 12.94 | 120- 16.14 |
| 8    - 1.77 | 21   - 3.56 | 46 - 6.78 | 71 - 9.95 | 96 - 13.11 | 121- 16.27 |
| 8.5 - 1.84 | 22   - 3.70 | 47 - 6.91 | 72 - 10.08 | 97 - 13.24 | 122- 16.40 |
| 9    - 1.90 | 23   - 3.84 | 48 - 7.03 | 73 - 10.21 | 98 - 13.37 | 123- 16.53 |
| 9.5 - 1.97 | 24   - 3.98 | 49 - 7.16 | 74 - 10.34 | 99 - 13.50 | 124- 16.66 |
| 10   - 2.04 | 25   - 4.11 | 50 - 7.29 | 75 - 10.47 | 100- 13.61 | 125- 16.77 |
| 10.5- 2.11 | 26   - 4.22 | 51 - 7.41 | 76 - 10.58 | 101- 13.74 | ********** |
| 11   - 2.18 | 27   - 4.38 | 52 - 7.54 | 77 - 10.70 | 102- 13.87 | ********** |
| 11.5- 2.25 | 28   - 4.51 | 53 - 7.67 | 78 - 10.83 | 103- 13.99 | ********** |
| 12   - 2.32 | 29   - 4.63 | 54 - 7.80 | 79 - 10.96 | 104- 14.12 | ********** |
| 12.5- 2.39 | 30   - 4.76 | 55 - 7.93 | 80 - 11.08 | 105- 14.25 | ********** |
| 13   - 2.46 | 31   - 4.88 | 56 - 8.05 | 81 - 11.21 | 106- 14.38 | ********** |

SALARY BY HOURS :
ON DAY TIME  $12.50
ON NIGHT TIME $14.00

EXHIBIT "A"

ATTACHMENT / EXHIBIT

## TON MILES

FIRST 40 MILES HAUL : ADD $ 0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS: SUMAR $ 0.03 POR CADA LUZ Y SEÑAL DE PARADA

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | = 0.70 | 13½ | = 2.20 | 26 | = 3.70 | 51 | = 6.45 | 76 | = 9.20 | 101 | = 11.95 |
| 1½ | = 0.76 | 14 | = 2.26 | 27 | = 3.81 | 52 | = 6.56 | 77 | = 9.31 | 102 | = 12.06 |
| 2 | = 0.82 | 14½ | = 2.32 | 28 | = 3.92 | 53 | = 6.67 | 78 | = 9.42 | 103 | = 12.17 |
| 2½ | = 0.88 | 15 | = 2.38 | 29 | = 4.03 | 54 | = 6.78 | 79 | = 9.53 | 104 | = 12.28 |
| 3 | = 0.94 | 15½ | = 2.44 | 30 | = 4.14 | 55 | = 6.89 | 80 | = 9.64 | 105 | = 12.39 |
| 3½ | = 1.00 | 16 | = 2.50 | 31 | = 4.25 | 56 | = 7.00 | 81 | = 9.75 | 106 | = 12.50 |
| 4 | = 1.06 | 16½ | = 2.56 | 32 | = 4.36 | 57 | = 7.11 | 82 | = 9.86 | 107 | = 12.61 |
| 4½ | = 1.12 | 17 | = 2.62 | 33 | = 4.47 | 58 | = 7.22 | 83 | = 9.97 | 108 | = 12.72 |
| 5 | = 1.18 | 17½ | = 2.68 | 34 | = 4.58 | 59 | = 7.33 | 84 | =10.08 | 109 | = 12.83 |
| 5½ | = 1.24 | 18 | = 2.74 | 35 | = 4.69 | 60 | = 7.44 | 85 | =10.19 | 110 | = 12.94 |
| 6 | = 1.30 | 18½ | = 2.80 | 36 | = 4.80 | 61 | = 7.55 | 86 | =10.30 | 111 | = 13.05 |
| 6½ | = 1.36 | 19 | = 2.86 | 37 | = 4.91 | 62 | = 7.66 | 87 | =10.41 | 112 | = 13.16 |
| 7 | = 1.42 | 19½ | = 2.92 | 38 | = 5.02 | 63 | = 7.77 | 88 | =10.52 | 113 | = 13.27 |
| 7½ | = 1.48 | 20 | = 2.98 | 39 | = 5.13 | 64 | = 7.88 | 89 | =10.63 | 114 | = 13.38 |
| 8 | = 1.54 | 20½ | = 3.04 | 40 | = 5.24 | 65 | = 7.99 | 90 | =10.74 | 115 | = 13.49 |
| 8½ | = 1.60 | 21 | = 3.10 | 41 | = 5.35 | 66 | = 8.10 | 91 | =10.85 | 116 | = 13.60 |
| 9 | = 1.66 | 21½ | = 3.16 | 42 | = 5.46 | 67 | = 8.21 | 92 | =10.92 | 117 | = 13.71 |
| 9½ | = 1.72 | 22 | = 3.22 | 43 | = 5.57 | 68 | = 8.32 | 93 | =11.07 | 118 | = 13.82 |
| 10 | = 1.78 | 22½ | = 3.28 | 44 | = 5.68 | 69 | = 8.43 | 94 | =11.18 | 119 | = 13.93 |
| 10½ | = 1.84 | 23 | = 3.34 | 45 | = 5.79 | 70 | = 8.54 | 95 | =11.29 | 120 | = 14.04 |
| 11 | = 1.90 | 23½ | = 3.40 | 46 | = 5.90 | 71 | = 8.65 | 96 | =11.40 | 121 | = 14.15 |
| 11½ | = 1.96 | 24 | = 3.46 | 47 | = 6.01 | 72 | = 8.76 | 97 | =11.51 | 122 | = 14.26 |
| 12 | = 2.02 | 24½ | = 3.52 | 48 | = 6.12 | 73 | = 8.87 | 98 | =11.62 | 123 | = 14.37 |
| 12½ | = 2.08 | 25 | = 3.58 | 49 | = 6.23 | 74 | = 8.98 | 99 | =11.73 | 124 | = 14.48 |
| 13 | = 2.14 | 25½ | = 3.64 | 50 | = 6.34 | 75 | = 9.09 | 100 | =11.84 | 125 | = 14.59 |

NOTE:
SALARY BY THE  HOUR:

- ON DAY TIME:  $ 35.00  per hour
- ON NIGHT TIME:  $38.00 per hour

MINIMUN 4 hours.

EXHIBIT "B"

ATTACHMENT / EXHIBIT ___

STATE OF FLORIDA        )
                        ) SS
COUNTY OF _Broward_  )

### AFFIDAVIT OF _____

1.  My name is _Gustavo londono_ and I am the owner of _Loma Trucking, Inc._

2.  _Loma Trucking_ is a truck brokerage business. We contract with about _30_ different independent truck owner-operators.

3.  I attended a meeting on February 9, 2000, with various independent truck owner-operators.

4.  The meeting was held at the Hialeah City Hall and began at 3:00PM.

5.  I learned of the meeting from a fax I received on stationary from the law offices of Richard J Diaz, P.A.

6.  Juan Aragonez who is the President of the association of owner-operator known as the Commission was present at the meeting.

7.  During the meeting, Mr. Aragonez indicated that rates paid to truckers needed to go up.

8.  Myself and the other brokers that were present at the meeting told Mr. Aragonez that we could not set prices.

9.  We also told Mr. Aragonez that the brokers do not set rates based on a rate sheet. There is no uniform rates sheet used by truck brokers.

Initials

10.     Mr. Aragonez emphasized that there needs to be a set minimum amount set for bids and a uniform, minimum tariff paid to truckers.

11.     Mr. Aragonez referred to rates on a rate sheet that was handed out to us at the meeting. A copy of this rate sheet is attached hereto as Exhibit "A".

12.     Mr. Aragonez emphasized that there had to be an agreement on setting a minimum tariff.

13.     After there were comments to Mr. Aragonez that the rates on the rate sheet appear to be high, the meeting broke down.

14.     The next day, on February 10, 2000, some drivers that have contracted with me to provide trucking services brought me a new rate sheet. A copy of which is attached hereto as Exhibit "B".

15.     When the truckers gave me the second rate sheet, they said that they had been given this new sheet and that it was better than the one we had been given before.

16.     The truckers told me that they want to establish a minimum tariff to be paid but that they would respect any current contracts that pay below the minimum they hope to set.

I declare under penalty of perjury that the foregoing affidavit containing sixteen (16) numbered paragraphs is true and correct to the best of my knowledge.

_____
                    AFFIANT

Date: February _17_, 2000.

ATTACHMENT / EXHIBIT ___

| TON MILES | | | | | |
|---|---|---|---|---|---|
| FIRST 40 MILES HAUL ADD : $0.03 PER EACH LIGHT & STOP SIGN | | | | | |
| PRIMERAS 40 MILLAS : SUMAR $ 0.03 POR CADA LUZ Y SEÑAL DE PARADA | | | | | |
| 1 - 080 | 13.5- 2.53 | 32 - 5.01 | 57 - 8.17 | 82 -11.34 | 107- 14.51 |
| 1.5 - 087 | 14 - 2.60 | 33 - 5.14 | 58 - 8.30 | 83 -11.47 | 108- 14.63 |
| 2 - 094 | 14.5- 2.67 | 34 - 5.26 | 59 - 8.43 | 84 -11.60 | 109- 14.76 |
| 2.5 - 098 | 15 - 2.74 | 35 - 5.39 | 60 - 8.56 | 85 -11.72 | 110- 14.88 |
| 3 - 1.01 | 15.5- 2.80 | 36 - 5.51 | 61 - 8.69 | 86 -11.85 | 111- 15.01 |
| 3.5 - 1.15 | 16 - 2.87 | 37 - 5.64 | 62 - 8.81 | 87 -11.97 | 112- 15.13 |
| 4 - 1.21 | 16.5- 2.94 | 38 - 5.76 | 63 - 8.94 | 88 -12.10 | 113- 15.26 |
| 4.5 - 1.28 | 17 - 3.01 | 39 - 5.89 | 64 - 9.05 | 89 -12.23 | 114- 15.39 |
| 5 - 1.35 | 17.5- 3.08 | 40 - 6.02 | 65 - 9.18 | 90 -12.36 | 115- 15.52 |
| 5.5 - 1.42 | 18 - 3.15 | 41 - 6.13 | 66 - 9.31 | 91 -12.49 | 116- 15.65 |
| 6 - 1.49 | 18.5- 3.22 | 42 - 6.27 | 67 - 9.44 | 92 -12.55 | 117- 15.73 |
| 6.5 - 1.56 | 19 - 3.29 | 43 - 6.40 | 68 - 9.57 | 93 -12.68 | 118- 15.91 |
| 7 - 1.63 | 19.5- 3.35 | 44 - 6.54 | 69 - 9.70 | 94 -12.81 | 119- 16.01 |
| 7.5 - 1.70 | 20 - 3.41 | 45 - 6.65 | 70 - 9.82 | 95 -12.94 | 120- 16.14 |
| 8 - 1.77 | 21 - 3.56 | 46 - 6.78 | 71 - 9.95 | 96 -13.11 | 121- 16.27 |
| 8.5 - 1.84 | 22 - 3.70 | 47 - 6.91 | 72 -10.08 | 97 -13.24 | 122- 16.40 |
| 9 - 1.90 | 23 - 3.84 | 48 - 7.03 | 73 -10.21 | 98 -13.37 | 123- 16.53 |
| 9.5 - 1.97 | 24 - 3.98 | 49 - 7.16 | 74 -10.34 | 99 -13.50 | 124- 16.66 |
| 10 - 2.04 | 25 - 4.11 | 50 - 7.29 | 75 -10.47 | 100-13.61 | 125- 16.77 |
| 10.5- 2.11 | 26 - 4.22 | 51 - 7.41 | 76 -10.58 | 101- 13.74 | ************ |
| 11 - 2.18 | 27 - 4.38 | 52 - 7.54 | 77 -10.70 | 102- 13.87 | ************ |
| 11.5- 2.25 | 28 - 4.51 | 53 - 7.67 | 78 -10.83 | 103- 13.99 | ************ |
| 12 - 2.32 | 29 - 4.63 | 54 - 7.80 | 79 -10.96 | 104- 14.12 | ************ |
| 12.5- 2.39 | 30 - 4.76 | 55 - 7.93 | 80 -11.08 | 105- 14.25 | ************ |
| 13 - 2.46 | 31 - 4.88 | 56 - 8.05 | 81 -11.21 | 106- 14.38 | ************ |

SALARY BY HOURS :
ON DAY TIME $ 2.50
ON NIGHT TIME $ 4.00

EXHIBIT "A"

ATTACHMENT / EXHIBIT ____

## TON MILES

FIRST 40 MILES HAUL : ADD $ 0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS: SUMAR $ 0.03 POR CADA LUZ Y SEÑAL DE PARADA

| | | | | | |
|---|---|---|---|---|---|
| 1 = 0.70 | 13½ = 2.20 | 26 = 3.70 | 51 = 6.45 | 76 = 9.20 | 101 = 11.95 |
| 1½ = 0.76 | 14 = 2.26 | 27 = 3.81 | 52 = 6.56 | 77 = 9.31 | 102 = 12.06 |
| 2 = 0.82 | 14½ = 2.32 | 28 = 3.92 | 53 = 6.67 | 78 = 9.42 | 103 = 12.17 |
| 2½ = 0.88 | 15 = 2.38 | 29 = 4.03 | 54 = 6.78 | 79 = 9.53 | 104 = 12.28 |
| 3 = 0.94 | 15½ = 2.44 | 30 = 4.14 | 55 = 6.89 | 80 = 9.64 | 105 = 12.39 |
| 3½ = 1.00 | 16 = 2.50 | 31 = 4.25 | 56 = 7.00 | 81 = 9.75 | 106 = 12.50 |
| 4 = 1.06 | 16½ = 2.56 | 32 = 4.36 | 57 = 7.11 | 82 = 9.86 | 107 = 12.61 |
| 4½ = 1.12 | 17 = 2.62 | 33 = 4.47 | 58 = 7.22 | 83 = 9.97 | 108 = 12.72 |
| 5 = 1.18 | 17½ = 2.68 | 34 = 4.58 | 59 = 7.33 | 84 = 10.08 | 109 = 12.83 |
| 5½ = 1.24 | 18 = 2.74 | 35 = 4.69 | 60 = 7.44 | 85 = 10.19 | 110 = 12.94 |
| 6 = 1.30 | 18½ = 2.80 | 36 = 4.80 | 61 = 7.55 | 86 = 10.30 | 111 = 13.05 |
| 6½ = 1.36 | 19 = 2.86 | 37 = 4.91 | 62 = 7.66 | 87 = 10.41 | 112 = 13.16 |
| 7 = 1.42 | 19½ = 2.92 | 38 = 5.02 | 63 = 7.77 | 88 = 10.52 | 113 = 13.27 |
| 7½ = 1.48 | 20 = 2.98 | 39 = 5.13 | 64 = 7.88 | 89 = 10.63 | 114 = 13.38 |
| 8 = 1.54 | 20½ = 3.04 | 40 = 5.24 | 65 = 7.99 | 90 = 10.74 | 115 = 13.49 |
| 8½ = 1.60 | 21 = 3.10 | 41 = 5.35 | 66 = 8.10 | 91 = 10.85 | 116 = 13.60 |
| 9 = 1.66 | 21½ = 3.16 | 42 = 5.46 | 67 = 8.21 | 92 = 10.92 | 117 = 13.71 |
| 9½ = 1.72 | 22 = 3.22 | 43 = 5.57 | 68 = 8.32 | 93 = 11.07 | 118 = 13.82 |
| 10 = 1.78 | 22½ = 3.28 | 44 = 5.68 | 69 = 8.43 | 94 = 11.18 | 119 = 13.93 |
| 10½ = 1.84 | 23 = 3.34 | 45 = 5.79 | 70 = 8.54 | 95 = 11.29 | 120 = 14.04 |
| 11 = 1.90 | 23½ = 3.40 | 46 = 5.90 | 71 = 8.65 | 96 = 11.40 | 121 = 14.15 |
| 11½ = 1.96 | 24 = 3.46 | 47 = 6.01 | 72 = 8.76 | 97 = 11.51 | 122 = 14.26 |
| 12 = 2.02 | 24½ = 3.52 | 48 = 6.12 | 73 = 8.87 | 98 = 11.62 | 123 = 14.37 |
| 12½ = 2.08 | 25 = 3.58 | 49 = 6.23 | 74 = 8.98 | 99 = 11.73 | 124 = 14.48 |
| 13 = 2.14 | 25½ = 3.64 | 50 = 6.34 | 75 = 9.09 | 100 = 11.84 | 125 = 14.59 |

NOTE:
SALARY BY THE  HOUR:

- ON DAY TIME:  $ 35.00  per hour
- ON NIGHT TIME:  $38.00 per hour

MINIMUN 4 hours.

EXHIBIT "B"



STATE OF FLORIDA     )
                        ) SS
COUNTY OF _____     )

ATTACHMENT / EXHIBIT 25

## AFFIDAVIT OF _____

1.     My name is RENE ARENCIB and I am the owner of OVERLAND _____

2.     _____ CARRIERS _____ is a truck brokerage business. We contract with about 70 different independent truck owner-operators.

3.     I attended a meeting on February 9, 2000, with various independent truck owner-operators.

4.     The meeting was held at the Hialeah City Hall and began at 3:00PM.

5.     I learned of the meeting from a fax I received on stationary from the law offices of Richard J. Diaz, P.A.

6.     Juan Aragonez who is the President of the association of owner-operator known as the Commission was present at the meeting.

7.     During the meeting, Mr. Aragonez indicated that rates paid to truckers needed to go up.

8.     Myself and the other brokers that were present at the meeting told Mr. Aragonez that we could not set prices.

9.     We also told Mr. Aragonez that the brokers do not set rates based on a rate sheet. There is no uniform rates sheet used by truck brokers.

Initials

10.    Mr. Aragonez emphasized that there needs to be a set minimum amount set for bids and a uniform, minimum tariff paid to truckers.

11.    Mr. Aragonez referred to rates on a rate sheet that was handed out to us at the meeting. A copy of this rate sheet is attached hereto as Exhibit "A".

12.    Mr. Aragonez emphasized that there had to be an agreement on setting a minimum tariff.

13.    After there were comments to Mr. Aragonez that the rates on the rate sheet appear to be high, the meeting broke down.

14.    The next day, on February 10, 2000, some drivers that have contracted with me to provide trucking services brought me a new rate sheet. A copy of which is attached hereto as Exhibit "B".

15.    When the truckers gave me the second rate sheet, they said that they had been given this new sheet and that it was better than the one we had been given before.

16.    The truckers told me that they want to establish a minimum tariff to be paid but that they would respect any current contracts that pay below the minimum they hope to set.

I declare under penalty of perjury that the foregoing affidavit containing sixteen (16) numbered paragraphs is true and correct to the best of my knowledge.

AFFIANT

Date: February 18, 2000.

ATTACHMENT / EXHIBIT A

## TON MILES

FIRST 40 MILES HAUL ADD : $0.03 PER EACH LIGHT & STOP SIGN

PRIMERAS 40 MILLAS : SUMAR $ 0.03 POR CADA LUZ Y SENAL DE PARADA

| | | | | | |
|---|---|---|---|---|---|
| 1 - .080 | 13.5 - 2.53 | 32 - 5.01 | 57 - 8.17 | 82 - 11.34 | 107 - 14.51 |
| 1.5 - .087 | 14 - 2.60 | 33 - 5.14 | 58 - 8.30 | 83 - 11.47 | 108 - 14.63 |
| 2 - .094 | 14.5 - 2.67 | 34 - 5.26 | 59 - 8.43 | 84 - 11.60 | 109 - 14.76 |
| 2.5 - .098 | 15 - 2.74 | 35 - 5.39 | 60 - 8.56 | 85 - 11.72 | 110 - 14.88 |
| 3 - 1.01 | 15.5 - 2.80 | 36 - 5.51 | 61 - 8.69 | 86 - 11.85 | 111 - 15.01 |
| 3.5 - 1.15 | 16 - 2.87 | 37 - 5.64 | 62 - 8.81 | 87 - 11.97 | 112 - 15.13 |
| 4 - 1.21 | 16.5 - 2.94 | 38 - 5.76 | 63 - 8.94 | 88 - 12.10 | 113 - 15.26 |
| 4.5 - 1.28 | 17 - 3.01 | 39 - 5.89 | 64 - 9.05 | 89 - 12.23 | 114 - 15.39 |
| 5 - 1.35 | 17.5 - 3.08 | 40 - 6.02 | 65 - 9.18 | 90 - 12.36 | 115 - 15.52 |
| 5.5 - 1.42 | 18 - 3.15 | 41 - 6.13 | 66 - 9.31 | 91 - 12.49 | 115 - 15.65 |
| 6 - 1.49 | 18.5 - 3.22 | 42 - 6.27 | 67 - 9.44 | 92 - 12.55 | 117 - 15.73 |
| 6.5 - 1.56 | 19 - 3.29 | 43 - 6.40 | 68 - 9.57 | 93 - 12.68 | 118 - 15.91 |
| 7 - 1.63 | 19.5 - 3.35 | 44 - 6.54 | 69 - 9.70 | 94 - 12.81 | 119 - 16.01 |
| 7.5 - 1.70 | 20 - 3.41 | 45 - 6.65 | 70 - 9.82 | 95 - 12.94 | 120 - 16.14 |
| 8 - 1.77 | 21 - 3.56 | 46 - 6.78 | 71 - 9.95 | 96 - 13.11 | 121 - 16.27 |
| 8.5 - 1.84 | 22 - 3.70 | 47 - 6.91 | 72 - 10.08 | 97 - 13.24 | 122 - 16.40 |
| 9 - 1.90 | 23 - 3.84 | 48 - 7.03 | 73 - 10.21 | 98 - 13.37 | 123 - 16.53 |
| 9.5 - 1.97 | 24 - 3.98 | 49 - 7.16 | 74 - 10.34 | 99 - 13.50 | 124 - 16.66 |
| 10 - 2.04 | 25 - 4.11 | 50 - 7.29 | 75 - 10.47 | 100 - 13.61 | 125 - 16.77 |
| 10.5 - 2.11 | 26 - 4.22 | 51 - 7.41 | 76 - 10.58 | 101 - 13.74 | *********** |
| 11 - 2.18 | 27 - 4.38 | 52 - 7.54 | 77 - 10.70 | 102 - 13.87 | *********** |
| 11.5 - 2.25 | 28 - 4.51 | 53 - 7.67 | 78 - 10.83 | 103 - 13.99 | *********** |
| 12 - 2.32 | 29 - 4.63 | 54 - 7.80 | 79 - 10.96 | 104 - 14.12 | *********** |
| 12.5 - 2.39 | 30 - 4.76 | 55 - 7.93 | 80 - 11.08 | 105 - 14.25 | *********** |
| 13 - 2.46 | 31 - 4.88 | 56 - 8.05 | 81 - 11.21 | 106 - 14.38 | *********** |

SALARY BY HOURS :

ON DAY TIME $2.50

ON NIGHT TIME $5.00

EXHIBIT "A"

## TON MILES

FIRST 40 MILES HAUL : ADD $ 0.03 PER EACH LIGHT & STOP SIGN
PRIMERAS 40 MILLAS: SUMAR $ 0.03 POR CADA LUZ Y SEÑAL DE

ATTACHMENT / EXHIBIT

| | | | | | |
|---|---|---|---|---|---|
| 1 = 0.70 | 13½ = 2.20 | 26 = 3.70 | 51 = 6.45 | 76 = 9.20 | 101 = 11.95 |
| 1½ = 0.76 | 14 = 2.26 | 27 = 3.81 | 52 = 6.56 | 77 = 9.31 | 102 = 12.06 |
| 2 = 0.82 | 14½ = 2.32 | 28 = 3.92 | 53 = 6.67 | 78 = 9.42 | 103 = 12.17 |
| 2½ = 0.88 | 15 = 2.38 | 29 = 4.03 | 54 = 6.78 | 79 = 9.53 | 104 = 12.28 |
| 3 = 0.94 | 15½ = 2.44 | 30 = 4.14 | 55 = 6.89 | 80 = 9.64 | 105 = 12.39 |
| 3½ = 1.00 | 16 = 2.50 | 31 = 4.25 | 56 = 7.00 | 81 = 9.75 | 106 = 12.50 |
| 4 = 1.06 | 16½ = 2.56 | 32 = 4.36 | 57 = 7.11 | 82 = 9.86 | 107 = 12.61 |
| 4½ = 1.12 | 17 = 2.62 | 33 = 4.47 | 58 = 7.22 | 83 = 9.97 | 108 = 12.72 |
| 5 = 1.18 | 17½ = 2.68 | 34 = 4.58 | 59 = 7.33 | 84 = 10.08 | 109 = 12.83 |
| 5½ = 1.24 | 18 = 2.74 | 35 = 4.69 | 60 = 7.44 | 85 = 10.19 | 110 = 12.94 |
| 6 = 1.30 | 18½ = 2.80 | 36 = 4.80 | 61 = 7.55 | 86 = 10.30 | 111 = 13.05 |
| 6½ = 1.36 | 19 = 2.86 | 37 = 4.91 | 62 = 7.66 | 87 = 10.41 | 112 = 13.16 |
| 7 = 1.42 | 19½ = 2.92 | 38 = 5.02 | 63 = 7.77 | 88 = 10.52 | 113 = 13.27 |
| 7½ = 1.48 | 20 = 2.98 | 39 = 5.13 | 64 = 7.88 | 89 = 10.63 | 114 = 13.38 |
| 8 = 1.54 | 20½ = 3.04 | 40 = 5.24 | 65 = 7.99 | 90 = 10.74 | 115 = 13.49 |
| 8½ = 1.60 | 21 = 3.10 | 41 = 5.35 | 66 = 8.10 | 91 = 10.85 | 116 = 13.60 |
| 9 = 1.66 | 21½ = 3.16 | 42 = 5.46 | 67 = 8.21 | 92 = 10.92 | 117 = 13.71 |
| 9½ = 1.72 | 22 = 3.22 | 43 = 5.57 | 68 = 8.32 | 93 = 11.07 | 118 = 13.82 |
| 10 = 1.78 | 22½ = 3.28 | 44 = 5.68 | 69 = 8.43 | 94 = 11.18 | 119 = 13.93 |
| 10½ = 1.84 | 23 = 3.34 | 45 = 5.79 | 70 = 8.54 | 95 = 11.29 | 120 = 14.04 |
| 11 = 1.90 | 23½ = 3.40 | 46 = 5.90 | 71 = 8.65 | 96 = 11.40 | 121 = 14.15 |
| 11½ = 1.96 | 24 = 3.46 | 47 = 6.01 | 72 = 8.76 | 97 = 11.51 | 122 = 14.26 |
| 12 = 2.02 | 24½ = 3.52 | 48 = 6.12 | 73 = 8.87 | 98 = 11.62 | 123 = 14.37 |
| 12½ = 2.08 | 25 = 3.58 | 49 = 6.23 | 74 = 8.98 | 99 = 11.73 | 124 = 14.48 |
| 13 = 2.14 | 25½ = 3.64 | 50 = 6.34 | 75 = 9.09 | 100 = 11.84 | 125 = 14.59 |

NOTE:
SALARY BY THE HOUR:

- ON DAY TIME:  $ 35.00  per hour
- ON NIGHT TIME:  $38.00 per hour

MINIMUN 4 hours.

EXHIBIT "B"

STATE OF FLORIDA          )
                          ) SS
COUNTY OF BROWARD   )

ATTACHMENT / EXHIBIT 26

## AFFIDAVIT OF GERARDO FERNANDEZ

1.    My name is Gerardo Fernandez and I am the General Manager at Austin Tupler Trucking, Inc. ("Tupler").

2.    Austin Tupler Trucking, Inc. is a truck brokerage service who has independent contractor agreements with various independent owner-operators to provide dump truck and hauling services for Tupler.

3.    On February 9, 2000, I attended a meeting at the Hialeah City Hall on behalf of Tupler. I found out about the meeting when I received a fax from another broker announcing the meeting. The fax was on the letterhead of Richard J. Diaz, P.A. The fax indicated that Mr. Diaz and Mr. Hosey Hernandez represented "all current tractor trailer and dump truck drivers engaged in a work stoppage in Miami-Dade County, Florida." The letter indicated that the purpose of the meeting was "to discuss, negotiate and finalize all matters giving rise to this stoppage." A copy of the fax is attached hereto as Exhibit "A".

4.    When I arrived at the meeting at the Hialeah City Hall, Mr. Norvell Igarza handed me a rate sheet. A copy of which is attached hereto as Exhibit "B".

5.    Mr. Igarza, to the best of my knowledge, is the secretary for an association of independent truck owner-operators known as the Commission.

6.    Mr. Hosey Hernandez, Esq., who indicated he represented the Commission and its members was present at the meeting.

G.F.
Initials

7.      I did not stay for the meeting because Mr. Hernandez refused to allow us to have a court reporter present to take notes of the meeting.

8.      Because the rate sheet was given to me by an officer of the Commission and the purpose of the meeting was to resolve the strike, I understood that the rate sheet represented the demands of the association of truckers. The rates represent a uniform minimum tariff the truckers want all brokers to pay for their services.

9.      On February 14, 2000, I went to Tarmac, an aggregate pit with whom we do business. Parked on Okeechobee Road in the vicinity of the entrance to Tarmac were approximately 300 dump trucks owned by independent owner-operators.

10.     Several of the trucks had signs protesting Tupler Trucking. Photographs of these trucks with their signs is attached hereto as Exhibits "C", "D" and "E".

I declare under penalty of perjury that the foregoing affidavit consisting of ten (10) paragraphs is true and correct to the best of my knowledge.

Date: February _17_, 2000.

GERARDO FERNANDEZ, Affiant

ATTACHMENT / EXHIBIT 

LAW OFFICES OF
RICHARD J. DIAZ, P.A.

RICHARD J. DIAZ
ANA M. SANT STEBAN

2ND SOUTHWEST 3RD AVENUE
MIAMI, FLORIDA 33129-2335

(305) 285-1122
FAX (305) 285-0354

February 8, 2000

Molnat, Inc.
Via Facsimile: (305) 825-2302

REC Corporation
Via Facsimile: 1-954-581-5171

Allied Trucking of Florida
Via Facsimile: (305) 885-3131

F&C Trucking
Via Facsimile: (305) 823-2617

Sunrise Transport
Via Facsimile: (305) 829-1771

Lopelra Corp.
Via Facsimile: (305) 266-5703

Allied of West Palm Beach
Via Facsimile: (561) 640-4222

Wendel Dennis Trucking
Via Facsimile: 1-561-792-8912

Sorrel Development
Via Facsimile: (305) 883-4952

Junet
Via Facsimile: (305) 557-0300

Alco
Via Facsimile: (305) 655-3106

Overland Carriers, Inc
Via Facsimile: (305) 821-6520

Portland Trucking Serv.
Via Facsimile: (305) 690-9121

Try-County, Inc.
Via Facsimile: 1-954-450-0236

Farache Trucking
Via Facsimile: 1-954-742-5811

Austin Topler
Via Facsimile: (305) 583-0844

Alpeitia Trucking
Via Facsimile: (305) 220-6930

Marinel Trucking
Via Facsimile: 1-954-252-9138

Tate Transport
Via Facsimile: 1-954-581-6038

Rinker FEC
Via Facsimile: (305) 818-4951

National
Via Facsimile: (305) 822-7231

Florida Aggregate
Via Facsimile: (561) 718-3747

Dear Gentlemen:

February 8, 2000
Page 2 of 2

This letter advises you that my office, as well as the Law Office of Hosey Hernandez, Esq., represents all current tractor trailer and dump truck drivers engaged in a work stoppage in Miami-Dade County, Florida.

We are informed that most, if not all, company brokers are interested in an immediate meeting to discuss, negotiate and finalize all matters giving rise to this stoppage.

You are cordially invited to attend a meeting at Hialeah City Hall on Wednesday, February 9, 2000, from 3:00 p.m. to 5:00 p.m. Because of space concerns, we request only one representative per company and, if such company has legal counsel, one legal representative per company

Very truly yours,

Richard J. Diaz, Esq.                                    Hosey Hernandez, Esq.

ATTACHMENT / EXHIBIT 

## TON MILES

**FIRST 40 MILES HAUL ADD : $0.03 PER EACH LIGHT & STOP SIGN**
**PRIMERAS 40 MILLAS : SUMAR $ 0.03 POR CADA LUZ Y SENAL DE PARADA**

| | | | | | |
|---|---|---|---|---|---|
| 1 - 080 | 13.5- 2.53 | 32 - 5.01 | 57 - 8.17 | 82 - 11.34 | 107- 14.51 |
| 1.5 - 087 | 14 - 2.60 | 33 - 5.14 | 58 - 8.30 | 83 - 11.47 | 108- 14.63 |
| 2 - 094 | 14.5- 2.67 | 34 - 5.26 | 59 - 8.43 | 84 - 11.60 | 109- 14.76 |
| 2.5 - 098 | 15 - 2.74 | 35 - 5.39 | 60 - 8.56 | 85 - 11.72 | 110- 14.83 |
| 3 - 1.01 | 15.5- 2.80 | 36 - 5.51 | 61 - 8.69 | 86 - 11.85 | 111- 15.01 |
| 3.5 - 1.15 | 16 - 2.87 | 37 - 5.64 | 62 - 8.81 | 87 - 11.97 | 112- 15.13 |
| 4 - 1.21 | 16.5- 2.94 | 38 - 5.76 | 63 - 8.94 | 88 - 12.10 | 113- 15.26 |
| 4.5 - 1.28 | 17 - 3.01 | 39 - 5.89 | 64 - 9.05 | 89 - 12.23 | 114- 15.39 |
| 5 - 1.35 | 17.5- 3.08 | 40 - 6.02 | 65 - 9.18 | 90 - 12.36 | 115- 15.52 |
| 5.5 - 1.42 | 18 - 3.15 | 41 - 6.13 | 66 - 9.31 | 91 - 12.49 | 116- 15.65 |
| 6 - 1.49 | 18.5- 3.22 | 42 - 6.27 | 67 - 9.44 | 92 - 12.55 | 117- 15.73 |
| 6.5 - 1.56 | 19 - 3.29 | 43 - 6.40 | 68 - 9.57 | 93 - 12.68 | 118- 15.91 |
| 7 - 1.63 | 19.5- 3.35 | 44 - 6.54 | 69 - 9.70 | 94 - 12.81 | 119- 16.01 |
| 7.5 - 1.70 | 20 - 3.41 | 45 - 6.65 | 70 - 9.82 | 95 - 12.94 | 120- 16.14 |
| 8 - 1.77 | 21 - 3.56 | 46 - 6.78 | 71 - 9.95 | 96 - 13.11 | 121- 16.27 |
| 8.5 - 1.84 | 22 - 3.70 | 47 - 6.91 | 72 - 10.08 | 97 - 13.24 | 122- 16.40 |
| 9 - 1.90 | 23 - 3.84 | 48 - 7.03 | 73 - 10.21 | 98 - 13.37 | 123- 16.53 |
| 9.5 - 1.97 | 24 - 3.98 | 49 - 7.16 | 74 - 10.34 | 99 - 13.50 | 124- 16.66 |
| 10 - 2.04 | 25 - 4.11 | 50 - 7.29 | 75 - 10.47 | 100- 13.51 | 125- 16.77 |
| 10.5- 2.11 | 26 - 4.22 | 51 - 7.41 | 76 - 10.58 | 101- 13.74 | ----------- |
| 11 - 2.18 | 27 - 4.38 | 52 - 7.54 | 77 - 10.70 | 102- 13.87 | ----------- |
| 11.5- 2.25 | 28 - 4.51 | 53 - 7.67 | 78 - 10.83 | 103- 13.99 | ----------- |
| 12 - 2.32 | 29 - 4.63 | 54 - 7.80 | 79 - 10.96 | 104- 14.12 | ----------- |
| 12.5- 2.39 | 30 - 4.76 | 55 - 7.93 | 80 - 11.08 | 105- 14.25 | ----------- |
| 13 - 2.46 | 31 - 4.88 | 56 - 8.05 | 81 - 11.21 | 106- 14.38 | ----------- |

**SALARY BY HOURS :**
ON DAY TIME $42.50
ON NIGHT TIME $45.00



ATTACHMENT / EXHIBIT



ATTACHMENT / EXHIBIT



Mar-06-00 10:21A Steve Acosta Fla Carr Co 3058^74791          P.02
MAR 2 2000 4 51PM                                    NO C.73  P  J

STATE OF FLORIDA       )
                       ) SS
COUNTY OF DADE         )

ATTACHMENT / EXHIBIT 27

### AFFIDAVIT OF ENRIQUE ACOSTA

1.    My name is Enrique Acosta  I am employed with Truck Brokerage By National, Inc ("National Brokerage")

2.    National Brokerage provides dump truck services on construction projects where National Brokerage has contracts to provide such services.

3    As a result of the independent dump truck owner-operators' work stoppage in Dade County, our ability to meet the demands of our customers for trucking services has been greatly affected

4.    Several of our staff members have been subject to harassment, threats, and acts of violence by those who are engaged in the work stoppage. A list of events that occurred on February 9, and 10, 2000, is attached hereto as Exhibit "A."

5    One of our employee drivers reported an incident to the police after being stopped by a group of protesting truckers  During the confrontation, his brake lines were cut by one of the protestors, disabling the truck. A copy of the police report on this incident is attached hereto as Exhibit "B "

6    Our employee drivers have feared working during the work stoppage due to the acts of violence and threats that have been made against them, several even quit as a result.

Affiant further sayeth naught

I declare under penalty of perjury that the foregoing affidavit consisting of six (6) numbered paragraphs is true and correct to the best of my knowledge

ENRIQUE ACOSTA, Affiant

Date  March 6, 2000.

ATTACHMENT / EXHIBIT A

## INSIDENT REPORT

DATE:        02/10/00

TO:          SAFETY DEPARTMENT

CC:          FILE

FROM:        ENRIQUE ACOSTA

RE:          YEAR 2000 STRIKE

PRIORITY:    [URGENT]

Please be advised that this report is of **urgent** nature. Thus far throughout this strike our drivers and staff members have been subject to harassment, threats and violent acts. Below is a list of the independent occurrences:

- 02/09/00 approx. 10:00 a.m. one of our staff members was harassed and threatened.

- 02/09/00 approx. 7:00 p.m. one of our administrators was threatened and verbally abused.

- 02/09/00 approx.: 7:30 p.m. Unit #: 4629 Antolin Sierra was vandalized at the entrance of Union Rock on 58 street. Brake lines were cut immobilizing the unit. Also, the driver was threatened that if returned substantial damage would come to the unit and the driver.

- 02/09/00 approx. 8:00p.m. Unit # 4532 Manuel Gonzalez was vandalized at the entrance of Union Rock on 58 street. Brakes lines were cut. Also, driver was threatened that if returned substantial damage would come to both the unit and the driver.

- 02/10/00 approx. 10:30a.m. Unit # 3630 Luis Boveda was threatened at one of our pick-up locations.

- 02/10/00 approx. 11:00a.m. Unit # 7083 Rolando Aguilar was threatened at one of our pick-up locations.

- 02/10/00 approx. 13:30p.m. Six company units on N.W. 121 Way were attacked with flying objects and were harassed.

Please note that these are just some of the incidents that have occurred

DAV

# OFFENSE-INCIDENT REPORT

## MIAMI-DADE POLICE DEPARTMENT

Agency Report Number: 2000-0389

| Field | Value |
|---|---|
| Date of Involvement | |
| Original Day Reported | Wed | Date 02-09-2000 | Time (mil) 20:15 | Time Arrived (mil) 2023 | Time Completed (mil) 2052 |

Incident Type: Felony / Traffic Felony

Incident Day: From 02-09-2000 1830

#INC 1 Type 3 - Description: Criminal Mischief

Statute Violation Number: C 806-13

#INC 2

Incident Location (Street, Apt. Number): NW 121 Way + 104 Rd   City: Medley   Zip: 33178   District: 22   Grid: 872   Area   Zone: 03

Business Name/Area Identifier: Roadway

Forced Entry: 0 (1.N/A 2.No 3.Yes)   Occupancy: 0 (1.Unoccupied 2.Occupied 3.Abandoned)

### Location Type
- 01. Residence-Single
- 02. Apartment/Condo
- 03. Residence-Other
- 04. Hotel/Motel
- 05. Convenience Store
- 06. Gas Station
- 07. Liquor Sales
- 08. Bar/Nightclub
- 09. Supermarket
- 10. Dept/Discount Store
- 11. Specialty Store
- 12. Drug Store/Hospital
- 13. Bank/Financial Inst.
- 14. Commercial/Office Bldg.
- 15. Industrial/Mfg
- 16. Storage
- 17. Gov't/Public Bldg
- 18. School/University
- 19. Jail/Prison
- 20. Religious Bldg.
- 21. Airport
- 22. Bus/Rail Terminal
- 23. Construction Site
- 24. Other Structure
- 25. Parking Lot/Garage
- 26. Highway/Roadway
- 27. Park/Woodlands/Field
- 28. Lake/Waterway
- 29. Motor Vehicle
- 30. Other Mobile
- 99. Other

26

| # OFFANC | # Victims | # Offenders | # Prem. Ent. | # Veh. Stolen | Type Weapon |
|---|---|---|---|---|---|
| 1 | 1 | 10 | 0 | 0 | |

Type Weapon: 00. N/A / 01. Handgun / 02. Rifle / 03. Shotgun / 04. Firearm / 05. Knife/Cutting Instrument / 07. Hands/Fist/Feet / 08. Poison / 09. Explosives / 10. Fire/Incendiary / 11. Threat/Intimidation / 12. Simulated Weapon / 88. Unknown / 99. Other

88

### Codes
V-Victim / W-Witness / C-Reporting Person / P-Proprietor / Z-Other

Victim Type: 0. N/A / 1. Juvenile / 2. L.E. Officer / 3. Adult / 4. Business / 5. Government / 6. Church / 9. Other

Race: N-N/A / W-White / B-Black / I-American Indian / O-Oriental/Asian / U-Unknown

Sex: N-N/A / M-Male / F-Female / U-Unknown

Residence: 1. Florida / 2. County

Residence Status: 0. N/A / 1. Full Year / 2. Part Year / 3. Non-Resident

Extent of Injury: 0. None / 1. Minor / 2. Serious / 3. Fatal

Injury Type: 00. N/A / 01. Gunshot / 02. Stabbed / 03. Laceration / 04. Unconscious / 05. Poss. Broken Bones / 06. Poss. Internal Injury / 07. Loss of Teeth / 08. Burns / 09. Abrasions/Bruises / 99. Other

Victim Relationship To Offender: 00. N/A / 01. Undetermined / 02. Stranger / 06. Parent / 04. Spouse / 04. Ex-Spouse / 05. Co-Habitant / 07. Step-Child / 08. Child / 09. Step-Parent / 10. In-Law / 11. Brother/Sister / 12. Other Family / 13. Student / 14. Teacher / 15. Child of Boy/Girl / 16. Boy/Girl Friend / 17. Friend / 18. Neighbor / 19. Sitter/Day Care / 20. Employee / 21. Employer / 22. Landlord/Tenant / 23. Acquaintance / 99. Other Known

### Victim/Witness 1
OFF/INC Indicator: 1 #1 J. Both #2   V/W Code: V   V. Type: 4   Name (Last, First, Middle or Business): National Brokerage, Inc.

Address (Street, Apt. Number): 12080 NW So River Dr   City: Medley   State: FL   Zip: 33178   Business Phone: (305) 888-1717

### Victim/Witness 2
OFF/INC Indicator: 1 #1 J. Both #2   V/W Code: c   V. Type: 4   Name (Last, First, Middle or Business): Sierra, Antolin

Address (Street, Apt. Number): 501 SW 104 Ave.   City: Miami   State: FL   Zip: 33174   Business Phone: (305) 552-0826

If V/W: W, V, or P   Race/Sex/Date of Birth or Age: WM 09-02-1928

### Suspect
OFF/INC Indicator: #1 J. Both #2

(suspect fields blank)

## NARRATIVE
Reporter states that he was stopped in the roadway by several protesters. One or more of the protesters went to the rear of the truck and cut the air brake hose on the right side, disabling the truck.

### Administrative
Person/Unit Notified   Time   Related Report Number(s)

Officer(s) Reporting: D. [signature]   I.D. Number(s)/Locator Code: 92 - 22   Unit: 303

Officer Reviewing (if applicable): Sgt. [signature]   I.D. Number: 699

Case Status | Clearance Type | A-Adult J-Juvenile | Date Cleared | Jail Number | Number Arrested

Page 1 of 2

**VEHICLE / PROPERTY REPORT**

METRO-DADE POLICE DEPARTMENT

☐ 1 Original
☐ 2 Supplement

Date of Supplement

Agency No.   Number: 2000 - 0839

**Original Date Reported:** 02 09 00
**Primary Offense Description:** Criminal Mischief
**Victim #1 Name:** National Parking

ATTACHMENT / EXHIBIT 2

Person Code: V
Status: I
Damage: 1
Type: 2
Year: 88
Make: Mack
Model: Dump Truck
Style:

Tag Reg./Doc. #: M0722R    Reg. State: Fl

VIN/Hull/FAA: 2M1N190Y8JC023628
Estimated Value: $

Condition: ☐ 1 Window Closed  ☐ 3 Keys in Ignition

Color (Top/Bottom): Blue

Recovery Address/Geographic Indicator:

Person Code/Item #: V
Status: I
Damage: 1
Property Type: 9
Quantity: 2
Name: A
Brand: I   Air Brake hose
Model Name/Number:

Value: $   Value Recovered: $ 51.00

**Officer(s) Reporting:** D. W. Scott
I.D. Number(s)/Locator Code: 92   22
Unit: 303
Date: 02-08-00

Page 2 of 2

nounce.

- The police officer may need to investigate further and request an arrest warrant from the State Attorney's Office before an arrest can be made. You can obtain information about your case by contacting the police agency listed below.
- You may be required to go to the State Attorney's Office to file a complaint before any further action can be taken.

## CASES INVOLVING JUVENILES

A juvenile is a person under the age of 18. A juvenile who is arrested and charged with a misdemeanor or non-violent felony may be released immediately into the custody of the parents or *legal guardian*. Juveniles charged with more serious crimes must go to a pre-detention hearing within 24 hours to set the conditions of release.

Remember, you have a right to be present at this hearing and tell the court how the crime affected you.

Detention hearings take place as follows:

Weekdays - Juvenile Court, 3300 N.W. 27th Avenue at 1:30 p.m.
Check with the information desk for the room number.

Weekends - Richard E. Gerstein Justice Building
1351 N.W. 12th Street, 5th floor at 9:00 a.m.

For questions about juvenile cases, including detention hearings and restitutions, call the Juvenile Division of the State Attorney's Office, (305) 637-1300.

advised when an arrest is made.

## SEXUAL ASSAULT OR INJURY

If you or your child were raped or sexually assaulted, seek IMMEDIATE the Rape Treatment Center, Jackson Memorial Hospital (Phone (305) 585-7 you have other injuries, tell your doctor.

## RECEIVING COMPENSATION

If you were physically injured as the direct result of a crime or were sexual assaulted, you may be eligible for financial assistance from the State of F Crimes Compensation Fund (1-800-226-6667). This fund may pay for your and/or psychological expenses, as well as time lost from work. You must in be deemed eligible to receive this benefit.

## RETURN OF PROPERTY BY LAW ENFORCEMENT

You have the right to request and promptly receive any property held for unless there is a compelling reason to retain the property.

## GENERAL VICTIM ASSISTANCE

Victims and witnesses shall be provided with assistance such as transporta parking, separate pretrial waiting areas, and translator services in attending it is practicable.

## NUMBERS TO CALL FOR HELP

Police Emergency . . . . . . . . . . . . . . . . . . . . . . . . . . . 911

**State Attorney's Office**
  Crime Victim Helpline (24 hours) . . . . . . . . . . (305) 545-4357

Domestic Violence Hotline/Coordination Unit . . . . . . (305) 547-3170

**Advocates for Victims Program**
  North Miami-Dade Victims Center . . . . . . . . . (305) 758-2546
  South Miami-Dade Victims Center . . . . . . . . . (305) 247-4249

Sexual Assault . . . . . . . . . . . . . . . . . . . . . (305) 585-RAPE (7273)
If you or a child are a victim of a sexual assault, it is very important that you contact the **Rape Treatment Center** (Jackson Memorial Hospital) for immediate emergency services. They offer medical treatment, pregnancy information and counseling and can provide important evidence to the court in a criminal case.

**Child, Elderly and Disabled Abuse** . . . . . . . . . . . 1-800-96-ABUSE
This hotline enables you to report abuse directly to Florida's Department of Children and Families. If you have knowledge of, or believe such abuse is taking place, you must, by law, report it to the Department of Children and Families. It also is advisable to call the police.

**Defendant Information**
  Miami-Dade County Jail . . . . . . . . . . . . . . . . . (305) 545-5011
  Call this number for bond hearing, booking and release information.

**Referral Information**
  Switchboard of Miami . . . . . . . . . . . . . (305) 358-HELP (4357)
  Family & Victim Services . . . . . . . . . . . . . . . (305) 643-8533
  For long-term family treatment services
  Attorney General's Office
  Crime Victim Information & Referral Desk . . . . 1-800-226-6667

**Domestic Violence (Adult)**
Primarily for battered women, the following p provide emergency assistance, shelter and, or counseling.

**Advocates for Victims Program** - Call the office near find out which program or service best meets needs:
  North Miami-Dade Victims Center . . . . . . . . . GO
  South Miami-Dade Victims Center . . . . . . . . . GO

Domestic Intervention Program . . . . . . . . . . . . . . G

Domestic Violence Hotline/Coordination Unit . . . . . G

Florida Coalition Against
Domestic Violence . . . . . . . . . . . . . . . . . . . . 1-

For further information, the Miami-Dade County Department of Justice System Support provides overall coordination of county victim services . . C

---

**Your case information:**

Police Department
_Medkef_

Phone
_883-7047_

Police Case #
_2000-0889_

Officer's Name                          I.D.#
_S. Casted_

Date of Offense
_2-9-00_

Address of Offense
_121 Way + 1030 BK_

**This case:**
☐ is a felony
☒ is a misdemeanor
☐ involves a juvenile

☐ **No arrest has been made:**
  ☒ To file charges you must go to the Criminal Intake Division of the State Attorney's Office (305) 547-0255 at:
    ☐ Graham Building, 1350 N.W. 12 Ave., 1st Floor
    ☐ Caleb Center, 5400 N.W. 22 Ave.
    ☐ North Miami-Dade Justice Center, 15555 Biscayne Blvd.
    ☐ South Miami-Dade Government Center, 10710 S.W. 211 Street
    ☐ Miami Beach Branch, 1130 Washington Ave.
  ☐ The investigation continues. You will be notified if an arrest is made.

☐ **An arrest has been made:**
  ☐ **You must appear** at the State Attorney's Office checked below:
    Day/Date: _____ Time: _____
    Call: (305) 547-0200 for appointment informa
    ☐ Graham Building, 1350 N.W. 12 Ave.
    ☐ North Miami-Dade Justice Center, Witness 15555 Biscayne Blvd.
    ☐ South Miami-Dade Government Center, 10710 S
  ☐ You will be notified by the State Attorney's Offi required to appear.

**DEFENDANT'S NAME(S):**
1) _____
2) _____
3) _____
Bring this brochure with you to the State Attorney

MED 01-3 12/99

STATE OF FLORIDA )
                 ) SS
COUNTY OF Dade   )                      ATTACHMENT / EXHIBIT _____

## AFFIDAVIT

I, _Jose Ramon Niebla_, having been informed that my cooperation and my giving

of this Affidavit is entirely voluntary, that I am free to answer or not answer any questions and to

give or not to give this Affidavit, that I will not be rewarded for my cooperation nor will there be any

adverse consequences if I exercise my right to refuse to assist or to give this Affidavit, and that I may

terminate my interview and my cooperation at any time, do hereby declare that:

1. On January 28, 2000 travelling South on Krome before getting to 8 street at around 6:00 a.m. I heard a loud explosion. It was dark so I didn't know what had happened. I thought my tire had blown out.

2. I proceed to stop along side the road after passing 8th Street. I then noticed that a gun shot had broken my windshield. I called FHP and the officer gave me a card with case number FHP00-25-05082-01.

JRN

I declare under penalty of perjury that the foregoing _eleven_ ( 11 ) paragraphs are true

and correct to the best of my knowledge and belief.

3. On February 15, 2000 I was following Velazquez on Krome going South towards Rinker Quarry at Krome & Kendall. As we were turning in, a mob of over 60-70 guys began attacking Velazquez's truck & mine as well.

4. These men were also pushing the security guards outside the Quarrey.

5. The men threatened me, told me to stop running my truck. They told me they would burn the truck and kill me.

6. The brake lines on my truck were cut by these men and they also cut an airbag.

7. As they began to disperse and no longer block us, we were able to move into the Quarrey.

8. From inside the truck I called 911 and Rinker when they were blocking us and hitting the trucks.

JRN

9. Inside the police showed up & I made a report. Attached is a copy of the card I received from the police with case # 86125-X.

10. I have received calls at home threatening me and have been told I would get hurt or killed if I ~~didn't~~ didn't stop running the truck. They also threatened to burn the truck.

11. I drive truck # 4261.    JRN



Contact/Case # 86125-X

HAMMOCKS
DISTRICT/UNIT

TELEPHONE 383-6860

☒ Offense Report
☐ Crash Report
☐ Contact Only

DATE REPORTED 2·15-00

Date/Time of Contact 1-15-00

V. Fernandez #2164
Name/Rank/ID #

An Internationally
Accredited
Police Service

CASE# FHP00-25-05082-01

# FLORIDA HIGHWAY PATROL

## DRIVER EXCHANGE INFORMATION

This form has been designed to assist all parties in making an immediate report to their Insurance Company. If you have no insurance, write "none" opposite item 10.

1. Date of Crash _01-28-00_

2. Location of Crash _STATE ROAD 997_

3. Driver's Name _____

4. Address _____

5. Business Phone _____ Home Phone _____

6. Year and Make of Automobile _____

7. License Number _____ State _____

8. Name of Owner _____

9. Address of Owner _____

10. Insurance Company or Agent (Liability) _____ Policy No. _____

11. Investigating Officer's Name _K C Daugharty 0408-0474_ - _FHP_
    _1011 NW 111 Av_
    _Miami, Fl_
    _(305-470-2500)_

**WHEN COMPLETED EXCHANGE WITH DRIVER OF OTHER VEHICLE**

HSMV 61041 (Rev 4/92)

STATE OF FLORIDA    )
                     ) SS
COUNTY OF Dade    )

ATTACHMENT / EXHIBIT 29

## AFFIDAVIT

I, Pablo J. Coto _____, having been informed that my cooperation and my giving

of this Affidavit is entirely voluntary, that I am free to answer or not answer any questions and to

give or not to give this Affidavit, that I will not be rewarded for my cooperation nor will there be any

adverse consequences if I exercise my right to refuse to assist or to give this Affidavit, and that I may

terminate my interview and my cooperation at any time, do hereby declare that:

1. On February 10, 2000 at around 5:00 a.m. I was travelling in my truck going North on the Turnpike before the Okechobee exit to the Rinker Quarrey to pick up my first load.

2. A green chevy pickup with 3 guys in the back was trying to block me. At that time, I turned on to the middle median & made a u-turn to avoid them.

3. I was then travelling South on the Turnpike. The same pickup truck also made a u-turn and came after me.

P. J. C

4. They managed to pass me... When they were ahead, one of the guys in the bed of the pick-up truck fired a gun-shot towards me & the truck. The shot ~~xxx~~ missed me and hit the chauffeur's side door.

5. The pick up then left. I returned to the Rinker FEC Quarrey and made a report to the FHP.

*P.J.C*

I declare under penalty of perjury that the foregoing _____Five_____ ( 5 ) paragraphs are true

and correct to the best of my knowledge and belief.

STATE OF FLORIDA          )
                          ) SS
COUNTY OF Dade            )

ATTACHMENT / EXHIBIT 3

RG

## AFFIDAVIT

I, Ramon A. Gonzalez, having been informed that my cooperation and my giving

of this Affidavit is entirely voluntary, that I am free to answer or not answer any questions and to

give or not to give this Affidavit, that I will not be rewarded for my cooperation nor will there be any

adverse consequences if I exercise my right to refuse to assist or to give this Affidavit, and that I may

terminate my interview and my cooperation at any time, do hereby declare that:

1. On February 14, 2000 around 10:30 a.m. as myself and 15 to 20 other dump trucks were entering the Turnpike heading North off Okeechobee, we were blocked by some pickup trucks, who would not let us pass.

2. Two other trucks from another company passed and were attacked by rocks.

3. The police eventually came and they disbursed allowing us to pass.

4. On February 14, 2000 around 1:15 p.m. I along with another truck were leaving the South Lauderdale Plant. About 3 to 4 blocks after the plant, we were bombared with rocks.

5. These rocks came from men in a pickup & a jeep along side the road.

6. These men screamed obscenities and told us to stop.

7. The rocks damaged the truck's windshield, headlight & grill.

8. I have been called at home a number of times and been threatened. I have been told not to work & and that they would burn the truck.

9. I drive truck # 4196.

I declare under penalty of perjury that the foregoing _nine_ ( 9 ) paragraphs are true and correct to the best of my knowledge and belief.

STATE OF FLORIDA )
) SS
COUNTY OF Dade )

ATTACHMENT / EXHIBIT

## AFFIDAVIT

I, James J. Gylio , having been informed that my cooperation and my giving of this Affidavit is entirely voluntary, that I am free to answer or not answer any questions and to give or not to give this Affidavit, that I will not be rewarded for my cooperation nor will there be any adverse consequences if I exercise my right to refuse to assist or to give this Affidavit, and that I may terminate my interview and my cooperation at any time, do hereby declare that:

1. On February 15, 2000 I was driving a Tractor Trailer dump truck leaving the sweetwater cement plant towards the Rinker FEC Quarry at krome.

2. As I was travelling on krome about 5 to 6 miles before kendall Drive, some guys in a truck pulled up in front of me and began to slow down. Soon more trucks appeared. Eventually they forced me to stop. There were 3 pick up trucks in front of me and a couple behind me, with a number of guys.

3.   The guys on the trucks started to come up beside the trucks and speaking to me in spanish. I don't understand spanish. They began to beat on the truck.

4.   At this point one guy rolled up under the truck, to cut my brake lines. I put the truck in gear to move forward.

5.   I also got on the phone to call police. At this time they started yelling policia & took off.

6.   I had called FHP before the incident occurred to tell them I was sensing that they were following me. FHP never showed up.

I declare under penalty of perjury that the foregoing ___Six___ ( _6_ ) paragraphs are true and correct to the best of my knowledge and belief.

STATE OF FLORIDA )
                  ) SS
COUNTY OF Dade    )

### AFFIDAVIT

I, _Joel Velazquez_ , having been informed that my cooperation and my giving

of this Affidavit is entirely voluntary, that I am free to answer or not answer any questions and to

give or not to give this Affidavit, that I will not be rewarded for my cooperation nor will there be any

adverse consequences if I exercise my right to refuse to assist or to give this Affidavit, and that I may

terminate my interview and my cooperation at any time, do hereby declare that:

1. On February 15, 2000 as I was travelling in a dump truck to the Rinker Quarry at Krome and as I was turning into the Quarry my truck was attacked by a mob of about 40 to 50 guys.

2. The mob caused me to stop as they were blocking the entrance. They screamed obscenities at me.

3. The men threatened me and told me if I didn't stop working they would burn the truck.

4. They threw rocks at my truck, breaking one windshield.

5. The men cut my brake lines and cut the air bags that raise the dump truck.

6. I continued to drive forward and finally made it into the Quarrey.

7. The police showed up and made a report. A copy of the card I was given by the policeman is attached. It is case # 86125-X.

I declare under penalty of perjury that the foregoing _Seven_ (_7_) paragraphs are true

and correct to the best of my knowledge and belief.



Contact/Case # 86/25-X

DISTRICT/UNIT Hammocks

TELEPHONE 383-6860

DATE REPORTED 2-15-00

[X] Offense Report
[ ] Crash Report
[ ] Contact Only

Date/Time of Contact 2-15-00 1230hr

V. Fernandez #4164

Name/Rank/ID #

An Internationally
Accredited
Police Service

03/10/2000 10:23   9545815171          RETRANCA EQUPMENT AD              PAGE  02

STATE OF FLORIDA        )
                        ) SS                    ATTACHMENT / EXHIBIT 33
COUNTY OF BROWARD       )

## AFFIDAVIT OF ANGEL TRUJILLO

1.    I, Angel Trujillo, am the *President* of Retranca Equipment & Trucking Corporation.

2.    On February 8, 2000, around 10:30 a.m., I was in my truck on 172nd Avenue just South of Miramar Parkway. I had come to this road because I had heard that there were going to be people blocking the trucks.

3.    At that time, I witnessed six men in a late model pick-up on 172nd Avenue stop a dump truck and block its way in order to prohibit the truck from working.

4.    One of the men from the pick-up truck went behind the dump truck and cut the truck's brake lines.

5.    Scott, who is one of my customers, was also present and was attempting to write down the tag number of the pick up truck. As he started to take down the tag number, one of the guys from the pick up truck came from behind and attacked him. This same guy put him in a headlock and started hitting him. Another guy jumped in and also started to attack Scott.

6.    As I saw what was going on, I exited from my truck and helped to separate the men from Scott.

7.    The men then got in the pick up truck and took off.

8.    The police arrived shortly thereafter.

Affiant further sayeth naught.

I declare under penalty of perjury that the foregoing eight (8) numbered paragraphs are true and correct to the best of my knowledge.

                                    _____
                                    ANGEL TRUJILLO, Affiant

Date:  February  29, 2000.

STATE OF FLORIDA          )
                          ) SS
COUNTY OF BROWARD         )

ATTACHMENT / EXHIBIT 34

### AFFIDAVIT OF JEFF BAILEY

1.    My name is Jeff Bailey and I am employed as *TERMINAL MANAGER* for CSR Rinker.

2.    On February 10, 2000, one of the drivers reported that his truck had been shot. I went out to view the truck and there was a bullet hole in the gas tank. As a result of the damage to the gas tank, the truck had to be taken out of service.

3.    The shots at the truck were fired from a 1997 red Ford pick-up truck bearing the license plate of J9874E.

4.    I verified that the 1997 Ford pick-up truck is registered to Julio Gomez of 418 West 13th Street, Hialeah, Florida.

5.    On January 28, 2000, one of our trucks was damaged due to protestors throwing rocks. The rocks were thrown from a group of men in a 1998 white Dodge pick-up truck bearing the license plate RII44K.

6.    I verified the 1998 Dodge pick-up is registered to Rigoderto Pupo at 1555 West 44th Place, #338 in Hialeah, Florida.

7.    At Rinker we have faced problems with trying to send trucks out of our pit which have been blocked from accessing the Florida Turnpike.

8.    Other truckers have indicated they have been followed and forced off the road, threatened and had items thrown at their trucks.



Initials

9.    We have also had boxes of nails thrown on the road at the entrance to our aggregate pits in Dade County.

10.    It has been reported to me that all of the acts of violence, threats and blockades are by independent owner-operators who are involved in a concerted work stoppage.

11.    As a result of the work stoppage, our business has been down due to other brokers to whom we sell materials being unable to find independent owner-operators who would be willing to drive trucks to our pits to pick up the material for delivery to construction projects. Some of these truck brokers include Austin Tupler Trucking, Inc., Juner Hauling Corporation, Retranca Equipment & Trucking Corporation, and Truck Brokerage by National, Inc.

I declare under penalty of perjury that the foregoing affidavit consisting of eleven (11) paragraphs is true and correct to the best of my knowledge.



JEFF BAILEY, Affiant

Date: February _23_, 2000.

# STRIKE INFORMATION UPDATE

cc: J. Bailey, P. Fagan, B. Heydrich, J. Jenkins III, C. Kirkmeyer, L. Maguire, S. Maguire, B. Meyer, G. Pearson, K. Watson Sr.,
K. Watson Jr. M. Williamson

| Date | Time | To Who Done | Who Did It | Where | What Happened |
|------|------|-------------|------------|-------|---------------|
| 2-15-00 | am | Aggregate Drivers | Strikers Unknown | Krome Quarry | Two instances of brake lines being cut at Krome Quarry |
| 2-15-00 | 12 Noon | Jim Giglio | Strikers (3-4 men) Unknown | Krome Avenue | Traveling south on Krome Avenue a Ford pick-up slowed down and 3-4 guys came up behind him. As the car approached the pick-up parked in front of Jimmy, stopped forcing Jimmy to stop as well. He put the truck in gear to pull away and that's when one of the drivers pulled a knife and cut the brake lines. By this time he had already called the police, and knowing this the bandits took off. |
| 2-15-00 | am | Aggregate Drivers | Strikers Unknown | 595 Expressway | A driver had his radiator cracked. |
| 2-15-00 | 12:30 pm | Entrance Road to Cement Plant | Strikers Unknown | 137 Avenue SW | At the entrance to the Cement Plant there were several pick-up trucks and cars parked by the CSR Rinker sign with picket signs in their hands and one truck with a sign attached to the grill of the pick-up with a statement ref. tariffs in Spanish. The police was called out but they dispersed within ten minutes. |
| 2-15-00 | 3:00pm | | Strikers (various) | Outside White Rock | Approximately 80 people striking outside White Rock Quarry police is on the scene. |
| 2-15-00/ 2-16-00 | PM Noon | | Strikers (various) | Outside White Rock | Late afternoon 2-15-00 congregation of strikers and police at White Rock unconfirmed reports reveal that a DOT vehicle was struck by a thrown object. The culprit fled into the woods. Through use of helicopter and police dogs, the offender(s) were tracked down and arrested. If the report are true, it probably accounts for today's(2-16-00) dramatic decrease in striker activity as of Noon 2-16-00. |
| 2-15/2-16 | Evening | George Marrero | Strikers Unknown | Cement Plant | Windshield of truck was broken |
| 2-15/2-16 | Evening | Jose Auli | Strikers Unknown | Cement Plant | Windshield of truck was broken |
| 2-16-00 | 1:00 pm | Alfredo Rodriguez | Strikers Unknown | 195 and 595 | While traveling in Ft. Lauderdale on exit ramp of 195 connecting to West 595 he was struck by an unknown object and broke his windshield. |

| Date | Time | Driver | | Location | Description |
|---|---|---|---|---|---|
| 2-16-00 | 1:00 pm approx. | Carlos Perez (#4145) | Striker Unknown | 836 past Le Juenc exit | While traveling on 836 just past the Le Juenc exit a gold minivan cut-off the driver. The driver had to take evasive action to miss the van. Then driver of van began yelling at him. Believe driver of van was out of the Port of Miami. Jimmy Jenkins video taped the van as it left the scene. |
| 2-17-00 | 8:30 am | | Strikers Unknown | Krome Quarry Road | Approx. 25 strikers on Krome Avenue trying to close the Krome Quarry Road. |
| 2-17-00 | am | FAT Driver #8119 | Striker Unknown | Driver's home | Drivers' wife received a threatening phone call at their home stating that they would burn the drivers truck or cause harm in some way if driver did not stop running. Driver has continued to run with no incident today. |
| 2-17-00 | 10:00 a.m. | | Striker Unknown | Along Alico Rd. | Blocking incidents occurred again at 10 am along Alico Road. FHP was on the [?] and chased down offending driver |
| 2-17-00 | 2:00 pm | | Strikers Unknown | Intersection Alico and Corkscrew | Blocking incident occurred at intersection of Alico and Corkscrew at 2pm. Several of our drivers were delayed getting thru. FHP responded right away. |
| 2-18-00 | 6:45 am | Humberto De la Pena (#3109) | Strikers Unknown | Leaving FEC Quarry heading North | While traveling north out of FEC Quarry (Turnpike & 57th) ... truck driven by Humberto dela Pena. There was no damage to the truck the rock hit the bed of the trailer. |
| 2-20-00 | ? | Aggregate driver Alberto Cue | Striker Unknown | Driver's home | Threatening phone call in his home. |
| 2-21-00 | 1:25 pm | | Striker Unknown | Southbound on I95 | Traveling southbound on I95 near Hollywood Blvd when a white van pulled up beside him and threw a rock. The rock hit the lower section of his windshield but did not break it. |

STATE OF FLORIDA )
                 ) SS
COUNTY OF DADE   )

ATTACHMENT / EXHIBIT _____

### AFFIDAVIT OF TONY ANGOTTI

1. My name is Tony Angotti and I am employed with Austin Tupler Trucking, Inc.

2. On February 10, 2000, four men in an Omega paving pick-up truck entered the Bishop aggregate pit in Palm Beach County and stopped five trucks who were doing business for Austin Tupler Trucking, Inc.

3. Two of the individuals involved were Osmely Jiminez and Oscar Suarez. Both men are independent owner-operators who have contracted with Austin Tupler Trucking, Inc. in the past.

4. The drivers of the five trucks doing business with Austin Tupler Trucking, Inc. were stopped and told that if they did not cease doing business with Austin Tupler Trucking, Inc., that their trucks would be damaged. One of the truckers reported that he was told that if he did not stop working, his truck would be shot.

5. The police were called and told of the incident and given the names and addresses of Mr. Jiminez and Mr. Suarez.

6. I was told later by those owner-operators who are on strike that they knew that I am the one who gave the police the names and addresses of Mr. Jiminez and Mr. Suarez. The tone and the manner in which they told me this information was in a threatening fashion, indicating that there may be some retribution for my turning in these two people.

Affiant further sayeth naught.

_____ _____ Initials

I declare under penalty of perjury that the foregoing affidavit consisting of six (6) numbered paragraphs is true and correct to the best of my knowledge.

TONY ANGOTTI, Affiant

Date: February 24 , 2000.

2

Mar-06-00 10:23A Steve Acosta   Fla Carr Co 3058874791          P.02
MAR. 3 2000 12:21PM                                  NO 7017  P 2

STATE OF FLORIDA      )
                      ) SS
COUNTY OF DADE        )                    ATTACHMENT / EXHIBIT _____

## AFFIDAVIT OF EVETTE PEREA

1.    My name is ~~Evette~~ *Ivett* Perea and I am employed with Truck Brokerage by National, Inc.

2.    On March 1, 2000, I received a call from a man who identified himself as Juan Arragones. He said he is the president of Support Dump Trucking Group.

3.    Mr. Arragones asked to speak with Alex Acosta, owner of Truck Brokerage by National but Mr. Acosta was not available.

4.    Mr. Arragones asked that I leave Mr. Acosta a message. Mr. Arragones said to tell Mr. Acosta that he was calling about the tariff rates that should be paid to members of Support Dump Trucking Group for a job we are doing.

5.    The job Mr. Arragones referred to was the job we have at Port Everglades where truckers haul materials from the Port to Miami.

Affiant further sayeth naught.

I declare under penalty of perjury that the forgoing affidavit consisting of five (5) numbered paragraphs is true and correct to the best of my knowledge.

                        _____
                        ~~EVETTE~~ PEREA–Affiant
                        *Ivett*

March __6__, 2000.

MAR- 6-00 MON 14:56    TRUCKING    FAX NO. 9545830844    P. 02

ATTACHMENT / EXHIBIT __27__

On March 4, 2000 at 7:10 AM I received a telephone call from Trk No. 547, Inocente Vilche, stating that Dade Contracting was late arriving at the job at NW 113 Ct & 127 St, Medley -Nationwide Trucking- and that all the trucks were in place but that no one would be dumping because the price of $1.10 per ton was too cheap. I told him that I would call the customer to find out his arrival time and that I would call him back.

At 7:20 AM, I made contact with Luis Lara from Dade Contracting, and he told me that he was at the job site and he said: "These Cubans are outrageous, they are fighting among themselves in reference to what the price should be." I told him that our supervisor Rafael Gonzalez would be arriving shortly.

I spoke to Rafael and he told me to increase the price by five cents making it $1.15 per ton. I called Mr. Vilche and gave him the rate. He told me that he would pass on the information to the other drivers that were at this job site.

At 7:30 AM, I received a phone call from Trk No. 627, Felix Munoz, he told me that Inocente #547 had all the trucks stopped due to the price of the job. No one was allowed to dump. He told me that he did not want to be part of this situation and that after this load he would go home. Immediately after this, I received a telephone call from trk # 218, Alain Hernandez, he told me that he just had a verbal confrontation with one of the Tupler drivers because they were not giving Tupler the opportunity to do what he promised he would do. Alain did not specify which driver. He also said that this would be his only load for the day.

At 7:35 AM, Mr. Vilche called me again and told me that no one was in agreement of doing this job at $1.15 per ton.

After informing Austin Tupler of the situation, he told me to give them five cents more, making it $1.20 per ton. I placed another call to Mr. Vilche and he was given the new rate which he gladly accepted.

At 9:05 AM, a phone call was received from Trk #630, Dagoberto Munoz, he told me that the situation started when Trk #570, Oscar De Leon, came to the job site in his private vehicle and said to the truckers that they should not be working this job for the cheap rate of $1.10 per ton, and that he had a verbal confrontation with one of the Tupler drivers and that this was the main reason for which the early morning work stoppage took place.

CECILIO G.L    - 3/4/2000