

FILED by _____ D.C.

2000 MAR 30  AM 9: 13

CLERK U S DIST CT.
S.D. OF FLA - MIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 00-6223-CIV-GOLD/Simonton

AUSTIN TUPLER TRUCKING, INC., JUNER
HAULING CORPORATION, RETRANCA
EQUIPMENT & TRUCKING CORP., TRUCK
BROKERAGE BY NATIONAL, INC., and
EASTMAN AGGREGATES

        Plaintiffs,

vs.

SUPPORT DUMP TRUCKING GROUP, INC.,
JUAN ARAGONES, OSCAR DE LEON,
REYNALDO RODRIGUEZ, RAFAEL D.
JIMENEZ, NORVEL IGARZA, ALAYN
HERNANDEZ, EDUARDO RODRIGUEZ,
OSMELY JIMENEZ, OSCAR SUAREZ,
JULIO GOMEZ, RIGODERTO PUPO,
RENIER MARTINEZ, GIRALDO VICTORIA,
VICTOR MORALES, JOHN DOE 1 through 300,
OWNERS ASSOCIATION OF PALM BEACH
AND BROWARD COUNTY, CHARLES LUQUE,
JORGE VALIENTE, JOSE MATOS, ISAAC
TURGEMAN, ILCEANE SFORCA, OSSIE
FERNANDEZ, and DANIEL BALAZI

        Defendants.

**PLAINTIFFS' AUSTIN TUPLER**
**TRUCKING, INC., ET. AL.'S**
**MEMORANDUM OF LAW IN**
**SUPPORT OF THEIR MOTION**
**FOR PRELIMINARY INJUNCTION**

_____/

Pursuant to Rule 7.1(A)(1), S.D. Fla. L.R., Plaintiffs, Austin Tupler Trucking, Inc., Juner

Hauling Corporation, Retranca Equipment & Trucking Corp., Truck Brokerage By National, Inc.,



and Eastman Aggregates (collectively, "Plaintiffs") file this Memorandum of Law in Support of Their Motion for Preliminary Injunction.

## BACKGROUND FACTS[1]

Plaintiffs are all truck brokers in South Florida.  As truck brokers, they contract with general contractors or sub-contractors to provide trucking services on various construction projects in Dade, Broward, and Palm Beach counties.  Plaintiffs provide truck services on state and federal highway construction projects and other construction projects in interstate commerce.  By way of example, if a construction project needs 50,000 tons of rock to make asphalt or concrete, Plaintiffs contract to provide the material.  Plaintiffs purchase the material from an aggregate producer such as CSR Rinker, White Rock, Tarmac, or Palm Beach Aggregate.  Because Plaintiffs own few, if any, trucks, they contract with independent truck owner-operators, such as Defendants, to do the work.  When the contractor or sub-contractor says they need 3,000 tons of material a day for the next 3 weeks, Plaintiffs offer the jobs to the number of trucks needed to meet the demands of the construction project.  The price paid depends on the bid price accepted by the general contractor or sub-contractor.  MPI ¶¶ 1-2.

Defendants are all independent contractors.  Many of the Defendants call Plaintiffs to find out what work is available and the price paid on each job.  Defendants are free to accept or decline any job.  Under their contracts with Plaintiffs, Defendants lease their trucks to Plaintiffs for use on jobs Defendants accept.  Accordingly, the prices paid are by the tonnage of materials hauled or miles driven.  Defendants either drive the trucks themselves or hire other drivers to drive their trucks.

---

[1]The materials and affidavits setting forth these facts are attached to Plaintiffs' Motion for Preliminary Injunction.  Citations to these materials will be made as "MPI ¶ ___."

Defendants control the manner, means, and details of their work, restricted only by the demands of the customer.

Defendants own their own trucks. Defendants are solely responsible for fuel, insurance, and maintenance on the trucks. No taxes are withheld from payments made to Defendants by Plaintiffs for work performed. MPI ¶¶ 3-6.

On or about February 2, 2000, due in large part to rising diesel fuel prices, Defendants, in combination with one another, called or participated in a work stoppage to protest what they believed to be insufficient prices being paid for their services. Defendants' goal has been to collectively establish a higher, uniform, minimum tariff or price paid for the work they perform for all brokers, including Plaintiffs. To accomplish their goal, Defendants have boycotted Plaintiffs, their customers and suppliers, and threatened and intimidated other owner-operators who want to continue doing business with Plaintiffs. MPI ¶¶ 9, 14-23, 25-30, 32-36.

The Association Defendants were formed by the Individual Defendants for the purpose of uniting the owner-operators into groups with the common goal of forcing higher prices. In furtherance of their plan, the Association Defendants have also solicited individual brokers about raising rates for all Defendants who contract with that broker. For example, Defendant Owners Association of Palm Beach and Broward County, an unincorporated association whose six member board includes Defendants Charles Luque, Jorge Valiente, Jose Matos, Isaac Turgeman, and Ilceane Sforca, have requested a fixed rate for all of their members. Defendant Owners Association of Palm Beach and Broward County, through their attorney Cathleen Scott, Esq. sent a letter to Plaintiff Eastman Aggregate demanding a set price of 30% above the 1980 tariff rate for all member independent owner-operators, among other conditions. MPI ¶ 23. To force Plaintiff Eastman

3

Aggregate to accept their demands, these Defendants along with Defendants Ossie Fernandez and Daniel Balazi, their agents and allies, boycotted Palm Beach Aggregate, a supplier of materials for Plaintiff Eastman Aggregate. They also intimidated drivers who wanted to work for Eastman Aggregate during the work stoppage. MPI ¶¶ 29-30.

In another effort "to resolve" the work stoppage, Defendant Support Dump Trucking Group, Inc., through their attorneys Richard Diaz, Esq. and Hosey Hernandez, Esq., solicited meetings with brokers to encourage "settlement" of the dispute on terms established by Defendant Support Dump Trucking Group, Inc. At a meeting held on February 9, 2000, at the Hialeah City Hall, Defendants Juan Aragones and Norvel Igarza, two officers of the group, provided a rate sheet they said represented the uniform, minimum tariff to be paid for an independent owner-operator's services. No explanation was given for the source of the rates or the differences in the prices being sought. The only explanation given was that these rates were what the Defendants wanted from the brokers, including Plaintiffs, before they would return to doing business with the brokers. Defendant Juan Aragones emphasized that there had to be agreed upon minimum tariffs or prices that would apply to all independent owner-operators and paid by the brokers. MPI ¶¶ 14-15.

In a February 24, 2000 article in *The Miami Herald*, another officer, Defendant Oscar de Leon is quoted as saying the Defendants are looking for a set minimum tariff. Defendant Oscar de Leon is also quoted as saying that unless a minimum tariff is set, the Defendants will not stop their boycott. Defendants are clearly trying to arbitrarily and uniformly fix prices for trucking services in South Florida. MPI ¶ 17.

4

Defendant Support Dump Trucking Group, Inc. is a non-profit corporation incorporated under the laws of the State of Florida. The Defendant maintains its principal place of business in Florida. Defendants Juan Aragones, Oscar de Leon, Reynaldo Rodriguez, Rafael D. Jimenez, Norvel Igarza, Alayn Hernandez, and Eduardo Rodriguez are all officers of Defendant Support Dump Trucking Group, Inc. This group claims to represent the almost 1,000 dump truck owner-operators who engaged in the work stoppage and who continue to demand higher rates in Dade County. MPI ¶ 10-12.

Defendant Support Dump Trucking Group, Inc., through its officers, has monitored various jobs being offered by Plaintiffs. If Defendants do not like the rates being paid, they shut down the job by intimidating the owner-operators working on the job into stopping work until a higher rate is agreed to by the Plaintiff offering the job. Defendant Juan Aragones called Plaintiff National on March 1, 2000, to discuss the prices paid on a job hauling materials from Port Everglades to Miami. MPI ¶ 16. On March 4, 2000, Defendant Oscar de Leon shut down a job belonging to Plaintiff Tupler at N.W. 113th Court and 127th Street in Medley, Florida. Defendants Oscar de Leon and Alain Hernandez, along with other drivers, enforced the work stoppage until Plaintiff Tupler agreed to pay an additional .10 per ton to all owner-operators working on the job. MPI ¶ 18.

Defendants Osmely Jimenez, Oscar Suarez, Julio Gomez, Rigoderto Pupo, Reynaldo Rodriguez, and their agents and allies, have threatened, beaten, shot at, followed, and impeded owner-operators who are doing business with Plaintiffs. Defendants or those acting in concert with them have called in bomb threats to Plaintiffs, trespassed on Plaintiffs' property, damaged trucks, and beaten employees. MPI ¶¶ 19-22.

5

Defendants Osmely Jimenez and Oscar Suarez, on or about February 10, 2000, went into the Bishop Pit in Palm Beach County along with two other men and threatened a group of owner-operators providing truck services for Plaintiff Tupler. Defendants Osmely Jimenez and Oscar Suarez threatened to damage their trucks if the owner-operators did not stop working. One of the owner-operators who was trying to work was told that if he did not stop working, his truck would be shot. MPI ¶ 20.

Defendants Julio Gomez and Rigoderto Pupo were involved in acts of violence at a CSR Rinker pit in Dade County. On or about February 10, 2000, a group of unknown Defendants using Defendant Julio Gomez's truck shot at a truck trying to deliver materials from a Rinker aggregate pit. The truck was struck in the gas tank and disabled. MPI ¶ 21. On or about January 28, 2000, a group of unknown Defendants using Rigoderto Pupo's truck threw rocks at trucks leaving the Rinker pit. The trucks' windshield was damaged. MPI ¶ 22.

Defendant Reynaldo Rodriguez, in addition to being an officer of Defendant Support Dump Trucking Group, Inc., was involved in an attempt to shut down a construction project on Biscayne Boulevard in Dade County. On February 22, 2000, a group of unknown Defendants using his truck were involved in fist fights with owner-operators who were trying to deliver materials to the job site. On February 23, 2000, the same group of unknown Defendants threw rocks at owner-operators doing business in Dade County, breaking a side window. MPI ¶ 19.

As a result of Defendants' actions, Plaintiffs were unable to conduct business during the month of February. They were unable to supply materials to construction sites as required by their contracts because Defendants threatened and intimidated drivers who wanted to work but feared crossing the blockade at Plaintiffs' suppliers. MPI ¶ 31. Defendants have changed their strategy in

6

recent weeks. Now Defendants target specific jobs and force a shut down of those jobs until the

Plaintiff who offers the job agrees to pay a higher rate on the job. The goal is still the same, to force

Plaintiffs to raise or set prices paid to all independent owner-operators.[2] MPI ¶ 39.

The economic impact on Plaintiffs and South Florida has been great. Defendants and their

agents and allies demonstrated in large numbers along the sides of federal and state roads in Dade

County, impeding the flow of traffic and interstate commerce. Defendants' actions involved acts

of violence and intimidation against Plaintiffs and violence and intimidation to force other owner-

operators from doing business with Plaintiffs. The sole purpose of these actions is to force Plaintiffs

to pay higher rates to Defendants for truck services. Defendants actions in forcing the shutdown of

Plaintiffs' businesses and other such businesses have had a dramatic impact on interstate commerce,

from the movement of goods and materials to the interruption of construction projects concerning

and affecting interstate commerce such as roadways and office buildings used in interstate

commerce.

## DEFENDANTS CONDUCT CONSTITUTES A PER SE VIOLATION OF THE SHERMAN ANTI-TRUST ACT, THE CLAYTON ACT, AND THE FLORIDA ANTI-TRUST ACT OF 1980 AND MUST BE ENJOINED.

Defendants, as independent business owners, have illegally contracted or conspired to

restrain trade by fixing prices and boycotting businesses in violation of federal and state antitrust

laws. Defendants' actions do not constitute a labor dispute exempt from federal antitrust laws.

Accordingly, Defendants are not immune from this Court's power to enjoin their illegal conduct.

---

[2]Plaintiffs also believe Defendant Support Dump Trucking Group, Inc., through its officers, has threatened and intimidated owner-operators in Dade County to either join their association and display their sticker or be prevented from working in Dade County. This boycott of independent owner-operators who do not want to join Defendants' association is also a violation of the antitrust laws as set forth below. *See Local 36 of Int'l Fisherman & Allied Workers of America v. United States*, 177 F.2d 320 (9th Cir. 1949).

Because Defendants' collective conduct constitutes a *per se* violation of the antitrust laws, the injunction provisions of the statutes demand the Court grant a preliminary injunction prohibiting Defendants' illegal conduct.

A.    **Defendants Have Conspired To Illegally Set Prices And Boycott Businesses In Violation Of Federal And State Antitrust Laws.**

"A combination of businessmen illegally restraining trade offends the antitrust laws of the United States." *United States Steel Corp. v. Fraternal Assoc. of Steelhaulers*, 601 F.2d 1269, 1273 (3rd Cir. 1979).[3]  The antitrust laws of the United States and the State of Florida prohibit any "contract, combination . . ., or conspiracy, in restraint of trade or commerce . . .." 15 U.S.C. § 1; Fla. Stat. § 542.18. "Price-fixing is *per se* an unreasonable restraint of trade. It is not for the courts to determine whether in particular settings price-fixing serves an honorable or worthy end. An agreement, shown either by adherence to a price schedule or by proof of consensual action fixing the uniform or minimum price, is itself illegal under the Sherman Act, no matter what end it was designed to serve. That is the teaching of an unbroken line of decisions." *United States v. Nat'l Assoc. of Real Estate Boards*, 339 U.S. 485, 489, 70 S. Ct. 711, 714, 94 L. Ed. 1007 (1950). "Unless specifically authorized by legislation, a conspiracy to fix prices is in and of itself a violation of the first section of the [Sherman] Act, 15 U.S.C.A. § 1. No inquiry as to substantiality, directness, effectiveness, or reasonableness of restraint is permitted. The section is violated by the agreement to fix prices standing alone under such conditions." *Local 36 of Int'l Fishermen & Allied Workers of America v. United States*, 177 F.2d 320, 331 (9th Cir. 1949)(footnote omitted).  Additionally,

_____

[3]The Florida Antitrust Act of 1980 follows federal interpretations of the federal antitrust laws. Fla. Stat. § 542.32.

"exclusion of producers and dealers from the market according to prearranged plan is a violation of the statute, in and of itself." *Id.* By attempting to fix prices and boycott Plaintiffs, their suppliers, customers, and other owner-operators who were doing business with Plaintiffs, Defendants actions are a *per se* violation of federal and state antitrust laws.

Defendants are engaged in an illegal conspiracy, combination, and/or contract to fix prices and boycott businesses. Defendants, all independent contractors and independent business owners, and associations of independent owner-operators, collectively called a work stoppage, enforced with violence and intimidation, for the purpose of forcing Plaintiffs and other truck brokers to agree to a uniform, fixed, minimum tariff to be paid for truck services. MPI ¶ 14-15, 23, 31-32, 36, 38. Some Defendants are now boycotting specific jobs until their demands for higher prices are met. MPI ¶ 16, 18, 39. Defendants' actions are specifically designed to force prices higher.

Defendants have blockaded the entrance to Plaintiffs' businesses and the entrance to Plaintiffs' customers' and suppliers' businesses such as rock quarries. MPI ¶ 28, 30. Defendants have used threats and acts of violence to keep other owner-operators from doing business with Plaintiffs during the work stoppage. MPI ¶¶ 19-22. These owner-operators wanted to continue doing business with Plaintiffs and other brokers in South Florida but they fear becoming victims of violence and having to travel through large crowds of angry, protesting Defendants. Indeed, many that did continue to work were followed and threatened. MPI ¶¶ 13, 29-30. Many were subjected to rock throwing and shootings causing damage to their trucks. Now owner-operators are forced to stop working on a job they accepted until the Plaintiff with whom they contracted agrees to meet Defendants' demands for higher rates on that job. The sole purpose of Defendants actions is to force

Plaintiffs to meet their demands on setting a uniform, minimum tariff in violation of federal and state antitrust laws and forcing prices to go up.[4]

Defendant Support Dump Trucking Group, Inc. and its officers, Defendants Juan Aragones, Oscar de Leon, Reynaldo Rodriguez, Norvel Igarza, Rafael Jiminez, Eduardo Rodriguez and Alayn Hernandez, through its attorneys, set up two meetings in Miami with various brokers, including Plaintiffs, in an attempt to reach an agreement on minimum pricing. These Defendants have published two rate sheets they want Plaintiffs and other truck brokers to follow. Defendant Juan Aragones is President of Support Dump Trucking Group, Inc. and represented to a group of brokers on February 9, 2000, that the rates on the rate sheet were to be the minimum tariffs to be paid for trucking services. Defendant Norvel Igarza, Secretary of Defendant Support Dump Trucking Group, Inc., passed out the rate sheet at the meeting. The message from Defendants was clear; if a broker does not follow the rate sheets then the Defendants will not do business with the broker. MPI ¶¶ 14-15. These Defendants are now enforcing these rates on specific jobs. MPI ¶ 39. These actions violate the antitrust laws. *Nat'l Assoc. of Real Estate Records*, 399 U.S. at 489.

The same is true for Defendants working in Broward and Palm Beach counties. These Defendants have formed an unincorporated association called Owners Association of Palm Beach and Broward County. They are represented by Cathleen Scott, Esq. This association has published a rate sheet of its own and, through its attorney, has solicited Plaintiff Eastman Aggregate to enter into a price fixing arrangement with the Defendants. MPI ¶ 23. Defendants Charles Luque, Jorge

---

[4]It is the combination of Defendants for the purpose of setting prices that is illegal. Defendants' collective attempts to force even a single broker to agree to a minimum price for two or more independent owner-operators on a single job is a violation of the antitrust laws because such combination of independent businesses to fix prices offends the statute. *See generally, Steelhaulers*, 601 F.2d at 1273.

Valiente, Jose Matos, Isaac Turgeman, and Ilceane Sforca are officers of Defendant Owners Association of Palm Beach and Broward County, and Defendants Ossie Fernandez and Daniel Balazi are members of the association. MPI ¶ 23. Each has participated in the illegal boycotts with the goal of forcing Plaintiffs to accept the demands of the association. This is clearly a violation of federal and state antitrust laws. *Id.*; *Local 36 of Int'l Fisherman*, 177 F.2d at 331.

The United States Court of Appeals for the Third Circuit in *United States Steel Corp. v. Fraternal Association of Steelhaulers*, 431 F.2d 1046 (3rd Cir. 1970), was faced with an identical situation as the one at issue here. In *Steelhaulers*, the defendant association of independent owner-operators, FASH, organized a work stoppage. The Defendant truckers refused to supply service to and from the plaintiffs' mills and plants and, by concerted action, sought to dissuade other truckers from providing services to plaintiffs as well. Defendants' persuasion tactics included acts of violence such as shootings, rock throwing, arson, and tire slashing. The purpose of the boycott was to force plaintiffs to pay higher tariffs to the defendants. *Id.* at 1047. In granting a preliminary injunction, the district court

> found that the individual [defendants], as owners of their own rigs and fleets, were businessmen who, through the concerted action of FASH and its related organizations, had illegally interfered with and disrupted the free flow of commerce and constituted an unlawful restraint of trade in violation of the Sherman and Clayton Acts.

*Id.* at 1047-1048. The Third Circuit affirmed the granting of the preliminary injunction because there was "no doubt that the activities described herein – a boycott designed to interfere with the free play of market forces – [was] an illegal restraint of trade . . .." *Id.* at 1048. For the same reasons, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

As noted above, Defendants have conspired with each other and through the Association Defendants to force Plaintiffs to pay higher rates for trucking services. They have made collective demands to each Plaintiff and to all brokers as a whole. They have tried to force the acceptance of their demands by boycotting Plaintiffs' suppliers, customers, and owner-operators who have not joined their cause and by shutting down jobs until Plaintiffs meet their demands for higher prices. This is precisely the conduct the court found illegal in *Steelhaulers*.

Other courts have been faced with analogous situations. In *Local 36 of Int'l Fishermen & Allied Workers of America, supra,* the court was faced with a group of independent fishing boat owners who wanted to regulate the price they received for fish caught off the California and Mexico coast. The boat owners were indicted and convicted of violating the Sherman Act. In carrying out their conspiracy, it was shown that the boat owners conspired "to fix minimum prices to be charged for the sale of fresh fish . . . caught by the fishermen," agreed that the prices set should be "stabilized and non-competitive," agreed to picket and boycott any dealer that would not agree to the prices set by the boat owners by not selling any fish to them and preventing them from getting fish from other sources, and conspired to prevent any non-agreeing fishing boat owner from catching fish or selling their catch to dealers. 177 F.2d at 325. Upon finding that the evidence proved the boat owners engaged in this conduct, the court affirmed the jury's guilty verdict. *Id.* at 332. Defendants' action of agreeing to set minimum prices for services, boycotting brokers who do not pay the desired rate, and forcing owner-operators to join their association and honor any work stoppage initiated by Defendants is identical to the illegal activity of the fishermen.

In *Federal Trade Commission v. Superior Court Trial Lawyers Assoc,* 493 U.S. 411, 110 S.Ct. 768, 107 L. Ed. 2d 851 (1990), the United States Supreme Court addressed a situation where a group of lawyers were accused of violating the antitrust laws. In *Superior Court Trial Lawyers,* a group of lawyers in Washington D.C. that accepted the bulk of court appointed indigent criminal defense cases wanted an increase in the rates paid for indigent cases. When the city did not raise the rates, the attorneys met and agreed that the only way to get the rates increased was for them to collectively stop accepting indigent cases and protest for higher rates. *Id.* at 416. The attorneys signed a petition and staged a series of events to get publicity for their cause. *Id.* It did not take long for the boycott to have an overwhelming effect on the D.C. criminal justice system. As a result, an agreement was reached between the city and the lawyers to increase rates to the amount requested.

The Court found the lawyers "concerted action in refusing to accept further CJA assignments until their fees were increased was thus in plain violation of the antitrust laws." *Id.* at 428. The Court found this to be an easy decision because the "lawyers were in competition with one another, each deciding independently whether and how often to offer to provide services to the District at CJA [indigent] rates. The agreement among the CJA lawyers was designed to obtain higher prices for their services and was implemented by a concerted refusal to serve an important customer in the market for legal services . . .." *Id.* at 422-423.

The situation is no different here. Defendants, all independent business owners who are in competition with one another for work and who independently decide when, how often, and for what price they will work, have conspired to stop working to force Plaintiffs to pay higher prices as a whole and on specific jobs. The concerted action against even a single broker is a violation of the

antitrust laws. *Id.* The inclusion of violence and boycotts against Plaintiffs' suppliers and customers have furthered Defendants cause. All of this conduct is illegal and should be enjoined.

Defendants may claim that the rates they are seeking are not unreasonable. Further Defendants may argue that the only way for them to stay in business is to get higher rates. Whatever the justification for Defendants' actions, the justification does not create a defense to this action or justify a violation of the antitrust laws.

> The social justifications proffered for [Defendants'] restraint of trade thus do not make it any less unlawful. The statutory policy underlying the Sherman Act 'precludes inquiry into the question whether competition is good or bad.' . . . [I]t was settled shortly after the Sherman Act was passed that it 'is no excuse that the prices fixed are themselves reasonable.'"

*Id.* at 424 (citations omitted). Defendants actions are a *per se* violation of the antitrust laws and must be enjoined.

**B.    Defendants Are Not A Labor Organization Exempted From Coverage Under The Antitrust Laws.**

Defendants may assert that they are a labor organization exempted from the provisions of the federal antitrust laws under 15 U.S.C. § 17. Defendants may claim that because they are protesting over the use of their labor, they are not subject to the federal antitrust laws. Finally, Defendants may assert that they are attempting to negotiate over higher wages which are terms and conditions of employment and exempted from injunctive relief under the Norris-LaGuardia Act. Each of these contentions is without merit.

Initially, just because Defendants may perform the trucking services themselves by driving their trucks on the jobs they accept does not entitle them to an exemption from the antitrust laws. Under the independent contractor agreements Defendants signed with Plaintiffs, Defendants lease

their trucks and equipment to Plaintiffs. Defendants are paid for the use of their trucks by the load or by the mile. Defendants are not paid any wages by Plaintiffs. MPI ¶¶ 3-6. Accordingly, the tariffs Defendants are seeking to impose concern a return on their investment as business owners in their trucks and equipment. In just a situation, the court in *Pan Alaska Trucking v. Int'l Brotherhood of Teamsters*, 621 F. Supp. 800 (D. Alaska 1985), found that a work stoppage and boycott by a group of owner-operators for the purpose of obtaining higher tariffs for the lease of their trucks was illegal under federal antitrust laws. Defendants here are seeking the same thing that the defendants in *Pan Alaska* sought, more money for the lease of their trucks under their independent contractor agreement. Defendants are seeking to obtain more money by illegally joining together to force an increase in prices and boycott Plaintiffs until their demands are met. These actions clearly violate federal antitrust laws and must be enjoined. *Id.* at 803.

"A party seeking refuge in the statutory exemption [15 U.S.C. § 17] must be a bona fide labor organization and not independent contractors." *Spence v. Southeastern Alaska Pilots' Assoc.*, 789 F. Supp. 1007, 1012 (D. Alaska 1990). While Defendants may assert they are part of a labor organization involved in a labor dispute, *Spence* dispels such a theory. Defendants do not qualify as a labor organization because Defendants are independent contractors. The labor organization exemption implies an employer-employee relationship that is absent here. *Id.* at 1013 (citing, *Columbia River Packers Assoc. v. Hinton*, 315 U.S. 143, 146-47, 62 S.Ct. 520, 522, 86 L. Ed. 750 (1942)). Federal law specifically excludes independent contractors from the definition of "employee". *See* 29 U.S.C. § 152(3). Because, as set forth above, Defendants are independent contractors and independent business owners, they do not qualify as a labor organization exempt from the provisions of the antitrust laws. *Spence*, 789 F. Supp. at 1012.

*Steelhaulers* also addressed this very issue and found that an association of independent owner-operators does not qualify as a labor organization exempt from the antitrust laws. *Steelhaulers*, 431 F. 2d at 1049. The court focused primarily on the fact that the defendants were independent business owners interested in obtaining a greater return on their capital investment, their trucks. *Id.* at 1050.[5] Because the defendant owner-operators were not involved in a labor dispute, the Norris-LaGuardia Act did not prohibit the court from issuing a preliminary injunction. *Id.* at 1050-1051; *see also, Local 36 of Int'l Fishermen*, 177 F.2d at 331 (finding that because the boat owners were independent contractors, their picketing and boycotts were not protected by the Norris-LaGuardia Act).

In reaching its conclusion, *Steelhaulers* distinguished the United States Supreme Court's decision in *Local 24 of the Int'l Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L. Ed. 2d 312 (1959). Such a distinction was appropriate because *Oliver*, in approving that lease payments on trucks was an appropriate subject of collective bargaining, was concerned with the limited situation where the owner-operator, when driving his truck for the company, was actually an employee of the company. *Oliver*, 358 U.S. at 286-287; *Steelhaulers*, 431 F.2d at 1049-1050. In *Oliver*, the drivers were employees and not independent contractors as Defendants are here. In *Oliver*, the employer controlled the manner, means, and details of the driver's work, including the times he was going to drive and the work rules he must follow. The employer also provided benefits

---

[5]The court in *Pan Alaska* also addressed the issue of whether independent owner-operators acting in concert were entitled to the protection of the labor organization exemption to the federal antitrust laws and found they were not. The court noted that from the complaint, the owner-operators were interested in getting higher rates for the lease of their trucks under their independent contractor agreements and not wages as drivers. Accordingly, the court found, "it cannot be said that the defendant truck owners constituted a labor group within the statutory exemptions from the antitrust laws." 621 F. Supp. at 803.

to the drivers such as insurance, and the employer withheld taxes, such as social security taxes, from the driver's pay. *Oliver*, 358 U.S. 286-287. Those factors made it apparent the drivers were actually employees and not independent contractors. Such factors are noticeably absent here. MPI ¶¶ 3-8.

As noted above, Defendants control the manner, means, and details of their work. They are not on Plaintiffs' payroll; they are not covered under Plaintiffs' worker's compensation insurance; they do not have taxes withheld from their pay; they receive no benefits such as medical or life insurance. Defendants accept the jobs they want and decline the jobs they do not want. Defendants pick the days they work and the hours they work. Defendants own their own trucks and are solely responsible for the truck's maintenance, insurance, and fuel. The only aspect Plaintiffs are involved in are those areas required by federal and state law such as verifying that any driver has a valid commercial driver's licence, that any driver is DOT certified, that Plaintiffs' are named as a covered entity on Defendants' insurance, and that any non-owner driver is covered under the owner's worker's compensation insurance or the owner has a valid waiver. MPI ¶¶ 3-6. Such factors indicate that Defendants are independent contracts and not employees. Accordingly, they are not subject to unionization or coverage under the National Labor Relations Act or the Norris-LaGuardia Act. *N.L.R.B. v. A. Duie Pyle, Inc.*, 606 F.2d 379, 385 (3rd Cir. 1979)(refusing to enforce an NLRB bargaining order because the truck owner-operators were independent contractors, for reasons set forth in the opinion, and, therefore, did "not fall within the protection of the labor laws and the company [had] no duty to bargain with their representative"); MPI ¶¶ 8.

If Defendants are not a labor organization, they are not exempt from the antitrust laws. If they are not exempt from the antitrust laws, then their collective activity to influence prices is not protected. As noted herein, Defendants' conduct is the classic example of an antitrust violation not

17

subject to any exemption. Accordingly, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

**C.     A Preliminary Injunction Is Appropriate.**

As noted above, Plaintiffs have been unable to conduct business due to Defendants' illegal activities. Plaintiffs have lost thousands of dollars due to Defendants' illegal boycotts. MPI ¶ 45. Other owner-operators who do not join Defendants' cause and who want to do business with Plaintiffs are threatened and intimidated. These owner-operators have been threatened with beatings and arson, they have been subjected to rock throwing, vandalism, and shootings, they have been followed and had their ability to travel on state and federal roads impeded. MPI ¶¶ 19-22. All of this conduct is part of an illegal conspiracy to fix prices. Plaintiffs will continue to lose business and face defaults on contracts they have with other companies if Defendants continue to shut down work being done by Plaintiffs. Absent the Court granting a preliminary injunction, Defendants' conduct will continue to cause Plaintiffs irreparable harm.

Both the federal and state antitrust laws specifically provide for injunctive relief. 15 U.S.C. § 26; Fla. Stat. § 542.23. Because Plaintiffs have demonstrated a violation of the antitrust laws, a preliminary injunction is appropriate. "[W]here the plaintiff seeks an injunction to prevent the violation of a federal statute that specifically provides for injunctive relief, it need not show irreparable harm." *Illinois Bell Telephone Co. v. Illinois Commerce Commission*, 740 F.2d 566, 571 (7th Cir. 1984); *see also, Gresham v. Windrush Partners, LTD*, 730 F.2d 1417, 1423 (11th Cir. 1984); *South Central Bell Telephone Co. v. Louisiana Public Service Commission*, 744 F.2d 1107, 1120 (5th Cir. 1984). A mere showing of a violation of the statute is enough to support a preliminary injunction against further violations of the statute. *Gresham*, 730 F.2d at 1423; *United States v.*

18

*Medina*, 718 F. Supp. 928, 930 (S.D. Fla. 1989). In this case, if the Court concludes that

Defendants' actions are in violation of the antitrust laws and Defendants are not a labor organization,

then the issuance of a preliminary injunction is appropriate. *Steelhaulers*, 431 F.2d at 1048.

### D.    Because Defendants' Conduct Is In Violation Of The Antitrust Laws And There Would Be No Economic Harm To Defendants From An Injunction, Only A Minimal Security Should Be Required.

Rule 65(c), Fed. R. Civ. P. provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

In this case, Defendants are engaging in illegal conduct through acts of violence and boycotts of

businesses. Defendants have blockaded the entrance to businesses and congregated on state and

federal roads impeding the free flow of traffic. Defendants are calling specific work stoppages until

the Plaintiff responsible for the job agrees to their price demands. Defendants are not engaged in

any legitimate business, but are simply trying to force Plaintiffs and other brokers to acquiesce to

their illegal demands to raise and fix prices. Accordingly, Defendants will suffer no damages by

having their conduct enjoined and any security should be nominal.

"The [injunction] should be designed to ensure that the defendant will not continue the

specific illegal practice." *Ohio-Sealy Mattress Manf. Co. v. Sealy, Inc.*, 669 F.2d 490, 495 (7th Cir.

1982). Plaintiffs are not asking the Court to enjoin any legal conduct. Plaintiffs are seeking an

injunction that will prohibit Defendants from engaging in illegal boycotts of Plaintiffs' businesses,

Plaintiffs' customers' and suppliers' businesses, and owner-operators who do not support

Defendants' cause and who want to continue doing business with Plaintiffs. Defendants should be

prohibited from congregating on state and federal roads and at the entrances to businesses.

Defendants should be prohibited from blocking access to state and federal roads used in the transportation of materials. Defendants should be prohibited from engaging in acts of violence and intimidation, specifically, but not limited to, throwing rocks, cutting brake lines, shooting firearms at trucks, beating drivers, threatening drivers and owner-operators with physical harm, arson, and retaliation if the driver or owner-operator continues to do business with Plaintiffs, and threatening Plaintiffs if they do not agree to meet Defendants' price demands. Further, Defendants should be prohibited from collectively agreeing to set prices or to act in concert to affect an overall increase in prices or an increase in prices on a single job. Each of these activities is in violation of federal and state antitrust laws as they are all directed toward the restriction of trade.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request the Court grant their Motion for Preliminary Injunction and enjoin the Defendants from any further illegal conduct as set forth herein and in Plaintiffs' Motion for Preliminary Injunction. Plaintiffs also request the Court set a nominal security of $1 for the issuance of the injunction. Finally, Plaintiffs request the Court direct Defendants Support Dump Trucking Group, Inc., and Owners Association of Palm Beach and Broward County to provide copies of any injunction to each of its members and file a list of the names and addresses of those people served with a copy of the injunction.

Respectfully submitted this 27th day of March, 2000.


By: _____

FISHER & PHILLIPS LLP                    Charles S. Caulkins
NationsBank Tower                        (Fla. Bar No. 0461946)
One Financial Plaza, Suite 2300          James C. Polkinghorn
Fort Lauderdale, Florida 33394           (Fla. Bar. No. 0376892)
Telephone:    (954) 525-4800             Edward H. Trent
Facsimile:    (954) 525-8739             (Fla. Bar. No. 0957186)
                                         Attorneys for Plaintiffs.

20

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of PLAINTIFFS' AUSTIN TUPLER TRUCKING,

INC., ET. AL.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR

PRELIMINARY INJUNCTION was served by First Class United States mail this ___day of

March, 2000, upon the following:

Richard Diaz, Esq.
Richard A. Diaz, P.A.
2701 Southwest 3rd Avenue
Miami, Florida 33127-2335
Attorneys for Support Dump
Trucking Group, Inc., Juan Aragones,
Oscar De Leon, Rafael D. Jimenez,
Alayn Hernandez, and Renier Martinez

Hosey Hernandez, Esq.
Hosey Hernandez, P.A.
Coconut Grove Bank Building
2701 South Bayshore Drive, Suite 602
Coconut Grove, Florida 33133
Attorneys for Support Dump Trucking
Group, Inc.

Cathleen A. Scott, Esq.
Strolla & Scott, P.A.
120 South Olive Avenue, Suite 303
West Palm Beach, Florida 33401-5532
Attorneys for the Owners Assoc. of
Palm Beach and Broward County,
Oscar Suarez, Victor Morales, Jose
Matos, Ilceane Sforca, Jorge Valiente,
Daniel Balazi and Ossie Fernandez

Angel Ruiz, Esq.
Gomez, Del Pino & Ruiz, P.A.
1835 West Flagler Street
Miami, Florida 33135
Attorneys for Julio Gomez

Terry R. Swartz, Esq.
Sonneborn Rutter Cooney
Klingensmith & Eyler, P.A.
1545 Centrepark Drive North
West Palm Beach, Florida 33401
Attorneys for Isaac Turgeman

Individual Defendants:

Reynaldo Rodriguez
2769 West 71st Place
Hialeah, Florida 33016

Norvel Igarza
2990 West 9th Avenue
Hialeah, Florida 33012

Eduardo Rodriguez
575 West 16th Street
Hialeah, Florida 33010

Osmely Jimenez
2624 Riverside Drive
Coral Springs, Florida 33065

Rigoderto Pupo
1555 West 44th Place #338
Hialeah, Florida  33012

Charles Luque
4701 Lyons Road, #212
Coconut Creek, Florida 33073

Attorney