UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO.: 00-6223-CIV-GOLD/Simonton

AUSTIN TUPLER TRUCKING, INC., JUNER
HAULING CORPORATION, RETRANCA
EQUIPMENT & TRUCKING CORP.,TRUCK
BROKERAGE BY NATIONAL, INC., and
EASTMAN AGGREGATES

        Plaintiffs,

vs.

SUPPORT DUMP TRUCKING GROUP, INC.,
JUAN ARAGONES, OSCAR DE LEON,
REYNALDO RODRIGUEZ, RAFAEL D.
JIMENEZ, NORVEL IGARZA, ALAYN
HERNANDEZ, EDUARDO RODRIGUEZ,
OSMELY JIMENEZ, OSCAR SUAREZ,
JULIO GOMEZ, RIGODERTO PUPO,
RENIER MARTINEZ, GIRALDO VICTORIA,
VICTOR MORALES, JOHN DOE 1 through 300,
OWNERS ASSOCIATION OF PALM BEACH
AND BROWARD COUNTY, CHARLES LUQUE,
JORGE VALIENTE, JOSE MATOS, ISAAC
TURGEMAN, ILCEANE SFORCA, OSSIE
FERNANDEZ, and DANIEL BALAZI

        Defendants.

_____/

**PLAINTIFFS' AUSTIN TUPLER
TRUCKING, INC., ET. AL.'S
MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO
DISMISS OR IN THE
ALTERNATIVE MOTION FOR
SUMMARY JUDGMENT**

       Pursuant to Rule 7.1(C), S.D. Fla. L.R., Plaintiffs, Austin Tupler Trucking, Inc. et. al.,

("Plaintiffs") file this Memorandum of Law in Opposition to Defendants Owners Association of

Palm Beach and Broward County, Oscar Suarez, Victor Morales, Jose Matos, Ilceane Sforca, Jorge



Valiente, Daniel Balazi, and Ozzie Fernandez's Motion to Dismiss or in the Alternative Motion for Summary Judgment. As part of their response, Plaintiffs rely on the materials submitted with Plaintiffs' Motion for Preliminary Injunction and the legal arguments contained in Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Injunction currently pending before the Court.[1] As set forth herein, Defendants are not entitled to a dismissal of Plaintiff's claims under the federal and state antitrust laws because Defendants are unable to show that Plaintiffs cannot prove any set of facts to support their allegations set forth in the Amended Complaint. Additionally, Defendants are not entitled to summary judgment because Defendants are not entitled to judgment as a matter of law.

Following the discussion of the standards applicable to a motion to dismiss and a motion for summary judgment, Defendants' arguments are consolidated into the four topics upon which they rely: (1) proof of damages, (2) proof of the necessary elements of an antitrust violation, (3) Defendants' alleged right to assembly, and (4) mootness. As set forth herein and in the arguments set forth in Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support of their Motion for Preliminary Injunction, Defendants' motion should be denied.

---

[1]Citations to Plaintiffs' Motion for Preliminary Injunction setting forth the facts supporting Plaintiffs' claims under the federal and state antitrust laws will be made as "MPI ¶ __." Any other materials referenced herein that are attached to Plaintiffs' Motion for Preliminary Injunction and will be referenced as "MPI Exhibit __."

# I.
## Standards for Dismissal or Summary Judgment

### A.    Standard For Motion to Dismiss

Defendants' burden under Rule 12, Fed. R. Civ. P., to justify dismissal of Plaintiffs' action is extremely high. The burden in such cases is well established.

> Under *Conley v. Gibson*, a district court should not dismiss a complaint "for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts" that would entitle the plaintiff to relief. 355 U.S. 41, 45, 78 S.Ct. 99, 2 L. Ed. 2d 80 (1957); *see also Bracewell v. Nicholson Air Services, Inc.*, 680 F.2d 103, 104 (11th Cir. 1982). To survive a motion to dismiss, a plaintiff may not merely "label his or her claims." *Blumel v. Mylander*, 919 F. Supp. 423, 425 (M.D. Fla. 1996). At a minimum, the Federal Rules of Civil Procedure require "a short and plain statement of the claim" that "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S. Ct. 99 (quoting Fed. R. Civ. P. 8(a)(2)).
>
> In deciding a motion to dismiss, a court can only examine the four (4) corners of the complaint. *Richman v. Precisionaire, Inc.*, 902 F. Supp. 232 (M.D. Fla. 1995). The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) (citation omitted). Also a court must accept a plaintiff's well pled facts as true and construe the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); *Howry v. Nisus, Inc.*, 910 F. Supp. 567 (M.D. Fla. 1995).

*United States v. Seminole Tribe of Florida*, 45 F. Supp. 1330, 1330 (M.D. Fla. 1999). Looking at the four corners of the Amended Complaint, Plaintiffs have clearly stated a cause of action for violation the Sherman and Clayton Acts and the Florida Antitrust Act of 1980.

In order to state a cause of action under § 1 of the Sherman AntiTrust Act, 15 U.S.C. § 1, Plaintiffs need only prove three elements: (1) the existence of an agreement, (2) which unreasonably restrains trade, that (3) caused damage to Plaintiffs. *Abadir & Co. v. First Mississippi Corp.*, 651

3

F.2d 422, 424 (5th Cir. 1981).[2]  As set forth in Plaintiffs' Amended Complaint, Defendants, all independent business owners, have conspired, collaborated and agreed for the purpose of restraining trade by influencing prices for dump trucking services in interstate commerce, causing Plaintiffs to suffer damage.  The allegations of an agreement are set forth in paragraphs 17, 29, 33, 34, 42 and 43 of the Amended Complaint.  The allegations of the unlawful purpose for restraint of trade are set forth in paragraphs 18, 21- 26, and 28 of the Amended Complaint.  The various elements of damages Plaintiffs have suffered as a direct result of Defendants' illegal activity are set forth in paragraphs 30, 38, 50 and 56 of the Amended Complaint.  Based on the four corners of the Amended Complaint, all necessary elements have been plead to sustain a cause of action for violation of the federal and state antitrust laws.[3]  Accordingly, Defendants' Motion to Dismiss should be denied.

**B.**    **Standard for Motion for Summary Judgment**

Rule 56(c), Fed. R. Civ. P., provides that summary judgment may only be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(e) also provides, "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts would as be in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[4]  Since no

---

[2]The Florida AntiTrust Act of 1980 follows federal interpretations of the federal antitrust laws.  Fla. Stat. § 542.32.

[3]Each of these allegations and the facts supporting them are discussed in detail in sections II and III below.

[4]As set forth below, Defendants assert that Plaintiffs rely on a rate sheet established in 1980 to set rates they pay for dump truck services.  The affidavits of Defendants Daniel Balazi, Carlos

discovery has been taken in this case, there are no depositions, answers to interrogatories or admissions on file. Defendants have submitted the affidavits of Defendants Daniel Balazi, Eddie Perez, Jose Matos, and Carlos Marcelo. Additionally, the Court has before it the affidavits, declarations and additional materials submitted by Plaintiffs in support of their Motion for Preliminary Injunction. Based on these materials, it is clear that Defendants are not entitled to judgment as a matter of law. Actually, the contrary is true. The materials submitted by Plaintiffs in support of their Motion for Preliminary Injunction and the affidavits submitted by Defendants in support of their Motion all indicate that Defendants have engaged in illegal activity under the federal and state antitrust laws as alleged in the First Amended Complaint.

## II.
### Defendants Assert That Plaintiffs' Claims Should Be Dismissed Because They Cannot Prove Adequate Damages

Defendants assert that Plaintiffs do not have standing in this action because (1) they did not suffer an "antitrust injury," (2) they cannot prove causation between their injury and Defendants' illegal conduct, and (3) any damages would be speculative. Defendants have presented no facts to support such an assertion, and their argument is without merit.

Plaintiffs clearly have standing to bring this action. The United States Court of Appeals for the Eleventh Circuit has adopted the "target area" test for standing under the antitrust laws. In *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1494 (11th Cir. 1985), the court stated:

---

Marcelo, Jose Matos, and Eddie Perez all assert this as fact but do not provide any information on how they allegedly know this to be true. Plaintiffs deny the use of any such rate sheet. *See* Tupler Aff. ¶ 13-14; Eastman Aff. ¶ 8, 13, MPI Exhibits 21 and 22, respectively. Without any basis to determine how Defendants have first hand knowledge of this assertion, it should stricken. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1105 (S.D. Ga. 1995).

> To obtain standing under this target area test, plaintiff "must be one against whom the conspiracy is aimed. Or, . . . the complainant must show that he is within the sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975). While the traditional target area test requires that the antitrust violators "aim" at the plaintiff, proof of conspiratorial intent to injure is not necessary. All that is requires is that the plaintiff be in the sector of the economy which is the target of the antitrust violation. *Blue Shield v. McCready*, 457 U.S. at 479 n. 15, 102 S. Ct. at 2548 n. 15; *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.*, 710 F.2d 752, 765 (11th Cir. 1983).

Plaintiffs are clearly the ones against whom Defendants' conspiracy has been aimed. Defendants have joined together for the purpose of forcing Plaintiffs to pay higher rates for Defendants' services. MPI ¶ 23, 28-31, and Exhibit 22. Defendants' actions as alleged are a textbook definition of price fixing, a per se antitrust violation. *See Federal Trade Commission v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 428, 110 S.Ct. 768, 778, 107 L. Ed. 2d 851 (1990); *United States Steel Corp. v. Fraternal Association of Steelhaulers*, 431 F.2d 1046 (3rd Cir. 1970); *Local 36 of Int'l Fishermen & Allied Workers of America v. United States*, 177 F.2d 320 (9th Cir. 1949). Plaintiffs' damages are directly related to Defendants' illegal conduct. Clearly, Plaintiffs have standing.[5]

In looking at the concept of evaluation of damages for lost profits and additional costs incurred as a result of Defendants' illegal conduct, the Eleventh Circuit looks to applicable state law. *Hill v. Nelson*, 676 F.2d 1371, 1374 (11th Cir. 1982). As set forth in the Amended Complaint,

---

[5] The effect of Defendants' conduct is discussed in greater detail in Plaintiffs' Motion for Preliminary Injunction. As noted in the cases cited herein and in Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Injunction, a full market analysis is not necessary nor determinative of standing. Defendants' price fixing agreement alone constitutes a violation of the antitrust laws. Plaintiffs are not only in the market for dump trucking services, but according to Defendants' affidavits, the target of the antitrust violations. In just such a situation, the United States Court of Appeals for the Third Circuit upheld a preliminary injunction against a group of independent owner-operators. *Steelhaulers*, 431 F.2d at 1048. As in that case, Plaintiffs clearly have standing here.

Plaintiffs' damages include lost revenue and profits during the illegal work stoppage, additional losses for having to pay higher rates on current contracts in order to obtain Defendants' services, future lost profits, and additional costs for on-site security, legal costs, and attorneys' fees. The amount of lost profits Plaintiffs' suffered during Defendants' illegal work stoppage is clearly identifiable and calculable. *See, e.g.*, Tupler Aff. ¶ 18, MPI Exhibit 21. Defendants offer no evidence to the contrary.

Additionally, loss of future profits is also calculable and recoverable as damages. In a case where the plaintiff claimed it lost business as a result of purchasing defective batteries from the defendant, the Eleventh Circuit upheld an award of lost profits. In describing the difference between uncertainty over the cause of the damages – clearly not an issue in this case – and uncertainty over the amount of damages – something Defendants challenge without seeking the first bit of discovery on the issue – the court noted:

> We conclude that the evidence supports the jury's award for lost profits. In the landmark case of *Twyman v. Roell*, 123 Fla. 2, 66 So. 215, 218 (1936), the Florida Supreme Court stated that "the uncertainty which defeats recovery in [lost profit] cases has reference to the cause of the damage rather than the amount of it." *Twyman* indicates that "uncertainty as to the amount of damages or difficulty in proving the damages will not prevent recovery if it is clear that substantial damages were suffered as a result of the wrong. Inability to give the exact or precise amount of damages does not preclude recovery. . . ." *Conner v. Atlas Aircraft Corp.*, 310 So. 2d 352, 354 (Fla. Dist. Ct. App.)(footnote omitted), *cert. denied*, 322 So. 2d 913 (Fla. 1975); *accord R.A. Jones & Sons v. Holman*, 470 So. 2d 60, 70 (Fla. Dist. Ct. App. 1985), *petition for review dismissed*, 482 So. 2d 348 (Fla. 1986); *A.O. Smith Harvestore Products, Inc., v. Suber Cattle Co.*, 416 So. 2d 1176, 1178 (Fla. Dist. Ct. App. 1982); *Adams v. Dreyfus Interstate Development Corp.*, 352 So. 2d 76, 78 (Fla. Dist. Ct. App. 1977); *National Papaya Co. v. Domain Industries*, 592 F.2d 813, 818 (5th Cir. 1979)(applying Florida law).

> Consequently, "if from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person." *Twyman*, 166 So. at 218. "The requisite to . . .

allowance [for lost profits] is some standard, such as regular market values, or other established data, by reference to which the amount may be satisfactorily ascertained." *Id.*, 166 So. at 217. Generally, "proof of the income and of the expenses of the business for a reasonable time anterior to the interruption charged, or facts of equivalent import, is usually required." *New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.*, 122 Fla. 718, 16 so. 856, 860 (1936); *see National Industries v. Sharon Steel Corp.*, 781 F.2d 1545, 1547 (11th Cir. 1986).

In the present case, it is undisputed that Exide caused Electro to lose profits as a result of "lousy" batteries. Causation of damages thus is not an issue; rather, the amount of damages is the issue. As set forth above, Florida law clearly provides that inability to give the precise amount of damages does not preclude recovery when substantial damages were suffered. Tyler's testimony, based upon Electro's financial records, customer accounts, net profit margin, and sales projections, satisfies the dictates of Florida law and supports the award as it relates to commercial purchasers. *See Born v. Goldstein*, 450 So. 2d 262, 264 (Fla. Dist. Ct. App.), *petition for review dismissed*, 458 So. 2d 272 (Fla. 1984); *Massey-Ferguson, Inc. v. Santa Rosa Tractor co.*, 415 So. 2d 865, 867 (Fla. Dist. Ct. App. 1982). Similarly, Tyler's testimony regarding Electro's sales figures and determination of a net profit margin, the testimony by Price and Anderson concerning lost customers, and the number of batteries returned provided adequate evidence to satisfy the "reasonable certainty" requirement for lost profits as determined by the jury for individual accounts.

*Electro Services, Inc. v. Exide Corp.*, 847 F.2d 1524, 1527-1528 (11th Cir. 1988); *see also, National Papaya Co. v. Domain Industries*, 592 F.2d 813, 818 (5th Cir. 1979).

Defendants have taken no discovery nor do they present any facts upon which the Court could find that Plaintiffs are unable to prove causation or sufficient valuation of damages in this case. Defendant's Motion for Summary Judgement should be denied.

### III.
### Elements of Antitrust

The elements of an antitrust action are an agreement between the Defendants for the purpose of restraining trade that caused damage to Plaintiffs. *Abadir & Co.*, 651 F.2d at 424. As noted in the previous section, Plaintiffs have suffered extensive damage as a result of Defendants' conspiracy to force an increase in prices by engaging in an illegal work stoppage and boycott of Plaintiffs'

businesses and their customers, suppliers, and contractors. Defendants' assert three defenses to Plaintiff's antitrust claims: (1) the lack of evidence of an agreement, (2) the lack of evidence of an unlawful purpose, and (3) the alleged reasonableness of Defendants' actions.

## A.    Plaintiffs are Able to Prove an Agreement Among the Defendants

The affidavits submitted by Defendants in support of their Motion clearly show an agreement among the Defendants. The affidavits of Daniel Balazi, Carlos Marcelo, Jose Matos, and Eddie Perez confirm that Defendant Owners Association of Palm Beach and Broward County and its members, the individual Defendants, agreed to stop hauling materials for the Plaintiffs for the purpose of forcing Plaintiffs to pay Defendants higher rates for their services. Balazi Aff. ¶ 11-12, 17, 20, and 22; Marcelo Aff. ¶ 11-12, and 16-17; Matos Aff. ¶ 13-15, 19-21, 27-28, and Exhibit B; Perez Aff. ¶ 11-12, and 16. The mass demonstrations, acts of violence, and demands for higher prices all demonstrate an agreement among the Defendants. *See, e.g.,* MPI ¶ 11, 23, 24, 25, 28-31, and MPI Exhibits 2-4, 21, 22. Accordingly, Plaintiffs are able to prove the necessary agreement, conspiracy, or combination to sustain their claims under the federal and state antitrust laws.

## B.    Plaintiffs are Able to Prove Defendants' Agreement was for an Illegal Purpose

The express purpose of Defendants' agreement and illegal boycotts of Plaintiffs' businesses, customers and suppliers, was to force Plaintiffs to pay higher rates to Defendants. *See, e.g.,* Matos Aff. ¶ 13-15, 19-21, and 27-28. This express purpose is illegal under the antitrust laws. *See Trial Lawyers,* 493 U.S. at 426-428; *Steelhaulers,* 431 F.2d at 1048; *Local 36 of Int'l Firshermen & Allied Workers of America,* 177 F.2d at 332; *Pan Alaska Trucking v. Int'l Brotherhood of Teamsters,* 621 F. Supp. 800, 803 (D. Alaska 1985).

9

As set forth more fully in Plaintiffs' Motion for Preliminary Injunction, Defendants have engaged in an illegal work stoppage and illegal boycott of Plaintiffs' businesses, blockaded the entrances to their customers and suppliers, threatened their contractors, and demanded that certain higher prices be paid them, as a group, to assure continuing dump trucking services to Plaintiffs. MPI ¶ 11, 23, 24, 25, 28-31.[6]  Such conduct is in direct violation of the antitrust laws. *Steelhaulers*, 431 F.2d at 1048.

## C.    The Alleged Reasonableness of Defendants' Actions Does Not Justify a Violation of the AntiTrust Laws.

Defendants argue that because their actions were reasonable in trying to obtain what they deemed to be a necessary increase in the rates being paid to owner-operators, they have not violated the antitrust laws.[7]  Price fixing, however, is a per se violation of the antitrust laws. *Local 36 of Int'l*

---

[6]Defendants' counsel sent a letter to Plaintiff Eastman Aggregates on February 14, 2000, stating: "The Association requires that the brokers increase the pay rate by thirty percent (30%) based on the 1980 Tariff Rate." Eastman Aff. ¶ 12, Exhibit B, MPI Exhibit 22.  The same demand was sent to another truck brokerage company in Palm Beach County, Siboney Trucking. Matos Aff. ¶ 27, Exhibit B.  In the February 13, 2000 edition of the *Palm Beach Post*, Defendants are quoted as saying they represent "75 percent of the area's independent haulers," and that "The 175-member group . . . voted to stop all hauling until they reach a settlement with their brokers" over what Defendants claim are low hauling rates. MPI Exhibit 3.  In the February 13, 2000 edition of the *Palm Beach Post* it is reported that Defendants "are demanding a 30 percent rate hike." MPI Exhibit 4.  Defendant Jorge Valiente is quoted in the February 10, 2000 edition of the *Palm Beach Post* as saying, Defendants are demanding "a 15 percent increase in the per ton rate" and that the boycott was because "'we're trying to hurt them [the brokers] in their pockets to feel what we feel.'" MPI Exhibit 2.  Finally, one trucker engaged in the illegal work stoppage displayed a sign saying, "No set price no work, Tupler is unjust." MPI Exhibit 26.E. There is more than sufficient evidence to prove Defendants' primary purpose was to fix prices, conduct illegal per se under the federal and state antitrust laws.

[7]Defendants claim Plaintiffs have utilized a 1980 rate sheet to bid on jobs and in turn pay Defendants prices based on this rate sheet.  As noted in footnote 4, *supra*, Defendants offer no evidence to suggest the validity of this claim. Indeed, Defendants' assertion is untrue. Tupler Aff. ¶ 13-14; Eastman Aff. ¶ 8, 13, MPI Exhibits 21 and 22, respectively.  Additionally, as Plaintiff's

*Fishermen & Allied Workers of America*, 177 F.2d at 331. "No inquiry as to substantiality, directness, effectiveness, or reasonableness of restraint is permitted. The section [15 U.S.C. § 1] is violated by the agreement to fix prices standing alone under such conditions." *Id.* There is no defense to a price fixing violation of the antitrust laws.

> The social justifications proffered for [Defendants'] restraint of trade thus do not make it any less unlawful. The statutory policy underlying the Sherman Act 'precludes inquiry into the question whether competition is good or bad.' . . . [I]t was settled shortly after the Sherman Act was passed that it 'is no excuse that the prices fixed are themselves reasonable.'"

*Trial Lawyers*, 493 U.S. at 424 (citations omitted). Even Defendants' claims that the rates being paid by Plaintiffs were unreasonably low is not a defense to liability in this case. As the United States Supreme Court noted in *Trial Lawyers*,

> [Defendants'] boycott may well have served a cause that was worthwhile and unpopular. We may assume that the preboycott rates were unreasonably low, and that the increase has produced better legal representation for indigent defendants. Moreover, given that neither indigent criminal defendants nor the lawyers who represent them command any special appeal with the electorate, we may also assume that without the boycott there would have been no increase in District CJA fees at least until the Congress amended the federal statute. These assumptions do not control the case, for it is not our task to pass upon the social utility or political wisdom of price-fixing agreements.

*Id.* at 421-422. The "rule of reason" is simply not applicable in this case. *Abadir & Co.*, 651 F.2d at 425-426. Accordingly, Defendants' Motion for Summary Judgment should be denied.

---

Motion for Preliminary Injunction demonstrates, Defendants were not wanting to discuss new bidding techniques with Plaintiffs; they just wanted more money; i.e., they wanted higher prices for the use of their trucks. Such conduct among independent business owners is illegal. *Pan Alaska Trucking*, 621 F. Supp. at 803.

11

## V.
## Finding Defendants' Conduct Illegal Will Not Violate Their Right to Assembly

Defendants argue they have a constitutional right under the First Amendment to the United States Constitution to form an association. Defendants go on to argue that if their association is found to be in violation of the antitrust laws, such a finding would violate their First Amendment rights. Defendants' arguments are wholly misplaced.

Plaintiffs do not allege that the mere fact that Defendants have formed an association constitutes a violation of the antitrust laws. Defendants have confused the formation of their association with Plaintiffs' argument that Defendants have attempted to form a monopoly. The basis of the monopoly claim is that the Defendants approached a single broker with the proposition that if that single broker would agree to the price Defendants were demanding, then Defendants would work exclusively with that broker and cease doing business with any other broker, including Plaintiffs. Amended Complaint ¶ 27. This would constitute a monopoly in violation of the antitrust laws. The mere fact that Plaintiffs have formed an association has not been alleged to be illegal, but the association's conduct to influence prices and illegally boycott Plaintiffs' business is in violation of the antitrust laws. *Steelhaulers*, 431 F.2d at 1048.

The United States Supreme Court addressed Defendants' First Amendment rights in *Trial Lawyers, supra*. In that case, a group of criminal defense lawyers who defended the vast majority of indigent criminal defendants in Washington, D.C. decided to collectively stop accepting new assignments until the city agreed to increase the rates paid for indigent representation. As part of their plan, the defendants lobbied the city, staged public events, and obtained a lot of publicity for their cause. The Court found that such actions were for the primary purpose of increasing rates paid

to the defendants, and, therefore, constituted a per se violation of the antitrust laws. *Id.*, 493 U.S. at 422-423.

The Court addressed the defendants' contention that their activities were protected because they were designed to affect a change in the law, activity protected in *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L. Ed. 2d 1215 (1982). In *Clairborne Hardware*, the Court upheld the rights of a group of African-American citizens to peacefully boycott and picket a white business owner who refused to allow African-Americans to shop in his store. The Court found the defendants' conduct in *Trial Lawyers* distinguishable because the Court found that "the undenied objective of [the defendants'] boycott was an economic advantage for those who agreed to participate." *Trial Lawyers*, 493 U.S. at 426. The Court held:

> No matter how altruistic the motives of respondents may have been, it is undisputed that their immediate objective was to increase the price that would be paid for their services. Such an economic boycott is well within the category that was expressly distinguished in the *Clairborne Hardware* opinion itself.

*Id.* at 427. The Court never addressed the rights of the defendants to form an association because that was not an issue; the issue was the defendants' conduct. Finding the conduct to be in violation of the antitrust laws, the Court upheld an injunction. *Id.* at 426.

Additionally, Defendants' argument appears to be that they have a right to assemble for purposes of legal representation and to petition the legislature or the executive for the enactment of various laws. Defendants' Memorandum of Law, p. 12. Such a purpose, however, would not justify the conduct alleged by Plaintiffs to be in violation of the antitrust laws. *Trial Lawyers*, 493 U.S. at 428. Defendants own affidavits, however, expressly contradict that the purpose of the association was to lobby the legislature or the executive. Indeed, in all four affidavits, Defendants state that their

purpose in engaging in the illegal work stoppage and boycotts of Plaintiffs and their customers was to "make a statement to the brokerage companies that we would no longer work for such little payment . . .." Matos Aff. ¶ 21; Balazi Aff. ¶ 17; Marcelo Aff. ¶ 16; Perez Aff. ¶ 16. Besides, Plaintiffs are not the legislature or the executive. There is no violation of Defendants' right to assembly by enjoining Defendants' conduct that is illegal under federal and state law. *Trial Lawyers*, 493 U.S. at 426.

## VI.
## Defendants Assertion That Plaintiffs' Claims Are Now Moot Because Defendants Have Gone Back to Work Is Without Merit

Defendants claim that because they have returned to work and are no longer engaging in their illegal work stoppage and boycotts that Plaintiffs' suit should be dismissed as moot. The fact that Defendants have gone back to work after demanding higher prices, and in many cases getting an increase in rates over those paid prior to their illegal conduct, does not moot Plaintiffs' claims. Plaintiffs have suffered great damage as a result of Defendants' illegal conduct, and the mere fact that Defendants have returned to work has not cured those losses. "[A] claim for money damages looks back in time and is intended to redress a past injury." *Adler v. Duval county School Bd.*, 122 F.3d 1475, 1477 (11ᵗʰ Cir. 1997). Accordingly, even with Defendants returning to work, Plaintiffs claims for money damages are not moot. *Id.* at 1478 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371, 102 S.Ct. 1114, 1120, 71 L. Ed. 2d 214 (1982)). The mere fact that Defendants have returned to work cannot undo the illegal conduct of the past.

Plaintiffs' claims for equitable relief are not moot. As noted in Plaintiff's Motion for Preliminary Injunction, because Defendants have violated the antitrust laws, which specifically authorize injunctive relief, entitles Plaintiffs to equitable relief. *Gresham v. Windrush Partners LTD*,

14

730 F.2d 1417, 1423 (11th Cir. 1984). "[T]he mere voluntary cessation of a challenged practice does not render a case moot. Otherwise, a party could moot a challenge to a practice simply by changing the practice during the course of a lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." *Jews for Jesus, Inc. v. Hillsborough county Aviation Authority*, 162 F.3d 627, 629 (11th Cir. 1998)(citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979)). Because Defendants voluntarily ended their illegal work stoppage and mass blockades before this Court could rule on the legality of such actions does not render Plaintiffs' claims moot.[8]

The shortness of the duration of Defendants' actions only kept the matter from being adjudicated while Defendants were engaged in their illegal work stoppage and boycott. Because there is a reasonable expectation that Plaintiffs will be subjected to the same illegal actions by Defendants in the future, Plaintiffs' claims for equitable relief are not moot. *Weinstein v. Bradford*, 423, U.S. 147, 149, 96 S. Ct. 347, 349, 46 L. Ed. 2d 350 (1975); *Adler*, 112 F.3d at 1477-1478. Indeed, Defendant Jose Matos, one of the organizers of Defendant Owners Association of Palm Beach and Broward County, Matos Aff. ¶ 15, is quoted extensively on his unhappiness with the prices being paid by Plaintiffs in an article in the March 22-28, 2000 edition of *City Link*, a copy of which is attached hereto as Exhibit "A".

Because Plaintiffs' claims under the federal and state antitrust laws for monetary damages and equitable relief are still viable claims, Defendants' motion for summary judgment should be denied.

---

[8]Other problems have occurred since the mass work stoppage such specific job boycotts. *See* MPI ¶ 18. It appears these actions, for the time being, have ceased as well.

## VII.
## Conclusion

For the reasons set forth herein, Plaintiffs Austin Tupler, Inc. et. al., respectfully request the

Court deny Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment.

Respectfully submitted this 10th day of April, 2000.

By: _____

FISHER & PHILLIPS LLP
NationsBank Tower
One Financial Plaza, Suite 2300
Fort Lauderdale, Florida 33394
Telephone:    (954) 525-4800
Facsimile:    (954) 525-8739

Charles S. Caulkins
(Fla. Bar No. 0461946)
James C. Polkinghorn
(Fla. Bar. No. 0376892)
Edward H. Trent
(Fla. Bar No. 0957186)
Attorneys for Plaintiffs.

16

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of PLAINTIFFS' AUSTIN TUPLER TRUCKING,

INC., ET. AL.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO

DISMISS OR IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT was served by

First Class United States mail this ___ day of April, 2000, upon the following:

Richard Diaz, Esq.
Richard A. Diaz, P.A.
2701 Southwest 3rd Avenue
Miami, Florida 33127-2335
Attorneys for Support Dump
Trucking Group, Inc., Juan Aragones,
Oscar De Leon, Rafael D. Jimenez,
Alayn Hernandez, and Renier Martinez

Hosey Hernandez, Esq.
Hosey Hernandez, P.A.
Coconut Grove Bank Building
2701 South Bayshore Drive, Suite 602
Coconut Grove, Florida 33133
Attorneys for Support Dump Trucking
Group, Inc.

Cathleen A. Scott, Esq.
Strolla & Scott, P.A.
The Comeau Building
319 Clematis Street, Suite 801
West Palm Beach, Florida 33401
Attorneys for the Owners Assoc. of
Palm Beach and Broward County,
Oscar Suarez, Victor Morales, Jose
Matos, Ileeane Sforca, Jorge Valiente,
Daniel Balazi and Ossie Fernandez

Angel Ruiz, Esq.
Gomez, Del Pino & Ruiz, P.A.
1835 West Flagler Street
Miami, Florida 33135
Attorneys for Julio Gomez

Terry R. Swartz, Esq.
Sonneborn Rutter Cooney
Klingensmith & Eyler, P.A.
1545 Centrepark Drive North
West Palm Beach, Florida 33401
Attorneys for Isaac Turgeman

Individual Defendants:

Reynaldo Rodriguez
2769 West 71st Place
Hialeah, Florida 33016

Norvel Igarza
2990 West 9th Avenue
Hialeah, Florida 33012

17

Eduardo Rodriguez
575 West 16th Street
Hialeah, Florida 33010

Osmely Jimenez
2624 Riverside Drive
Coral Springs, Florida 33065

Rigoderto Pupo
1555 West 44th Place #338
Hialeah, Florida  33012

Charles Luque
4701 Lyons Road, #212
Coconut Creek, Florida 33073

Attorney

Weekly news & entertainment connection to Broward & Palm Beach

MARCH 22-28, 2000

# CITY LINK

www.citylinkonline.com

# DUMPED ON

## BY DAVE WARM

**News:** Hemophilia's on trial in the wake of a newsman's death | **News:** Port Everglades firefighters get hosed by the county | **Music:** Take a spin around the neighborhood with local CDs



**Running on empty:** Independent trucker Jose Matos, 58, joined 175 other Palm Beach County drivers in a walkout that was not very successful.

# THE SHORT HAUL



**Dump truck drivers spend hours in cramped cabs, eating dirt and inhaling fumes while others get rich. What happens when they speak up? They get sued.**

Three weeks after Palm Beach County's rendition of an independent truckers' strike silently crumbled under the weight of its own shaky foundation, veteran driver Jose Matos is certain he pinpointed the problem: "We were stabbed in the back," Matos says. "In plain English, we were stabbed in the back."

While nothing is plain about the 58-year-old, Puerto Rican-born truck driver's English, it would be tough to challenge the merits of his indictment. Less than two weeks after Matos and approximately 175 other mostly Hispanic drivers parked their dump trucks outside a Palm Beach County rock quarry to protest the bankrupting costs of diesel fuel and insurance, the united front tumbled like dominoes in a tempestuous wind.

Despite the hope of similar protests throughout the country and state, Matos had sensed the end of this short and uneventful holdout approaching when one of the group's seven appointed leaders stepped down to negotiate his own deal and others quickly followed suit.

"They didn't want to be organized," Matos says. "They

### story by Dave Warm
### photos by Sherri Cohen

thought it was going to last a couple of days. Some of the drivers, they couldn't handle the loss. They were complaining they had truck payments. They had this and they had that. But when you are on a strike, when you are on a stoppage, you got to go for all the marbles."

If the defection of one leader and a few stragglers foreshadowed the inevitable conclusion of this dispute, lawsuits filed in mid-February against the truckers by the rock quarry and a group of powerful truck brokers, sealed it.

The numerous brokers that dot South Florida serve as middlemen between independent truck owners and the contractors they serve. The relationship is completely symbiotic if not particularly fair. It also is a large reason for the strike.

A contractor needs trucks, so he calls a broker who has a list of independent owners ready to work. For his organizational role in this well-oiled machine, the broker generally takes 10 percent of the driver's daily pay, sometimes more. "They are getting rich on us," Matos says.

Brokers often make huge profits while paying truckers from

**continued page 20**

**from page 19**

an antiquated scale developed in 1980. Officially known as the "tariff rate," this scale takes into account the weight of each shipment of rock or sand, the distance it must be hauled and how many red lights and stop signs there are on the way. The actual equation is cubic yards per mile. Each truck can carry approximately 18 cubic yards, or 22.5 tons. A typical day's work brings $200 or $300, which was fine before diesel prices began to approach $2 per gallon. The price of fuel constitutes roughly 20 percent of a trucker's expenses.

It now costs Matos about $200 dollars to fill both tanks in his truck, which gets eight miles to the gallon. Between gas, maintenance, insurance and high-interest loans (sometimes mortgages) on trucks that can cost up to $120,000, an independent trucker might pay $50,000 a year in overhead.

"To make a good living, they should be making more than $2,000 a week," says Chuck Chirillo, a Mack truck salesman of 16 years at Nextran in Pompano Beach. "Most are making about $1,200."

So, instead of making $50,000 a year, some are making $20,000 or less.

Says Matos: "We're making less than we did in the 1980s."

The independent truck owners' other major complaint involves the high cost of insurance, which they usually purchase through these same brokers because it is so hard to find on the open market. Insurance can cost as much as $12,000 a year. While the state requires dump trucks carry a minimum of $300,000 worth of coverage, most brokers insist independent owners carry $1 million worth, doubling premiums and costing the truckers thousands more.

"We pay about $18 to $20 a day for insurance," Matos says. "Gas is 50 percent more than it was three months ago. Some of these guys are lucky if they make $100 a day [after expenses]. Some don't even make that. It's not enough money. It's not enough money with the high cost of living today."

But it was enough to bring this disjointed group of drivers together. With high costs turning profits into expenditures, independent owners began to stir and CBs began to crackle with dissatisfaction. Then, on Feb. 7, more than 100 dump trucks responded by cutting their engines in the grass along Southern Boulevard, in an industrial area of suburban West Palm Beach across the street from Palm Beach Aggregates, the rock pit that fills their beds.

When boredom set in, the truckers pulled onto Southern, driving slow, making noise and disrupting traffic. They traveled a 20-mile loop in low gear through West Palm Beach, moving east to Dixie Highway, north to Belvedere Road and west again with the Spanish population emerging from storefronts to applaud their efforts.

For the next 11 days, they would park outside the quarry, refusing to work and parading picket signs along the busy street. This is where attorney Cathleen Scott would find them the Saturday before Valentine's Day, when she drove out with one of the protestors and introduced herself from the bed of his pickup truck.

She would later sit down with them, do the math and figure out that some were earning $30 a day after expenses. Scott has been a member of the Florida Bar for just four years, practicing labor law with partner Stacy Strolla in West Palm Beach

employees. But nothing she's come across in her short career could have prepared her for this. "It's tough representing 175 predominantly male truck drivers who are mostly older than I am," she says.

## That's why they call 'em brokers

Scott's first order of business was forming the Owners Association of Palm Beach and Broward County (a similar group formed in Miami), consisting of the 175 truckers who had come out to protest, which is a fraction of the dump truck owners hauling building materials throughout the two counties.

The group also appointed leaders Charles Luque, Jorge Valiente (the president), Isaac Turgeman (who left the group to negotiate on his own), Ilceane Sforca, Ossie Fernandez, Daniel Balazi (who drove Scott to the site) and Matos. Matos was appointed, partially because of his involvement in two previous strikes, but primarily because he is bilingual. "I got caught up in the middle of this," he says. Turgeman and Valiente didn't return calls. None of the others could



**Angry truckers on parade:** Part of the protest of independent truckers in Palm Beach County snakes along Belvedere Road in West Palm Beach. They traveled a 20-mile route in low gear on Feb. 7. At right, a few supporters of the strike line the street to cheer them on.

for years that some of the small brokers aren't licensed to sell diesel fuel and pay no taxes on it.

The second demand insisted brokers follow statewide insurance requirements, which would have allowed the drivers to carry $300,000 worth of insurance instead of the $1 million, slashing premiums. The final and most consequential demand would have required brokers to pay independent owners 30 percent more than the 1980 scale.

"It turned out to be very bad," Matos says. "But what we were asking for was fair. It wasn't nothing that we didn't deserve."

What they got was a barrage of lawsuits that scared this loose-knit band of truckers into abandoning the strike. The first

...er involved in protests and work s... pages from Miami to West Palm Be... naming the leaders of both groups s... rately and citing conduct that has "h... profound impact on interstate comm... and competition" and "continues... cause irreparable harm to plaintiffs... their business relationships."

Technically, the group of bro... accused the independent owners of... lating the Sherman Anti-Trust Act an... Florida Anti-Trust Act by forming an... gal monopoly and conspiring with... another to fix prices. Both acts were... ated to do away with monopolies an... prevent the kind of nepotism the... alleges. While the Sherman Anti-T... Act has existed for more than 100 ye... Florida's version was created in 1... around the same time the governm... deregulated the trucking industry... the Motor Carrier Act, breaking up... large corporations that dominated... business and opening up the marke... independents. The independents... dominate the business but reap nor... the rewards.

"What they've claimed is we're tryi... set prices and even in the most gene... application of the law, that's a gross...

*continu...*

## "I'M NOT PRICE-FIXING ANYBODY. I'M MAKING A LIVING OUT HERE. I'M TRYING TO SURVIVE AS A HUMAN BEING. AND I'VE GOT JUST AS MUCH RIGHT TO SURVIVE AS THEY HAVE."

## — JOSE MATOS, VETERAN TRUCKER

be reached for comment.

With some structure now about the group, Scott initiated negotiations by sending a letter to the brokers that would later appear as "Exhibit A" in court documents. In the letter, Scott listed three demands, the least heralded of which asked "that all brokers who sell gasoline to the drivers comply with the licensing requirement set by the State of Florida

suit was filed in state court by Miami brokers Retranca Equipment and Trucking, Truck Brokerage by National and Juner Hauling. Joining them were Austin Tupler of Davie and Eastman Aggregates of Lake Worth, which didn't return phone calls for comment.

The still-active lawsuit asked for an injunction to stop the strike, plus damages in excess of $1 million and legal ... It implicated every dump truck driv...



**Drafted for leadership:** Jose Matos, in the cramped quarters of his cab, got caught in the middle of the dispute.

from page 20

representation," Scott says.

Matos puts it in simpler terms: "I'm not price-fixing anybody," he says. "I'm making a living out here. I'm trying to survive as a human being. And I've got just as much right to survive as they have."

The two firms representing the brokers never questioned the truckers' right to survive, they just don't endorse their methods. According to the same suit, "As part of the conspiracy, and to increase the effectiveness of their work stoppage, several defendants and their allies and agents have threatened, harassed and assaulted other independent owner-operators who have contracts to provide services to plaintiffs."

> **"TO MAKE A GOOD LIVING, THEY SHOULD BE MAKING MORE THAN $2,000 A WEEK. MOST ARE MAKING ABOUT $1,200."**
>
> **— CHUCK CHIRILLO, TRUCK SALESMAN**

This charge pops up repeatedly in this suit and the two others filed against the independent owners in February. Both of those are active, as well. Palm Beach Aggregates accuses the truckers of intimidating and harassing nonstriking truckers and of destroying tires by placing spikes on the entry road to the quarry. West Palm Beach broker Siboney Contracting accuses protesting truckers of the same malicious activities, plus posting signs that told nonstriking truckers they were being "watched."

Rinker Concrete, which is unionized, reported having drivers shot at and brake lines cut. "I sympathize with them," says Lamar Mathis, treasurer

Lauderdale. "Everybody's out there trying to make a living, but I'm not sure I agree with their tactics."

Matos, though, denies any of this ever occurred. "That was a lie," he says. "I was one of the leaders and one of my first statements to all the drivers was that as soon as I saw any type of violence I was going to walk out. We didn't slash nobody's tires. We didn't put no studs on the road. I'm not a man of violence."

## Not my bear to cross

Matos is a small, pot-bellied man with skin the color of motor oil and meaty hands that resemble bear claws, but not the kind found on an ursus as much as those staring out from a bakery shelf.

The hands are a tribute to hard labor and the understanding that life has not always been so nonviolent. "I spend my time more wisely now than I did before," he says. "In the house of the Lord instead of in bars and nightclubs drinking and fighting — committing all kinds of sins against my body."

Matos does not go into the details of his less moral days out of respect for his wife of 20 years, an Italian woman who keeps him in church and cooks his favorite meals. "She's a good woman," he says. One gets the impression he was not so fond of his first wife, an Irish woman who bore him two children. He heard she died from a stroke. That was more than 20 years ago.

Matos came to America at 18 because work was scarce in Puerto Rico. He landed in Aurora, Ill., learned English by watching television, graduated from trade school with a machinist degree, went to work, encountered his first strike and spent seven months on a picket line. "When I realized it would take 10 years to make up what I lost in those seven months, I got discouraged and quit."

His next stint on a picket line came years later in New York City when he was working as a gypsy taxi driver competing against Yellow Cab. He doesn't recall the exact terms of this dispute, but



with ZERO down
Total Move In $395

We are a V.A. direct lender
• Most prior bankruptcy & lates O.K.
• No Credit O.K.
• Specializing in Government Mortgage Programs
• Homes up to $203,000

**Call for details:**

SUSAN - Realtor 954-817-6543
FABIEN - Mortgage Consultant 954-494-3522

mushroom place
BODY JEWELRY
Water Pipes, Hand Pipes, Pipes, Cigars
Changing Glass, Custom Jewelry
Cigars, Pipes, Custom Jewelry
Sports Candles, Oil Burners, Gifts, Lights
Custom Glass Products, Glow Sticks

CIGARS

EZ Whips
w/coupon
$13.99  24 pk.

903 Sunrise Lane • Ft. Lauderdale
Open every day from 11:30am
(954) 630-0615



Real photos, Real references,
**Real results!**

No salesmen –
meet with Dr. Shapiro in person!

As low as $3 per graft,
approx. $83 a month,
also Orlando and Delray Beach

Physicians & Surgeons, D.O.

**Dr. Shapiro's Hair Institute**
1-800-799-HAIR  3475 Sheridan St., Ste 201, Hollywood,



# PEACE ✌ PIPE
FORT LAUDERDALE

A World of Quality
Smoking Accessories

Color Change
PYREX

• Graffix
• Chills
• Tabak
• DVS
• Darkside
• E-Z WHIPS
• Kama Sutra
• Zippo Lighters
• Colibri Lighters
and much more!

• Black Lights
• Stickers
• Posters
• Incense
• T-Shirts
• Scales
• Clove

• Jerome Baker
• Sterling Glass
• Darkside
• Diablo Glass
• Roore
• Sour Diesel
• Space
• Hundreds Glass
• MANY more!

ALL NATURAL HERBAL
TEAS & DETOXIFIERS
from $19.95

PAPERS!
Box Such as:
E-Z Wider, Club, JOB, Rizla, Smoking,
Pure Hemp, Joker, Chills, Bambu

4808 North Dixie Hwy.  Open 7 Days from 10am



**Daddy's constant companion:** Independent trucker Pablo Cruz takes his son David on his route because he can't afford a baby sitter. David has his own child's safety seat in his dad's truck.

from page 23

he does know it was a bitter strike, resulting in the bloody deaths of four cab drivers. This fuels his hard line on violence.

With a bitter taste in his mouth, Matos abandoned his cab for a tractor-trailer, hauling anything he could anywhere he could for more than 10 years, spending a month on the road without ever seeing his home. "It's murder on a person," he says. "Especially if you got a family." This revelation led him to a solitary existence inside the cramped cab of a dump truck, a place that suits his sensibilities as well as his second wife, who likes him home for supper. In 1996, he bought a used Mack for $60,000. His reliable old rig has eight gears, $350 tires and 545,000 miles. It's guaranteed for one million miles.

What's particularly interesting about Matos is how little he actually had to gain from a strike that could have taken everything from him. He does all of his hauling for one small company rather than a large broker and is compensated better than most for his work. A $400 day isn't uncommon. The high cost of insurance still is a problem, but he could have parked his truck for a month without worrying about his bank account.

"I went in because I felt it was the right thing to do," he says. "I didn't go in because I wanted any benefit for myself. I'm not sorry I got involved. I'm sorry about the outcome."

In addition to his name appearing in bold letters at the top of three lawsuits, the day he went back to work, Matos found out he and other strike leaders had been barred indefinitely from the quarry on Southern Boulevard — their virtual lifeline. The ban has forced him to buy his material from a nearby recycling yard that charges significantly more for the same minced concrete. A representative of Palm Beach Aggregates, who asked that his name not be used, says he has no knowledge of the ban.

"If I was somebody who would steal something from them, it would be justified," Matos says. "But I didn't steal nothing from them. We were asking for something that was fair. I didn't do nothing against the pit. My gripe was with the brokers."

**The dump truck enigma**

When Scott refers to the "ironic and humorous" part of the lawsuits, she is talking about the brokers' insistence that these drivers are powerful enough to form a monopoly. "All of them together are still smaller than the companies suing them," she says.

Take Siboney Contracting, for example, which is suing for damages, costs, attorneys' fees and civil penalties of $100,000 per individual. In its lawsuit, the West Palm Beach broker cites valuable contracts with Continental Concrete, Maschmeyer, Tarmac Concrete, Parkway Asphalt, Orlando Paving and Prestige Gunite. Davie trucking giant Austin Tupler provides another example. Running this operation for more than 40 years, Tupler is an influential businessman who has served on the boards of the Florida Department of Children and Families and its predecessor and is well known in Broward Democratic circles. He endured strikes in 1981 and 1990. His company runs between 200 and 300 trucks each day, almost all of which are operated by independent owners.

"I drive a 1992 truck and a 1989 station wagon that's all beat-up," Matos says. "I'm not getting rich off this. I'm not driving a Lexus or a Cadillac."

This much is evident from the cab of his aging Mack, which is small and dirty and impersonal. There is none of the luxury of a tractor-trailer. No place to sleep. Just a CB and a tape deck, which mostly goes unused because the noise inside drowns out everything else. Frequent gear changes sound like a chain saw cutting through metal. Seat backs go straight up and down. Leg room is sparse. It's no wonder they write country songs and movies about the other truckers.

"Dump trucks are kind of an enigma," says Larry Lark, director of National Truck Drivers School in Jacksonville. "We have guys who come into the school and all they want to do is drive dump trucks. They don't have to travel, they don't stay overnight. I guess that's the appeal."

Matos' day begins early, before traffic builds on

## "I SYMPATHIZE WITH THEM. EVERYBODY'S OUT THERE TRYING TO MAKE A LIVING, BUT I'M NOT SURE I AGREE WITH THEIR TACTICS."

### — LAMAR MATHIS, TEAMSTERS LOCAL UNION NO. 769

I-95, where he has spent many an idle hour. "You have to have patience," he says. He spends much of his time parked in a sandy lot along Southern Boulevard waiting for his cell phone to ring. Around 10 a.m. on a Friday morning, he gets a call, telling him a construction site in Boca Raton needs a few tons of rock for the foundation of a beachfront condo.

He travels down Southern Boulevard to the recycling yard, which fills his bed with giant **continued next page**

Zone

**$5.00 Off** Your First Visit With This Ad

**Romantico!**

**GONDOLA RIDES**
Leave the dock of The Cove Restaurant in Deerfield Beach, on Hillsboro Blvd. and the Intracoastal for 1/2 hour rides or 1 hour rides, daily.
TOLL FREE **1-877-946-6365**

**Sexxy Things**
Upscale Boutique at the Lowest Prices
- Felina
- Cosabella
- Free Voogue
- Ragged
- Leg Avenue
- Shirley of Hollywood
- Risqué
- Intimate Attitude
- Magic Silk
- Escante

Bring in this ad for 10% off our already low prices

2017 Harrison St. Hollywood
954-924-4800

**Adopt-A-Manatee today and help protect them for tomorrow**



Save the Manatee Club • 1-800-432-JOIN (5646)

**from previous page**

scoops from a crumbling hill. The load costs $250, where it night have cost $160 at the quarry he says banned him. Unwitting customers will pick up the extra cost. Weighted down, Matos pulls into traffic, running through six gears by the time he hits 30 mph, never using his clutch, but shifting when the truck hits 1200 rpms. He hits the interstate at 50 mph and refuses to leave the right lane, "four-wheelers" avoiding him like a bad stink. "I don't like to speed," he says. "The only place that will take you is to a faster grave."

Twenty minutes later, Matos exits I-95 at Palmetto Park Road and heads east toward the construction site. He turns left and finds a level spot in the dirt that will allow him to spill the load without tipping his truck, which happens on occasion, but has never happened to him. More often, trucks just get stuck and require an expensive tow.

With the emergency brake engaged, Matos initiates the noisy pneumatic arm that raises his bed, shaking the truck and leaving a pile of rock on the ground. With the bed still raised, he pulls forward a few feet to free the remaining stones. He then lowers the bed, but before leaving, picks up another load, this time from a heap of dirt, concrete and Rebar on the opposite side of the site. Each scoop explodes into his empty bed, roaring like thunder and sending the truck into convulsions. Matos stares into his side mirror.

"Damn, man, don't break my truck," he says. Twenty minutes later, he's back on the interstate, 50 mph in the right lane, watching cars pass and suddenly cursing the strike. "In Miami, they stood their ground and succeeded," he says. "Our people just run off. They got what they wanted. We didn't get nothing."

It wasn't that simple, though. The 700 independent drivers who appear to have benefited in Miami weren't driving dump trucks but tractor-trailers that were hauling to and from one of the busiest ports in the country. The holdout was killing businesses in Miami-Dade and Broward counties, which hastened to a settlement. After refusing to drive for the better part of a month, port haulers returned to work in late February amid promises of more money, better access to their cargo and a state investigation into the insurance dilemma.

The dump truck drivers on strike in Miami organized late and suffered much the same fate as Matos and his colleagues, returning to work with little more to show for their efforts than a lawsuit naming them as the defendants and asking for thousands of dollars in damages. This has mirrored what's happened across the nation since gas prices began to rise. A coalition of independent dump truck owners from New Jersey even lobbied Congress to no avail. This week, leaders from South

Florida trucking groups will storm Capitol Hill, asking the government to release strategic oil reserves that will ease their pain. They also will ask the U.S. Department of Transportation to investigate the practices of local brokers.

"None of the truckers nor their lawyers claim to have the right solution," Scott says. "But the end result should be for truckers to put more money in their pockets at the end of the day. They bear all of the expenses."

Included in those expenses are Scott's legal fees, which come out to $50 a head. Last week, she took a step toward earning her money, filing a motion to dismiss the suits on various technical and complicated grounds. One of her arguments is that the Owners Association doesn't legally exist yet, so how can you sue them? Another challenge regards the allegations that the truckers attempted to fix prices. "There's no cost-fixing because we don't propose a solution," she says. "The whole purpose was to sit down with the brokers and find a solution."

For Matos, the annoyances of everyday life continue to mount. Aside from his many problems resulting from the strike, he continues to fight with West Palm Beach brokers Cabrera and Rego, a much-litigated duo that pleaded guilty in February to skirting excise taxes on diesel they sold to drivers. They've also been sued for not paying employees. Matos, who worked for the company for five years, purchased his truck from them in 1994 and paid it off four years later, but never received the title. He filed suit — along with four other owners — in 1998, but it continues to linger in the court system. "That's another beef," he says, managing a smile.

Driving west on Southern Boulevard, Matos is somehow able to laugh about it all, perhaps by looking three years down the road when he hopes to retire from trucking to import classic cars from South America. He once owned a '54 Chrysler Imperial Classic and a '60 Lincoln and a '57 Ford Fairlane convertible. "I'm sorry I got rid of them," he says. "I see the prices now."

Tonight, Matos will attend a prayer service with his wife, which they do three times a week along with attending church every Sunday, still picking up the pieces of his past. But early tomorrow morning, Matos will be back on the road, an overpriced load of rock in his bed, creeping down the interstate toward a beachfront construction site in Boca Raton, passing other dump truck drivers doing the same, all living by their own diluted definition of independence.

"I love this," Matos says over the noise of the road. "This is what I love. I love my freedom. That's one thing about truck drivers. We are free."

*Contact Dave Warm, at dwarm@tribune.com.*

## ARRESTED? NEED A LAWYER

**YOU CAN CALL THE REFFERAL SERVICE 24 HOURS - 7 DAY**
**MANY OF OUR ATTORNEYS ARE EX-PROSECUTORS AND PUBLIC DEFENDERS/TRIAL ATTORNEYS**

- DUI/BUI
- DWL
- TRAFFIC
- ALIMONY
- PAROLE/PROBATION
- FELONIES
- MISDEMEANORS
- FEDERAL/STATE
- DOMESTIC VIOLENCE

**1-800-733-LEGAL**   24 HOURS   **1-800-733-534**



# Join the party.
# Then join the club.

**MEMBER APPRECIATION DAY**
Thursday, March 16th. 5:00pm–10:00pm. Get an autograph from members of the Miami Dolphins Cheerleaders. Register to win free prizes.



**GRAND OPENING PARTY**
Saturday, March 25th. 11:00am–8:00pm. Get an autograph from O.J. McDuffie of the Miami Dolphins. Enjoy free food and entertainment.

**KIDS' CARNIVAL AND FAMILY DAY**
Sunday, March 26th. Noon–5:00pm. Bring the kids to the club for a day of free food and entertainment.

### Bally Total Fitness Grand Opening Celebration in Oakland Park.

Meet members of the Miami Dolphins Cheerleading Squad on Thursday, March 16th! Get an autograph from O.J. McDuffie of the Miami Dolphins on Saturday, March 25th! Plus, bring the kids for a day filled with carnival-like fun on Sunday, March 26th! Best of all, you'll have a chance to see everything the new Bally Total Fitness in Oakland Park has to offer, including:

- Treadmills
- Elliptical trainers
- Stationary bikes
- Resistance equipment
- Certified personal trainers
- SPINNING® classes
- Childcare
- Bally Retail® Store
- Hammer Strength® training area

Join now and get a special Grand Opening Discount. 50% off your start-up fee and 50% off your renewal dues. You'll save when you join and every year you're a member. Join the party. Then join Bally and save big. Call now, this offer ends March 31st.


New PowerFlex program


The latest car equipment


Advanced training area



**GRAND OPENING DISCOUNT**
**50%/50%**
OFF START-UP FEE   OFF RENEWAL DUES





## 959 East Commercial Boulevard · Oakland Par
# 954-491-9196

BALLY TOTAL FITNESS

*Available at Oakland Park only on Premier memberships with $50 minimum down payment. Maximum start-up discount is $50. 50% off renewal dues expires 3/26/00. 50% off start-up expires 3/31/00. Discount is off price that will be charged after grand opening month. Some restrictions apply. Annual Equal Opportunity Club. ©2000 Bally Total Fitness Corporation.*