

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6223-CIV-GOLD/Simonton

AUSTIN TUPLER TRUCKING, INC., JUNER
HAULING CORPORATION, RETRANCA
EQUIPMENT & TRUCKING CORP.,TRUCK
BROKERAGE BY NATIONAL, INC., and
EASTMAN AGGREGATES

        Plaintiffs,

vs.

SUPPORT DUMP TRUCKING GROUP, INC.,
JUAN ARAGONES, OSCAR DE LEON,
REYNALDO RODRIGUEZ, RAFAEL D.
JIMENEZ, NORVEL IGARZA, ALAYN
HERNANDEZ, EDUARDO RODRIGUEZ,
OSMELY JIMENEZ, OSCAR SUAREZ,
JULIO GOMEZ, RIGODERTO PUPO,
RENIER MARTINEZ, GIRALDO VICTORIA,
VICTOR MORALES, JOHN DOE 1 through 300,
OWNERS ASSOCIATION OF PALM BEACH
AND BROWARD COUNTY, CHARLES LUQUE,
JORGE VALIENTE, JOSE MATOS, ISAAC
TURGEMAN, ILCEANE SFORCA, OSSIE
FERNANDEZ, and DANIEL BALAZI

        Defendants.

_____/

**PLAINTIFFS AUSTIN TUPLER
TRUCKING, INC., ET. AL.'S
MOTION TO DISMISS
DEFENDANTS' COUNTERCLAIM**

        Pursuant to Rules 8, 9, 12, and 13, Fed. R. Civ. P., Plaintiffs Austin Tupler Trucking, Inc.,

et. al. ("Plaintiffs") file this Motion to Dismiss Defendants Juan Aragones, Oscar de Leon, Rafael

D. Jimenez, Alayn Hernandez, Renier Martinez, and John Doe 1-900's ("Dade Defendants")

Counterclaim.  As grounds therefore, Plaintiffs state:

122 #

1.      The Dade Defendants have failed to establish that this Court has jurisdiction over the claims raised in the Counterclaim.

2.      The Dade Defendants have raised novel and complex issues of state law over which the Court should not exercise supplemental jurisdiction.

3.      The Dade Defendants have not identified a single individual who has suffered a personal injury as a result of any alleged wrongful or illegal conduct by the Plaintiffs.

4.      The Dade Defendants fail to state a claim upon which relief may be granted in any of the counts in the Counterclaim.

Accordingly, for the reasons stated herein and in Plaintiffs Austin Tupler Trucking, Inc., et. al.'s Memorandum of Law in Support of their Motion to Dismiss Defendants' Counterclaim, Plaintiffs respectfully request that the Court dismiss Defendants' Counterclaim in its entirety and award Plaintiffs their reasonable costs and attorney's fees in defense of this action.

Respectfully submitted this 28th day of July, 2000.

|  |  |
|---|---|
| | By: _____ |
| FISHER & PHILLIPS LLP | Charles S. Caulkins |
| Bank of America | (Fla. Bar No. 0461946) |
| One Financial Plaza, Suite 2300 | James C. Polkinghorn |
| Fort Lauderdale, Florida 33394 | (Fla. Bar. No. 0376892) |
| Telephone:    (954) 525-4800 | Edward H. Trent |
| Facsimile:    (954) 525-8739 | (Fla. Bar No.  0957186) |
| | Attorneys for Plaintiffs. |

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of PLAINTIFFS AUSTIN TUPLER TRUCKING,

INC., ET. AL.'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIM was served by First

Class United States mail this 28th day of July, 2000, upon the following:

Richard Diaz, Esq.
Richard A. Diaz, P.A.
2701 Southwest 3rd Avenue
Miami, Florida 33127-2335
Attorneys for Support Dump
Trucking Group, Inc., Juan Aragones,
Oscar De Leon, Rafael D. Jimenez,
Alayn Hernandez, and Renier Martinez

Hosey Hernandez, Esq.
Hosey Hernandez, P.A.
Coconut Grove Bank Building
2701 South Bayshore Drive, Suite 602
Coconut Grove, Florida 33133
Attorneys for Support Dump Trucking
Group, Inc.

Attorney

3

have suffered an 'injury in fact' – an invasion of legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. The Court then noted, "[b]y particularized, we mean that the injury must effect the plaintiff in a personal and individual way." *Id.* at n. 1. As noted above, it is the Dade Defendants' burden to set forth facts establishing that they have standing in this case before the Court will have jurisdiction to hear the matter. *Id.* at 561, 112 S.Ct. at 2136. Because the Dade Defendants have not identified any individual who has allegedly suffered an "injury in fact," a personal, concrete, and actual injury, they lack standing to bring the claims asserted in the Counterclaim.

Even if the Court should find that the Dade Defendants have somehow met the minimum constitutional requirements for standing, there are other considerations that justify the Court finding the Dade Defendants lack standing in this case. The Supreme Court has listed three considerations that discourage judicial action despite a party's satisfaction of the three constitutional requirements discussed earlier: (1) assertion of a third party's rights; (2) allegation of a generalized grievance instead of an injury peculiar to the litigant; and (3) assertion of an injury outside the statute's or constitutional provision's zone of interest. *S.J. Groves & Sons*, 920 F.2d at 757 (citing *Valley Forge Christian College*, 454 U.S. at 474-475, 102 S.Ct. at 759-760). In this instance, there are several reasons for the Court to dismiss this action for lack of standing.

The Dade Defendants clearly attempt to assert a third party's rights. For example, in paragraph 16 of the Counterclaim, the Dade Defendants assert the "average independent owner/operator drivers earns a gross sum of approximately $70,000.00 per year from his/her broker." There is no indication who this "average independent owner/operator driver" is, but the inference

is clearly that it is not one of the five "Group 1 Defendants." In paragraph 19 of the Counterclaim, the Dade Defendants only assert a hypothetical situation and do not identify a single individual, let alone one of the five "Group 1 Defendants" who have "suffered" this "injury." In paragraph 21 of the Counterclaim, the Dade Defendants assert that the Plaintiffs have misrepresented the actual number of owner-operators driving under a blanket insurance policy. Such an allegation would at most give rights to the insurance company, not the Dade Defendants. In paragraph 35 of the Counterclaim, Dade Defendants assert that "All Counter-Defendants have made representations to their independent owner/operator drivers (Counter-Plaintiffs not including SDTG) that they were fully insured, . . .." This allegation clearly involves unidentified third parties as well. There are other such blanket assertions that clearly apply to unnamed, and presumably unrepresented, third parties throughout the Counterclaim. There is no indication these Dade Defendants, the five "Group 1 Defendants," are the appropriate parties to represent the rights of these third parties.

Finally, the allegations in the Counterclaim, specifically that truck brokers, including Plaintiffs, offer to pay a single rate to all independent owner-operators for a job and then charge independent owner-operators more than the actual amount of the premium paid by Plaintiffs for insurance coverage, do not raise individualized claims, but, instead, a general grievance. In an effort to address their generalized grievance over the way the truck brokerage industry operates, the Dade Defendants filed their Counterclaim. What makes it obvious that this is nothing more than a generalized grievance over, which this Court should not exercise jurisdiction, is the total lack of identifiable individual claims. Not one person has been identified that paid $7,000 to a Plaintiff for insurance and was somehow harmed by that fact. Not a single individual has been identified who was duped into obtaining insurance coverage under a broker's policy when he or she could have

9

purchased cheaper insurance on his or her own from an insurance agent. Not a single individual has been identified who allegedly paid a broker for the cost of insurance coverage, then got into an accident, and was told that he or she was not actually covered under the policy. Indeed, in paragraph 21 of the Counterclaim, the Dade Defendants admit that some of their allegations may not apply to any of the Plaintiffs. CC ¶ 21 ("Investigation has revealed that some brokers (which may or may not include any of the Counter-Defendants until further investigation is completed) . . . ."). The Dade Defendants simply make baldfaced, unsubstantiated allegations that amount to nothing more than a generalized grievance over which this Court should decline to exercise jurisdiction. *Valley Forge Christian College*, 454 U.S. at 475, 102 S.Ct. at 760; *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)(noting, "the Court has held that when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction"). Accordingly, the Court should dismiss the Counterclaim in its entirety for lack of standing.

## III.   THE DADE DEFENDANTS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Should the Court find that the Dade Defendants have standing to assert their claims, the Court should dismiss the Counterclaim for failure to state a claim upon which relief can be granted. Even under the liberal rules of notice pleading under Rule 8, Fed. R. Civ. P., the Counterclaim fails to set forth any claims upon which relief can be granted. Indeed, based on the allegations in the Counterclaim, Plaintiffs would be entitled to judgment as a matter of law.

## A.    Standard for Dismissal.

The criteria for dismissal of the Dade Defendants' Counterclaim is well established.

Under *Conley v. Gibson*, a district court should not dismiss a complaint "for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts" that would entitle the plaintiff to relief.  355 U.S. 41, 45, 78 S.Ct. 99, 2 L. Ed. 2d 80 (1957); *see also Bracewell v. Nicholson Air Services, Inc.*, 680 F.2d 103, 104 (11th Cir. 1982). To survive a motion to dismiss, a plaintiff may not merely "label his or her claims." *Blumel v. Mylander*, 919 F. Supp. 423, 425 (M.D. Fla. 1996).  At a minimum, the Federal Rules of Civil Procedure require "a short and plain statement of the claim" that "will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S. Ct. 99 (quoting Fed. R. Civ. P. 8(a)(2)).

In deciding a motion to dismiss, a court can only examine the four corners of the complaint. *Richman v. Precisionaire, Inc.*, 902 F. Supp. 232 (M.D. Fla. 1995).  The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low.  *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) (citation omitted).  Also a court must accept a plaintiff's well pled facts as true and construe the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); *Howry v. Nisus, Inc.*, 910 F. Supp. 567 (M.D. Fla. 1995).

*United States v. Seminole Tribe of Florida*, 45 F. Supp. 1330, 1330 (M.D. Fla. 1999).  Looking at the four corners of the Amended Complaint, the Dade Defendants have failed to plead even the most basic facts to state a claim upon which relief can be granted in any of their counts.  The reason for this is that, taking the allegations as true, there is no legal basis for awarding the Dade Defendants any relief based on their allegations.

## B.    The Dade Defendants Fail to State A Claim Upon Which Relief Can be Granted in any of the Counts of the Counterclaim.

The Dade Defendants have failed to set forth a valid claim in any of the counts of the Counterclaim.  Based on the allegations in the Counterclaim, the Dade Defendants do not set forth a claim for fraud, negligent misrepresentation, civil theft, conversion, insurance fraud, antitrust

violations, intentional or negligent infliction of emotional distress, extortion, or violations of Florida's Civil Remedies for Criminal Practices Act.

### 1.    The Dade Defendants fail to allege any actionable misrepresentation.

In Counts I and II, the Dade Defendants assert that Plaintiffs misrepresented (1) the actual cost Plaintiffs paid for their blanket insurance policy, and (2) that the Dade Defendants' who paid for coverage under that blanket policy were named beneficiaries on that policy. CC ¶ 22, 27. The allegations, however, are insufficient as a matter of law to state a claim for fraud or negligent misrepresentation.

### a.    There is no basis for a claim of fraud.

In addition to not meeting the heightened pleading requirements for claims based on fraud[3], the Dade Defendants fail to state a substantive claim for fraud in Count I. "The elements for

---

[3]Rule 9(b), Fed. R. Civ. P., provides that allegations of fraud must be plead with particularity. Specifically, to state a claim for fraud, the Eleventh Circuit in *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir. 1994) stated that the "complaint must allege the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." Additionally, the court in *Vicom, Inc. v. Harbridge Merchant Services*, 20 F.3d 771 (7th Cir. 1994) concluded that "the case law and commentary agree that the reference to 'circumstances' in the rule requires the plaintiff to state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'"

*NCR Credit Corp. v. Reptron Elecs., Inc.*, 155 F.R.D. 690, 693 (M.D. Fla. 1994); *see also, Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997) (emphasizing, "This Court has explained that, for Rule 9(b), '"circumstances" include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby. . . . Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule'")(quoting *Commercial Property Investments, Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995)(quotations and citations omitted)). The Dade Defendants fail to identify a single person who made a false statement. The Dade Defendants fail to identify a single Plaintiff that made such a false statement with the purpose of inducing a single Dade Defendant to obtain insurance coverage under the broker's policy. The Dade Defendants fail to identify when the allegedly false statements were made or how they were material to a single Dade Defendant's decision to allegedly obtain insurance coverage under the broker's policy. The Dade Defendants do not come close to satisfying Rule 9's requirement that allegations of fraud be plead with particularity.

actionable fraud are (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party. In summary, there must be an intentional material misrepresentation upon which the other party relies to his detriment." *Lance*, 457 So. 2d at 1011; *see also, Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985). It is not sufficient that someone made a false statement; the false statement must be "concerning a material fact." "A material fact is one that is of such importance that (claimant) would not have [entered into the transaction][acted], but for the false statement." *Standard Jury Instructions*, 613 So. 2d 1316, 1318 (Fla. 1993). The Dade Defendants fail to present any facts to satisfy the necessary elements for an action for fraud.

The Dade Defendants' claim for fraud is based on their assertion that they overpaid for insurance coverage when they chose to obtain insurance through a Plaintiff. CC ¶ 26. They also assert that "[i]n many instances, they have not been covered by insurance and/or represented by an insurance company when a claim was made against them." *Id.* The allegedly false statements were that the Dade Defendants "were fully insured, that they were paying dollar for dollar the actual cost of automobile insurance to the broker, and that each independent owner/operator driver was a named insured and beneficiary." CC ¶ 22. It is unclear how any of these alleged statements were the cause of the Dade Defendants' alleged injuries.

The main argument is that the Dade Defendants "have overpaid for many years, the cost of insurance." CC ¶ 22. There is no allegation that the Dade Defendants were not told the amount they would be charged if they chose to obtain their insurance through a broker. CC ¶ 16. There is no allegation that they were required to obtain their insurance through a Plaintiff. Indeed, the opposite

13

is true. The Dade Defendants admit they had the option of purchasing insurance through an insurance agent and not through the broker. *See* CC ¶ 69. Given the alleged great difference in cost between what a broker allegedly charged and what an insurance agent would have charged for an individual policy, it is clear the alleged representation was not material to the independent owner-operator's decision to obtain insurance under the broker's policy. Because the independent owner-operator had the option of obtaining his own individual policy, the *cost* of the insurance was obviously not material to his decision to contract. The cost the broker paid for the blanket policy is completely irrelevant. Even if the insurance coverage a broker provided to an independent owner-operator only cost 1 penny but the broker told the independent owner-operated it cost $10,000 and would, therefore, charge the owner-operator $10,000 for coming under his policy, the result would not constitute fraud.

The absence of inducement is overwhelming as well. There is nothing in the Counterclaim to suggest why a broker, allegedly hoping the driver would obtain his insurance coverage through the broker, would tell the independent owner-operator that it will cost him $7,000 for insurance when the broker knows it only costs $3,500, while the independent owner-operator could find out this fact by calling his personal insurance carrier. Overpaying for insurance does not give rise to a claim for fraud.

The Dade Defendants also assert that they were not covered by insurance. CC ¶ 26. The Dade Defendants, however, do not state how they were harmed by this. There is no allegation that they had to pay a claim that should have been covered by the insurance company. There is no allegation that a single person was denied coverage by the insurance company because he was not on the policy after allowing the broker to charge him for such coverage. There are no allegations

14

that a single Dade Defendant did not get the benefit of his bargain when he chose to come under a broker's insurance policy instead of purchasing his own policy. A Dade Defendant must suffer actual damage before he can recover in a fraud action. If there is no damage, there is no claim for fraud. *Standard Jury Instructions*, 613 So. 2d at 1319; *Casey v. Welch*, 50 So. 2d 124 (Fla. 1951); *National Aircraft Services, Inc. v. Aeroserv International, Inc.*, 544 So. 2d 1063 (Fla. 3d DCA 1989).

Finally, the Dade Defendants assert they were not "represented by an insurance company when a claim was made against them." CC ¶ 26. Again, there is no allegation that they had to pay a claim that should have been covered by the insurance company. There is no allegation that a single person was denied coverage by the insurance company because he was not on the policy after allowing the broker to charge him for such coverage. There is also no allegation that the policy provided that the insurance company would provide legal representation in the event of an accident or claim filed against the driver. Indeed, if there is any claim in such a situation, then that claim would be against the insurance company, not the broker. Accordingly, the Dade Defendants fail to state a claim for fraud.

**b.     There is no basis for a claim for negligent misrepresentation.**

Just as the Dade Defendants fail to state a claim for fraud, they fail to state a claim for negligent misrepresentation. To state a claim for negligent misrepresentation, the Dade Defendants must prove: (1) a false statement of a material fact; (2) that in the exercise of reasonable care the person should have known was false; (3) the statement was made with the intent to induce reliance on the statement; (4) the claimant reasonably relied on the representation; and (5) the claimant suffered loss as a result of such reliance. *Standard Jury Instructions*, 613 So. 2d at 1318. The basis for the Dade Defendants' claims in Count II for negligent misrepresentation is the same as that raised

15

in Count I for fraud. In this count, however, the Dade Defendants must prove they "reasonably relied" on the "misrepresentation" that they were paying the actual cost of the insurance. Because the Dade Defendants were free to obtain a personal policy from an insurance agent and not be covered under the broker's policy, there is no basis to find that the Dade Defendants reasonably relied on this alleged misrepresentation. Just as the Dade Defendants' claims in Count I fail, so do their claims in Count II.

The Dade Defendants also assert that Plaintiffs "had a duty to the [Dade Defendants] to act in good faith, not to steal from them, to accurately charge them for the actual cost of the automobile liability insurance and to make sure that each such independently [sic] owner/operator driver . . . was actually insured." CC ¶ 31. It is unclear where this "duty" comes from. As set forth below, there are no facts to suggest Plaintiffs stole from a single Dade Defendant. There is also no indication that the Dade Defendants were not "accurately charged" for their insurance coverage. There are no allegations Plaintiffs charged an amount other than what they allegedly told the Dade Defendants they would charge for allowing the independent owner-operator to fall under the broker's blanket policy. CC ¶ 16. Furthermore, there is no basis to suggest Plaintiffs had a legal duty to charge "the actual cost of the automobile liability insurance."[4] There are also no allegations in the Counterclaim that Plaintiffs did not list each Dade Defendant who chose to obtain his insurance coverage from the broker on the policy with the insurance company. Accordingly, the Dade Defendants have failed to state a claim for negligent misrepresentation. Count II should be dismissed.

---

[4] To the extent the Dade Defendants suggest that any charge above the actual amount of the premium charged to the broker by the insurance company is fraudulent, those allegations are addressed *infra* when addressing Count V of the Counterclaim.

### 2.    The Dade Defendants fail to state a claim for theft.

In Counts III and IV, the Dade Defendants assert claims for civil theft and conversion related to the alleged overcharging for insurance coverage. The Dade Defendants fail to plead any facts to suggest Plaintiffs took any money or property from the Dade Defendants they did not bargain for.

### a.    There is no basis for a claim of civil theft.

In Count III of the Counterclaim, the Dade Defendants assert the same allegations raised in their allegations of fraud. Namely, the Dade Defendants assert that "they were paying dollar for dollar the actual cost of automobile insurance to the broker and that each independent owner/operator driver . . . was a named insured and beneficiary under the policy." CC ¶ 35. The alleged theft is an alleged misappropriation of money belonging to the Dade Defendants. From the allegations in the Counterclaim, this can only be any alleged money charged over the actual premium paid by the broker for a blanket insurance policy that could be used to cover an independent owner-operator. As noted above, this alleged overcharge was not fraudulent nor does it constitute a theft.

The Dade Defendants admit they were told what a broker would charge them for obtaining state mandated insurance under the broker's policy. CC ¶ 15-16. There are no allegations that the independent owner-operator was denied coverage under the broker's policy when he allegedly paid to be covered under that policy, or suffered any loss associated with obtaining his insurance through the broker. There are also no allegations that a broker charged a Dade Defendant more than the amount the broker said would be charged. At best, the Dade Defendants claim they could have purchased insurance at a lower rate from an independent insurance agent. Assuming a Dade Defendant could have obtained cheaper insurance elsewhere, that does not make the amount paid to a broker theft.

17

Florida statutes provide that one is guilty of theft if he "knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently: (a) Deprive the other person of a right to the property or a benefit from the property, or (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property." Fla. Stat. § 812.014(1). The statute presumes that money or property was taken without authorization by the person from whom the money or property was taken. In other words, the statute does not establish a theft simply because a person believes he paid too much for an item or a person made too large a profit. Indeed, the Florida legislature did not intend the language of the statute to go beyond its obvious goals and required that the statute be given a reasonable interpretation and not applied strictly or liberally. Fla. Stat. § 812.037.

According to the allegations in the Counterclaim, the Dade Defendants authorized the payment to a broker for coverage under the broker's insurance policy. CC ¶ 16. Once they made their payment for insurance coverage, they had no right to that money any longer. There is no allegation that they did not receive what they paid for: coverage for any accident. While the Dade Defendants assert they were without insurance, the Counterclaim is noticeably absent of any allegations of an independent owner-operator having to pay damages for an accident that should have been covered under a broker's policy when the independent owner-operator paid the broker to come under the broker's policy. Absent such a situation, there are no damages and, therefore, no claim. *Standard Jury Instructions*, 613 So. 2d at 1319. Accordingly, the Dade Defendants fail to state a claim for civil theft.

18

**b.      There is no basis for a claim for conversion.**

A claim for conversion is the same as a claim for theft. *Envases Venezolanos, S.A. v. Callazo*, 559 So. 2d 651, 653 (Fla. 3d DCA 1990). The most common claims for conversion are when a person takes money from another's account without authorization. *See, e.g., Id.* and cases cited therein. There is no such claim here. The Dade Defendants do not allege that a Plaintiff was not authorized to withhold 10% of the "per haul payment" to cover the cost of insurance. CC ¶ 16. The Dade Defendants only allege that they now realize that they could have obtained insurance cheaper and wish they had. *See, e.g.,* CC ¶ 24 (where the Dade Defendants claim they felt comfortable that they were paying "the fair and actual cost of such insurance" and realize "now to their detriment" that they could have purchased it themselves for less). As noted above, this does not state a claim for theft or conversion. Accordingly, the Court should dismiss Count IV for failure to state a claim upon which relief can be granted.

**3.      The Dade Defendants fail to state a claim for Insurance Fraud.**

In Count V of the Counterclaim, the Dade Defendants assert that Plaintiffs unlawfully charged an insurance premium, charged a premium above that of the policy, and did so while not being licenced to sell insurance in the State of Florida. Under the facts alleged in the Counterclaim, however, Plaintiffs are not "insurers" selling "insurance," and, therefore, are not subject to the state insurance regulations. Accordingly, the Dade Defendants fail to state a claim for insurance fraud.[5]

---

[5]The Dade Defendants also allege "some" Plaintiffs "provided a [sic] illusory document titled 'Florida Automobile Insurance Card' to the owner/operator driver." CC ¶ 18. The undersigned never received a copy of this exhibit to the Counterclaim, and, accordingly, this memorandum does not address any allegations concerning this "card." Importantly, however, there are no allegations that this card suggested the broker was to provide indemnification to the Dade Defendants in the event one of them was involved in an accident. Accordingly, there is no legal significance to this allegation.

Under Florida law, an "'Insurer' includes every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity." Fla. Stat. § 624.03. The Dade Defendants assert there were times when they had no insurance or were not represented by *the insurance company* when a claim was made against them. *See, e.g.,* CC ¶ 26, 33, 37, and 41. The Counterclaim constantly refers to a blanket policy purchased by a broker and under which an independent owner-operator may come if he or she so chooses. CC ¶ 17 and 21. Accordingly, the only "person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance" is the insurance company, not the broker.[6]

Florida's insurance code only applies to "insurers." The statutory definition of "insurer," therefore, is important to determining the applicability of the insurance code to the Plaintiffs. Because the Plaintiffs are not "insurers" under the Act, they are not bound by the other Act provisions. The court in *Farley v. Gateway Insurance Co.*, 302 So. 2d 177 (Fla. 2d DCA 1974), stated as much when it held:

> Finally, it is significant that §§ 624.03, F.S.1971, which is applicable to the *entire* Florida Insurance Code, defines the word "insurer" as follows:
>> "624.03 Insurer defined: 'Insurer' includes every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance or of annuity."
>
> Thus, an insurer is one in the *business* of *selling* insurance.

---

[6]There are no reported opinions on the novel issue raised by the Dade Defendants in their Counterclaim. The plain language of the Florida Insurance Code establishes that the Dade Defendants cannot maintain a claim of insurance fraud against Plaintiffs. Of course, this being an issue of first impression, the Court could decline to exercise supplemental jurisdiction over the Dade Defendants' state tort claims involving alleged insurance practices. *Schwartz*, 813 F. Supp. at 1368 and n.4; 28 U.S.C. § 1367(c)(1) & (2).

*Id.* at 179 (Emphasis in original). It is clear from the Counterclaim that Plaintiffs are not in the business of selling insurance (CC ¶ 3, 9), and, accordingly, they are not "insurers" subject to the provisions and prohibitions of the insurance code.

Additionally, the alleged contract between various independent owner-operators and various brokers where the broker agrees to provide insurance coverage to the driver under the broker's blanket policy in exchange for a 10% per haul payment, does not meet the definition of insurance under the Act. "'Insurance' is a contract whereby one undertakes to indemnify another or pay or allow a specified amount or a determinable benefit upon determinable contingencies." Fla. Stat. § 624.02. Going beyond this abbreviated statutory definition, the court in *Guaranteed Warranty Corp. v. Humphrey, supra,* cited by both parties, stated that five elements are normally present in an insurance contract, which are (533 P.2d at 90):

1.    An insurable interest.

2.    A risk of loss.

3.    An assumption of the risk by the insuror [sic].

4.    A general scheme to distribute the loss among the larger group of persons bearing similar risks.

5.    The payment of a premium for the assumption of risk.

*Professional Lens Plan, Inc. v. Department of Insurance*, 387 So. 2d 548, 550 (Fla. 1st DCA 1980); *see also, Liberty Care Plan v. Dept. of Insurance*, 710 So. 2d 202, 206 (Fla. 1st DCA 1998). Where, as here, there is "no assumption of the risk" by Plaintiffs for any loss suffered by the Dade Defendants in the event of an accident, no "general scheme to distribute the loss among the larger group of persons bearing similar risks," or "the payment of a premium for the assumption of risk,"

21

there is no contract of insurance. As set forth in the Counterclaim, the insurance company, not the broker, was to bear all the risk in the event of an accident pursuant to the blanket policy issued to the brokers. Accordingly, the alleged agreement between the Dade Defendants and Plaintiffs is not one for insurance regulated by the Florida Insurance Code. As a result, any money charged for coverage under the broker's blanket policy is not an insurance premium as contemplated by the statute.

The alleged agreement to allow an independent owner-operator to obtain the necessary insurance coverage under a broker's blanket policy is actually a service contract and not an insurance contract. The purpose and effect of the agreement was the sale of a service, adding a driver to the broker's blanket policy so the driver would not have to purchase an insurance policy himself from an independent insurance company. The driver did not obtain a policy of his own, but simply came under the broker's policy. CC ¶ 16. The broker provided this service without incurring any responsibility to indemnify the driver in the event of an accident; that responsibility remained with the insurance company. *See, e.g.,* CC ¶ 21. Accordingly, because the express purpose of the contract was to provide a service and not indemnity, the contract is not an insurance contract subject to the provisions of Florida's Insurance Code. *See Boyle v. Orkin Exterminating Co.*, 578 So. 2d 786, 787-788 (Fla. 4th DCA 1991). Count V must accordingly be dismissed.

### 4. The Dade Defendants fail to state a claim for intentional or negligent infliction of emotional distress.

The Dade Defendants assert that the Plaintiffs actions regarding the charges for covering an independent owner-operator under the broker's insurance policy caused the Dade Defendants extreme emotional distress. The Dade Defendants fall far short of establishing a claim for either

22

intentional or negligent infliction of emotional distress under Florida law. The Dade Defendants'
claims fall so short that they can be characterized only as frivolous.

### a. There is no basis to support a claim of intentional infliction of emotional distress.

To establish a claim for intentional infliction of emotional distress, a plaintiff must prove:
(1) a deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which
conduct must have caused the suffering; and (4) the suffering must have been severe. *Metropolitan
Life Ins Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985). To state a claim for intentional infliction
of emotional distress, a plaintiff must allege that the defendant's conduct was "so outrageous in
character, and so extreme in degree, as to go beyond all possible bounds of decency and to be
regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 278-79.

The determination of whether an actor's conduct may form the basis of a claim for intentional
infliction of emotional distress is a matter of law for the court, not a question of fact. *See Golden v.
Complete Holdings, Inc.*, 818 F. Supp. 1495, 1499 (M.D. Fla. 1993); *Ponton v. Scarfone*, 468 So.
2d 1009, 1011 (Fla. 4th DCA 1985). The subjective response of the individual exposed to the
conduct does not control. *Id.*

Florida case law reflects an extremely high standard for maintaining an action for intentional
infliction of emotional distress. In *Golden v. Complete Holdings, Inc.*,818 F. Supp. 1495, 1499
(M.D. Fla. 1993), the plaintiff alleged that his employment was terminated for discriminatory
reasons, coupled with fraud, by claiming that the defendants

> misrepresented and concealed vital financial information, misrepresented their plans
> to reduce employment, terminated Plaintiff despite satisfactory work performance,
> systematically eliminated older employees, including the Plaintiff, replaced Plaintiff
> and other employees with younger persons, discharged Plaintiff without warning,

23

ejected him from his office without giving him an opportunity to collect his personal effects (which Defendants destroyed), and refused for months to pay Plaintiff severance pay and other entitlements.

Despite the allegations of egregious discriminatory conduct resulting in tangible economic loss, the court applied Florida law and dismissed the intentional infliction of emotional distress count, holding that "the alleged conduct does not rise to the level of outrageousness as required by *McCarson*." 1495 F. Supp. at 1500.

Other cases rejecting the tort in which there were allegations of verbal abuse and some form of physical contact, include: *Vance v. Southern Bell Tel. & Tel. Co.*, 983 F.2d 1573 (11th Cir. 1993) (hanging a rope "noose" in work station, intentionally taking plaintiff to wrong hospital when injured, causing a nervous breakdown, and driving out of the company); *Studstill v. Borg Warner Leasing*, 806 F.2d 1005, 1007 (11th Cir. 1986) (no cause of action where plaintiff alleged ongoing sexual harassment and that defendant grabbed her breast); *Blount v. Sterling Healthcare Group, Inc.*, 934 F. Supp. 1365, 1370 (S.D. Fla. 1996) (no cause of action where company president repeatedly hugged plaintiff, rubbed plaintiff's breasts with back of his arm and made sexually explicit jokes and suggestive comments to plaintiff); *Howry v. Nisus, Inc.*, 910 F. Supp. 576, 580-81 (M.D. Fla. 1995) (no cause of action where employer physically touched two employees and himself in a suggestive manner, used obscene language, and commented on sex organs); *Hayes v. Liberty National Life Ins. Co.*, 1995 WL 500896 (M.D. Fla. 1995) (no cause of action where plaintiff's supervisor told other employees in plaintiff's presence that "she's sleeping with me tonight," grabbed plaintiff, pulled her against him, tried to kiss her, and made other sexually-oriented statements to her) (unreported order attached as Exhibit C); *Lay v. Roux Laboratories, Inc.*, 379 So. 2d 451 (Fla. 1st DCA 1980)(verbal abuse, racial slurs and threats of termination).

24

To support their claim for intentional infliction of emotional distress, the Dade Defendants rely on the allegations discussed above alleging overcharging for insurance and offering low per haul rates. As shown from the cases discussed above, these allegations, even if true, do not approach the level of egregiousness required to state a claim for intentional infliction of emotional distress under Florida law. Within this framework, the Dade Defendants' allegations are not sufficient to satisfy Florida's strict standards for maintaining an action for intentional infliction of emotional distress.

The decision of Florida's Fourth District Court of Appeal in *Ponton v. Scarfone*, 468 So. 2d 1009, 1100 (Fla. 4th DCA 1985), punctuated the rationale common to the above-cited cases, by stating that the defendant's alleged sex harassment, though "condemnable by civilized social standards, does not ascend, or perhaps descend, to a level permitting us to say that the benchmarks enunciated in *Metropolitan* have been met." *Id.* at 1011. The same can be said of Plaintiffs' alleged conduct. As a matter of law, the Dade Defendants have not alleged conduct which could be deemed sufficiently "outrageous" to establish the tort of intentional infliction of emotional distress. Therefore, Count VIII should be dismissed in its entirety and with prejudice.

### b. There is no basis to support a claim of negligent infliction of emotional distress.

The Dade Defendants claim of negligent infliction of emotional distress is even less supportable under controlling Florida law. Initially, a claim of negligent infliction of emotional distress under Florida is limited to instances where the plaintiff witnesses the death or injury to a loved one. *Champion v. Gray*, 478 So. 2d 17 (Fla. 1985). There are no such allegations here. Indeed, the Dade Defendants' allegations do not even come close to the very narrow set of

25

circumstances that could possibly support a claim for negligent infliction of emotional distress. This courmt is a clear indication of the frivolous nature of the Dade Defendants' claims.

The Florida Supreme Court recently reaffirmed the narrow elements necessary to support a claim of negligent infliction of emotional distress.

> The elements required to allege a cause of action for negligent infliction of emotional distress [are]: (1) the plaintiff must suffer a physical injury; (2) the plaintiff's physical injury must be caused by the psychological trauma; (3) the plaintiff must be involved in some way in the event causing the negligent injury to another; and (4) the plaintiff must have a close personal relationship to the directly injured person.

*Zell*, 665 So. 2d at 1054. The only conduct alleged to support their claim concerns alleged insurance practices and low hauling rates. Such allegations do not meet the first element of a claim for negligent infliction of emotional distress. Count IX, therefore, should be dismissed with prejudice.

### 5. The Dade Defendants fail to establish claims for extortion, racketeering, or violation of federal and state antitrust laws,.

In Counts VI, VII, X, XI, and XII, Dade Defendants assert claims for violation of the Sherman and Clayton Antitrust Acts (Count VI), violation of the Florida Antitrust Act of 1980 (Count VII), extortion (Count X), Florida RICO conspiracy (Count XI), and Florida RICO (Count XII). The basis for these claims is the Dade Defendants' allegations that Plaintiffs charged the Dade Defendants more for coverage under the broker's blanket insurance policy than the actual premium paid on the policy (CC ¶ 16); that Plaintiffs gave preferential assignments to independent owner-operators who secured their insurance under the broker's insurance policy (CC ¶ 69); and that Plaintiffs set a uniform price that was offered to all independent owner-operators who contracted

26

with each of the Plaintiffs (CC ¶ 6).[7] None of these allegations support the claims made by the Dade Defendants.[8]

In *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3rd Cir. 1998), the United States Court of Appeals for the Third Circuit addressed similar issues and found that the allegations did not amount to a violation of the antitrust laws, RICO, or support a claim of extortion. In *Brokerage Concepts*, BCI provided services as a third party administrator ("TPA") for a chain of pharmacies called I Got It at Gary's ("Gary's"). Gary's was a self-insured employer and, therefore, sought the services of a TPA to administer its health plan for its employees. U.S. Healthcare provided group health insurance with prescription drug plans that required its insureds to select which pharmacy the insured will use for his or her prescription drugs. The insured pays a low co-pay and the pharmacy is reimbursed by U.S. Healthcare for the difference. U.S. Healthcare also provided other financial rewards to its network of pharmacies.

---

[7] As discussed more fully below, it is unclear what the Dade Defendants allege to be a violation of the antitrust laws. In paragraph no. 9 of the Counterclaim, the Dade Defendants suggest that Tupler offering each independent owner-operator the same hauling rate on a single job somehow constitutes price fixing. Of course, Tupler may offer a job at a set rate to all suppliers, i.e. drivers, and that does not constitute a contract or conspiracy to restrain trade. It is a "combination of businessmen illegally restraining trade that offends the antitrust laws of the United States." *United States Steel Corp. v. Fraternal Assoc. of Steelhaulers*, 601 F.2d 1269, 1273 (3rd Cir. 1979). Accordingly, a single company offering a single price to multiple suppliers or customers does not offend the antitrust laws. Offering a job at a set rate is no different than a retail store offering an item for sale at the same price to all customers. To the extent this is the Dade Defendants' claim, they clearly fail to state a claim for violation of the antitrust laws.

[8] Although Plaintiffs address the merits of the Dade Defendants' allegations here in the generic form in which they were plead, this still does not cure the Dade Defendants' failure to adequately prove standing. There is still not a single individual Dade Defendant identified that allegedly suffered some injury from the allegedly illegal conduct. Additionally, the Dade Defendants do not identify a single Plaintiff who allegedly committed any of the alleged conduct or how the Plaintiff's conduct cause the Dade Defendant to suffer the alleged injury. Absent these basic elements, the Dade Defendants lack standing and are unable to maintain their claims. *See* sec. II, *supra*.

27

Gary's was a network pharmacy for U.S. Healthcare. Prior to becoming self-insured, Gary's offered its employees an option of two health plans, one through Blue Cross and Blue Shield and the other through U.S. Healthcare. When Gary's went self-insured, it cancelled its contract with U.S. Healthcare for coverage of its employees while continuing to serve as a U.S. Healthcare network pharmacy. Because Gary's dropped U.S. Healthcare as its insurance provider and chose BCI for its TPA, U.S. Healthcare starting causing trouble for Gary's and began putting pressure on Gary's to switch TPAs to U.S. Healthcare's subsidiary Corporate Health Administrators ("CHA"). Because of the economic pressure asserted by U.S. Healthcare on Gary's, Gary's switched its TPA from BCI to CHA.[9] BCI sued U.S. Healthcare as a result.

The issues before the court were BCI's claims that when U.S Healthcare conditioned Gary's continuance in its pharmacy network, a condition worth considerable amount of money to Gary's, on Gary's switching to CHA as its TPA, U.S. Healthcare violated the antitrust laws, and its actions constituted extortion, and violated federal racketeering statutes. The court found BCI's claims without merit. Initially, the court noted that the relationship between Gary's and U.S. Healthcare fell somewhere between a tying agreement and reciprocal dealing. Under either theory, because there was no harm on competition in the market, there was no violation of antitrust laws. *Id.* at 511-512. Additionally, because the use of economic leverage in a situation where both received something of value, there was no evidence of extortion, in spite of U.S. Healthcare's greater

---

[9]BCI claimed that Gary's switch to CHA for TPA services actually cost Gary's $64,000 more per year than if Gary's had stayed with BCI. 140 F.3d at 508. This allegation was immaterial as is the Dade Defendants' allegation that they paid approximately $3,500 per year more for having to pay a broker to come under the broker's blanket policy than if the Dade Defendant had purchased his own insurance policy through an independent insurance agent. CC ¶ 16. As explained below, the court found that using CHA for TPA services in exchange for Gary's remaining as a network pharmacy with U.S. Healthcare was legal and did not constitute extortion, nor did it violate the antitrust laws or the federal RICO statute.

leverage. *Id.* at 522, 525-526. Finally, because BCI was unable to assert the necessary predicate acts, there was no basis to uphold a claim of RICO. *Id.* at 529. As noted below, these same considerations apply to the Dade Defendants' Counterclaim. Upon consideration of these issues, it is clear the Dade Defendants are unable to maintain a claim under any of these counts.

### a.    The Dade Defendants fail to state a claim for violation of federal and state antitrust laws.

The Dade Defendants assert Plaintiffs set minium tariffs, boycotted the Dade Defendants "for the purpose of effecting their plan to set prices and affect commerce," filed the lawsuit at issue in this case, and attempted to establish a monopoly. None of the Dade Defendants claims are sufficient to state a claim for violation of the antitrust laws.

According to paragraph no. 9 of the Counterclaim, it appears the Dade Defendants' claims of price fixing concern the offering of one price by a single broker to all independent owner-operators on a single job. The essence of the Dade Defendants' claims, therefore, goes to the question of whether a broker, e.g. Tupler, has the right to determine what it will pay to its suppliers, e.g. an independent owner-operator. The Dade Defendants are dump truck drivers that contract with brokers to haul construction materials for jobs obtained by the broker through the bidding process. CC ¶ 2, 3, 9. Accordingly, the Dade Defendants are suppliers of hauling services purchased by the broker. There is nothing in the antitrust laws to suggest a broker cannot determine for itself what it will pay for these services. Even the setting of a "low" price to suppliers does not constitute an antitrust violation. *Brokerage Concepts*, 140 F.3d at 509 (finding that U.S. Healthcare, which drastically reduced its reimbursement rates to the lowest in southeastern Pennsylvania region and only lost 2 of over 8000 network pharmacies, did not violate antitrust laws by exerting market

29

pressure even though it possessed economic leverage over network pharmacies who "had to choice but to accept U.S. Healthcare's arrangement").

Plaintiffs have the right to contract with suppliers of their choice. "The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137, 119 S.Ct. 493, 499, 142 L.Ed.2d 510 (1998). Indeed, this freedom to contract with suppliers of its own choosing is "the most efficient means for the prevention of monopoly." *Id.* (quoting, *Standard Oil v. United States*, 221 U.S. 1, 62, 31 S.Ct. 502, 55 L.Ed. 619 (1911)).

There are no cases where a company that sets a price it will pay for a service or accept for a product is found to be in violation of the antitrust laws. In addition to the five Plaintiffs, the Dade Defendants suggest there are at least 25 other truck brokerage companies operating in Miami-Dade County. CC ¶ 5. Because the Dade Defendants can contract to haul for any of these brokers, there is no basis to conclude that a broker setting its own price to be offered to independent owner-operators curbs competition. *Brokerage Concepts,* 140 F.3d at 518 (the customer's ability to contract with multiple providers proves defendant did not possess sufficient market power to violate the antitrust laws). Accordingly, the Dade Defendants have failed to state a claim for violation of the antitrust laws.

The Dade Defendants also assert they were boycotted for the purpose of setting prices. CC ¶ 48. It is unclear how the Dade Defendants were boycotted. If the Dade Defendants are only the five members of the "Group 1 Defendants" then they have failed to allege even a simple statement of facts to suggest an illegal boycott. If the Dade Defendants are the 900 (presumably all or nearly all) independent owner-operators in Miami-Dade County, then any boycott against them would leave

30

Plaintiffs without any providers of hauling services and out of business. Without some facts to suggest what action is alleged to constitute a boycott, there is no basis for relief on such a claim.

If the Dade Defendants are referencing their recent illegal work stoppage, the subject of Plaintiffs' Amended Complaint and pending Motion for Preliminary Injunction, then there is no basis for this Court to find an illegal boycott by Plaintiffs. In that situation, the Dade Defendants collectively made themselves unavailable for work as set forth in Plaintiffs' Motion for Preliminary Injunction. If the Dade Defendants assert they are being boycotted for participating or leading the mass work stoppage, then they still have no claim as Plaintiffs have a right to select their supplier and to contract with drivers of their choice. *NYNEX Corp.*, 525 U.S. at 137, 119 S.Ct. 499. "It is well established that a party 'may choose with whom he will do business and with whom he will not do business,' and that this behavior, referred to as 'exclusive dealing,' will not give rise to liability absent a showing of actual competitive injury." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991)(quoting, *Construction Aggregate Transp., Inc. v. Florida Rock Indus., Inc.*, 710 F.2d 752, 772-73 (11th Cir.1983)).

It is clear the brokers are not competitors of the Dade Defendants, but actually obtain construction contracts and then in turn offer jobs to the independent owner-operators. CC ¶ 2, 3, 9. The relationship between the Dade Defendants and the Plaintiffs is vertical, not horizontal. As the court in *Schwartz v. Jamesway Corp.*, 660 F. Supp. 138, 141 (E.D.N.Y. 1987), explained in dismissing the plaintiff's complaint alleging an illegal boycott,

> Plaintiff's complaint does not set forth a *per se* violation of the antitrust laws. Group boycotts are considered to be per se illegal only when they are engaged in by competitors of the plaintiff. *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S. Ct. 2009, 2018, 90 L. Ed. 2d 445 (1986); *Northwest Wholesale Stationery, Inc. v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 105 S. Ct. 2613, 2619, 86

31

L. Ed. 2d 202 (1985). In the present case, plaintiff does not allege that his competitors have conspired to boycott his business. . . . [S]ince plaintiff does not allege in the complaint that he competes with either defendant, plaintiff must pursue his antitrust claim under the rule of reason, rather than on the basis of *per se* illegality. Except where a *per se* violation is alleged, the plaintiff must allege that the defendants acted to restrain competition in order to state a claim under the Sherman Act. *International Tel. Productions, Ltd. v. Twentieth Century Fox*, 622 F. Supp. 1532, 1539 (S.D.N.Y. 1985); 1 E. Kintner, *Federal Antitrust Law* §§ 8.3 (1980). To do so, the plaintiff must identify in its pleadings the relevant product market and alleged "how the net economic effect of the alleged violation is to restrain trade in the relevant market and that no reasonable alternate source is available." *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982); accord *Rosenberg v. Cleary, Gottlieb, Steen & Hamilton*, 598 F. Supp. 642, 646 (S.D.N.Y. 1984).

Plaintiff's complaint fails to satisfy these pleading requirements. First of all, the complaint does not delineate the relevant market. Plaintiff pleads in conclusory fashion that he has an "interest in maintaining a free and unhampered market for the representation of manufacturers of jeans and slacks and other childrens' [sic] wear." Complaint para. 8. Such a vague statement cannot satisfy the market delineation requirement. See *Twentieth Century Fox, supra*, 622 F. Supp. at 1539; *Gianna, supra*, 551 F. Supp. at 1354.

Second, plaintiff does not allege that competition has been injured. Plaintiff merely states that he was injured in his business. Such pleading does not state an antitrust claim because it does not allege an injury to competition among several competitors. See *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 250-51 (2d Cir. 1985).

The Dade Defendants' Counterclaim suffers from the same deficiencies. The Dade Defendants do not even attempt to define the relevant market or allege any damage to competition. Accordingly, Counts VI and VII should be dismissed.

The Dade Defendants assert that the underlying lawsuit in this case constitutes a form of extortion and is itself a violation of the antitrust laws. As set forth in Plaintiffs' Amended Complaint, the purpose of the lawsuit was not to restrain trade (it is unclear how this case could restrain trade in any event), but to remedy Defendants' violations of the antitrust laws. There is nothing about a suit seeking relief from violations of federal and state law that would make the suit

itself an antitrust violation. If that were the case, no party could bring such a claim without violating

the very law it seeks to have enforced. Surely Congress did not create such an absurdity in the law.

Finally, the Dade Defendants assert that Plaintiffs attempted to form a monopoly.

> To prevail on a monopolization claim, a plaintiff must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury. *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966); *Catlin v. Washington Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986). To prove attempted monopolization, the plaintiff must prove a specific intent to monopolize a relevant market, predatory or anticompetitive acts, and a dangerous probability of successful monopolization. *See, e.g., Catlin*, 791 F.2d at 1348.

*Advanced Health-Care Servs. v. Radford Community Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990). "A

firm, even one with monopoly power, is not guilty of predatory exclusionary conduct when it is

simply exploiting the competitive advantages legitimately available to it." *Id.* at 147 n. 14. The

Dade Defendants do not allege the relevant market or that competition has been harmed by any of

the alleged acts of Plaintiffs. Such a failure warrants dismissal of these claims. *See, Brokerage*

*Concepts*, 140 F.3d at 509, 518; *Schwartz*, 660 F. Supp. at 141.

The Dade Defendants assert that Tupler "has positioned itself as a leading, manipulating,

controlling and powerful force in the construction and construction materials hauling industry as a

broker," but this does not even remotely suggest that Tupler has a monopoly power among the 30

alleged brokers in Miami-Dade County. CC ¶ 3.[10]  There is no allegation that Tupler has a

controlling share of the market for brokerage services. Indeed, a 25% market share has been found

---

[10]The Dade Defendants seem to imply that all 30 brokers somehow were acting together to create a monopoly. There are certainly no facts in the Counterclaim to suggest that the 30 named and unnamed brokers have attempted to control competition and prevent new brokers from entering the market. Absent such a controlling use of such power, there is no violation of § 2 of the Sherman Act. *Advanced Health-Care Serv.*, 910 F.2d at 147; *see also, Brokerage Concepts,* 140 F.3d at 518.

insufficient as a matter of law to support a claim of unlawful tying agreements, and falls far short of a claim of monopolization. *Brokerage Concepts*, 140 F.3d at 516. Accordingly, the Dade Defendants fail to state a claim of unlawful monopolization.

The Dade Defendants allegations are generally a complain about how the market for dump trucking services operates. "The purpose of the Sherman Act 'is not to protect businesses from the market; it is to protect the public from the failure of the market.'" *Id.* at 518 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3rd Cir. 1997)(quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993))). Because the Dade Defendants fail to allege any facts to support a claim for violation of the antitrust laws, Counts VI and VII of the Counterclaim should be dismissed.

### b.    The Dade Defendants fail to state a claim for extortion.

In Count X of their Counterclaim, Dade Defendants claim they were victims of extortion. The basis of their claims is that Plaintiffs have made offers to pay "ridiculously low rates which have not increased for almost over twenty years" on a "take it or leave it" basis (CC ¶ 68); given preferential treatment to those "who purchase insurance through the brokers over the independent owner/operator drivers who had their own insurance" (CC ¶ 69); and required Dade Defendants "to pay an auto insurance deductible up front so that in the event of a claim, the deductible is covered" while not paying interest on this money (CC ¶ 71). None of these allegations constitute extortion under Florida law.

Florida law defines extortion as follows:

Whoever, either verbally or by a written or printed communication, maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or

34

maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will, shall be guilty of a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Fla. Stat. § 836.05. The Counterclaim is totally devoid of any allegations that Plaintiffs threatened "to accuse another of any crime or offense," threatened any injury to any independent owner-operator, his property or reputation, threatened to expose an independent owner-operator to disgrace or expose any secret or "impute any deformity or lack of chastity" with the purpose of extorting money. Accordingly, the Dade Defendants have failed to state a claim for extortion under Florida law and Count X must be dismissed.

The Dade Defendants' first allegation is nothing more than a complaint over market conditions that have kept prices "ridiculously low." The Dade Defendants admit they earn, on average, approximately $70,000 per year. CC ¶ 16. The prices cannot possibly be that low if 900 dump truck drivers make what is still a significant amount of money per year. As noted above, there is nothing illegal about a broker deciding what price he will pay for dump truck services. *Brokerage Concepts*, 140 F.3d at 509. As Dade Defendants admit, they can work for whomever they wish and accept or reject any offer. Affirmative Defense No. 1. There is nothing about making an offer "take it or leave it" that makes the offer extortion. If that were the case, every retail merchant that does not negotiate its prices on any item with any customer is guilty of extortion, an absurd result. *See Brokerage Concepts*, 140 F.3d at 509, 518.

Regarding the Dade Defendants allegation that preferential treatment is being given to independent owner-operators who obtain insurance coverage under the broker's policy over those

35

who do not, this alleged preferential treatment is not extortion. Just as Plaintiffs have the right to select who they will do business with, they can also set the terms of that relationship. The Dade Defendants' claim is analogous to the claim dismissed in *Brokerage Concepts*. There the court analyzed U.S. Healthcare's pressure on Gary's to use its subsidiary as its TPA in exchange for continuing to include Gary's on its network of pharmacies. The court concluded that the situation fell somewhere between a tying agreement and a reciprocal dealing, neither of which constituted extortion or a violation of the antitrust laws. The court concluded that the use of fear of economic loss as leverage in a business transaction was entirely appropriate because both sides offered "the other property, services, or rights it legitimately owns or controls." *Brokerage Concepts*, 140 F.3d at 523 (quoting *United States v. Capo*, 791 F.2d 1054, 1062 (2nd Cir. 1986), *vacated in part, on other grounds*, 817 F.2d 947 (2nd Cir. 1987)(en banc)).

The Dade Defendants allege they were paid approximately $70,000 per year on average for hauling services. If, as alleged, a broker uses economic pressure to cover the costs of obtaining a blanket insurance policy and make a profit by encouraging independent owner-operators to obtain their required insurance under that policy, there is nothing illegal about it. Both parties receive something of value from this arrangement. As the court in *Brokerage Concepts*, explained there:

> In the present case, the property that U.S. Healthcare obtained from Gary's was the payments made by Gary's to CHA pursuant to its TPA contract. In return for this property, U.S. Healthcare gave Gary's access to its provider network -- something that is of considerable value to Gary's. Thus, like the court in *Viacom*, we deal with a very narrow subset of the potential universe of extortion cases: one involving solely the accusation of the wrongful use of economic fear where two private parties have engaged in a mutually beneficial exchange of property. While we believe that the fact-bound nature of this type of case will not supply a generalized precept, we are convinced by the logic of *Viacom* that BCI's extortion claim can only survive if Gary's had a right to pursue its business interests free of the fear that it would be

36

> excluded from the provider network. Albeit with misgivings, we find that it had no
> such right.

140 F.3d at 525-526. There is no provision in Florida law that the Dade Defendants as independent

dump truck owner-operators are protected to pursue their business interests free of the fear that they

would be placed "at the end of the line" if they did not obtain their insurance coverage under the

broker's policy. Accordingly, the Dade Defendants fail to state a claim for extortion and Count X

of the Counterclaim should be dismissed with prejudice.

The Dade Defendants finally claim that because they were the victim of extortion by

allegedly being required to pay the deductible on the insurance policy up front without receiving

interest on the money paid. CC ¶ 71. There is nothing about this "program" that even remotely

suggests extortion. There is no legal requirement that interest be paid on this money. *See, e.g.,* Fla.

Stat. § 627.7283 (interest is owed on unearned premiums only if the unearned premiums are not

returned within 30 days of the cancellation of the policy). Absent any legal requirement that interest

be paid on money held to cover the deductible an independent owner-operator would owe under the

broker's blanket policy in the event of an accident, the Dade Defendants have no claim based on

these allegations, and clearly do not have a claim for extortion. Accordingly, Count X should be

dismissed with prejudice.

### c.    There is no basis for a claim under Florida's RICO statute.

Under Florida's Civil Remedies for Criminal Practices Act (referred to by the Dade

Defendants as "RICO"), the Dade Defendants must show by clear and convincing evidence that

engaged in a pattern of criminal activity. Fla. Stat. §§ 772.103 & 772.104. The Dade Defendants'

claims in Counts XI and XII alleging "RICO Conspiracy" and "Substantive RICO", fail because the

37

Dade Defendants are unable to prove any predicate acts. As noted above, the Dade Defendants are unable to state a claim for fraud, theft, insurance fraud, extortion, or antitrust. Absent proof of the necessary predicate acts, the Dade Defendants claims under Florida' Civil Remedies for Criminal Practices Act must be dismissed. *See Brokerage Concepts,* 140 F.3d at 529.

As a final note on the Dade Defendants' claims in Counts XI and XII, Fla. Stat. § 772.103 only applies to "persons," not corporations. The Dade Defendants have not named a single individual in their Counterclaim who has allegedly engaged in any of these actions. Accordingly, the Dade Defendants have further failed to state a valid claim in Counts XI and XII and these counts should be dismissed.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request the Court dismiss the Dade Defendants' Counterclaim in its entirety and award Plaintiffs their reasonable costs and attorney's fees in defense of these claims.

Respectfully submitted this 28th day of July, 2000.

By:_____

FISHER & PHILLIPS LLP
NationsBank Tower
One Financial Plaza, Suite 2300
Fort Lauderdale, Florida 33394
Telephone:    (954) 525-4800
Facsimile:    (954) 525-8739

Charles S. Caulkins
(Fla. Bar No. 0461946)
James C. Polkinghorn
(Fla. Bar. No. 0376892)
Edward H. Trent
(Fla. Bar No. 0957186)
Attorneys for Plaintiffs.

38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 98-754-CIV-HIGHSMITH

NORMAN BROWN,

     Plaintiff,

vs.

R&B HOLDING COMPANY, d/b/a
KENDALL TOYOTA, MARK JOCOBSON,
and BRIAN BARRISON,

     Defendants.



_____/

## ORDER OF DISMISSAL AS TO COUNTS III, IV AND V

THIS CAUSE comes before the Court upon Defendant Kendall's Motion to Dismiss with

Prejudice Counts III, IV and V of the Second Amended Complaint, filed May 27, 1998.

Plaintiff Norman Brown ("Brown") was employed by Defendant R&B Holding Company

d/b/a Kendal Toyota ("Kendall") as a salesman from approximately February 1994 until December

1996. Brown alleges that he was subjected to racial discrimination at work by his supervisors,

Defendants Mark Jacobson and Brian Barrison, and that he was terminated because of his race.

Brown has sued Kendall for: violations of 42 U.S.C. § 1981 (Count I); violations of Title VII of the

Civil rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (Count II); Florida common law

claims for negligent hiring, negligent supervision and negligent retention (Counts III, IV and V,

respectively).

Upon a review of the Second Amended Complaint, the motion to dismiss, and relevant case

law, this Court concludes that the three Florida law claims raise complex and novel issues of state law

that would predominate over the two claims based on federal law. Accordingly, pursuant to 28

EXHIBIT____A____

U.S.C. § 1367(c), this Court declines to exercise supplemental jurisdiction over the Florida law claims. Accord <u>Winn v. North American Philips Corp.</u>, 826 F. Supp. 1424 (S.D. Fla. 1993). Therefore, it is hereby

ORDERED AND ADJUDGED that Defendant Kendall's Motion to Dismiss with Prejudice Counts III, IV and V of the Second Amended Complaint, filed May 27, 1998, is GRANTED in part. The motion is GRANTED to the extent that the Court declines to exercise supplemental jurisdiction over the state law claims, and DISMISSES Counts III, IV and V without prejudice.

DONE AND ORDERED in Chambers at Miami, Florida, this 29 day of July, 1998.

SHELBY HIGHSMITH
UNITED STATES DISTRICT JUDGE

cc:    Beth M. Gordon, Esq.
       Kenneth A. Knox, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 94-6995-CIV-ZLOCH

ROSA MARIA MACFARLANE, MARTA
NAY and ROBERT MacFARLANE,

        Plaintiffs,

vs.

                               O R D E R

STRATEGIC MARKETING SYSTEMS, INC.,
a Florida corporation, and HENRY
O. WESTENDARP.,

        Defendants.

_____/

FILED by _____ O.C.

APR 1 1 1995

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

THIS MATTER is before the Court upon the Defendants, Strategic
Marketing Systems, Inc. and Henry O. Westendarp's, Motion To
Dismiss With Prejudice The First State Claim For Relief And To
Dismiss All Of Plaintiffs' Supplemental Claims (DE 7), the
Plaintiffs, Rosa Maria MacFarlane, Robert MacFarlane, and Marta
Nay's, Motion For Leave To File Sur-Reply Memorandum Of Law (DE
15), and the Plaintiffs' Motion To Strike Defendants' Response To
Plaintiff's Motion For Leave To File Sur-Reply Memorandum (DE 20).
The Court has carefully considered the merits of said Motions and
is otherwise fully advised in the premises.

## I. Background

The Plaintiffs commenced the above-styled cause on October 14,
1994 by filing a Complaint (DE 1) asserting two federal causes of
action and five supplemental state causes of action against the
Defendants. On November 22, 1994, the Plaintiffs filed a First
Amended Complaint (DE 5) asserting three federal causes of action
and five supplemental state causes of action against the
Defendants. Specifically, Federal Claims One through Three assert
federal claims as follows: (1) violation of Title VII of the Civil

EXHIBIT ___B___

Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), (2) violation of the Equal Pay Act, 29 U.S.C. § 206, and (3) violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"). The State Claims One through Five assert supplemental state claims as follows: (1) intentional infliction of emotional distress, (2) negligent misrepresentation, (3) fraudulent misrepresentation, (4) battery, and (5) false imprisonment. The Defendants responded by filing their Answer To First Amended Complaint (DE 6) and the instant Motion To Dismiss With Prejudice The First State Claim For Relief And To Dismiss All Of Plaintiffs' Supplemental Claims (DE 7).

## II. Discussion

28 U.S.C. § 1367(a) provides that

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

It is clear that this Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). After reviewing the First Amended Complaint (DE 5), the Court finds that the state claims against Defendants are so related to the federal claims in the instant action that they form part of the same case or controversy. 28 U.S.C. § 1367(a). Therefore, this Court has the authority to exercise supplemental jurisdiction over the state claims in the instant action.



However, the Court's supplemental jurisdiction inquiry does not end here.  In 1990, Congress codified the formally well-entrenched jurisdictional doctrine denominated as pendent and ancillary jurisdiction set forth in <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715 (1966).  28 U.S.C. § 1367(c) provides in pertinent part:

> (c)  The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if --
> (1)  the claim raises a novel or complex issue of state law, [or]
> (2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction . . . .

The Plaintiffs assert that the Court should dismiss the Plaintiffs' state claims pursuant to 28 U.S.C. § 1367(c)(2) because the state claims require different elements of proof, encompass different legal duties, are wholly unrelated to the federal claims, and would substantially predominate over the federal claims.  This Court agrees, and applying 28 U.S.C. § 1367(c)(1) and (2), the Court finds that supplemental jurisdiction should not be exercised over the state claims in the instant case.

The Defendants, Strategic Marketing Systems, Inc. and Henry O. Westendarp's, Motion To Dismiss With Prejudice The First State Claim For Relief And To Dismiss All Of Plaintiffs' Supplemental Claims (DE 7) requires this Court to make a determination as to whether the intentional infliction of emotional distress cause of action exists under state law, and whether the Complaint properly states such a claim under state law.  Further, the Plaintiffs' federal claims, which provide the basis for this Court's

3



jurisdiction, as set forth in Counts one through three of the First Amended Complaint (DE 5), allege the Defendants discriminated against the Plaintiffs, Rosa MacFarlane and Marta Nay, based on their sex, and that the termination of the Plaintiffs, Rosa and Robert MacFarlane's, employment was pretextual, purposefully interfering with their rights to continued benefits under the Defendant Strategic's employee benefit plan. The Court notes that the five state law claims require completely different elements of proof wholly separate and distinct from the federal claims at issue.   In   addition,   the   state   law   tort   of   negligent misrepresentation encompasses legal duties and standards of care which are wholly unrelated to the federal claims.

Finally, the Court notes that the Title VII claim is asserted solely by the Plaintiff, Rosa MacFarlane, alleging that her employment was terminated because of her sex and she was replaced with a less-qualified man at a higher pay. Conversely, the Plaintiff, Marta Nay, solely has asserted state causes of action for intentional infliction of emotional distress and battery, based on the allegations that the Plaintiff Nay was repeatedly forced to perform oral sex on the Defendant Westendarp while at the Defendant Strategic's office. While these factual allegations are relevant to the Plaintiff Nay's state law claims, these allegations have no relevance to the federal claims asserted in the Plaintiff's First Amended Complaint (DE 5). Certainly, there is the danger that the Plaintiff Nay's state law intentional infliction of emotional distress and battery claims would predominate over the federal

4

claims asserted in the First Amended Complaint (DE 5).

Therefore, the Court finds that the state claims would tend to dominate the federal claims and obscure the significance of the federal claims. See Winn v. North American Philips Corp., 826 F. Supp. 1424, 1426 (S.D. Fla. 1993). Further, this Court will not decide novel and complex questions of state law, especially where the state claims would also predominate over the Federal claims in the present action. Therefore, the Court, pursuant to § 1367(c)(1) and (2), will exercise its discretion and DISMISS, without prejudice, the five supplemental state law claims as these claims present both novel and complex questions of state law which would also predominate over the Federal claims presented here.[1]

### III. Conclusion

The Court having reviewed the court file and being otherwise fully advised in the premises, it is

ORDERED AND ADJUDGED as follows:

1.    The Defendants, Strategic Marketing Systems, Inc. and Henry O. Westendarp's, Motion To Dismiss With Prejudice The First State Claim For Relief And To Dismiss All Of Plaintiffs' Supplemental Claims (DE 7) be and the same is hereby GRANTED in part and DENIED in part as follows:

A.    Insofar as the Defendants move this Court to dismiss with prejudice the Plaintiffs' First State Claim For Relief,

---

[1]    The Court directs Plaintiff to 28 U.S.C. § 1367(d) which tolls the limitations period on these claims for thirty days, unless state law provides for a longer tolling period, so that the claims may be refiled in state court.

the Defendants' Motion To Dismiss With Prejudice The First State Claim For Relief And To Dismiss All Of Plaintiffs' Supplemental Claims (DE 7) be and the same is hereby DENIED without prejudice;

B. Insofar as the Defendants move this Court to decline supplemental jurisdiction over the state claims, the Defendants Motion To Dismiss With Prejudice The First State Claim For Relief And To Dismiss All Of Plaintiffs' Supplemental Claims (DE 7) be and the same is hereby GRANTED, and the Court, pursuant to 28 U.S.C. § 1367(c)(1) and (2), DISMISSES, without prejudice, the five State Claims For Relief asserted in the Plaintiffs' First Amended Complaint (DE 5);

2. The Plaintiffs, Rosa Maria MacFarlane, Robert MacFarlane, and Marta Nay's, Motion For Leave To File Sur-Reply Memorandum Of Law (DE 15) be and the same is hereby DENIED; and

3. The Plaintiffs' Motion To Strike Defendants' Response To Plaintiff's Motion For Leave To File Sur-Reply Memorandum (DE 20) be and the same is hereby DENIED;

DONE AND ORDERED in Chambers at Fort Lauderdale, Broward County, Florida, this ____11____ day of April, 1995.

_____
WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

Norman E. Ganz, Esq.
For Plaintiffs

James C. Polkinghorn, Esq.
For Defendants

6

## CERTIFICATE OF SERVICE

I certify that on this date I caused a true and correct copy of the foregoing DEFENDANT

SEA ESCAPE CRUISES, LTD.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO

DISMISS COUNTS II AND III OF COMPLAINT OR, ALTERNATIVELY, TO STRIKE

PUNITIVE DAMAGE CLAIMS to be served on the following individual by depositing same in

the United States Mail, First Class, postage prepaid:

> Randy A. Fleischer, Esquire
> Randy A. Fleischer, P.A.
> Suite 3070
> 4801 S. University Drive
> Davie, Florida 33328-3845
>
> Attorneys for Plaintiff

Date: April 12, 1999

Not Reported in F.Supp.                                                                          Page 1
(Cite as: 1995 WL 500896 (M.D.Fla.))

Rita HAYES, Plaintiff,
v.
LIBERTY NATIONAL LIFE INSURANCE
COMPANY, etc., and William Taylor, etc.,
Defendants.

No. 94-425-CIV-J-10.

United States District Court, M.D. Florida

Aug. 4, 1995.

Archibald J. Thomas, III, Archibald J. Thomas III,
P.A., Jacksonville, FL, for plaintiff Rita Hayes.

Margaret H. Campbell, Ogletree, Deakins, Nash,
Smoak & Stewart, Atlanta, GA, for defendant
Liberty Nat. Life Ins. Co., an Alabama Corp.

Robert Gambrell Riegel, Jr., Eric James
Holshouser, Coffman, Coleman, Andrews &
Grogan, P.A., Jacksonville, FL, for defendant
William Taylor, individually and in his capacity as
agent of Liberty Nat. Life Ins. Co.

ORDER

HODGES, District Judge.

*1 Defendants Liberty National Life Insurance
Company ("Liberty National") and William Taylor
("Taylor") have moved (Docs. 26 and 27) for
summary judgment. The Plaintiff has responded
(Docs. 30 and 31).

FACTS

For purposes of the Defendants' motions for
summary judgment, the facts as reflected in the
Plaintiff's submissions will be accepted as true.

Plaintiff was employed by Liberty National, and
was allegedly supervised by Defendant Taylor who
subjected her to sexual harassment. She was hired
initially as a sales agent in October, 1989, and was
promoted to the position of Sales Manager in
January, 1991. Her promotion put her under the
direct supervision of Defendant Taylor. At the time
of her promotion, Hayes was told in the presence of
Taylor by Vurl Duce, a senior vice president of
Liberty National, that he never thought he'd be
putting a "damn woman in [her] position." (Hayes

Deposition, p. 98). In September, 1991, while
attending a work-related conference, Hayes
experienced the first of her problems with Taylor
when he told others, in her presence, that "she's
sleeping with me" tonight. (Id., p. 170). Later that
night, Hayes and Taylor walked outside and "[he]
grabbed me and pulled me up against him.... and
tried to kiss me." (Id., p. 171-72.)

Plaintiff further alleges that Taylor thereafter forced
her to submit a resignation from her job contingent
upon him convincing another employee to transfer
into her position. The resignation was returned to
Hayes when the targeted employee rejected the
transfer. During Hayes' employment under Taylor,
he also made other sexually-oriented statements to
her, told her not to hire any more female agents,
and hugged her on at least one other occasion.
Hayes states that she "was afraid to say anything,"
for fear of being fired by Taylor. (Id., p. 148).

Plaintiff claims that her resignation on April 30,
1992 should be viewed as a constructive discharge,
and was triggered by further behavior by Taylor.
Hayes claims that she complained of a headache, at
which point Taylor looked at her head and
remarked, "I can't do anything for that end." He
then looked "down at [her] bottom" and stated that
he "can sure work on that end." (Id., p. 201).

The complaint seeks relief against the Defendants
for sexual harassment under Title VII, for
intentional infliction of emotional distress, and for
assault and battery.

SUMMARY JUDGMENT

Summary judgment is appropriate only when the
Court is satisfied "that there is no genuine issue as
to any material fact and that the moving party is
entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c). In making this determination,
the Court must "view the evidence in a light most
favorable to the non-moving party." Samples on
Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330
(11th Cir.1988). The moving party has the initial
burden of establishing the absence of a genuine issue
of fact. Celotex Corp. v. Catrett, 477 U.S. 317,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Next, the
"non- moving party ... bears the burden of coming
forward with sufficient evidence of every element
that he or she must prove." Rollins v. Techsouth,

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works



EXHIBIT_____C_____

Not Reported in F.Supp.
(Cite as: 1995 WL 500896, *1 (M.D.Fla.))

Inc., 833 F.2d 1525, 1528 (11th Cir.1987). To that end, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.

I. Title VII Claims for Sexual Harassment

A. Corporate Liability

    1. Strict Liability Under Agency Principles

  *2 Liberty National's motion, in part, seeks summary judgment holding that Liberty National is not directly liable to Plaintiff under an agency theory.

Title VII states that it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition against sexual harassment encompasses two types of discrimination: (1) quid pro quo discrimination where the employer directly links an economic benefit to the sexual misconduct, and (2) discrimination created by a hostile working environment. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399 (1986).

The legal standard for determining a corporation's liability for sexual harassment by one of its supervisors varies depending on which of these two types of sexual harassment occurred. In a quid pro quo case, a supervisor is an agent of the corporation because he "exercises the authority actually delegated to him by his employer, by making or threatening to make decisions affecting the employment status of his subordinates." Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1559 (11th Cir.1987). When this occurs, the corporate defendant is strictly liable for the acts of the supervisor. Id.; Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316 (11th Cir.1989). Similarly, in a mixed case involving both quid pro quo and hostile environment sexual harassment, strict liability applies. Steele, 867 F.2d at 1316. By contrast, in a pure hostile environment case, the supervisor acts outside the scope of actual or

apparent authority, and therefore, corporate liability exists only through respondeat superior, i.e., only when the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor. Id.

Although Liberty National states that respondeat superior is the proper analysis in this case, Plaintiff alleges that this is a mixed case of quid pro quo and hostile environment claims, and therefore under Steele, Liberty National would be strictly liable for any acts of Taylor.

In view of the relevant law, two issues require resolution here to determine whether quid pro quo harassment is a viable claim. The first is whether Taylor possessed "actual or apparent authority to hire, fire, discipline, or promote." Id. (quoting Henson v. City of Dundee, 682 F.2d 897 (11th Cir.1982)). If so, a second issue arises: whether any evidence exists indicating that Taylor "explicitly or implicitly threatened to use his authority against the victim." Id. at 1317 (quoting Sparks, 830 F.2d at 1560 n. 9).

There exists a genuine issue of material fact as to the first prong of the analysis, because Taylor may have had the authority to hire, fire, discipline or promote the Plaintiff. As noted above, Hayes was of the belief that Taylor and/or Duce were able and willing to fire her if she caused Taylor any problems.

  *3 The other issue which must be resolved is whether any genuine issues of material fact exist concerning whether Taylor implicitly or explicitly threatened to use his alleged authority against the Plaintiff. Given the unwelcome comments, the "kissing incident," and Plaintiff's belief that she would be fired if she did not acquiesce to Taylor's advances, coupled with Taylor's supervisory role over the Plaintiff, a jury could find that Taylor implicitly threatened to use his authority against the Plaintiff if she did not tolerate his sexual harassment.

In conclusion, genuine issues of material fact exist which preclude summary judgment on Defendant Liberty National's Title VII claims. Therefore, the motion for summary judgment cannot be granted on these claims and these issues must be decided by a jury.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1995 WL 500896, *3 (M.D.Fla.))

Accordingly, Defendant Liberty National's motion for summary judgment will be denied to the extent that it seeks a ruling that Liberty National is not strictly liable for the acts of Defendant Taylor because he is not Liberty National's agent under Title VII.

## 2. Liability Under Respondeat Superior

Liberty National also seeks to avoid liability for Taylor's actions by arguing that the evidence is undisputed that as soon as Liberty National knew of the harassment, it took prompt remedial action. As stated above, this case appears to involve mixed claims of quid pro quo and hostile environment. Even if the evidence at trial were to show that it only contained hostile environment claims, and respondeat superior is the proper standard, the Plaintiff has submitted some evidence from which a jury might conclude that Liberty National knew or should have known of Taylor's conduct at a time before taking remedial action. Liberty National argues that Plaintiff's evidence is insufficient to demonstrate genuine issues for trial, but given the fact that this case must be tried based on Liberty National's potential strict liability for Taylor's conduct, the Court is inclined to submit the respondeat superior issues to a jury as well.

## B. Individual Liability

Defendant Taylor correctly notes in his motion for summary judgment that he is not a proper defendant under Title VII. The Eleventh Circuit has held that "[i]ndividual capacity suits under Title VII ... are inappropriate." Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir.1991). Accordingly, Defendant Taylor's motion for summary judgment will be granted to the extent it addresses this claim.

## II. Intentional Infliction of Emotional Distress

The Defendants also argue that the Plaintiff fails to allege facts sufficient to support her state law claim for intentional infliction of emotional distress. In Metropolitan Life Insurance Co. v. McCarson, 467 So.2d 277 (Fla.1985), the Florida Supreme Court recognized the tort of intentional infliction of emotional distress as set forth in the Restatement (Second) of Torts § 46 (1965). Section 46 states:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional

distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*4 A defendant's conduct is actionable only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." McCarson at 279 (quoting Restatement (Second) of Torts § 46). The question of whether a defendant's conduct is so extreme and outrageous is "a legal question in the first instance for the court to decide as a matter of law." Vance v. Southern Bell Telephone & Telegraph, 983 F.2d 1573, 1575 n. 7 (11th Cir.1993) (quoting Baker v. Florida National Bank, 559 So.2d 284, 287 (Fla. 4th DCA 1987)).

Courts applying Florida law have consistently dismissed claims of intentional infliction of emotional distress based upon an employer's retaliatory discharge, discipline, or harassment of an employee. For example, in Lay v. Roux Laboratories, Inc., 379 So.2d 451 (Fla. 1st DCA 1980), the court found that an employer's threats to fire an employee coupled with "humiliating language, vicious verbal attacks, [and] racial epithets" were not sufficiently outrageous to state a claim for intentional infliction of emotional distress. Similarly, in Scheller v. American Medical International, Inc., 502 So.2d 1268 (Fla. 4th DCA 1987), the court found that a pathologist's claim that a hospital ostracized him by excluding him from social affairs, falsely accusing him of theft, prohibiting him from conversing with laboratory personnel, and publishing false income information about him was insufficient as a matter of law.

In Vance v. Southern Bell Tel. & Tel. Co., 983 F.2d 1573 (11th Cir.1993), the Eleventh Circuit also had occasion to apply the Florida law of intentional infliction of emotional distress to a claim arising in the employment context. The plaintiff, a black woman, alleged that her employer hung a noose over her work station, sabotaged her work, disciplined her more harshly than white coworkers, and refused to transfer her to a department which was free from the alleged racially motivated conduct. Id. at 1574, n. 2. The Eleventh Circuit concluded that these allegations were not sufficiently outrageous to state a claim. Id. at 1575, n. 7. See also Mundy v. Southern Bell Tel. & Tel. Co., 676 F.2d 503, 505-06 (11th Cir.1982); Golden v. Complete Holdings, Inc., 818 F.Supp. 1495 (M.D.Fla.1993) (stating that "Florida courts have

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1995 WL 500896, *4 (M.D.Fla.))

consistently rejected claims for intentional infliction of emotional distress relating to sexual harassment, intentional age discrimination and verbal abuse in the employment context").

Accordingly, in light of the strong disfavor under Florida law toward employment-based claims for intentional infliction of emotional distress, this Court concludes that Plaintiff fails to state a claim for intentional infliction of emotional distress and the Defendants' motions for summary judgment will be granted to the extent they address this claim.

### III. Assault

Defendant Liberty National also argues that the common law claim of assault is not properly brought against it, as the company had no knowledge, either actual or constructive, of Taylor's harassment. However, as a jury determination will be necessary on the other claims, one of which is Liberty National's knowledge under the respondeat superior analysis of Title VII, this claim also will be submitted to the jury.

*5 Accordingly, upon due consideration:

(1) Defendant Liberty National's motion for summary judgment (Doc. 26) is GRANTED to the extent it addresses Plaintiff's intentional infliction of emotional distress claim, but is DENIED in all other respects;

(2) Defendant Taylor's motion for summary judgment (Doc. 27) is GRANTED, and the counts brought against him under Title VII and for the intentional infliction of emotional distress are dismissed.

Judgment will be entered on these claims after the resolution of the remaining claims at trial. See Fed.R.Civ.P. 54(b).

IT IS SO ORDERED.

DONE AND ORDERED.

END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of PLAINTIFFS AUSTIN TUPLER TRUCKING,

INC., ET. AL.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

DEFENDANTS' COUNTERCLAIM was served by First Class United States mail this 28th day

of July, 2000, upon the following:

Richard Diaz, Esq.
Richard A. Diaz, P.A.
2701 Southwest 3rd Avenue
Miami, Florida 33127-2335
Attorneys for Support Dump
Trucking Group, Inc., Juan Aragones,
Oscar De Leon, Rafael D. Jimenez,
Alayn Hernandez, and Renier Martinez

Hosey Hernandez, Esq.
Hosey Hernandez, P.A.
Coconut Grove Bank Building
2701 South Bayshore Drive, Suite 602
Coconut Grove, Florida 33133
Attorneys for Support Dump Trucking
Group, Inc.

_____
Attorney

39